**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SILVERGATE CAPITAL CORPORATION,** *et al.*[1] | **Case No. _____ (\_\_)** |
| **Debtors.** | **(Joint Administration Requested)** |

**DECLARATION OF ELAINE HETRICK IN SUPPORT OF**
**THE DEBTORS' CHAPTER 11 PETITIONS AND CERTAIN MOTIONS**

I, Elaine Hetrick, declare under penalty of perjury as follows:

1.      I am the Chief Administrative Officer of Silvergate Capital Corporation, a Maryland corporation founded in 1986 ("SCC" and, together with the above-captioned debtors and debtors in possession, collectively, the "Debtors").  I joined SCC in October 2018, and I am generally familiar with the operations, financial condition, business affairs, and regulatory status and obligations of the Debtors.

2.      On September 17, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Cases").  As described below, the Chapter 11 Cases have been commenced to implement a winddown plan (the "Plan") with the support of holders of approximately 63% of the aggregate liquidation preference

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Silvergate Capital Corporation (7337), Silvergate Liquidation Corporation (4449) and Spring Valley Lots, LLC (0474). The Debtors' mailing address is 4225 Executive Square, Suite 600, La Jolla, CA 92037.

of SCC's Preferred Stock (as defined below) pursuant to a restructuring support agreement[2] (the "Restructuring Support Agreement").  The Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.        I submit this declaration (the "Declaration") to provide an overview of the Debtors' businesses and the Chapter 11 Cases and to support the Debtors' applications and motions for "first day" relief (collectively, the "First Day Motions"). Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. To the extent that any information provided herein is materially inaccurate, the Debtors will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge.  References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I would testify to the facts set forth herein.

4.        In addition to providing the factual support for the First Day Motions, the primary purpose of this Declaration is to familiarize the Court with the Debtors, these Chapter 11 Cases and the relief sought in the First Day Motions.  The Declaration is organized as follows:

---

[2] A copy of the RSA is annexed to this Declaration as **Exhibit A**.

- Part I provides a general overview of the Debtors' business and corporate structure and the events leading up to these Chapter 11 Cases;

- Part II describes the Debtors' capital structure and claims asserted against them;

- Part III sets forth the relevant facts in support of each of the First Day Motions, which I have reviewed and with which I am familiar.

## Part I

## The Debtors' Business, Corporate Structure and Events Leading to these Chapter 11 Cases

A.   *Corporate Structure*

5.      Debtor SCC is a Maryland corporation headquartered in La Jolla, California.  Until July 1, 2024, it was a bank holding company subject to supervision by the Board of Governors of the Federal Reserve ("Federal Reserve").[3]   Debtor Silvergate Liquidation Corporation is a subsidiary of SCC and is a California corporation headquartered in La Jolla, California ("SLC").  SLC was formerly a California State-chartered bank known as Silvergate Bank.[4]  On July 5, 2024, Silvergate Bank changed its name to Silvergate Liquidation Corporation as a condition of relinquishing its banking charter to the California Department of Financial Protection and Innovation (the "DFPI").  On July 8, 2024, SLC formally relinquished its banking charter to the DFPI and thereby ceased its existence as a bank.  Debtor Spring Valley Lots, LLC is a subsidiary of SLC and is a Delaware limited liability company.  Its primary function was to own and hold

---

[3]     SCC's subsidiary bank ceased to be a "bank," as defined under the Bank Holding Company Act, when the bank's deposit insurance terminated as of July 1, 2024.  *See* 12 U.S.C. § 1841(c)(1).  Therefore, SCC ceased to be a bank holding company on that day.  *See id.* § 1841(a).

[4]     In this Declaration, SLC shall be referred to as Silvergate Bank when describing its historical operations and circumstances prior to July 5, 2024 and shall be referred to as SLC when describing its current operation and circumstances on and after July 5, 2024.

3

real estate that had been foreclosed on in connection with Debtor SLC's former banking operations.

6.      A corporate structure chart depicting the company's corporate structure is annexed to this Declaration as **Exhibit B**.

        *B.*     <u>*Circumstances Leading to these Chapter 11 Cases*</u>

7.      These Chapter 11 Cases are the culmination of a successful process led by the Debtors' directors and management to repay all of Silvergate Bank's depositors and wind down its operations as a result of headwinds within the digital asset industry followed by a shift in regulatory approach that made Silvergate Bank's business model untenable. Over the past two years, the Debtors took decisive action, first to stem the tide of a bank run in the midst of industry crisis, then, following the shift in regulatory approach, in the liquidation of Silvergate Bank in a manner that would protect depositors from suffering losses and avoid any claims against the Federal Deposit Insurance Corporation (the "<u>FDIC</u>") Deposit Insurance Fund (the "<u>DIF</u>"), while enabling Silvergate Bank to preserve capital for other stakeholders. The Debtors have done so, as all of Silvergate Bank's depositors' funds have been returned and the Debtors have reached resolutions with their banking regulators. The Debtors are now commencing these Chapter 11 Cases to implement a carefully negotiated, comprehensive plan of liquidation that will resolve expeditiously all outstanding claims against them, recover value for their remaining non-cash assets and distribute funds to their stakeholders in accordance with their legal priorities.

8.      For several years, Silvergate Bank was one of the leading banks providing services to the digital asset industry.  Silvergate Bank was able to secure some of the largest cryptocurrency-related businesses as customers due to its reputation as a trustworthy, regulated institution that welcomed digital asset customers.  Silvergate Bank rapidly grew in connection with the expansion

4

of the digital asset ecosystem, with its deposits increasing from $1.8 billion at the end of 2019 to approximately $14.3 billion at the end of 2021.  As of December 31, 2021, deposits from its 94 digital asset exchange customers represented approximately 58% of Silvergate Bank's overall deposits. Noninterest bearing deposits, substantially all of which were deposits from customers in the digital asset industry, totaled $14.2 billion (approximately 99.5% of total deposits) at December 31, 2021 and $13.4 billion (approximately 99.5% of total deposits) at June 30, 2022. During this period of growth in digital asset deposits, Silvergate Bank was subject to regular supervision by the Federal Reserve and the DFPI.[5]

9.    However, as the digital asset industry came under stress during 2022, Silvergate Bank's business also started to contract.  In mid-2022, certain large digital asset investment funds and exchanges, including Three Arrows Capital, Voyager Digital Holdings and Celsius Network LLC, commenced formal insolvency proceedings, which had a contagion effect on the digital asset industry as a whole, including on the exchanges that represented a substantial portion of Silvergate Bank's depositor base.

10.    Pressure on Silvergate Bank's business continued to build following the rapid collapse of FTX Trading Ltd. ("FTX") and Alameda Research LLC, as further troubles within the digital asset industry came to the forefront and continued to chill the crypto markets and generate increased regulatory scrutiny and restrictions on banks with a digital asset customer base.  FTX and certain of its subsidiaries and affiliates filed for relief under chapter 11 of the Bankruptcy Code on November 11, 2022.  Although Silvergate Bank possessed more than sufficient assets to cover

---

[5]    Silvergate is prohibited by law from disclosing confidential supervisory information, which broadly includes correspondence and communications with the Federal Banking Regulatory Agencies as well as reports of supervisory examination.  12 CFR § 261.2(b).

its liabilities to depositors and had no lending or other business relationship with FTX beyond holding deposits and providing bank account services, perception of risk and fear of contagion, likely as a result of the string of cryptocurrency-related insolvency proceedings, led to substantial withdrawals of deposits from Silvergate Bank, with Silvergate Bank's non-interest bearing deposits falling to approximately $3.852 billion on December 31, 2022, compared to approximately $12.005 billion on September 30, 2022.  The crisis of confidence across the digital asset industry, along with similar problems faced by banks across the country, caused a "run on the bank." Silvergate Bank was able to manage this bank run and pay all its depositors as they withdrew funds as a result of its liquidity risk management and planning.  In an article included in the Federal Reserve Bank of St. Louis's Economic Synopses detailing the speed and size of the most severe bank runs in 1984, 2008 and 2023, Silvergate Bank was the only bank included in the list of most severe bank runs that did not fail, experience a forced sale or government takeover or require government funds for stabilization.[6]

11.    A chart showing Silvergate Bank's non-interest bearing deposits, from which it derived the majority of its income on net-interest margin, is shown below:

---

[6]    Jonathan Rose, "Understanding the Speed and Size of Bank Runs in Historical Comparison," *Economic Synopses*, No. 12, 2023. https://doi.org/10.20955/es.2023.12.



12.     Silvergate Bank's contraction in deposits was exacerbated by the general rise in interest rates in the economy at large.  Faced with high inflation, in March 2022, the Federal Reserve raised the federal interest rate by 25 basis points, which was followed by several more interest rate hikes such that by the end of 2022, the federal funds rate was 4.5%.  Silvergate Bank's non-interest bearing accounts were significantly less appealing for depositors in this higher interest rate environment.  In addition, this general rise in interest rates drove down the value of Silvergate Bank's highly rated long-term bond investments, as even supposed safe haven investments held by Silvergate Bank such as treasury bonds[7], agency securities[8] and municipal bonds[9] fell significantly in value during 2022. As a result, Silvergate Bank realized substantial losses when it sold these securities to pay withdrawing depositors.  Silvergate's consolidated business reported a

---

[7]     Bloomberg US Treasury Total Return Index (Unhedged USD) fell approximately 12.5% during 2022.

[8]     Bloomberg US Agencies Total Return Index (Unhedged USD) fell approximately 8% during 2022.

[9]     Bloomberg Municipal Bond Index Total Return Index (Unhedged USD) fell approximately 8.5% during 2022.

net loss of $948.7 million for the year ended December 31, 2022 as compared to net income of $75.5 million for the year ended December 31, 2021, largely driven by sales of long-dated securities impaired by rising interest rates.

13.     In light of Silvergate Bank's substantially reduced depositor base and realized losses on sales of long-dated securities, it began reducing the size of its operations to maintain cash liquidity and its ability to satisfy further deposit outflows.  Despite the losses it had incurred, at the beginning of 2023, Silvergate Bank still held assets valued in excess of deposits and met its regulatory capital requirements.

14.     The challenges faced by Silvergate Bank reached an inflection point in early 2023 following further regulatory scrutiny regarding its business model.  In the midst of the FTX collapse, the Federal Reserve, the FDIC and the Office of the Comptroller of the Currency (the "OCC", and, together with the Federal Reserve and the FDIC, the "Federal Bank Regulatory Agencies") on January 3, 2023 released their Joint Statement on Crypto-Asset Risks to Banking Organizations (the "First Joint Statement").  In the First Joint Statement, the Federal Bank Regulatory Agencies publicly advised for the first time of their "significant safety and soundness concerns with business models that are concentrated in crypto-asset-related activities or have concentrated exposure to the crypto-asset sector."  At the time of the First Joint Statement, Silvergate Bank's remaining deposit base was highly concentrated with crypto-asset related depositors, as it had been for several years.

15.     On January 5, 2023, SCC and Silvergate Bank announced plans to restructure their business to account for the economic realities facing the digital asset industry, including reducing headcount by 200 employees (approximately 40% of their total number of employees at that time)

and eliminating products such as Silvergate Bank's digital asset custody and certain cash management services that were no longer economical with a reduced depositor base.

16.     On February 23, 2023, the Federal Bank Regulatory Agencies released a further Joint Statement on Liquidity Risks to Banking Organizations Resulting from Crypto-Asset Market Vulnerabilities (the "Second Joint Statement").  In the Second Joint Statement, the Federal Bank Regulatory Agencies highlighted that banking organizations may face heightened liquidity risk from having concentration in crypto-asset-related entities as depository customers.

17.     Following the rapid contraction of Silvergate Bank's business, Silvergate Bank had stabilized, was able to meet regulatory capital requirements, and had the capability to continue to serve its customers that had kept their deposits with Silvergate Bank.  However, the increased supervisory pressure on Silvergate Bank[10] and other banks focused on servicing crypto-asset businesses forced Silvergate Bank to a point where it would have needed to remake its business model away from its focus on crypto-asset businesses, seek to sell itself as a going concern in the shadow of the regulatory overhang or begin winding down its affairs with the goal of preserving as much value as possible for stakeholders.

18.     The Debtors and their financial advisors conducted a thorough review of potential go-forward strategies, including having Silvergate Bank pivot to a new business model and selling Silvergate Bank as a going concern.  The Debtors determined that the cost of operating the business while pivoting to a new business model would outweigh the potential benefits of doing so, and following discussions with the Debtors' financial advisors, determined that there was little possibility of maximizing value through the sale of Silvergate Bank as a going concern due to lack

---

[10]     *See supra* note 5.

of interest from potential purchasers. The Debtors and their financial advisors also concluded that a liquidation of Silvergate Bank would best protect depositors and the FDIC DIF from suffering any losses and would best allow Silvergate Bank to avoid a potential FDIC receivership and preserve any remaining capital for the Debtors' residual claimants. After careful consideration of these options, on March 8, 2023, the Debtors announced their intent to wind down operations and voluntarily liquidate Silvergate Bank.

19.     The closure and sale of the failed Signature Bank is illustrative of the intense regulatory pressure faced by banks in the digital assets industry at that time. On March 12, 2023, Signature Bank was closed by the New York State Department of Financial Services and the FDIC was named receiver. When discussing the seizure of Signature Bank by the New York Department of Financial Services, Signature Bank director, former congressman Barney Frank, stated that "regulators wanted to send a very strong anti-crypto message."[11] On March 20, 2023, the FDIC announced Signature Bank was being sold to Flagstar Bank, N.A., and that the sale did not include the transfer of cash depositors related to Signature Bank's digital asset banking business. While Signature Bank's $38.4 billion worth of non-crypto-related deposits and $12.9 billion in loans were sold to Flagstar Bank, the $4 billion of deposits held by Signature Bank's digital asset business would be transferred directly to its digital banking customers. This public signaling and sudden regulatory shift made clear that, at least as of the first quarter of 2023, the Federal Bank Regulatory Agencies would not tolerate banks with significant concentrations of digital asset

---

[11]  Jen Wieczner, *Barney Frank Talks More About the Surprise Shuttering of Signature Bank*, New York Magazine, Mar. 15, 2023, https://nymag.com/intelligencer/2023/03/barney-frank-says-more-shuttering-signature-bank.html.

customers, ultimately preventing Silvergate Bank from continuing its digital asset focused business model.

20.     The Debtors have since worked constructively with regulators, including the Federal Reserve and the California Department of Financial Protection and Innovation (together, the "Supervisors"), to carry out their wind down process in an efficient manner that is compliant with law.

21.     On May 23, 2023, SCC and Silvergate Bank entered into a Cease and Desist Order (the "C&D Order") with the Supervisors that imposed prohibitions and other requirements on SCC and Silvergate Bank. The C&D order required, among other terms, the use of SCC's financial and managerial resources to serve as a source of strength to Silvergate Bank, restrictions on dividends and other capital distributions by SCC and Silvergate Bank, the preservation of the Debtors' cash assets and the submission of, and adherence to, a plan of liquidation of Silvergate Bank approved by the Supervisors.

22.     The Supervisors then approved Silvergate Bank's voluntary plan of liquidation on October 2, 2023, which provided the framework under which the voluntary wind down and liquidation of Silvergate Bank would be conducted.

23.     Despite facing an unprecedented confluence of industry and regulatory pressures, Silvergate Bank did not fail.  Pursuant to its plan of liquidation, Silvergate Bank has wound down all its banking operations and has ceased to be a bank in any legal, regulatory or business sense. Silvergate Bank has not accepted any deposits since March 13, 2023.  On November 22, 2023, Silvergate Bank announced that it had repaid all depositors with the exception of *de minimis* funds that were blocked from transfer at that time by the U.S. Treasury Department's Office of Foreign Assets Control.  The remaining *de minimis* deposits were paid out on June 28, 2024.  On July 1,

2024, Silvergate Bank's FDIC insurance was terminated, and importantly, all Silvergate Bank depositors had been paid in full with no losses imposed on the DIF.  On July 5, 2024,  the entity that was formerly known as Silvergate Bank changed its name to Silvergate Liquidation Corporation. And on July 8, 2024, Silvergate Liquidation Corporation successfully relinquished its banking charter to the DFPI.

24.     The Debtors have also worked with the Supervisors to resolve regulatory concerns. On July 1, 2024, the Debtors announced they had settled with the Federal Reserve for $43 million in full and final resolution of a Federal Reserve investigation of Silvergate Bank. Similarly, on July 1, 2024, the Debtors announced a settlement of $20 million with DFPI to fully and finally resolve the DFPI's related investigation.  Also on July 1, 2024, the Debtors announced they had settled with the Securities and Exchange Commission (the "SEC") to fully and finally resolve the SEC's investigation of certain public statements made by the Debtor in late 2022 and early 2023 prior to the wind down.  The SEC settlement included a payment of $50 million, which was fully offset by the settlement payments made to the Federal Reserve and the DFPI.  The United States District Court for the Southern District of New York approved the SEC settlement and entered final judgment on July 9, 2024.

25.     SLC is not a "bank" by any definition—it has not taken deposits since March 2023, returned all its depositors' funds by November 2023 and relinquished its banking charter on July 8, 2024—and is therefore an eligible chapter 11 debtor.  SLC and its affiliated Debtors now seek to use the chapter 11 process to complete the wind down of their businesses as efficiently as possible and distribute their remaining assets to stakeholders in the order of their legal priorities.

C.      _These Chapter 11 Cases and Next Steps_

26.     At this stage, the Debtors have no remaining revenue-generating enterprise and seek to complete winding down their affairs and liquidating in a fashion that will maximize the return to their stakeholders.  In connection with SLC becoming eligible as a chapter 11 debtor, the Debtors, together with their advisors, worked diligently to negotiate a consensual plan with the support of holders of the Preferred Stock. The Debtors do not expect to make distributions in connection with the Chapter 11 Cases sufficient to cover the liquidation preference of the Preferred Stock. Shortly prior to the filing of these Chapter 11 Cases, the Debtors reached an agreement in principle on the support of holders of approximately 63% of the aggregate liquidation preference of the Preferred Stock on a comprehensive winddown plan that will distribute funds to their stakeholders in accordance with their legal priorities. Through these Chapter 11 Cases, the Debtors seek to implement the Plan, which was filed contemporaneously herewith, to expeditiously resolve all outstanding claims against them, recover value for their remaining non-cash assets and distribute funds to their stakeholders in accordance with those legal priorities. The Plan is consistent with these purposes. It provides a mechanism to resolve or reserve for claims against the Debtors, the prompt distribution of the Debtors' cash to creditors and holders of Preferred Stock Interests, and for the creation of a liquidation trust to fulfill the Debtors' remaining legal obligations and liquidate their remaining assets.

27.     The support of the holders of Preferred Stock is also memorialized in a restructuring support agreement (the "RSA") executed by holders of approximately 63% of the aggregate liquidation preference of the Preferred Stock. Together, the Plan and the RSA provide a framework for the Debtors to swiftly complete the wind down of their businesses and return value to their stakeholders.

**Part II**

**Summary of Assets, Funded Debt and Equity Interests**

*A.     Assets*

28.     As of the date of this Declaration, the Debtors' primary assets consist of approximately $163.1 million in cash and cash equivalents.

29.     The Debtors also possess intellectual property and other technology assets related to a blockchain-based payment network, which they purchased in January of 2022 from the Diem Group. The Debtors, with the assistance of their former investment banker, Centerview Partners, conducted a prepetition marketing process in 2023 in an attempt to maximize the value of the Diem assets, but did not receive actionable interest in the assets.  In the event that no actionable proposals arise for the Diem assets during these Chapter 11 Cases, the Debtors may abandon these assets in the Chapter 11 Cases.

30.     Additionally, the Debtors possess claims and causes of action against third parties. These claims have uncertain value, and the Debtors intend to take appropriate action in these Chapter 11 Cases to assert, prosecute or retain such causes of action to maximize distributable value to stakeholders in accordance with their legal priorities.

*B.     Funded Debt*

31.     As of the Petition Date, the Debtors had outstanding funded debt of approximately $18.3 million of principal plus accrued and unpaid interest (approximately $549,117 of which is attributable to capital provided by SCC) attributable to subordinated debentures ("Debentures"), consisting of (i) approximately $14.8 million (principal plus accrued and unpaid interest) of Debentures issued under an indenture, dated as of July 16, 2001 (the "2001 Indenture") between SCC, as issuer, and The Bank of New York, a New York banking corporation, as trustee, and (ii)

14

approximately $3.5 million (principal plus accrued and unpaid interest) of Debentures issued under an indenture, dated as of January 27, 2005 (the "2005 Indenture" and together with the 2001 Indenture, the "Indentures") between SCC, as issuer, and Wilmington Trust Company, a Delaware banking corporation, as trustee. As described below, the Debentures were issued in connection with "trust preferred securities" ("TruPS") in a series of transactions that were historically used by bank holding companies to take advantage of favorable regulatory, tax, and accounting treatment while allowing the bank holding companies to raise capital.

32.     In 2001, SCC formed Silvergate Capital Trust I (the "2001 Trust"), a Delaware statutory trust wholly owned by SCC, which issued preferred securities commonly known as TruPS for a principal amount of $12.5 million as part of a pooled offering to third party investors. In 2005, SCC formed Silvergate Capital Trust II (the "2005 Trust", and together with the 2001 Trust, the "Trusts"), also a Delaware statutory trust wholly owned by SCC, which issued TruPS for a principal amount of $3.0 million as part of a pooled offering to third party investors. SCC issued the Debentures to each trust in exchange for the proceeds from their respective offerings.

33.     The payment schedules under the Indentures are the same as the payment schedules of the corresponding TruPS such that payments made by SCC in satisfaction of obligations under the Indentures provide the Trusts with a source of payment for the principal and interest due on the TruPS. SCC also guarantees the TruPS for the benefit of the TruPS holders.

34.     The following chart details SCC's funded indebtedness as of September 17, 2024.

| Instrument | Coupon | Maturity | Amount Outstanding as of Petition Date (Principal plus Accrued and Unpaid Interest) |
|---|---|---|---|
| 2001 Subordinated Debentures | Floating rate (8.85% at 7/25/2023) | 7/25/2031 | $14,790,662.80 |
| 2005 Subordinated Debentures | Floating rate (7.40% at 9/15/2023) | 3/15/2035 | $3,490,444.56 |

35.     Based on projections prepared by the Debtors and their advisors, the Debtors anticipate having sufficient assets to repay the Debtors' outstanding funded indebtedness in full.

C.     *Equity Interests*

36.     SCC's Articles of Incorporation, as in effect on the Petition Date, authorize the issuance of up to 150,000,000 shares of common stock.  As of the Petition Date, there were 31,729,832 issued and outstanding shares of Class A Common Stock.  SCC is also authorized to issue 25,000 shares of non-voting Class B common stock.  As of the Petition Date, there were 0 shares of Class B common stock issued and outstanding.  SCC's Articles of Incorporation, as in effect on the Petition Date, also authorize the issuance of up to 10,000,000 shares of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A (the "Preferred Stock"). On August 4, 2021, SCC issued 200,000 shares of the Preferred Stock, and issued and sold 8,000,000 depositary shares, each representing a $1/40^{th}$ ownership interest in the 200,000 shares of Preferred Stock SCC had issued.  The Preferred Stock has a liquidation preference to the common stock of $1,000 per share of Preferred Stock, for a total liquidation preference of $200 million.  Based on projections prepared by the Debtors and their advisors, the Debtors do not anticipate having sufficient assets to satisfy the Preferred Stock liquidation in full in connection with these Chapter 11 Cases. The following chart indicates SCC's equity structure:

| Security | Shares Authorized | Shares Outstanding as of the Petition Date |
|---|---|---|
| Preferred Stock | 10,000,000 | 200,000 ($200 million liquidation preference) |
| Class A Common Stock | 150,000,000 | 31,729,832 |

D.     *Litigation*

37.      In the past several years, a series of plaintiffs brought suits against SCC, Silvergate Bank and certain of its current and former directors and officers and/or employees (the "Prepetition Litigation"). The Prepetition Litigation includes, among other claims, the following.

38.      Bhatia Litigation. On February 14, 2023, Soham Bhatia, on behalf of himself and other plaintiffs, filed a complaint in the U.S. District Court for the Northern District of California captioned *Bhatia et al. v. Silvergate Capital Corporation, Silvergate Bank and Lane*, asserting claims against SCC, Silvergate Bank and former CEO of Silvergate Bank, Alan J. Lane (the "Bhatia Litigation"). On the same day, two similar complaints were filed in the U.S. District Court for the Northern District of California captioned *Magleby v. Silvergate Bank and Silvergate Capital Corporation* and *Keane v. Silvergate Bank and Silvergate Capital* Corporation.  The three cases were consolidated, and defendants' motion to transfer the action to the Southern District of California was granted. This matter consists of a putative class action alleging that the defendants knew of and aided and abetted FTX's fraud and breaches of fiduciary duties by failing to establish and/or properly execute a due diligence program and prevent improper "misdirection" of billions of dollars of funds from FTX client accounts to Alameda Research LLC. The Debtors have reached an agreement on the material terms of a settlement as a class action with the plaintiffs in the Bhatia Litigation (the "Bhatia Litigation Settlement"), and intend to stipulate to relief from the automatic stay in order to seek approval in the U.S. District Court for the Southern District of California for the Bhatia Litigation Settlement. The Bhatia Litigation Settlement will be subject to Bankruptcy Court approval under Bankruptcy Rule 9019. Pursuant to the Bhatia Litigation Settlement, the Debtors will pay $10 million to a settlement fund that will be applied to payment of class member claims, notice and administration expenses, service awards, and attorneys' fees and expenses.

17

39.    <u>Word of God Fellowship Litigation</u>. On June 14, 2023, Word of God Fellowship, Inc filed a complaint in the Superior Court of California, County of San Diego, captioned *Word of God Fellowship, Inc v. Silvergate Bank, Silvergate Capital Corporation, Alan J. Lane and Does 1 through 50*, asserting claims against SCC, Silvergate Bank and former CEO of Silvergate Bank, Alan J. Lane (the "<u>Word Of God Fellowship Litigation</u>") on a substantially similar basis as those claims asserted in the Bhatia Litigation on behalf of a single plaintiff, seeking damages no less than $25 million, the amount allegedly deposited in FTX by plaintiff through Silvergate Bank.

40.    <u>Securities Litigation</u>. On December 7, 2022, Steven Rosa, on behalf of himself and certain putative stockholders of SCC, filed a complaint in the U.S. District Court for the Southern District of California captioned *Rosa v. Silvergate Capital Corporation, Alan J. Lane and Antonio Martino.* Three similar securities class action cases were filed in the Southern District of California on December 10, 2022, January 10, 2023 and January 19, 2023, and were ultimately consolidated on January 18, 2023 and February 14, 2023. The case is referred to as *In re Silvergate Capital Corporation Securities Litigation* (the "<u>Securities Litigation</u>"). The Securities Litigation consists of a putative class action alleging that SCC's public disclosures relating to Silvergate Bank's due diligence and monitoring of customers, including FTX and other crypto exchanges, were materially misleading and that SCC's stock price fell once Silvergate Bank's purported failure to undertake adequate due diligence and monitoring was discovered. The motions to dismiss filed by the Debtors and the other defendants have been under submission since the hearing on November 29, 2023.

41.    <u>Derivative Litigation</u>. A lawsuit has been brought derivatively on behalf of SCC and/or Silvergate Bank in a case captioned *Nkonoki, derivatively on behalf of Silvergate Capital Corporation and Silvergate Bank v. Brassfield, Dircks, Reed, Lane, Colucci, Fraher, Reynolds,*

*Eisele, Lempres, Paik, Gupta, Campbell, and Sullivan* (the "Derivative Action"). This litigation was brought in California Superior Court, and alleges (1) failure to ensure that Silvergate Bank operated in accordance with all state and federal laws and had adequate controls to manage risk and ensure compliance with applicable laws and safe and sound banking practices, (2) materially misleading statements concerning SCC's compliance, risks, controls, reporting systems, and sustainability of its business model, and (3) that certain defendants are subject to insider trading claims under the California Corporations Code.

42.     The Prepetition Litigation has caused the Debtors to incur substantial costs. First, the Debtors have incurred significant direct expenditures for legal fees and other costs incurred to defend against the Prepetition Litigation. Second, the Debtors have been forced to sacrifice valuable employee time to conduct internal investigations and participate in interviews, which have resulted in large losses to productivity over the period that the Prepetition Litigation has been pending.

43.     While the Debtors intend to satisfy allowed claims in the order of their legal priorities, the Debtors strongly disagree with the allegations raised in the pending Prepetition Litigation, and intend to continue to vigorously defend themselves.

44.     On August 23, 2024, the Board of SCC appointed a Special Investigations Committee consisting solely of Director Ivona Smith, who is disinterested and independent with respect to all claims asserted in the Derivative Action and other potential claims that may be asserted against current and former directors and officers. The Special Investigations Committee has been empowered by the board of SCC to investigate and take all action to commence litigation, settle or release any claims held by the Debtors against their current or former directors, officers and employees, including the claims asserted in the Derivative Action. The Debtors understand

19

that the Special Investigations Committee intends to resolve such claims (including claims asserted in the Derivative Action) during the course of the Chapter 11 Cases or recommend such claims vest in a liquidation trust.

## Part III

## First Day Motions

45.     The Debtors have filed a number of First Day Motions, consisting of administrative motions and motions relating to the Debtors' cash management and business operations. The Debtors believe, and I agree, that approval of each First Day Motion is important to minimize the disruption caused by the bankruptcy filing during this critical phase of the Chapter 11 Cases and maximize the value of its estate. I have reviewed each of the First Day Motions or had their contents explained to me, including the exhibits thereto, and believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue its business operations, as requested in the First Day Motions. Factual information with respect to each First Day Motion is provided below and additional detail is contained in each First Day Motion. Capitalized terms, to the extent not defined herein, have the meanings provided in the respective First Day Motions.

### I.     Administrative Motions

    *A.*     <u>Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")</u>

46.     By the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of these Chapter 11 cases for procedural and administrative purposes only.

47.     Joint administration of the Debtors' cases is warranted because it will ease the administrative burden on the Court and the parties.  Joint administration of the Debtors' Chapter 11 Cases will eliminate the need for duplicate pleadings, notices, and orders in each of the

respective dockets and will save the Court, the Debtors, and other parties in interest substantial time and expense when preparing and filing such documents. Further, joint administration will protect parties in interest by ensuring that they will be apprised of the various motions filed with the Court with respect to each of the Debtors' Chapter 11 Cases. For those reasons, the relief requested in the Joint Administration Motion is in the best interest of the Debtors, their estates, creditors, and other parties in interest, and therefore, should be granted.

       *B.*       <u>Debtors' Motion for Entry of Order (I) Authorizing the Debtors to (A) Redact Personally Identifiable Information for Individuals, and (B) File a Consolidated Creditor Matrix, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Granting Related Relief (the "Creditor Matrix and Equity List Motion")</u>

48. Pursuant to the Creditor Matrix and Equity List Motion, the Debtors seek entry of an order (i) authorizing the Debtors to (a) redact or suppress certain personally identifiable information of individuals in their consolidated Creditor Matrix and other papers filed or to be filed with the Court, and (b) file a consolidated Creditor Matrix in lieu of submitting a separate mailing matrix for each Debtor, (ii) waiving the requirement to file a list of equity security holders, as set forth in Rule 1007(a)(3) of the Federal Rules of Bankruptcy Procedure as to SCC and (iii) granting related relief.

49. The Debtors have more than two hundred creditors or parties in interest and are therefore required to retain a claims and noticing agent pursuant to Local Rule 2002-1(f). Contemporaneously herewith, the Debtors have filed an application seeking the appointment of Stretto, Inc. as their claims and noticing agent pursuant to 28 U.S.C. § 156(c). Accordingly, the Debtors respectfully submit that permitting the Debtors to maintain a single consolidated Creditor Matrix in lieu of maintaining a separate Creditor Matrix for each Debtor is warranted.

50.     The Debtors also submit that it is appropriate to authorize the Debtors to redact the home addresses or email addresses of individuals from their consolidated Creditor Matrix, the Debtors' list of equity security holders, the Debtors' schedules of assets and liabilities and statements of financial affairs, affidavits or certificates of service, and any paper filed or to be filed with the Court in these Chapter 11 Cases because such information could be used, among other things, to perpetrate identity theft or to locate survivors of domestic violence, harassment, or stalking.

51.     Finally, the Debtors submit that preparing a list of all SCC's equity security holders with the last known addresses for each such holder would be expensive, time consuming and impracticable under the circumstances. Instead, SCC proposes to provide such notice on its equity security holders by: (i) publishing the Notice of Commencement on the Debtors' case website located at https://cases.stretto.com/Silvergate; (ii) serving by first class mail, the Notice of Commencement on all known registered holders of SCC's common stock and Preferred Stock as soon as practicable after the entry of the Proposed Order; and (iii) serve by first class mail all notices in these Chapter 11 Cases required under Bankruptcy Rule 2002(d) on all known registered holders of SCC Stock and Preferred Stock.  Further, to the extent equity security holders of SCC are entitled to vote on a chapter 11 plan, the Debtors intend to provide them notice of the bar date and the opportunity to assert their interests, as set forth in any orders governing the provision of such notices.  The Debtors submit that these efforts provide adequate notice to SCC's equity security holders.

52.     For those reasons, the relief requested in the Creditor Matrix and Equity List Motion is in the best interest of the Debtors, their estates, creditors, and other parties in interest, and therefore, should be granted.

22

C.   Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing
     Agent (the "Claims Agent Application")

53.    I understand that this Court is authorized to utilize agents and facilities other than

the Clerk for the administration of bankruptcy cases. I believe that if Stretto, Inc. ("Stretto") is

retained as the claims and noticing agent in these Chapter 11 Cases, the distribution of notices and

the processing of claims will be expedited and the Clerk will be relieved of the administrative

burden of processing what may be an overwhelming number of claims and proofs of interest.

Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that

there will be in excess of 200 parties to be noticed. In view of the number of anticipated claimants

and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims

and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both

the Debtors' estates and their creditors.

54.    I have also reviewed Stretto's Engagement Agreement, which is attached as Exhibit

1 to the Claims Agent Application, and the description of services that Stretto has agreed to provide

and the compensation and other terms of the engagement as provided in its Engagement

Agreement. Based on that review, I believe that the Debtors' estates, creditors, parties-in interest

and the Court will benefit from Stretto's experience and cost-effective methods. Prior to retaining

Stretto, the Debtors obtained and reviewed engagement proposals from at least two other court-

approved claims and noticing agents. The Debtors believe, and I agree, that Stretto's rates are

competitive and reasonable given Stretto's quality of services and expertise, and that the

appointment of Stretto as claims and noticing agent is the most effective and efficient manner by

which to provide noticing and claims processing services in the Chapter 11 Cases and is necessary

and in the best interests of the Debtors and their estates.

II.      **Motions Relating to Business Operations**

   *D.*      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors
   to (A) Continue to Operate their Cash Management System, (B) Extending the
   Time to Comply with Section 345(B), (C) Honor Certain Prepetition Obligations
   Related Thereto; and (II) Granting Related Relief (the "Cash Management
   Motion")

55.     Pursuant to the Cash Management Motion, the Debtors are seeking interim and
final orders: (a) authorizing, but not directing, the Debtors to (i) maintain their current their existing
cash management system (the "Cash Management System"), (ii) extending the time for the
Debtors to comply with Section 345(b) of the Bankruptcy Code, (iii) authorizing the Debtors to
honor certain prepetition obligations related to their cash management system, (iv) authorizing the
Debtors to maintain existing business forms, (v) authorizing the Debtors to continue ordinary-
course intercompany transactions and (b) granting certain related relief, including scheduling a
hearing to consider approval of the Cash Management Motion.

56.     The Debtors' cash management system is operated through seven bank accounts
(the "Bank Accounts") maintained by the Debtors at Vista Bank, Partners Bank, and the FHLBank
of San Francisco.  In the ordinary course of business, SCC maintains a cash management system
utilizing the Bank Accounts to periodically receive from and disburse funds to SLC. These
arrangements are generally governed by the Affiliate Services Agreement, pursuant to which funds
of the Debtors are used to pay AlphaStaff, Inc. ("AlphaStaff"), which is a professional employer
organization, for the Debtors' 11 employees (all of whom are jointly employed by SLC and
AlphaStaff) and other expenses, including certain categories of vendor payments, in connection
with the Debtors' day-to-day operations. SCC also routinely disburses minimal funds to Debtor
Spring Valley Lots, LLC.

57.     The Debtors seek to continue these arrangements post-petition and seek a 45-day extension to comply with section 345(b) of the Bankruptcy Code in order to minimize the disruption caused by the bankruptcy filing and maximize the value of their estates, along with additional relief.   Under the circumstances, it is my belief that maintenance of the Cash Management System is in the best interests of the Debtors' estates and creditors. Furthermore, preserving "business as usual" conditions and avoiding the difficulties inevitably triggered by any substantial disruption of the Cash Management System will facilitate the Debtors' administration of these Chapter 11 Cases.  Additionally, to lessen the disruption caused by these Chapter 11 Cases and to maximize the value of the Debtors' estates, it is essential that Debtors be allowed to continue engage in Intercompany Transactions postpetition consistent with its prepetition practices.   I understand the Debtors will continue to maintain accurate and current records with respect to all transactions so that all transactions can be readily ascertained, traced and properly recorded.

    *E.*    <u>Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related thereto and (B) Renew, Amend, Supplement, Extend or Purchase Insurance Policies and (II) Granting Related Relief (the "Insurance Motion")</u>

58.     Pursuant to the Insurance Motion, the Debtors are seeking interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto and (ii) renew, amend, supplement, extend, or purchase insurance policies in the ordinary course of business, and (b) granting related relief.

59.     In the ordinary course of business, the Debtors maintain certain insurance policies that provide coverage for, among other things, property, general liability, employment benefit liability, excess liability, professional liability, automobile, executive risk ("<u>D&O</u>") and cyber and

data liability (collectively, the "Insurance Policies") administered through certain third-party insurance carriers. The Debtors' obligations pursuant to these insurance policies comprise all premiums and other obligations related thereto, including any broker or advisor fees, taxes, other fees, and deductibles.  A detailed list of the Insurance Policies that are currently held by the Debtors are attached as Exhibit B to the Insurance Motion.

60.     The Debtors believe, and I also believe, that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry. Although the Debtors are in the process of winding down their business, no longer conduct banking or bank holding company operations and intend to wind down operations completely, the Debtors believe that maintaining these insurance programs are essential to the preservation of the Debtors' businesses, property and assets from known and unknown liabilities associated with the historical operation of their businesses or that may arise in connection with the current wind down process they are conducting.

61.     Accordingly, for the reasons set forth herein and expanded on in the Insurance Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

> *F.*     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion")

62.     Pursuant to the Taxes Motion, the Debtors are seeking interim and final orders (a) authorizing the Debtor to negotiate, remit, and pay (or use applicable credits or overpayments to offset) certain accrued and outstanding prepetition obligations accrued in the ordinary course of

business on account of the certain Taxes and Fees (as defined below) of the Debtors, including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date; (b) authorizing the Debtor to continue paying the Taxes and Fees accrued in the ordinary course of business on a postpetition basis; and (c) granting related relief.

63.     The Debtors remit and/or pay the Taxes and Fees to the federal government and various state governments including taxing and licensing authorities on a monthly, quarterly, or annual basis depending on the nature and incurrence of a particular Tax or Fee (collectively, the "Authorities").

64.     The Debtors estimate that approximately $40,000 in Taxes and Fees relating to the prepetition period are or will become due and owing to the Authorities within the first 21 days of this Chapter 11 Case. These fees are for SLC's final FDIC insurance payment.  In addition, out of an abundance of caution, the Debtors seek authority, but not direction, to pay any amounts that come due.

65.     The Debtors believe that failing to pay the Taxes and Fees could materially disrupt the Debtors' administration of the case in several ways, including that: (i) the Authorities may initiate audits, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estate, which would unnecessarily divert the Debtors' attention from the Chapter 11 Cases; (ii) failing to pay Taxes and Fees could subject certain of the Debtors' directors and officers to claims of personal liability, which would distract those key employees from their duties related to the Debtors' restructuring; and (iii) unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, any of which could negatively impact the Debtors' reorganization process.

G.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages and Compensation, Fees, Withholdings and Taxes, (B) Continue Certain Employee Benefit Programs, (C) Continue Certain Health and Insurance Benefit Programs; and (II) Granting Related Relief (the "Employee Benefits Motion")

66.    Pursuant to the Employee Benefits Motion, the Debtors seek entry of orders (I) authorizing, but not directing the Debtors to (a) pay and/or otherwise honor, as applicable, prepetition obligations that the Debtors have historically directly or indirectly incurred with respect to the Debtors' employees (the "Employees"), including, but not limited to, (i) accrued prepetition wages, (ii) prepetition amounts funded by the Debtors and paid directly by AlphaStaff, which include employer payroll taxes, health and insurance benefit programs and telephone and remote working allowance, and (iii) payroll service fees payable to AlphaStaff, (iv) reimbursable expenses and (v) obligations related to independent contractors (collectively, the "Prepetition Employee Obligations") of approximately $55,500 (the "Interim Amount") and in the ordinary course of business as such obligations become due and payable subject to the limitations described herein; and (b) pursuant to the final order, continue to honor and pay all other Prepetition Employee Obligations, in the aggregate amount of approximately $55,500 (inclusive of the Interim Amount) and in the ordinary course of business as such obligations become due and payable subject to the limitations set forth in the Employee Benefits Motion; and (II) granting related relief.

*[Remainder of page intentionally left blank; signature page follows]*

28

67.     As of the Petition Date, the Debtors have only 11 employees remaining, all of whom are essential to completing the expeditious liquidation of the Debtors' business. Interruption of payment or benefits to these remaining employees would adversely affect their morale and should be expected to diminish the value of the Debtor's estates.

*        *        *

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 18th day of September 2024 in Las Vegas, Nevada.

By:     */s/ Elaine Hetrick*
        Elaine Hetrick
        Chief Administrative Officer

**Exhibit A**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

## RESTRUCTURING SUPPORT AGREEMENT

### September 17, 2024

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits and schedules attached hereto, and as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**") is entered into by and among the following parties:

(a)      Silvergate Capital Corporation ("**SCC**"), Silvergate Liquidation Corporation ("**SLC**"), and Spring Valley Lots, LLC ("**SVL**," and, collectively with SCC and SLC, the "**Company Parties**");

(b)      The undersigned holders or investment advisors, sub-advisors, or managers of discretionary accounts that hold (each, a "**Supporting Preferred Stockholder**," collectively, the "**Supporting Preferred Stockholders**" and collectively with the Company Parties each a "**Party**") certain 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A, authorized by the Articles of Incorporation of SCC (the "**Preferred Stock**");

## RECITALS

**WHEREAS**, the Company Parties and Supporting Preferred Stockholders have, in good faith and at arms' length, negotiated and approved of certain transactions that will result in the distribution of the Company Parties' remaining assets and wind-down of the Company Parties pursuant a chapter 11 plan (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Plan**"[1]) (a copy of which is attached hereto as **Exhibit A**, having the terms and conditions described therein and in this Agreement (such transactions, the "**Winddown**"));

**WHEREAS**, as of the date hereof, the Supporting Preferred Stockholders collectively hold 63% of the issued and outstanding Preferred Stock of SCC;

**WHEREAS**, the Company Parties intend to file voluntary chapter 11 petitions (the "**Bankruptcy Cases**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to seek confirmation and effectiveness of the Plan and implement the Winddown;

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

**WHEREAS**, the Parties desire to express to one another their mutual support and commitment in respect of the matters discussed herein; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.    Definitive Documentation.**

(a)    The definitive documents and agreements governing the Winddown (collectively, the "**Transaction Documents**") shall consist of:

(i)    this Agreement;

(ii)    the Case Budget (as defined herein), annexed hereto as **Exhibit B**

(iii)    the Plan;

(iv)    all other documents that will be included in the documents and forms of documents, schedules, and exhibits to the Plan filed by the Company Parties, including without limitation all documents to be included in the Plan Supplement;

(v)    a disclosure statement for the Plan (the "**Disclosure Statement**"), the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**"), and the motion to approve the Disclosure Statement and related solicitation materials;

(vi)    the order entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "**Disclosure Statement Order**");

(vii)    the order entered by the Bankruptcy Court approving the Plan (the "**Confirmation Order**") and any motion or briefing in support thereof;

(viii)    the First Day Pleadings and the Second Day Pleadings (each as defined below), and all motion and orders necessary or appropriate to implement the terms of the Winddown as set forth in this Agreement and the Plan, including without limitation the proposed order setting the date for filing proofs of claim (the "**Bar Date Order**") and related motion and supporting pleadings (the "**Bar Date Pleadings**"); and the order approving procedures for setting disputed claims reserves and estimation of claims (the "**Estimation Procedures Order**") and related motions and supporting pleadings (the "**Estimation Pleadings**"); and

2

(ix)    such agreements, instruments and documentation (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) as may be reasonably desired or necessary to consummate and document the Winddown and the transactions contemplated by this Agreement, and the Plan.

(b)    The Transaction Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and the Plan, and shall each be in form and substance reasonably acceptable (the "**Consent Rights**") to the Company Parties and the Required Supporting Preferred Stockholders. As used herein, the term "**Required Supporting Preferred Stockholders**" means, at any relevant time, Supporting Preferred Stockholders holding greater than 50.0% of the Preferred Stock held by the Supporting Preferred Stockholders. During the Effective Period (as defined below), each of the Transaction Documents shall not be amended, modified, waived, or supplemented in a manner inconsistent with this Agreement without the prior written consents (email, including by counsel, sufficient) of the Required Supporting Preferred Stockholders consistent with and subject to the applicable Consent Rights set forth in the first sentence of this Section 1(b).

(c)    The transaction documents in the foregoing forms, with the foregoing required approvals or as otherwise modified pursuant to the terms of this Agreement are collectively referred to herein as the "**Approved Transaction Documents**".

(d)    Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.  The terms of this Agreement and the exhibits shall whenever possible be read in a complementary manner; provided, that, to the extent there is a conflict between this Agreement and the exhibits, the conflicting term of this Agreement (excluding exhibits) shall control and govern.

**Section 2.    Representations of the Supporting Preferred Stockholders and the Company Parties.**

Each Supporting Preferred Stockholder, severally and not jointly, hereby represents and warrants to the Company Parties, and each of the Company Parties hereby represents and warrants to the respective Supporting Preferred Stockholders that, as of the Execution Date (as defined below), the following statements are true, correct, and complete:

(a)    It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated by, and perform its obligations contemplated under this Agreement; and the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)    The execution, delivery, and performance by such Party of this Agreement does not violate (i) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (ii) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries.

3

(c)     This Agreement is the legally valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(d)     Except as expressly set forth herein and with respect to the Company Parties' performance of this Agreement (and subject to necessary Bankruptcy Court approvals associated with the Winddown), the execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or material filing with, material consent or material approval of, or material notice to, or other material action to, with or by, any federal, state or other governmental authority or regulatory body, other than those which have been obtained, taken or made.

(e)     Although no Party intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation and acceptance of the Plan, such Supporting Preferred Stockholder (A) is a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in any securities that may be issued in connection with the Winddown, making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement; and (B) has made its own decision to execute this Agreement based upon its own independent assessment of documents, input and advice from advisors, and information available to it, as it deemed appropriate and sufficient.

(f)     Each Supporting Preferred Stockholder, in  represents that it is (i) either (A) is the sole legal and beneficial owner of the Preferred Stock set forth below its name on the signature page hereof (or the Joinder (as defined below)), free and clear of all claims, liens and encumbrances, or (B) has sole investment and voting discretion with respect to the Preferred Stock set forth below its name on the signature page hereof (or the Joinder (as defined below)) in respect of matters relating to the Winddown contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Preferred Stock to the terms of this Agreement (with respect to a Supporting Preferred Stockholder, all claims under clauses (A) and (B) and any additional Preferred Stock in the Company Parties it owns or has such control over from time to time or acquires after the Execution Date, collectively, its "**Participating Preferred Stock**") and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Preferred Stock in respect of matters relating to the Winddown contemplated by this Agreement and dispose of, exchange, assign and transfer such Participating Preferred Stock.  Further, such Supporting Preferred Stockholder has made no prior assignment, sale or other transfer of, and has not entered into any other agreement to assign, sell or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such Participating Preferred Stock.

**Section 3.     Agreements of the Supporting Preferred Stockholders.**

(a)     During the period beginning on the Execution Date and ending upon a termination of this Agreement pursuant to Section 6 hereof (such period, the "**Effective Period**"), each of the

Supporting Preferred Stockholders, severally and not jointly, agrees to perform and comply, as applicable, with the following obligations (in each case, subject to Section 1(b) hereof):

(i)    subject to the actual receipt by such Supporting Preferred Stockholder of the Plan, Disclosure Statement, and the Solicitation Materials (all in forms reasonably acceptable to the Required Supporting Preferred Stockholders):

1.    timely vote all Preferred Stock now or hereafter beneficially owned by such Supporting Preferred Stockholder or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, as applicable, to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis following the commencement of the solicitation of the Plan, which ballots shall be in favor of, and shall grant and not indicate that the Supporting Preferred Stockholder opts out of, any releases and exculpation provided under the Plan, including the "Releases by Holders of Claims and Interests" set forth in Article IX the Plan attached hereto as **Exhibit A** and support the releases, exculpations, and injunctions, in each case as set forth in the Plan attached hereto as **Exhibit A**; provided that such vote shall be immediately revoked and deemed *void ab initio* upon termination of this Agreement pursuant to the terms hereof (except any termination pursuant to Section 6 (hereof)); and

2.    not change or withdraw (or seek or cause to be changed or withdrawn) such vote.

(ii)    not (A) object to, delay, impede or take any other action to interfere with approval of the Disclosure Statement or acceptance or implementation of the Plan or the Winddown so long as the final form of all such Transaction Documents are reasonably acceptable to the Required Supporting Preferred Stockholders, (B) directly or indirectly seek, solicit, encourage, propose, file, support, assist, participate, engage in the formulation, negotiations or discussions of or vote for, any restructuring, sale of assets, merger, workout or plan of liquidation or reorganization for the Company Parties other than the Plan (any such transaction, an "**Alternative Transaction**"), (C) object to or otherwise commence any proceeding, take any action opposing, or support any other person's efforts to oppose or object to the relief sought in any First Day Motions and Second Day Motions, as applicable, so long as the terms of such documents are consistent with and subject to Sections 4(a)(xiii) and 4(a)(xvi) of this Agreement and conform substantially to, and are not inconsistent with, the terms set forth in the Disclosure Statement and Plan with respect to such documents, and other motions consistent with this Agreement filed by any Supporting Preferred Stockholder and each Company Party in furtherance of the Winddown or (D) otherwise take any action, other than consistent with the provisions of this Agreement, that would in any material respect interfere with, delay or postpone the consummation of the Winddown;

(iii)    use commercially reasonable efforts to cooperate with the Company Parties in obtaining additional support for the Liquidation from the Company Parties' other Preferred Stockholders unless such cooperation would affect the legal or economic the

recoveries by the Preferred Stockholders under the Plan, as reasonably determined by the Required Supporting Preferred Stockholders. For the avoidance of doubt, in no event shall the Supporting Preferred Stockholders have to expend any funds or otherwise alter any terms of the Plan in connection with efforts to obtain additional support for the Winddown;

(iv)    (A) support, and take all commercially reasonable actions necessary to facilitate the implementation and consummation of, the Winddown (including, without limitation, the confirmation of the Plan and the consummation of the Winddown pursuant to the Plan) and (B) not take any action that is inconsistent with the implementation or consummation of the Winddown;

(v)    not object to or initiate, or have initiated on its behalf, any litigation in connection with the retention or the reasonable and documented fees and expenses of the advisors to the Company Parties provided that, with the exception of fees and expenses of Cravath, Swaine & Moore LLP and Richards, Layton & Finger P.A., such fees and expenses are consistent with and subject to the Case Budget (as defined below) that is attached as **Exhibit B** to this Agreement;

(vi)    not initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Company Parties, any of the other Released Parties, the Winddown, or this Agreement, other than to enforce this Agreement, the Purchase Agreement, the Participation Agreement, the Plan, or any other Transaction Document;

(vii)    negotiate in good faith and use commercially reasonable efforts to address any legal or structural impediment that arises that would prevent, hinder or delay the consummation of the Winddown; and

(viii)    not (A) support or encourage the termination or modification of the Company Parties' exclusive period for the filing of a plan or the Company Parties' exclusive period to solicit votes on a plan, (B) take any other action, including initiating any legal proceedings or enforcing rights as a holder of Preferred Stock that is inconsistent with this Agreement or the Transaction Documents, or that would reasonably be expected to prevent, interfere with, delay or impede the implementation or consummation of the Winddown (including the Bankruptcy Court's approval of the Transaction Documents and the solicitation and confirmation of the Plan), and (C) oppose or object to, or support any other person's efforts to oppose or object to, any motions filed by the Company Parties that are not inconsistent with this Agreement.

(b)    During the Agreement Effective Period, each Supporting Preferred Stockholder, in respect of each of its Preferred Stock will support, and will not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement to interfere with any motion or other pleading or document filed by a Company Party that is consistent in all material respects with the terms of this Agreement, including without limitation the Plan.

(c)    Nothing in this Agreement shall be construed to prohibit any Supporting Preferred Stockholder from (i) appearing as a party-in-interest in any matter to be adjudicated in the Winddown so long as such appearance and the positions advocated in connection therewith during

6

the Effective Period are not inconsistent with this Agreement and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Winddown or (ii) enforcing any right, remedy, condition, consent or approval requirement under this Agreement (to the extent, in each case, not inconsistent with this Agreement, the Plan, or any of the Transaction Documents), or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, the Plan, or any of the Transaction Documents.

(d)     Notwithstanding any other provision in this Agreement, each of the Supporting Preferred Stockholders acknowledges and agrees that, in order to fulfill the Company Parties' fiduciary obligations under applicable law, or any of its duties or other obligations under applicable law, the Company Parties may receive proposals or offers for Alternative Transactions from other persons, and may, subject to compliance with Section 4(a)(xviii), provide due diligence, discuss, and/or analyze such Alternative Transactions and that such actions shall not, in and of themselves, constitute a breach of this Agreement or give rise to a right of termination hereunder except as set forth in Section 6 hereof.

(e)     Nothing in this Agreement shall require any Supporting Preferred Stockholder to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to the Company Parties or any stakeholders of the Company Parties.

**Section 4.    Agreements of the Company Parties.**

(a)     During the Effective Period, the Company Parties shall:

(i)     use commercially reasonable efforts to obtain additional support for the Winddown from the Company Parties' other stakeholders in a manner consistent with this Agreement;

(ii)     (A) support, and take all reasonable actions necessary to facilitate the implementation and consummation of, the Winddown (including, without limitation, the confirmation of the Plan and the consummation of the Winddown pursuant to the Plan) and (B) not take any action that is inconsistent with the implementation or consummation of the Winddown;

(iii)     negotiate in good faith with the Supporting Preferred Stockholders to finalize the Transaction Documents and any related documents, and to the extent practicable, afford respective advisors for such Parties a reasonable opportunity, to comment and review in advance of any filing thereof;

(iv)     take all actions necessary and appropriate to cause each of the milestones (each a "**Milestone,**" and collectively, the "**Milestones**") set forth in this section to occur, subject only to the Bankruptcy Court's availability:

1.     no later than September 17, 2024 (the "**Petition Date**"), the Chapter 11 Cases shall have been commenced;

7

2.      no later than 1 Business Day after the Petition Date, the Company Parties shall have filed with the Bankruptcy Court the Plan and the Disclosure Statement;

3.      no later than 5 Business Days after the Petition Date, the Company Parties shall file with the Bankruptcy Court a motion to obtain entry of the Bar Date Order;

4.      no later than 5 Business Days after the Petition Date, the Company Parties shall file with the Bankruptcy Court a motion seeking entry of the Estimation Procedures Motion;

5.      no later than 28 days after the Petition Date, the Company Parties shall file with the Bankruptcy Court a motion seeking approval of solicitation procedures;

6.      no later than 45 days after the Petition Date, the Bankruptcy Court shall have entered Disclosure Statement Order ;

7.      no later than 50 days after the Petition Date the Bar Date shall have occurred ;

8.      no later than 70 days after the Petition Date, the Debtors and the Required Supporting Preferred Stockholders shall have agreed on the amount of the reserves set forth in the Plan or otherwise scheduled an estimation hearing (which shall occur no later than the Confirmation Hearing) with respect to any Indemnification Claim (as defined in the Plan) and any contingent or unliquidated claim seeking payment that may be in excess of $500,000 or with respect to any disputed claim in excess of $500,000, unless otherwise agreed to by the Required Supporting Preferred Stockholders in their reasonable discretion;

9.      no later than 90 days after the Petition Date, the Confirmation Order shall have been entered by the Bankruptcy Court;

10.    no later than 100 days after the Petition Date , the Plan shall have become effective;

(v)     use commercially reasonable efforts to obtain any and all required regulatory approvals (if any) for the Winddown, solely to the extent that failure to receive any such approvals would, in the reasonable opinion of the Company Parties, upon the advice of outside counsel, have a material adverse effect on the Company Parties' ability to implement the Winddown in accordance with the terms of this Agreement;

(vi)    prepare and deliver (and remain in compliance with) a cash flow forecast, in form and substance acceptable to, and consented to by, the Supporting Preferred Stockholders setting forth all line-item and cumulative receipts and operating disbursements on a bi-weekly basis for the period beginning as of the week of the Petition

Date through and including the thirteenth (13th) week after such week (the "**Case Budget**"), which Case Budget in the form acceptable to the Debtors and the Supporting Preferred Stockholders is attached hereto as **Exhibit B**. By no later than 12:00 p.m. New York City time on the Thursday of every other calendar week following the first complete week after the Petition Date occurs, the Company Parties shall deliver to the Supporting Preferred Stockholders (and their advisors) a line-item by line-item report setting forth, in reasonable detail, the actual receipts and disbursements (including any professional fees) for each such line item for the prior two weeks (the "**Case Budget Report Date**"). The Company Parties shall also deliver to the Supporting Preferred Stockholders (and their advisors) a line-item by line-item variance report setting forth, in reasonable detail, (x) any differences between actual receipts and disbursements (the "**Case Budget Variance**") for each such line item for the relevant period versus the projected receipts and disbursements set forth in the Case Budget for each such line item for the relevant period and on a cumulative basis for the duration of the Chapter 11 Cases. The Company Parties shall not permit, as of any Case Budget Report Date, (x) the actual aggregate disbursements for the relevant period to exceed 110% of the projected disbursements for the cumulative four-week period ending during such period (excluding for purposes of such calculation the fees and expenses of Cravath, Swaine & Moore LLP and Richards, Layton & Finger, P.A.) or (y) the actual aggregate receipts for the relevant period to be less than 90% of the projected aggregate receipts for such period set forth in the Case Budget. Any modification to the Case Budget shall be subject to the consent and approval, not to be unreasonably withheld, of the Required Supporting Preferred Stockholders. Collectively, this Section 4(a)(vi) are defined as the "**Case Budget Requirements.**"

(vii)    Beginning one week after the Petition Date, and weekly thereafter, coordinate and attend calls with the Company Parties' advisors and the Required Supporting Preferred Stockholders to walk through the Case Budget Variance for the prior week;

(viii)    not amend, assume, or reject any executory contracts or unexpired leases prior to confirmation of the Plan without the consent, not to be unreasonably withheld, of the Required Supporting Preferred Stockholders;

(ix)    not enter into or amend any employee benefit, deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including offer letters, employment agreements, consulting agreements, severance arrangement, or change in control arrangements with respect to any of the Debtors' employees without the prior consent, not to be unreasonably withheld, of the Required Supporting Preferred Stockholders;

(x)    not enter into any settlement or other proposed resolution of any claim held by or against the Company Parties on account of any pending litigation as of the date hereof or any legal proceedings brought against any of the Company Parties during the pendency of the Chapter 11 Cases, or any potential causes of action that any of the Company Parties have or may have against any other party, whether such potential cause of action was known to exist before or discovered/determined to potentially exist after commencement

9

of the Chapter 11 Cases, without the consent of the Required Supporting Preferred Stockholders; *provided,* however, that the Company shall be permitted to implement, after consultation with the Supporting Preferred Stockholders, any settlement or resolution of derivative claims of Company Parties against the current or former directors, officers and employees of the Company Parties that is recommended by Silvergate Capital Corporation's Special Investigation Committee.

(xi)     to use commercially reasonable efforts to pursue any and all claims against any of the Company Parties' Insurance Policies (as defined in the Plan), including claims for reimbursement of any and all amounts paid by the Company in respect of any Indemnification Obligations for the benefit of the Liquidation Trust;

(xii)     inform the Supporting Preferred Stockholders within 1 Business Day after becoming aware of: (A) any notice of any commencement of any involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Party; (B) a breach of this Agreement by any Company Party; (C) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been incorrect in any material respect when made or deemed to be made; and (D) the occurrence of a termination event described in <u>Section 6</u> hereof of which any Company Party is reasonably aware, *provided* that any information disclosed by the Company Party to any Supporting Preferred Stockholder pursuant to this <u>Section 4(a)(xii)</u> shall be deemed to be included within the scope of any confidentiality agreement entered into between the Company Parties and such Supporting Preferred Stockholder; and *provided further* that nothing in this Agreement will require the Company Parties to disclose any information if, in the good faith reasonable belief of the Company Parties after consultation with outside counsel, such disclosure would (x) waive any legal privilege or (y) be in violation of applicable law or the provisions of any agreement (including any confidentiality agreement) to which the Company Parties or any of its affiliates is a party;

(xiii)     not, directly or indirectly, amend, supplement, waive or modify, or file a pleading seeking authority to amend, supplement, waive or modify, any Transaction Document in a manner that is inconsistent with this Agreement (including, without limitation, <u>Section 1(b)</u> hereof);

(xiv)     not, directly or indirectly, file or seek authority to file any pleading inconsistent with the Winddown or the terms of this Agreement, including, without limitation any motion to reject this Agreement in the Chapter 11 Cases;

(xv)     following the Petition Date, use commercially reasonable efforts to timely file an objection to any motion filed with the Bankruptcy Court by any person seeking an order (i) directing the appointment in the Chapter 11 Cases of an examiner with expanded powers or a trustee, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, (iv) granting any relief that is inconsistent with this Agreement in any material respect, or (v) modifying or

10

terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization;

(xvi)    The Company Parties shall provide the Supporting Preferred Stockholders with draft copies of all the first-day pleadings and all orders sought pursuant thereto (the "**First Day Pleadings**") and all second-day pleadings and all orders sought pursuant thereto (the "**Second Day Pleadings**") and all other material motions (including without limitation the Bar Date Pleadings and Estimation Procedures Pleadings), pleadings, and documents at least three (3) days before the date on which the Company Parties intend to file such First Day Pleadings, Second Day Pleadings or other material motions, pleadings or documents to the extent practicable, and, in the event that not less than three (3) days' notice is not reasonably practicable under the circumstances, the Company Parties shall provide such First Day Pleadings, Second Day Pleadings or other material motions, pleadings or documents to the Supporting Preferred Stockholders as soon as otherwise reasonably practicable before the date when the Company Parties intend to file any such First Day Pleadings, Second Day Pleadings or other material motions, pleadings or documents and, without limiting any approval rights set forth herein, consult in good faith with the Supporting Preferred Stockholders regarding the form and substance of any of the foregoing documents in advance of the filing thereof. Nothing in this <u>Section 4(a)(xvi)</u> shall affect the Company Parties' rights and obligations, or the respective rights and obligations of the Supporting Stakeholders, with respect to the Transaction Documents;

(xvii)   use commercially reasonable efforts to oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Winddown (including, if applicable, the filing of timely filed objections or written responses);

(xviii)  upon receipt of a written proposal or other expression of interest with respect to an Alternative Transaction, within one (1) Business Day of the receipt of such proposal or expression of interest, notify counsel to the Supporting Preferred Stockholders, with such notice to include a copy of such proposal; and

(xix)    subject to any required approvals of the Bankruptcy Court, timely pay all fees and expenses as set forth in <u>Section 7</u> of this Agreement.

(b)    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Winddown; or (b) prevent any Company Party from enforcing this Agreement, the Plan or any other of the other Transaction Documents, or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, the Plan or any of the other Transaction Documents.

**Section 5.    Transfers of Participating Preferred Stock.**

(a)    Each Supporting Preferred Stockholder agrees that, during the Effective Period, it shall not sell, transfer, assign or otherwise dispose of (collectively, "**Transfer**") any of its Participating Preferred Stock, or any option thereon or any right or interest (voting or otherwise)

in any of its Participating Preferred Stock (including, any participation therein), unless (i) the transferee is already a Supporting Preferred Stockholder or an affiliate thereof; <u>provided</u> that any such Participating Preferred Stock shall automatically be deemed to be subject to the terms of this Agreement, or (ii) the transferee executes and delivers a Joinder (as defined below) to the Company Parties on or prior to the date of the relevant transfer, in which case such transferee shall be deemed to be a Supporting Preferred Stockholder for purposes of this Agreement.  Subject to clause (c) below, the Company Parties shall be deemed to have acknowledged such Transfer.  Any Transfer of Participating Preferred Stock by a Supporting Preferred Stockholder that does not comply with the procedures set forth in this Agreement shall be deemed void without the need for further action.

(b)     This Agreement shall in no way be construed to preclude any Supporting Preferred Stockholder from acquiring additional Preferred Stock; <u>provided</u> that any such additional claims shall automatically be deemed to be Participating Preferred Stock of such Supporting Preferred Stockholder and shall be subject to all of the terms of this Agreement.  Each Supporting Preferred Stockholder agrees to provide to counsel for the Company Parties a notice of the acquisition of any additional claims within five (5) business days of the consummation of the acquisition transaction.

(c)     Any person that receives or acquires a portion of the Participating Preferred Stock pursuant to a sale or other Transfer by a Supporting Preferred Stockholder hereby agrees to be bound by all of the terms of this Agreement (as the same may be hereafter modified from time to time) (a "**Joining Party**") by executing and delivering to counsel for the Company Parties a joinder in the form of **Exhibit B** hereto (the "**Joinder**"), which Joinder may also be used by holders of Preferred Stock that are not Participating Preferred Stock who wish to become a party to this Agreement as set forth in <u>Section 22</u> of this Agreement.  The Joining Party shall thereafter be deemed to be a "Supporting Preferred Stockholder" and a Party for all purposes under this Agreement.  Each Joining Party shall indicate, on the appropriate schedule of its Joinder, the number and amount of Preferred Stock held by such Joining Party, which shall be deemed to be Participating Preferred Stock of such Joining Party and shall be subject to all of the terms of this Agreement.  Upon consummation of the transfer of such Participating Preferred Stock to the Joining Party, the Joining Party hereby makes the representations and warranties of the Parties set forth in <u>Section 2</u> of this Agreement to the other Parties and agrees to be bound by <u>Section 3</u> of this Agreement.

**Section 6.    Termination of Obligations.**

(a)     <u>Supporting Preferred Stockholder Events</u>. This Agreement may be terminated by the Required Supporting Preferred Stockholders as to the Supporting Preferred Stockholders upon written notice to the Company Parties, delivered in accordance with <u>Section 14</u> hereof, upon occurrence of any of the following events:

(i)     a material breach by a Company Party of any of its representations, warranties, covenants or other obligations; *provided* that the terminating Supporting Preferred Stockholder shall have transmitted written notice to the Company Parties pursuant to <u>Section 14</u> hereof detailing such breach and, if such breach is capable of being

12

cured, such breach shall not have been cured within five (5) business days after the transmission of such notice;

(ii)      failure to satisfy any of the Milestones set forth in Section 4(a)(iv) hereof;

(iii)     failure to achieve or otherwise satisfy any of the Case Budget Requirements;

(iv)     any Transaction Document, or any related order entered by the Bankruptcy Court, is inconsistent in a not immaterial manner with the terms and conditions set forth in this Agreement, including Section 1 hereof, or (ii) any Transaction Document is waived, amended, supplemented or otherwise modified in a not immaterial manner with the terms and conditions set forth in this Agreement, including with Section 1 hereof, in each case which remains uncured for five (5) business days after the receipt by the Company Parties of written notice delivered in accordance with Section 14 hereof;

(v)      the date that is 110 days after the Petition Date (the "**Outside Date**")

(vi)     except as otherwise set forth herein or in the Plan, the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order, without the written consent of the Required Supporting Preferred Stockholders (which shall not be unreasonably withheld, conditioned, or delayed), (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) dismissing one or more of the Chapter 11 Cases, unless such conversion or dismissal, as applicable, is made or sought with the prior written consent of the Required Supporting Preferred Stockholders, (iii) appointing a trustee or an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code for any Chapter 11 Case, or (iv) rejecting this Agreement;

(vii)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable,

(viii)   the Bankruptcy Court enters an order denying confirmation of the Plan;

(ix)     the Confirmation Order is reversed or vacated;

(x)      the Bankruptcy Court grants relief materially inconsistent with the Agreement of any of the Transaction Documents;

(xi)     the Company Parties file, propose, or otherwise support any of the plan or assert sale other than the Plan;

(xii)    the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order that, in each case, would have the effect of preventing consummation of the Winddown or a material portion thereof; *provided* that the Company Parties shall have forty-five (45) calendar days after issuance

of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Winddown;

(xiii)    any Company Party notifies any Supporting Preferred Stockholder that the board of directors, board of managers, or a similar governing body of the applicable Company Party determined in accordance with Section 28 hereof that proceeding with the Winddown would be inconsistent with its fiduciary or similar obligations or duties under applicable law or otherwise inconsistent with applicable law; or

(xiv)    any Company Party (i) makes a public announcement or communicates in writing to any other party that it intends to accept or pursue an Alternative Transaction, (ii) provides notice to the Supporting Preferred Stockholders that it is exercising its rights pursuant to Section 28, or (iii) enters into a definitive agreement with respect to an Alternative Transaction.

(b)    Company Party Termination Events. This Agreement may be terminated as to all Parties by the Company Parties upon written notice to the Supporting Preferred Stockholders, delivered in accordance with Section 14 hereof, upon the occurrence of any of the following events:

(i)    the Supporting Preferred Stockholders entitled to vote on the Plan will have failed to timely vote their Preferred Stock in favor of the Plan or at any time change their votes to constitute rejections to the Plan, in either case in a manner inconsistent with this Agreement; provided that in the case of a Plan this termination event will not apply if the applicable impaired classes with respect to such interests vote to "accept" the Plan consistent with section 1126 of the Bankruptcy Code;

(ii)    the occurrence of a material breach by any of the Supporting Preferred Stockholders holding, in the aggregate among such breaching Supporting Preferred Stockholders, more than one-third of the aggregate principal amount of issued and outstanding Preferred Stock; provided that, in each case, the Company Parties shall have transmitted written notice to such breaching Party pursuant to Section 14 hereof, detailing such breach (while providing copies of such notice pursuant to Section 14 hereof) and, if such breach is capable of being cured, such breach shall not have been cured within five (5) business days after the transmission of such notice;

(iii)    at any time during the Effective Period, holders of less than 33.4% of the aggregate issued and outstanding Preferred Stock are not party to this Agreement; provided that the Company Parties shall give the Supporting Preferred Stockholders not less than five (5) Business Days' prior written notice before exercising the termination right;

(iv)    the board of directors, board of managers, or a similar governing body of any of the Company Parties determines in accordance with Section 28 hereof that proceeding with the Winddown would be inconsistent with its fiduciary or similar obligations or duties under applicable law or otherwise inconsistent with applicable law, including, without limitation, pursuit of an Alternative Transaction;

14

(v)      the Bankruptcy Court enters an order denying confirmation of the Plan;

(vi)     the Confirmation Order is reversed or vacated; or

(vii)    the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order that, in each case, would have the effect of preventing consummation of the Winddown and remains in effect for, and has not been reversed, stayed or vacated within, thirty (30) calendar days after such issuance; *provided* that this termination right shall not apply to or be exercised by a Company Party if it or any other Company Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

(c)     <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among each of the Company Parties and the Required Supporting Preferred Stockholders.

(d)     <u>Individual Termination</u>.  Any individual Supporting Preferred Stockholder may terminate this Agreement as to itself only, by the delivery of written notice thereof in accordance with <u>Section 14</u> hereof if (a) the Outside Date has not occurred, or (b) any Company Party takes any action that has a material, disproportionate, and adverse effect on its recoveries under the Plan without such Supporting Preferred Stockholders consent.

(e)     <u>Termination Upon Completion of the Winddown</u>.  This Agreement shall terminate automatically without any further required action or notice on the Effective Date of the Plan.

(f)     <u>Effect of Termination</u>.  No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply directly or indirectly causing, or resulting in, the occurrence of the termination event on which such termination is based.  The date on which termination of this Agreement as to a Party is effective in accordance with this <u>Section 6</u> shall be referred to as a "<u>Termination Date</u>." Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Winddown or otherwise, that it would have been entitled to take had it not entered into this Agreement; *provided* that, in no event shall any such termination relieve a Party for liability for its breach or non-performance of its obligations hereunder that arose prior to the date of such termination or any obligations hereunder that expressly survive termination of this Agreement under <u>Section 17</u> hereof.  Upon the occurrence of a Termination Date, any and all consents, votes or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Winddown and this Agreement or otherwise.  Notwithstanding anything to the contrary, nothing in this Agreement shall be construed to prohibit the Company Parties or any of the Supporting Preferred Stockholders from contesting whether any termination is in accordance with the terms of this Agreement or to seek enforcement of any rights under this

Agreement that arose or existed before a Termination Date. If this Agreement terminates at any time during which, absent the Company Parties' consent, Bankruptcy Court approval would otherwise be required to change any ballots submitted or votes cast in connection with confirmation of the Plan, the Company Parties shall be deemed to consent to any Supporting Preferred Stockholder's modification or withdrawal of any ballots or votes previously submitted or cast by such Supporting Preferred Stockholder and such ballots or votes may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek an order of a court of competent jurisdiction or consent from the Company Parties or any other applicable Party allowing such change or resubmission).

(g)     Automatic Stay. The Company Parties acknowledge that, after the commencement of the Chapter 11 Cases, the giving of notice of default or termination by any other Party pursuant to this Agreement shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code, and the Company Parties hereby waive, to the fullest extent permitted by law, the applicability of the automatic stay as it relates to any such notice being provided; *provided* that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement. No cure period contained in this Agreement shall be extended pursuant to sections 108 and 365 of the Bankruptcy Code or any other applicable law without the prior written consent of each of the Supporting Preferred Stockholders, and the Company Parties hereby waive, to the greatest extent possible, the applicability of the automatic stay to such steps necessary to effectuate the termination of this Agreement.

**Section 7.    Payment of Fees and Expenses.**

The Company Parties shall prior to filing any bankruptcy petitions, pay in full in cash all accrued reasonable and documented fees, costs, and expenses (including any estimated fees through the Petition Date of Milbank LLP as counsel to the Required Supporting Preferred Stockholders and any local counsel of the Required Supporting Preferred Stockholders. Whether or not the transactions contemplated hereunder are consummated, but so long as such failure to consummate is not the result of any act or omission of the Supporting Preferred Stockholders and is the result of a valid termination of this Agreement, the Company Parties shall pay and reimburse promptly all reasonable and documented fees, costs, and expenses that are incurred in connection with preparation and negotiation of this Agreement and/or the implementation of the Winddown contemplated by this Agreement, to the extent invoiced, of Milbank LLP as counsel to the Required Supporting Preferred Stockholders, any local counsel of the Required Supporting Preferred Stockholders, and (if one is retained) any financial advisor of the Required Supporting Preferred Stockholders, subject to approval of the Bankruptcy Court on and after the Petition Date, but in no event later than the Effective Date of the Plan.

**Section 8.    Relationship Among Supporting Preferred Stockholders.**

Notwithstanding anything to the contrary herein, the duties and obligations of each of the Supporting Preferred Stockholders under this Agreement shall be several, not joint. It is understood and agreed that no Supporting Preferred Stockholder has any fiduciary duty, duty of trust or confidence in any kind or form with any other Supporting Preferred Stockholder, the

16

Company Parties or any other stakeholder of the Company Parties and, except as expressly provided in this Agreement, there are no commitments among or between them. No Supporting Preferred Stockholder shall be responsible in any way for the performance of the obligations of any other Supporting Preferred Stockholder under this Agreement or the transactions contemplated herein. No action taken by any Supporting Preferred Stockholder pursuant hereto shall be deemed to constitute the Supporting Preferred Stockholders as, and the Company Parties acknowledge that the Supporting Preferred Stockholders do not so constitute, a partnership, an association, a joint venture, or any other kind of entity, or create a presumption that the Supporting Preferred Stockholders are in any way acting in concert or as a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended. In this regard, it is understood and agreed that any Supporting Preferred Stockholder may trade in the debt or equity securities of the Company Parties without the consent of the Company Parties or any other Supporting Preferred Stockholder, subject to applicable securities laws, the terms of this Agreement, and any confidentiality agreement entered into with the Company Parties; *provided* that no Supporting Preferred Stockholder shall have any responsibility for any such trading by any other person or entity by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Supporting Preferred Stockholders shall in any way affect or negate this understanding and agreement.  Nothing in this Agreement shall create any fiduciary obligations or duties on the part of any of the Supporting Preferred Stockholders, or any members, partners, managers, managing members, equityholders, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, equity holder, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party or its affiliated entities, that such entities did not have prior to the execution of this Agreement.

**Section 9.    Good Faith Cooperation; Further Assurances; Transaction Documents.**

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Winddown.  Furthermore, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary, or as may be required by order of the Bankruptcy Court, to carry out the purposes and intent of this Agreement.  Each of the Company Parties and the Supporting Preferred Stockholders, as applicable, hereby covenants and agrees (a) to negotiate in good faith the Transaction Documents, each of which shall, except as otherwise provided for herein, (i) contain terms consistent in all respects with the terms set forth in the Plan and each of the other exhibits attached hereto (each as amended, supplemented or otherwise modified with the consent of the Required Supporting Preferred Stockholders), (ii) otherwise be in form and substance reasonably acceptable in all respects to the Parties, and (iii) be consistent with this Agreement in all respects, and (b) subject to the satisfaction of the terms and conditions set forth herein, to execute the Transaction Documents (in each case to the extent such Party is contemplated to be a party thereto).

### Section 10.   Specific Performance.

Notwithstanding anything in this Agreement to the contrary, it is understood and agreed by the Parties that money damages may not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach, including any order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

### Section 11.   Representation by Counsel.

Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto.  None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

### Section 12.   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in either a state or federal court of competent jurisdiction in the borough of Manhattan, the City of New York (the "**Chosen Courts**").  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit or proceeding; provided, however, that if the Company Parties commence the Bankruptcy Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.   EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

### Section 13.   Effective Date.

This Agreement shall become effective and binding upon each of the parties that has executed and delivered counterpart signature pages to this Agreement and effective on the date on which all of the following conditions have been satisfied or waived by the applicable Party or Parties in accordance with this Agreement (such date, the "**Execution Date**"):

(a)     Each of the Company Parties shall have executed and delivered (email is sufficient) counterpart signature pages of this Agreement to the Supporting Preferred Stockholders and their counsel; and

(b)     Supporting Preferred Stockholders holding in excess of 50% of the issued and outstanding Preferred Stock shall have executed and delivered (email is sufficient) counterpart signature pages of this Agreement to the Company Parties and their counsel.

**Section 14.  Notices.**

All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to the Company Parties, to:

Silvergate Capital Corporation
4225 Executive Square, Suite 600
La Jolla, CA 92037
Attention:     Paris Cribben
               pcribben@silvergate.com

with copies (which shall not constitute notice) to:

Cravath, Swaine & Moore LLP
375 Ninth Avenue
New York, New York 10001
Attention:     George E. Zobitz
               jzobitz@cravath.com

               Paul H. Zumbro
               pzumbro@cravath.com

               Alexander Gerten
               agerten@cravath.com

- and –

Richards, Layton & Finger, P.A.
One Rodney Square, 920 North King Street
Wilmington, DE 19801
Attention:     Paul N. Heath
               heath@rlf.com

               Michael J. Merchant
               merchant@rlf.com

David T. Queroli
queroli@rlf.com

(b)       if to the Supporting Preferred Stockholders, to their address set forth on the signature page to this Agreement with copies (which shall not constitute notice) to:

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:       Andrew Leblanc
aleblanc@milbank.com

Lauren C. Doyle
ldoyle@milbank.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received.

**Section 15.   Reservation of Rights.**

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to protect and preserve its rights, remedies and interests, including its Participating Preferred Stock and any other claims against or interests in the Company Parties or other parties.  Without limiting the foregoing sentence in any way, after a Termination Event, the Parties hereto each fully reserve any and all of their respective rights, remedies, claims and interests, subject to <u>Section 6</u>, in the case of any claim for breach of this Agreement.

**Section 16.   Interpretation and Rules of Construction.**

This Agreement is the product of negotiations among the Company Parties and the Supporting Preferred Stockholders and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Supporting Preferred Stockholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

**Section 17.   Survival.**

Notwithstanding the termination of this Agreement pursuant to <u>Section 6</u>, the agreements and obligations of the Parties in <u>Sections 6(e)</u>, <u>7</u>, <u>9</u>, <u>12</u>, <u>13</u>, <u>14 - 27</u> (to the extent provided therein), and any defined terms needed for the interpretation of any such Sections, shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

20

**Section 18.   Amendments.**

This Agreement, including the Plan, may not be modified, amended, or supplemented in any manner except in writing signed by each of the Company Parties and the Required Supporting Preferred Stockholders, as may be applicable in accordance with Section 1(b) hereof; *provided* that (a) any waiver, modification, amendment, or supplement that materially, disproportionately, and adversely affects the economic recoveries or treatment of any Supporting Preferred Stockholder compared to the economic recoveries or treatment of any other Supporting Preferred Stockholder (after taking into account each Supporting Preferred Stockholder's respective holdings of Preferred Stock and the recoveries contemplated by the Plan) shall require the prior written consent of such Supporting Preferred Stockholder and (b) any amendment or modification of this Section 18 or the definitions of "Required Supporting Preferred Stockholders" or "Supporting Preferred Stockholders" shall require the consent of each Supporting Preferred Stockholder.  Any proposed modification, amendment, or supplement that is not approved by the requisite Parties as set forth above shall be ineffective and void *ab initio*.

**Section 19.   Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction; provided, however, that nothing in this Section 19 shall be deemed to amend, supplement or otherwise modify, or constitute a waiver of, any event triggering a right to terminate this Agreement pursuant to Section 6 hereof.  The agreements, representations and obligations of the Supporting Preferred Stockholders under this Agreement are, in all respects, several and not joint.

**Section 20.   Third-Party Beneficiary.**

This Agreement is intended for the benefit of the Parties hereto and no other person or entity shall be a third-party beneficiary hereof or have any rights hereunder.

**Section 21.   Entire Agreement.**

This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Approved Transaction Documents; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company Parties and any Supporting Preferred Stockholder shall continue in full force and effect as provided therein.

**Section 22.   Counterparts; Additional Supporting Preferred Stockholders.**

This Agreement may be executed in several identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same

agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.  Any holder of claims that is not already an existing Supporting Preferred Stockholder hereto may execute the Joinder and, in doing so, shall become a Joining Party and shall thereafter be deemed to be a "Supporting Preferred Stockholder" and a Party for all purposes under this Agreement.

### Section 23.    Headings.

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

### Section 24.    Independent Due Diligence and Decision-Making.

Each Party hereto hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

### Section 25.    Settlement Discussions.

This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto.  Regardless of whether or not the transactions contemplated herein are consummated, or whether or not a Termination Event has occurred, if applicable, nothing herein shall be construed herein as an admission of any kind or a waiver by any Party of any or all of such Party's rights or remedies.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

### Section 26.    Publicity and Disclosure.

The Parties acknowledge and agree that, on or after the Execution Date, the Company Parties may disclose the existence of this Agreement without the consent of the other Parties, and that the Company Parties may only disclose the terms of this Agreement or any other term of the transactions contemplated herein with the consent of the other Parties (with such consent not to be unreasonably withheld); *provided* that, except as required by law, the Company Parties shall not disclose the identity of any Party or the principal amount or percentage of any Preferred Stock or any other securities of the Company Parties held by any other specific individual Party, in each case, without such individual Party's prior written consent; *provided*, *further*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Party a reasonable opportunity to review and comment in advance of such disclosure and (ii) nothing in this Agreement shall prohibit the disclosure, without the consent of any Party, of the aggregate percentage or amount of Preferred Stock held by all the Supporting Preferred Stockholders, provided that such disclosure does not identify any such Supporting Preferred Stockholders.  Notwithstanding the foregoing, the Parties shall (a) consult in good faith with each other before issuing any press release or otherwise making any public statement with

respect to the transactions contemplated by this Agreement, (b) provide to the other Parties for review a copy of any such press release or public statement at least one (1) calendar days prior to the contemplated issuance date of such press release or public statement, to the extent reasonably practicable to do so, and (c) not issue any such press release or make any such public statement prior to such consultation and review. For the avoidance of doubt, the Company Parties will submit to counsel for the Supporting Preferred Stockholders all press releases and material public filings relating to this Agreement or the Winddown and provide counsel to the Supporting Preferred Stockholders a reasonable opportunity to review and comment on such press releases and public filings. The Parties agree that the Company Parties may file this Agreement with the Bankruptcy Court in seeking approval of this Agreement and the transactions contemplated hereunder; *provided, however,* that any public filing of this Agreement with the Bankruptcy Court or otherwise shall not include the executed signature pages to this Agreement.  Finally, each of the Supporting Preferred Stockholders agrees to keep the existence of this Agreement and the contents hereof confidential pending the commencement of the Chapter 11 Cases for the Company Parties.

### Section 27.   Email Consents.

Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Company Parties or the Supporting Preferred Stockholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

### Section 28.   The Company Parties' Fiduciary Duties.

Notwithstanding anything to the contrary herein, to the extent that any Company Parties' boards of directors (or comparable governing body) determine in good faith after consulting with outside legal counsel that the Company Parties' fiduciary obligations under applicable law require the Company Parties to take any action or terminate this Agreement and the Company Parties' obligations hereunder, the Company Parties may terminate this Agreement without incurring any liability to any one or more of the Supporting Preferred Stockholders under this Agreement.  In the event that the Company Parties determine to terminate this Agreement in accordance with this Section 28, the Company Parties shall provide notice of such termination to each of the Supporting Preferred Stockholders and their advisors not more than one (1) business day after such determination.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Company Parties or any members, managers, or officers of the Company Parties or their affiliated entities, in such capacity, that did not exist prior to the Execution Date.

*[Remainder of Page Intentionally Left Blank]*

**Exhibit A**

**Chapter 11 Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Silvergate Capital Corporation., et al.,[1] | Case No. _____ (__) |
| Debtors. | (Joint Administration Requested) |

## JOINT CHAPTER 11 PLAN OF
## SILVERGATE CAPITAL CORPORATION AND ITS AFFILIATED DEBTORS

George E. Zobitz (*pro hac vice* pending)
Paul H. Zumbro (*pro hac vice* pending)
Alexander Gerten (*pro hac vice* pending)
**CRAVATH, SWAINE & MOORE LLP**
375 Ninth Avenue
New York, NY 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
Email:     jzobitz@cravath.com
           pzumbro@cravath.com
           agerten@cravath.com

Paul N. Heath (No. 3704)
Michael J. Merchant (No. 3854)
David T. Queroli (No. 6318)
Emily R. Mathews (No. 6866)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:     heath@rlf.com
           merchant@rlf.com
           queroli@rlf.com
           mathews@rlf.com

*Proposed Counsel and Co-Counsel to the Debtors and Debtors in Possession*

Dated: September 17, 2024, Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are as follow: Silvergate Capital Corporation (7337), Silvergate Liquidation Corporation (4449) and Spring Valley Lots, LLC (0474). The Debtors' mailing address is 4225 Executive Square, Suite 600, La Jolla, CA 92037.

## TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................1

ARTICLE I:
        DEFINED TERMS, RULES OF INTERPRETATION,
        COMPUTATION OF TIME, AND GOVERNING LAW ......................1
    A.    Defined Terms ................................................................................................1
    B.    Interpretation; Application of Definitions; and Rules of Construction................16
    C.    Computation of Time .....................................................................................16
    D.    Governing Law ..............................................................................................17
    E.    Reference to Monetary Figures .....................................................................17
    F.    Reference to the Debtors or the Post-Effective Date Debtors..........................17
    G.    Controlling Document.....................................................................................17

ARTICLE II:
        ADMINISTRATIVE AND PRIORITY CLAIMS .............................17
    A.    Administrative Expense Claims .....................................................................17
    B.    Professional Fee Claims ................................................................................18
    C.    Ad Hoc Preferred Stockholder Group Expenses .............................................19
    D.    Statutory Fees ...............................................................................................20
    E.    Priority Tax Claims........................................................................................20

ARTICLE III:
        CLASSIFICATION AND TREATMENT OF CLAIMS AND
        INTERESTS........................................................................................20
    A.    Summary of Classification of Claims and Interests.........................................20
    B.    Treatment of Claims and Interests .................................................................21
    C.    Elimination of Vacant Classes.......................................................................25
    D.    Separate Classification of Secured Claims......................................................26
    E.    Voting Classes; Presumed Acceptance by Non-Voting Classes .......................26
    F.    Controversy Concerning Impairment..............................................................26

ARTICLE IV:
        ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
        REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR
        INTERESTS........................................................................................26
    A.    Classes Entitled to Vote ................................................................................26
    B.    Class Acceptance Requirement ......................................................................26
    C.    Cramdown and No Unfair Discrimination .......................................................26

ARTICLE V:
        MEANS FOR IMPLEMENTATION.................................................27
    A.    Consolidation for Distribution Purposes Only .................................................27
    B.    Sources of Consideration for Distributions ......................................................27

C.     Establishing Disputed Claims Reserve and Indemnification Reserve ................27
D.     Dissolution and Board of Directors ...........................................................28
E.     Exemption from Registration ...................................................................28
F.     Deemed Holders of Subordinated Note Claims.........................................30
G.     Preservation of Insurance ........................................................................31
H.     Indemnification Obligations .....................................................................31
I.     Cancellation of Existing Securities and Agreements.................................32
J.     Exemption from Certain Taxes and Fees ..................................................32

ARTICLE VI:

LIQUIDATION TRUST.......................................................32
A.     Liquidation Trust Agreement ...................................................................32
B.     Purpose of the Liquidation Trust ..............................................................32
C.     Liquidation Trust Assets ..........................................................................33
D.     Liquidation Trustee..................................................................................34
E.     Functions of the Liquidation Trustee .......................................................34
F.     Preservation of Rights of Action ..............................................................35
G.     Substitution in Pending Legal Actions......................................................36
H.     Fees and Expenses of the Liquidation Trust.............................................36
I.     Data Retention and Production Obligations .............................................36
J.     Creation and Maintenance of Trust Accounts ..........................................36
K.     Exculpation and Indemnification of Liquidation Trustee ..........................37
L.     Insurance .................................................................................................37
M.     Records....................................................................................................37
N.     Liquidation Trust Tax Matters..................................................................37

ARTICLE VII:

PROVISIONS REGARDING DISTRIBUTIONS...................39
A.     Distributions Generally ............................................................................39
B.     Distribution Record Date..........................................................................40
C.     Disbursing Agent .....................................................................................40
D.     Rights and Powers of Disbursing Agent ...................................................40
E.     Post-Petition Interest ...............................................................................41
F.     Delivery of Distributions..........................................................................41
G.     Distributions after the Effective Date .......................................................41
H.     Unclaimed Property .................................................................................41
I.     Time Bar to Cash Payments .....................................................................42
J.     Manner of Payment under Plan ................................................................42
K.     Satisfaction of Claims ..............................................................................42
L.     Minimum Cash Distributions ...................................................................42
M.     Setoffs and Recoupments ........................................................................42
N.     Claims or Interests Paid by Third Parties .................................................43
O.     Allocation of Distributions between Principal and Interest ........................43
P.     No Distribution in Excess of Allowed Claim............................................43
Q.     Distributions Free and Clear ....................................................................43
R.     Compliance with Tax Requirements.........................................................44

ARTICLE VIII:
                    PROCEDURES FOR DISPUTED CLAIMS AND INTERESTS ............ 44
- A.    Objections to Claims ................................................................................. 44
- B.    Allowance of Claims ................................................................................ 44
- C.    Resolution of Claims ................................................................................ 44
- D.    Adjustment to Claims Register Without Objection .................................. 45
- E.    Disallowance of Claims ........................................................................... 45
- F.    Estimation of Claims ............................................................................... 45
- G.    Amendments to Proofs of Claim .............................................................. 45
- H.    No Distributions Pending Allowance and Disputed Interest Reserves ................ 46
- I.    Allowed and Disputed Claims Reserves .................................................. 46
- J.    Distributions After Allowance .................................................................. 46

ARTICLE IX:
                    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
                    PROVISIONS .............................................................................. 46
- A.    Compromise and Settlement of Claims, Interests, and Controversies ................ 46
- B.    Releases by the Debtors ........................................................................... 47
- C.    Releases by Holders of Claims and Interests ........................................... 48
- D.    Exculpation .............................................................................................. 48
- E.    Injunction ................................................................................................. 49
- F.    Protection Against Discriminatory Treatment .......................................... 50
- G.    Setoffs 50

ARTICLE X:
                    EXECUTORY CONTRACTS ...................................................... 50
- A.    Rejection of Executory Contracts ............................................................ 50
- B.    Rejection Damages Claims ....................................................................... 51
- C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........ 51
- D.    Assignment .............................................................................................. 52
- E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements 52
- F.    Reservation of Rights .............................................................................. 52

ARTICLE XI:
                    CONDITIONS PRECEDENT TO CONFIRMATION
                    AND THE EFFECTIVE DATE .................................................... 53
- A.    Conditions to Confirmation of the Plan ................................................... 53
- B.    Conditions to Occurrence of the Effective Date ...................................... 53
- C.    Waiver of Conditions to Confirmation and Effective Date ...................... 54
- D.    Effect of Failure of Conditions to the Effective Date .............................. 54

ARTICLE XII:
                    MODIFICATION OF THE PLAN ............................................... 54
- A.    Plan Modifications ................................................................................... 54
- B.    Effect of Confirmation on Modification .................................................. 55

ARTICLE XIII:
>   EFFECT OF CONFIRMATION..............................................................55
>   A.      Deemed Consent ....................................................................55
>   B.      No Waiver ...............................................................................55
>   C.      Disallowed Claims and Disallowed Interests .......................55

ARTICLE XIV:
>   RETENTION OF JURISDICTION ......................................................56

ARTICLE XV:
>   MISCELLANEOUS PROVISIONS ....................................................58
>   A.      Payment of Statutory Fees...................................................58
>   B.      Notices....................................................................................58
>   C.      Headings.................................................................................60
>   D.      Governing Law ......................................................................60
>   E.      Notice of Entry of Confirmation Order and Relevant Dates..............................60
>   F.      Revocation, Withdrawal or Non-Consummation of Plan ...60
>   G.      Binding Effect........................................................................61
>   H.      Severability of Plan Provisions............................................61
>   I.      No Admissions........................................................................61
>   J.      Time     ...................................................................................61
>   K.      Successors and Assigns.........................................................61
>   L.      Conflict between Plan, Disclosure Statement and Plan Documents....................62
>   M.      Substantial Consummation ...................................................62
>   N.      Plan Exhibits..........................................................................62

## INTRODUCTION[2]

Silvergate Capital Corporation and its subsidiaries Silvergate Liquidation Corporation and Spring Valley Lots, LLC, as debtors and debtors in possession, hereby collectively propose the following plan pursuant to the provisions of chapter 11 of the Bankruptcy Code.

Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in Article I hereof or in the Bankruptcy Code (as applicable). Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Although proposed jointly for administrative purposes, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors; provided that, the estates of the various Debtors shall be consolidated for the purpose of effectuating distributions under the Plan.

ALL HOLDERS OF CLAIMS AND INTERESTS (WHETHER ENTITLED TO VOTE ON THE PLAN OR OTHERWISE) ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN OR TAKING ANY OTHER ACTION WITH RESPECT TO THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, RULE 3019 OF THE BANKRUPTCY RULES, AND ARTICLE XII OF THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, SUPPLEMENT, REVOKE, OR WITHDRAW THE PLAN PRIOR TO ITS CONSUMMATION.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ALL HOLDERS OF CLAIMS AND INTERESTS (WHETHER ENTITLED TO VOTE ON THE PLAN OR OTHERWISE) ARE ENCOURAGED TO READ THE RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS SET FORTH UNDER ARTICLE IX OF THE PLAN.

## ARTICLE I:
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Ad Hoc Preferred Stockholder Group*" means that certain ad hoc group of holders, or investment advisors or managers acting on behalf of holders, of certain Preferred Stock Interests represented by Milbank LLP.

---

[2]    The Plan remains subject to ongoing revisions of the Debtors in all respects.

2.      "***Ad Hoc Preferred Stockholder Group Expenses***" means, collectively, all reasonable and documented fees and expenses of counsel to the Ad Hoc Preferred Stockholder Group.

3.      "***Administrative Expense Claim***" means a Claim against any of the Debtors for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, or commissions for services rendered after the Petition Date; (ii) Professional Fee Claims; and (iii) fees and charges payable to the U.S. Trustee pursuant to Section 1930 of the Judicial Code.

4.      "***Administrative Expense Claims Bar Date***" shall be such date that is thirty (30) days following the Effective Date.

5.      "***Administrative Claims Objection Deadline***" means the first Business Day that is one-hundred and eighty (180) days after the Effective Date; *provided that* such date may be extended by the Bankruptcy Court at the request of the Debtors or the Liquidation Trustee.

6.      "***Affiliate***" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

7.      "***Bhatia Litigation***" means the consolidated class action pending in the Southern District of California captioned *Bhatia v. Silvergate Capital Corporation, Silvergate Bank and Lane.*

8.      "***Bhatia Litigation Class Claim***" means the claim of all class members arising under the Bhatia Litigation Class, which shall be deemed Allowed in the amount of the Settlement Fund upon entry of the Bhatia Litigation Final Approval Order.

9.      "***Bhatia Litigation Class Members***" means members of the purported class of claimants under the Bhatia Litigation.

10.      "***Bhatia Litigation Final Approval Order***" means a Final Order of the U.S. District Court for the Southern District of California (or other court of competent jurisdiction) approving Bhatia Litigation Settlement.

11.      "***Bhatia Litigation Settlement***" means settlement agreed by and between Bhatia Silvergate Capital Corporation, Silvergate Liquidation Corporation and Alan Lane as defendants in the Bhatia Litigation and the purported class plaintiffs in the Bhatia Litigation, which is subject to approval by the Bankruptcy Court and the U.S. District Court for the Southern District of California.

12.      "***Bhatia Litigation Settlement Fund***" shall mean the agreed settlement amount of $10 million.

13. "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein, such Claim or Interest (or any portion thereof) that is not Disallowed and (i) has been expressly Allowed under the Plan, any stipulation approved by the Bankruptcy Court, or a Final Order of the Bankruptcy Court; (ii) is both not Disputed prior to the expiration of the Claims Objection Deadline and either (a) evidenced by a Filed Proof of Claim (or for which under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed) or (b) listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been Filed; (iii) is allowed by a Final Order; or (iv) is compromised, settled, or otherwise resolved by the Debtors and the Liquidation Trust, and the Holder of such Claim or Interest; *provided that*, except as otherwise expressly provided herein, the amount of any Allowed Claim or Allowed Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code. "Allow," "Allowance," and "Allowing" shall have correlative meanings.

14. "*Assets*" means all of the right, title and interest of any of the Debtors in and to property of whatever type or nature (whether real, personal, mixed, tangible, intangible, or otherwise), including property of any of the Debtors' Estates.

15. "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors and any recovery, subordination, or other remedies that may be brought by or on behalf of the Debtors and their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including under sections 502, 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, chapter 5 of the Bankruptcy Code, or applicable non-bankruptcy law.

16. "*Ballot*" means the form(s) distributed to Holders of Claims and Interests entitled to vote on the Plan to indicate their acceptance or rejection of the Plan and to make an election with respect to the releases by Holders of Claims and Interests provided by Article IX.C.

17. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Cases.

18. "*Bankruptcy Court*" means (i) the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases; (ii) to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code; or (iii) such other court as may have jurisdiction over the Chapter 11 Cases or any aspect thereof to the extent of such jurisdiction.

19. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

20.     "***Bar Date***" means the applicable deadline by which Proofs of Claim must be filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

21.     "***Bar Date Order***" means the *[●]*.

22.     "***Business Day***" means any day, other than a Saturday, Sunday, or "*legal holiday*" (as defined in Bankruptcy Rule 9006(a)), or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

23.     "***Cash***" means the legal tender of the United States of America or equivalents thereof.

24.     "***Cause of Action***" means any action, claim, proceeding, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guarantee, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of any doubt, "Cause of Action" includes (i) any right of setoff or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity; (iii) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Interests; (iv) any Claim pursuant to section 362 of the Bankruptcy Code; (v) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (vi) any Avoidance Action; and (vii) any rights and powers held by the Debtors pursuant to and in accordance with Bankruptcy Rule 2004 with respect to any of the foregoing.

25.     "***Certificate of Designation***" means the Articles Supplementary Designating the Rights and Preferences of the 5.375 Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A, Par Value $0.01 Per Share of Silvergate Capital Corporation.

26.     "***Chapter 11 Cases***" means (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (ii) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court which are styled as *In re Silvergate Capital Corporation et al.*, Case No. _____ (___).

27.     "***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code.

28.     "***Claims and Noticing Agent***" means Stretto, Inc., the Claims and Noticing Agent retained by the Debtors in the Chapter 11 Cases by order of the Bankruptcy Court.

29.     "***Claims Objection Deadline***" means, for each Claim, the latest of (a) the date that is one hundred and eighty (180) days after the Effective Date, (b) as to a particular Claim,

4

180 days after the filing of a Proof of Claim, or request for payment of such Claim, and (c) such later date as may be fixed by the Bankruptcy Court upon a motion by the Liquidation Trustee on regular notice on or before the day that is one hundred and eighty (180) days after the Effective Date or such later date as may be fixed by the Bankruptcy Court.

30.    "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

31.    "*Class*" means a category of Holders of Claims or Interests classified by the Plan pursuant to section 1122(a) of the Bankruptcy Code.

32.    "*Common Stock*" means the Class A Common Stock, par value $0.01 per share, of Silvergate Capital Corporation.

33.    "*Common Stock Interests*" means Interests in Common Stock in SCC, excluding any Section 510(b) Claims.

34.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

35.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

36.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

37.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan, pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Required Preferred Stockholders.

38.    "*Consummation*" means the occurrence of the Effective Date.

39.    "*Contract Rate*" means the rate of interest provided for under any agreement giving rise to a Claim against the Debtors, which, to the extent applicable, shall be calculated as of the Petition Date.

40.    "*Cure Amount*" means the payment of Cash by the Debtors or Liquidation Trust, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary pursuant to section 365(b)(1)(A) of the Bankruptcy Code to permit the Debtors to assume an executory contract or unexpired lease.

41.    "*D&O Liability Insurance Policies*" means, collectively, all Insurance Policies (including any "tail policy" or runoff period in respect of an Insurance Policy) issued at any time, whether expired or unexpired, to any of the Debtors for certain liabilities of the Debtors, their current or former directors and officers, including primary insurance, excess insurance, or tail insurance policies and all agreements, documents or instruments related thereto.

42.     "***Data Retention and Production Obligations***" means the obligations set forth in Paragraph 4 of the DFPI C&D, requiring Silvergate Capital Corporation to ensure that Silvergate Liquidation Corporation's[3] records are preserved and maintained in a form and accessible by the Commissioner of Financial Protection and Innovation, the Federal Reserve Board of Governors, law enforcement, and other state and federal regulators until July 8, 2031.

43.     "***Data Retention and Production Reserve***" means $[___] million, which amount shall be determined by the Debtors and the Required Preferred Stockholders, and shall be held in one or more separate accounts from other Liquidation Trust Assets.

44.     "***Debtors***" means, collectively, (i) Silvergate Capital Corporation; (ii) Silvergate Liquidation Corporation; and (iii) Spring Valley Lots, LLC.

45.     "***DFPI***" means the California Department of Financial Protection and Innovation.

46.     "***DFPI C&D***" means the Consent Order entered into between the Commissioner of Financial Protection and Innovation of the DFPI and Silvergate Capital Corporation and Silvergate Liquidation Corporation (previously named Silvergate Bank) on June 26, 2024.

47.     "***Directors and Officers***" means (i) the Chapter 11 Directors and Officers and (ii) the Former Directors and Officers.

48.     "***Disallowed***" means any Claim, or any portion thereof, that (i) has been disallowed by Final Order or settlement; (ii) is listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely Filed, deemed timely Filed pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order, or otherwise deemed timely Filed under applicable law; or (iii) is not listed on the Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order, or otherwise deemed timely Filed under applicable law, and for which no motion for leave to File a late Claim has been Filed prior to the Effective Date of the Plan. "Disallow" and "Disallowance" shall have correlative meanings.

49.     "***Disbursing Agent***" means an entity selected to make Distributions at the direction of the Liquidation Trustee, which may include the Claims and Noticing Agent or the Liquidation Trustee, the Debtors or the Post-Effective Date Debtors.

50.     "***Disclosure Statement***" means (i) the *Disclosure Statement for the Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Debtor Affiliates* [Docket No. [●]] (as amended, modified, or supplemented from time to time in accordance with its terms), including all exhibits and schedules thereto and references therein that relate to the Plan that are prepared and distributed in accordance with applicable law and (ii) any supplement, amendment, or modification thereto.

---

[3]     Previously named Silvergate Bank.

51.     "***Disputed***" means, with respect to a Claim or Interest, (i) a Claim or Interest listed on the Schedules as unliquidated, disputed, or contingent for which no Proof of Claim in a liquidated and non-contingent amount has been filed; (ii) a Claim or Interest that is the subject of an objection or request for estimation Filed by any of the Debtors, the Liquidation Trustee, or any other party-in-interest in accordance with applicable law and which objection or request has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; (iii) a Claim or Interest that is not otherwise Allowed or Disallowed under the Plan and, as to which, the applicable deadline for the Debtors, the Liquidation Trustee, or any other party-in-interest to object (including any extension to such deadline granted by the Bankruptcy Court) has not yet expired; or (iv) Section 510(b) Claims.

52.     "***Disputed Claims Reserve***" means an amount of Cash on the Effective Date allocable to, or retained on account of, Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed  Secured Claims, Disputed General Unsecured Claims and Disputed Preferred Stock Interests, and all Statutory Fees in connection with any distributions to be made on account thereof), which reserve shall (i) either (x) be set in accordance with the Estimation Procedures Order or (y) be subject to the reasonable consent of the Required Preferred Stockholders, (ii) serve as a cap on available distributions from the Disputed Claims Reserve and (iii) be held in one or more separate accounts from other Liquidation Trust Assets.

53.     "***Distribution***" means the distributions of Cash (or other property), including by way of dividend, to be made by the Post-Effective Date Debtors, or their agents (as applicable) to Holders of Allowed Claims or Interests in accordance with the terms of the Plan.

54.     "***DTC***" means the Depository Trust Company.

55.     "***Effective Date***" means, with respect to the Plan, the date that is the first Business Day on which (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in <u>Article XI</u> have been satisfied or waived (in accordance with <u>Article XI</u>); and (iii) the Plan is declared effective by the Debtors. Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

56.     "***Entity***" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

57.     "***Estimation Procedures Order***" means an order of the Bankruptcy Court, which shall be in form and substance reasonably acceptable to the Required Preferred Stockholders, establishing procedures for setting the Disputed Claims Reserve and the Indemnification Reserve, including procedures for estimating Claims filed by the Bar Date that are unliquidated or contingent seeking payment that may be in excess of $500,000, Disputed Claims in excess of $500,000, and Indemnification Claims, in each instance unless otherwise agreed to by the Required Preferred Stockholders.

58.     "***Estate***" means, as to a Debtor, the estate of such Debtor in its Chapter 11 Case under sections 301 and 541 of the Bankruptcy Code.

59.    "*Exculpated Parties*" means each of the following in their capacity as such: (i) the Debtors; and (ii) all officers, directors, employees, agents, attorneys, financial advisors, investment bankers, consultants, and other professionals of the foregoing, to the extent such parties are or were acting in such capacity between the Petition Date and the Effective Date.

60.    "*Executory Contract*" means a prepetition contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

61.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, calculated as set forth in section 1961 of the Judicial Code.

62.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest with the Claims and Noticing Agent.

63.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022 closing the Chapter 11 Cases.

64.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, the local rules of the Bankruptcy Court or applicable non-bankruptcy law, may be Filed relating to such order shall not prevent such order from being a Final Order.

65.    "*General Unsecured Claim*" means any Claim (including any Claim for indemnification, reimbursement, or otherwise that is not subject to subordination pursuant to section 510(b) of the Bankruptcy Code) against any of the Debtors that is not an Administrative Expense Claim, an Other Priority Claim, a Priority Tax Claim, a Secured Claim, a Subordinated Notes Claim or a Section 510(b) Claim.

66.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

67.    "*Holder*" means an Entity holding a Claim or an Interest, as applicable, each solely in its capacity as such.

68.    "*Indenture Trustees*" means, collectively, the SC Trust I Indenture Trustee and the SC Trust II Indenture Trustee.

69.    "*Indentures*" means, collectively, the SC Trust I Indenture and the SC Trust II Indenture.

70.    "*Indemnification Reserve*" means $[__], which amount shall (i) either (x) be set in accordance with the Estimation Procedures Order or (y) be subject to the reasonable consent of the Required Preferred Stockholders, and (ii)  serve as a cap on available distributions under the Plan on account of contingent Indemnification Claims for current and former directors, officers and employees, and which shall be held in one or more separate accounts from other Liquidation Trust Assets.

71.    "*Impaired*" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

72.    "*Insurance Policies*" means any and all known and unknown insurance policies or contracts that have been issued at any time to, or that provide coverage in any capacity to, the Debtors or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the first named insured, a named insured or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, and all agreements, documents or instruments related thereto, including but not limited to, the D&O Liability Insurance Policies and/or any agreements with third-party administrators.

73.    "*Insurer*" means any company or other entity that issued any Insurance Policies, any third-party administrators of claims against the Debtors or asserted under the Insurance Policies, and any respective predecessors and/or affiliates thereof.

74.    "*Intercompany Claim*" means a Claim held by any Debtor against any other Debtor.

75.    "*Intercompany Interest*" means an Interest held by a Debtor in another Debtor.

76.    "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all issued, unissued, authorized, or outstanding shares of Common Stock, Preferred Stock, or capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor), whether or not arising under or in connection with any employment agreement, plan or program implemented by the Debtors, and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security. In the interest of clarity, Interests include any and all ownership interests in any Debtor arising under or in connection with any employment agreement, plan or program implemented by the Debtors that has vested or that would have vested but for the freezing of any such award as a result of or connection with the Chapter 11 Cases.

77.    "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

78.    "*IRS*" means the United States Internal Revenue Service.

79.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

80.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

81.    "*Liquidation Trust*" means that certain trust established pursuant to Article VI hereof and the Liquidation Trust Agreement to, among other things, hold the Liquidation Trust Assets, make Distributions to holders of Allowed Preferred Stock Interests pursuant to this Plan, and wind down the Debtors after the Effective Date.

82.    "*Liquidation Trust Agreement*" means the trust agreement governing the Liquidation Trust, which shall be in form and substance acceptable to the Required Preferred Stockholders, which shall be filed with the Plan Supplement.

83.    "*Liquidation Trust Assets*" means (a) all remaining Assets of each of the Debtors that have not been sold, abandoned or distributed prior to the Effective Date and following funding of: (i) the Professional Fee Escrow Account, (ii) all distributions to holders of Allowed Claims in accordance with the Plan, (iii) the Disputed Claims Reserve, (iv) the Data Retention and Production Reserve, (v) the Indemnification Reserve; (vi) the Liquidation Trust Initial Funding; (vii) the Bhatia Litigation Settlement Fund; and (vii) the Preferred Stock Initial Distributable Amount; (b) all assets recovered by the Liquidation Trustee on behalf of the Liquidation Trust on or after the Effective Date through enforcement, resolution, settlement, collection, return, or otherwise; (c) all Causes of Action of the Debtors or the Estates, other than those expressly released pursuant to this Plan; (d) any proceeds resulting from the Liquidation Trustee's investment of the Liquidation Trust Assets on or after the Effective Date owned by the Debtors on the Effective Date; all amounts remaining after satisfaction of the applicable Allowed Claims from the Professional Fee Escrow Account, the Disputed Claims Reserve, the Data Retention and Protection Reserve, and the Indemnification Reserve, which shall automatically vest in the Liquidation Trust.

84.    "*Liquidation Trust Beneficial Interests*" means the beneficial interests in the Liquidation Trust that shall entitle the holders thereof to receive Distributions from the Liquidation Trust Assets in accordance with the Plan and Liquidation Trust Agreement, which, among other things, shall provide for distribution among Liquidation Trust Beneficiaries. The Liquidation Trust Beneficial Interests shall not be certificated and shall be subject to the limitations on transferability and other matters as set forth in this Plan or the Liquidation Trust Agreement.

85.    "*Liquidation Trust Beneficiaries*" shall mean holders of Liquidation Trust Beneficial Interests.

86.    "*Liquidation Trust Expenses*" means any and all reasonable fees, costs and expenses incurred by the Liquidation Trust or the Liquidation Trustee (or any Professional or other Person retained by the Liquidation Trustee) on or after the Effective Date in connection with any of their duties under the Plan and the Liquidation Trust Agreement, including any administrative fees, attorneys' fees and expenses, insurance fees, taxes and escrow expenses subject to the terms of the Liquidation Trust Agreement.

87.    "*Liquidation Trust Initial Funding*" means [$__], which amount shall be subject to the consent of the Required Preferred Stockholders, which shall fund the Liquidation Trust Expenses in accordance with the terms of the Liquidation Trust Agreement.

88.    "*Liquidation Trustee*" means such Person as designated by the Required Preferred Stockholders, and shall be identified in the Plan Supplement.

89.    "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (i) an Administrative Expense Claim or (ii) a Priority Tax Claim.

90.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

91.    "*Petition Date*" means the date on which the Chapter 11 Cases were commenced.

92.    "*Plan*" means this *Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* (including the Plan Supplement and all exhibits hereto and thereto), as the same may be amended, modified, supplemented, or amended and restated from time to time, which shall be in form and substance reasonably acceptable to the Required Preferred Stockholders.

93.    "*Plan Objection Deadline*" means the date established by the Bankruptcy Court by which objections to Confirmation of the Plan must be Filed.

94.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, as may be amended, modified, or supplemented from time to time, each of which shall be in form and substance materially consistent with this Plan, and otherwise acceptable to the Debtors and the Required Preferred Stockholders. The Debtors shall be entitled to amend such documents in accordance with their respective terms and Article XII of this Plan through and including the Effective Date.

95.    "*Post-Effective Date Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

96.    "*Post-Petition Interest*" means interest, with respect to Holders of Allowed General Unsecured Claims, accruing from the later of (i) the Petition Date and (ii) the date on which such amounts first became due and owing by the applicable Debtor, until the date the applicable Distribution to such Holder of an Allowed General Unsecured Claim is issued.

97.    "*Preferred Stock*" means the 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A, authorized by the Articles of Incorporation of Silvergate Capital Corporation and governed by the Certificate of Designation.

98.    "*Preferred Stock Initial Distributable Amount*" means all Cash remaining on the Effective Date, after payment in full of all Allowed Claims and after giving effect to the funding of the Professional Fee Escrow Account, the Disputed Claims Reserve, the Indemnification Reserve, the Data Retention and Production Reserve, the Bhatia Litigation Settlement Fund and the Liquidation Trust Initial Funding.

99.     "*Preferred Stock Interests*" means Interests in Preferred Stock.

100.    "*Preferred Stock Liquidation Preference*" means the Liquidation Preference set forth and defined in (and in accordance with the terms of) the Certificate of Designation, including under Section 5 thereof.

101.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

102.    "*Pro Rata*" means, the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

103.    "*Professional*" means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

104.    "*Professional Fee Claims*" means all Claims for fees and expenses incurred by a Professional on or after the Petition Date through the Effective Date.

105.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date equal to the estimated amount of unpaid Professional Fee Claims to be incurred prior to the Effective Date.

106.    "*Proof of Claim*" means a proof of Claim or Interest that is Filed against any of the Debtors in the Chapter 11 Cases.

107.    "*Quarterly Fees*" means the quarterly fees required to be paid to the Office of the United States Trustee pursuant to section 1930 of title 28 of the United States Code and any interest thereon pursuant to 31 U.S.C. § 3717.

108.    ["*Released Party*" means each of the following in their capacity as such: (i) the Debtors; (ii) the Post-Effective Date Debtors; (iii) each of the Debtors' Estates; (iv) the Ad Hoc Preferred Stockholder Group and each of its members, in their capacity as such, (v) the Liquidation Trustee, and (vi) with respect to each of the foregoing Entities in clauses (i) through (v), their respective current and former officers, directors, employees, attorneys, accountants, investment bankers, consultants and other professionals, each in its capacity as such; *provided that*, notwithstanding anything in the foregoing, any Person or Entity that is entitled to vote on the Plan and either votes to reject the plan or opts out of the releases provided by the Plan shall not be a Released Party.][4]

---

[4] This definition and any related provision in this Plan remain subject to an ongoing investigation. The Debtors shall consult with the Supporting Preferred Stockholders prior to agreeing to or implementing any settlement, release or other resolution of any Causes of Action arising from any investigation.

109.    "**_Releasing Party_**" means each of the following in their capacity as such: (i) the Released Parties (other than the Debtors, the Post-Effective Date Debtors, the Debtor's Estates and the Liquidation Trustee), (ii) all Holders of Claims or Interests that vote to accept the Plan, (iii) all Holders of Claims or Interests that are entitled to vote on the Plan who vote to reject the Plan and do not opt out of the third party releases provided for in Article IX.C by checking the box on the applicable Ballot or form indicating that they opt out of granting such releases in the Plan submitted on or before the Voting Deadline; (iv) all Holders of Claims or Interests that are deemed to accept the Plan and do not opt out of the third party releases provided for in Article IX.C by checking the box on the applicable Ballot or form indicating that they opt out of granting such releases in the Plan submitted on or before the Voting Deadline and (v) with respect to each of the foregoing Entities in clauses (i), (ii), (iii) and (iv), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in its capacity as such; _provided_, _however_, that the Entities identified in part (v) shall be Releasing Parties only to the extent the corresponding Entities in parts (i), (ii), (iii) and (iv) are legally able to bind such Entities in part (v) to the releases contained in the Plan under applicable law.

110.    "**_Retained Causes of Action_**" means the Causes of Action listed or described in the Schedule of Retained Causes of Action filed in connection with the Plan Supplement, including (i) Causes of Action against Holders of Claims, vendors, and customers; (ii) any Cause of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence and claims made policies, occurrence and claims made contracts, and similar agreements to which any Debtor, Post-Effective Date Debtor or the Liquidation Trust is or was a party or pursuant to which any Debtor, Post-Effective Date Debtor or the Liquidation Trust has any rights whatsoever, including the Insurance Policies, and (iii) all other Causes of Action listed or described in the Schedule of Retained Causes of Action filed in connection with the Plan Supplement.

111.    "**_RSA_**" means that certain Restructuring Support Agreement, dated September 17, 2024, by and among the Debtors and certain holders of the Preferred Stock Interests that are signatory thereto.

112.    "**_Required Preferred Stockholders_**" means 50% of the holders of the Preferred Stockholder Interests that are parties to the RSA from time to time.

113.    "**_SC Trust I_**" means Silvergate Capital Trust I, a statutory business trust formed under the Delaware Statutory Trust Act pursuant to the SC Trust I Declaration of Trust and a Certificate of Trust filed with the Secretary of State of the State of Delaware on June 27, 2001.

114.    "*SC Trust I Claim*" means any Claim arising out of or related to the SC Trust I Indenture.[5]

115.    "*SC Trust I Declaration of Trust*" means that certain Declaration of Trust, dated as of June 27, 2001, as amended and restated by the Amended and Restated Declaration of Trust, dated as of July 16, 2001 (as further amended or supplemented from time to time) relating to SC Trust I.

116.    "*SC Trust I Indenture*" means that certain Indenture, dated as of July 16, 2001, between Silvergate Capital Corporation and SC Trust I Indenture Trustee.

117.    "*SC Trust I Indenture Trustee*" means the Bank of New York.

118.    "*SC Trust I Subordinated Debentures*" means the Floating Rate Junior Subordinated Deferrable Interest Debentures due 2031, outstanding under the SC Trust I Indenture.

119.    "*SC Trust I Preferred Securities*" means those certain Floating Rate TruPS issued pursuant to the SC Trust I Declaration of Trust.

120.    "*SC Trust II*" means Silvergate Capital Trust II, a statutory trust formed under the Delaware Statutory Trust Act pursuant to the SC Trust II Declaration of Trust and a Certificate of Trust filed with the Secretary of State of the State of Delaware on January 13, 2005.

121.    "*SC Trust II Capital Securities*" means those certain Fixed/Floating Rate Capital Securities issued pursuant to the SC Trust II Declaration of Trust.

122.    "*SC Trust II Claim*" means any Claim arising out of or related to the SC Trust II Indenture.[6]

123.    "*SC Trust II Declaration of Trust*" means that certain Declaration of Trust, dated as of January 13, 2005, as amended and restated by the Amended and Restated Declaration of Trust, dated as of January 27, 2005 (as further amended or supplemented from time to time) relating to SC Trust II.

124.    "*SC Trust II Indenture*" means that certain Indenture, dated as of January 27, 2005, between Silvergate Capital Corporation and SC Trust II Indenture Trustee.

125.    "*SC Trust II Indenture Trustee*" means Wilmington Trust Company.

---

[5] For the purposes of this Plan, the SC Trust I Claims shall be deemed to be held by the holders of the SC Trust I Preferred Securities in accordance with Article V.E of this Plan.

[6] For the purposes of this Plan, the SC Trust II Claims shall be deemed to be held by the holders of the SC Trust II Capital Securities in accordance with Article V.E of this Plan.

126.     "**SC Trust II Subordinated Debentures**" means the Fixed/Floating Rate Junior Subordinated Deferrable Interest Debentures due 2035, outstanding under the SC Trust II Indenture.

127.     "**Schedule of Retained Causes of Action**" means a schedule of retained Causes of Action filed in connection with the Plan Supplement, in form and substance acceptable to the Debtors and the Required Preferred Stockholders.

128.     "**Schedules**" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors on August 1, 2023 pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been, or in the future may be, amended, modified, or supplemented from time to time.

129.     "**Section 510(b) Claim**" means any Claim against a Debtor subject to subordination pursuant to Section 510(b) of the Bankruptcy Code, including claims asserted in connection with the Securities Litigation and any claims for indemnification, advancement or reimbursement arising in connection with the Securities Litigation.

130.     "**Secured**" means, when referring to a Claim, a Claim secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, in each case, as determined pursuant to section 506(a) of the Bankruptcy Code.

131.     "**Secured Claim**" means any Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) subject to setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff.

132.     "*Securities Litigation*" means the litigation proceeding captioned *In re Silvergate Capital Corp. Securities Litigation*, Case No. 3:22-cv-01936-JES-MSB (S.D. Cal.).

133.     "**Security**" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

134.     "**Subordinated Notes Claims**" means, collectively, the SC Trust I Claims and the SC Trust II Claims.

135.     "**Unimpaired**" means, with respect to a Claim or a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

136.     "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

137.    "***Voting Deadline***" means [●] (prevailing Eastern time), which date may be extended by the Debtors.

**B.    *Interpretation; Application of Definitions; and Rules of Construction***

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (iv) unless otherwise specified herein, all references herein to "Articles" or "Sections" are references to Articles or "Sections" of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (xii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control, *provided that* no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any party; and (xiv) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

**C.    *Computation of Time***

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.     *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided that* corporate or limited liability company governance matters relating to the Debtors, as applicable, not incorporated or formed (as applicable) in the State of Delaware shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

E.     *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein. Any conversion required to convert foreign currency to United States dollars shall be done using the applicable exchange rates on the Petition Date.

F.     *Reference to the Debtors or the Post-Effective Date Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Post-Effective Date Debtors shall mean (i) prior to the Effective Date, the Debtors and, (ii) on or after the Effective Date, the Post-Effective Date Debtors.

G.     *Controlling Document*

In the event of an inconsistency between the Plan, on the one hand, and (i) the Disclosure Statement or (ii) the Plan Supplement, on the other, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Confirmation Order and the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II:
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, including Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in <u>Article III</u>.

A.     *Administrative Expense Claims*

Requests for payment of Administrative Expense Claims must be Filed on or before the Administrative Expense Claims Bar Date. Except as otherwise ordered by the Bankruptcy Court, Holders of Administrative Expense Claims that are required to, but do not, file and serve a request for payment of such Administrative Expense Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property and such Administrative Expense Claims shall be deemed released against the Debtors

as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Liquidation Trustee and the requesting party by the Administrative Claims Objection Deadline.

Except with respect to Administrative Expense Claims that (a) are Professional Fee Claims, (b) have already been paid during the Chapter 11 Case, or (c) for which the Holder of an Allowed Administrative Expense Claim has agreed to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall receive in full satisfaction of its Administrative Expense Claim, Cash equal to the amount of such Allowed Administrative Expense Claim either: (i) on the Effective Date; (ii) if the Administrative Expense Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which an order Allowing such Administrative Expense Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (iii) if the Allowed Administrative Expense Claim is based on a liability incurred by the Debtors in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed Administrative Expense Claim, without any further action by the Holders of such Allowed Administrative Expense Claim and without any further notice to, or action, order, or approval of, the Bankruptcy Court.

Pursuant to Local Rule 3002-1, the governmental entity shall not be required to file any Proof of Claim or applicable for allowance for any Claims covered by section 503(b)(1)(B), (C), or (D).

## B.    *Professional Fee Claims*

1.    *Final Fee Applications.*  All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date shall be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Liquidation Trust (or the authorized signatories to the Professional Fee Escrow Account, after consultation with the Liquidation Trust) shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals from funds held in the Professional Fee Escrow Account within two (2) Business Days or as soon thereafter as reasonably practicable after such Professional Fee Claims are allowed by entry of an order of the Bankruptcy Court. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Expense Claim for any such deficiency, and the Liquidation Trustee, as applicable, shall pay the full unpaid amount of such Allowed Administrative Expense Claim in Cash.

2.    *Professional Fee Claims Estimate.*  Professionals shall reasonably estimate their unpaid Professional Fee Claims incurred in rendering services to the Debtors before and as of the Effective Date for the purpose of funding the Professional Fee Escrow Account and shall deliver such estimate to the Debtors no later than five (5) days before the anticipated Effective Date; *provided, however,* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of any Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate the Debtors may estimate the unpaid and unbilled fees and expenses of

such Professional.  Nothing in the Plan shall preclude any objection by any party to the RSA to any Professional Fee Claims that do not comply with the terms of the RSA.

3.    *Professional Fee Escrow Account.*  Following the Confirmation Date, and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estate, the Debtor, the Post-Effective Date Debtor, or the Liquidation Trust.

When all Allowed amounts owing to the Professionals have been irrevocably paid in full pursuant to one or more Final Orders of the Bankruptcy Court, any amount remaining in the Professional Fee Escrow Account shall promptly be paid to the Liquidation Trust, without any further action or order of the Bankruptcy Court.

4.    *Post-Effective Date Fees and Expenses.*  Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Liquidation Trustee shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by professionals providing services to the Post-Effective Date Debtors or the Liquidation Trustee, as applicable, including the fees and expenses of any of the Debtors' Professionals incurred in addressing or responding to any discovery, trial preparation, or trial in any action, suit, proceeding or audit. From and after the Effective Date, any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date shall terminate.

**C.    *Ad Hoc Preferred Stockholder Group Expenses***

From and after the Confirmation Date, any outstanding and unpaid Ad Hoc Preferred Stockholder Group Expenses shall be paid in full in Cash.  All outstanding Ad Hoc Preferred Stockholder Group Expenses, to the extent not previously paid shall be paid on the Effective Date.

All Ad Hoc Preferred Stockholder Group Expenses to be paid on the Effective Date shall be estimated, as necessary, prior to or as of the Effective Date and such estimate shall be delivered to the Debtor; *provided* that such estimate shall not be considered an admission or limitation with respect to such Ad Hoc Preferred Stockholder Group Expenses. In addition, the Liquidating Trust is authorized to pay the Ad Hoc Preferred Stockholder Group Expenses, as necessary, after the Effective Date when due and payable in the ordinary course solely to the extent incurred on or after the Confirmation Order is entered, without any requirement for review or approval by the Bankruptcy Court or any Entity.

**D.**     *Statutory Fees*

All Quarterly Fees due and payable and any interest thereon pursuant to section 3717 of Title 31 of the United States Code prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Chapter 11 Cases of all of the Debtors, other than Debtor Silvergate Capital Corporation shall be deemed closed and only the Chapter 11 Case of Silvergate Capital Corporation shall remain open for purposes of administering the resolution of Disputed Claims, pending litigation, and any Retained Causes of Action by the Liquidation Trust. All Quarterly Fees shall be paid from the Disputed Claims Reserve when due and payable. The Debtors shall file all reports due prior to the Effective Date when they become due in the form and manner prescribed by U.S. Trustee. After the Effective Date, the Liquidation Trustee, for and on behalf of the Post-Effective Date Debtors and Liquidation Trust, shall file with the Bankruptcy Court any and all quarterly reports when they become due in the form and manner prescribed by U.S. Trustee. Each and every one of the Debtors, the Post-Effective Date Debtors, or the Liquidation Trust shall remain obligated to pay Quarterly Fees to the U.S. Trustee until the earliest of the Debtors' cases being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. Notwithstanding anything in the Plan to the contrary, the U.S. Trustee shall not be required to file any proof of claim for quarterly fees and any interest thereon.

**E.**     *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree (whether before or after the Effective Date) to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III:**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

**A.**     *Summary of Classification of Claims and Interests*

All Claims and Interests, except for Administrative Expense Claims, including Professional Fee Claims, Quarterly Fees and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests pursuant to the Plan is as set forth below. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.B. The Plan shall constitute a separate Plan for each of the Debtors, provided that, the estates of the various Debtors shall be consolidated for the purpose of effectuating distributions under the Plan. For all purposes under the Plan, where applicable, each Class contains a sub-Class for each Debtor. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.C. Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.  Only Debtor Silvergate Capital Corporation has any voting classes.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim / Interest | Status | Voting Rights |
|-------|-----------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Subordinated Note Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 5 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| 7 | Preferred Stock Interests | Impaired | Entitled to Vote |
| 8 | Common Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Bhatia Litigation Class Claim | Unimpaired | Note Entitled to Vote (Deemed to Accept) |

**B.    *Treatment of Claims and Interests***

    1.    Class 1 – Other Priority Claims

        a.    *Classification*: Class 1 consists of all Other Priority Claims against the Debtors.

        a.    *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive on account thereof payment of the full amount of such Allowed Other

Priority Claim in Cash or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code, except to the extent the Holder of an Allowed Other Priority Claim agrees to less favorable treatment.

b.   *Voting*: Class 1 is Unimpaired, and Holders of Other Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Secured Claims are not entitled to vote to accept or reject the Plan.

2.   Class 2 – Secured Claims

a.   *Classification*: Class 2 consists of all Secured Claims against the Debtors.

b.   *Treatment*:  Each Holder of an Allowed Secured Claim shall receive on account of such Claim at the Liquidation Trustee's exclusive election, except to the extent that any Holder of an Allowed Secured Claim agrees to less favorable treatment therefor, either: (i) Cash equal to the amount of such Allowed Secured Claim, including Post-Petition Interest at the Federal Judgment Rate; (ii) the property that serves as security for such Allowed Secured Claim; or (iii) such other treatment that shall render such Allowed Secured Claims Unimpaired pursuant to section 1124 of the Bankruptcy Code (which may include reinstatement). Any portion of any Secured Claim that is not secured by collateral or the proceeds thereof shall constitute a General Unsecured Claim to the extent it is allowed.

c.   *Voting*: Class 2 is Unimpaired, and Holders of Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Secured Claims are not entitled to vote to accept or reject the Plan.

3.   Class 3 – General Unsecured Claims

a.   *Classification*: Class 3 consists of all General Unsecured Claims against the Debtors.

b.   *Treatment*: Each Holder of an Allowed General Unsecured Claim shall receive on account of such Claim at the Liquidation Trustee's exclusive election, except to the extent that any Holder of an Allowed General Unsecured Claim agrees to less favorable treatment therefor, either: (i) Cash equal to the amount of such Allowed General Unsecured Claim, including Post-Petition Interest at the Federal Judgment Rate; or (ii) such other treatment that shall render such Allowed General Unsecured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

c.   *Voting*: Class 3 is Unimpaired, and Holders of General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section

22

1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

4.    Class 4 – Subordinated Note Claims

a.    *Classification*: Class 4 consists of all Subordinated Notes Claims.

b.    *Allowance*: Subordinated Notes Claims shall be Allowed in the aggregate outstanding principal amount of $15,980,000, *plus* accrued and unpaid interest to an including the Effective Date at the non-default Contract Rate.

c.    *Treatment*: Each Holder of an Allowed Subordinated Notes Claim shall receive on account of such Claim at the Liquidation Trustee's exclusive election, except to the extent that any Holder of an Allowed Subordinated Notes Claim agrees to less favorable treatment therefor, either: (i) Cash equal to the amount of such Allowed Subordinated Notes Claim; or (ii) such other treatment that shall render such Allowed Subordinated Notes Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

d.    *Voting*: Class 4 is Unimpaired, and Holders of Subordinated Notes Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 4 Subordinated Notes Claims are not entitled to vote to accept or reject the Plan.

5.    Class 5 – Intercompany Claims

a.    *Classification*: Class 5 consists of all Intercompany Claims.

b.    *Treatment*: Each Intercompany Claim shall be, at the option of the Debtors, reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Claim, or such other treatment as is reasonably determined by the Debtors.

c.    *Voting*: Holders of Claims in Class 5 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.    Class 6 – Intercompany Interests

a.    *Classification*: Class 6 consists of all Intercompany Interests.

b.    *Treatment*: Each Intercompany Interest shall be, at the option of the Debtors, reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Interest, or such other treatment as is reasonably determined by the Debtors.

    c.    *Voting*: Holders of Interests in Class 6 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.    <u>Class 7 – Preferred Stock Interests</u>

    a.    *Classification*: Class 7 consists of all Preferred Stock Interests in Silvergate Capital Corporation.

    b.    *Treatment*: Except to the extent that a holder of an Allowed Preferred Stock Interest agrees to less favorable treatment, in full and final satisfaction, settlement, and release of, and in exchange for its Allowed Preferred Stock Interest each such holder thereof shall receive on the Effective Date (a) such holder's Pro Rata share of Liquidation Trust Beneficial Interests and (b) such holder's Pro Rata share of the Preferred Stock Initial Distributable Amount.

    c.    *Voting*: Class 7 is Impaired. Holders of Allowed Preferred Stock Interests are entitled to vote to accept or reject the Plan.

8.    <u>Class 8 – Common Stock Interests</u>

    a.    *Classification*: Class 8 consists of all Common Stock Interests in the Debtors.

    b.    *Treatment*: On the Effective Date, all Allowed Common Stock Interests shall be extinguished, cancelled, and released and not entitled to Distribution or any recovery under the Plan.

    a.    *Voting*: Class 8 is Impaired, and holders of Allowed Common Stock Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Common Stock Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Common Stock Interests.

9.    <u>Class 9 – Section 510(b) Claims</u>

    a.    *Classification*: Class 9 consists of all Section 510(b) Claims against the Debtors.

    b.    *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

    c.    *Treatment*: On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be extinguished, cancelled, and released and not entitled to Distribution or any recovery under the Plan.

    d.    *Voting*: Class 9 is Impaired, and holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders (if any) of Allowed Section 510(b) Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders (if any) will not be solicited with respect to such Allowed Section 510(b) Claims.

10.    <u>Class 10 – Bhatia Litigation Class Claim</u>

    a.    *Classification*: Class 10 consists of the Bhatia Litigation Class Claim against the Debtors.

    b.    *Allowance*: Upon entry of the Bhatia Litigation Final Approval Order, and without the filing of a proof of claim, the Bhatia Litigation Class Claim shall be Allowed as a single class Claim in the amount of the Settlement Fund.

    c.    *Treatment*: Upon entry of the Bhatia Litigation Final Approval Order, the Bhatia Litigation Class Claim shall be entitled to receive the Settlement Fund, to be paid by the Debtors and distributed in accordance with the Bhatia Litigation Final Approval Order in full and complete settlement and satisfaction of the Bhatia Litigation Class Claim.

The Debtors understand that Bhatia Litigation Class Members may be provided with the option to opt-out of the Bhatia Litigation Settlement. Any Claims of putative Bhatia Litigation Class Members that opt-out of the Bhatia Litigation Settlement be treated as General Unsecured Claims and shall receive the treatment provided in the Plan to General Unsecured Claims if such Claims become Allowed.

    d.    *Voting*: Class 10 is Unimpaired, and holders of Bhatia Litigation Claim are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 10 Claims are not entitled to vote to accept or reject the Plan.

**C.**    ***Elimination of Vacant Classes***

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

25

D.      *Separate Classification of Secured Claims*

Each Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under this Plan.

E.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

F.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV:
## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS

A.      *Classes Entitled to Vote*

Holders of Preferred Stock Interests (Class 7) are entitled to vote on the Plan. Any Holder of an Interest that has been objected to may file a motion pursuant to Bankruptcy Rule 3018 for an order temporarily allowing such Interest solely for purposes of voting to accept or reject the Plan in accordance with the procedures to be set forth in the order approving the Disclosure Statement, including any deadlines set forth therein. Class 1, Class 2, Class 4, Class 5, and Class 6 are deemed to have accepted the Plan.

The Debtors have requested that the Bankruptcy Court adopt a presumption that if no Holder of a Claim or Interest in a Class of Claims or Interests eligible to vote in a particular Class timely submits a timely Ballot to accept or reject the Plan, then the applicable Class will be deemed to have accepted the Plan. Accordingly, if any Holder of a Claim or Interest in Class 7 does not wish such a presumption to apply with respect to any Class for which such Holder holds a Claim, then the Holder should timely submit a Ballot accepting or rejecting the Plan for any such Class.

B.      *Class Acceptance Requirement*

Class 7 shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount in such Class that have voted on the Plan.

C.      *Cramdown and No Unfair Discrimination*

In the event that any impaired Class of Claims or Interests rejects the Plan or is deemed to have rejected the Plan, the Debtors hereby request, without any delay in the occurrence of the Confirmation Hearing or Effective Date, that the Bankruptcy Court confirm the Plan in accordance

with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief.

## ARTICLE V:
## MEANS FOR IMPLEMENTATION

**A.    *Consolidation for Distribution Purposes Only***

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors' Chapter 11 Cases for the limited purpose of making Distributions. For all other purposes, this Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor in all respects other than for Distributions. Upon the entry of the Confirmation Order, the claims register maintained in the various Chapter 11 Cases shall be deemed consolidated into a single claims register in respect of the consolidated Estate. Further, Claims asserted against multiple Debtors, including Claims based on joint and several liability and guarantee and/or surety Claims shall be deemed to constitute a single Claim against the consolidated Estate. Notwithstanding the substantive consolidation for the limited purpose of making Distributions contemplated herein, on and after the Effective Date the Debtors will each continue as separate post-effective date entities after emergence from the Chapter 11 Cases.

**B.    *Sources of Consideration for Distributions***

Cash payments or cash distributions to be made hereunder on the Effective Date shall be funded from the existing cash of the Debtor.  All other assets of the Debtors and property of the Debtors' estates shall constitute Liquidation Trust Assets and shall vest in the Liquidation Trust on the Effective Date.

**C.    *Establishing Disputed Claims Reserve and Indemnification Reserve***

On the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall make all distributions to holders of Allowed Claims and Interests and transfer the Liquidation Trust Assets to the Liquidation Trust.  In order to effectuate the terms of this Plan and to avoid undue delay in the administration of the Chapter 11 Cases, unless otherwise agreed to by the Required Preferred Stockholders, the Debtors shall have sought and obtained estimation of all Claims, including any Indemnification Claims (other than Allowed Claims and Section 510(b) Claims (which, in the case of Section 510(b) Claims, shall not receive any recovery under the Plan)) timely filed against the Debtors that are contingent and/or unliquidated or asserted in amounts in excess of $500,000, which estimated amount of such Claim, as determined by the Bankruptcy Court, shall serve as either the Allowed amount of the applicable Claim or a cap on any recovery by the holders of such estimated Claims (the "**Estimated Amount**").    The Estimated Amount of the Indemnification Claims shall serve as the amount required to be set aside for the Indemnification Reserve unless otherwise agreed to amongst the applicable indemnitees, the Debtors and the Required Preferred Stockholders.  All other Estimated Amounts shall be set aside for purposes of the Disputed Claims Reserve.

**D.**    *Dissolution and Board of Directors*

On the Effective Date, the Liquidation Trustee shall be appointed for the purpose of conducting carrying out the provisions of the Plan and winding down the Post-Effective Date Debtors. The Debtors shall be authorized to be (and, upon the conclusion of their affairs shall be) dissolved by the Liquidation Trustee. The Liquidation Trustee shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors, members or managers, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, articles of incorporation or amendment by-laws, and related documents, as applicable, are deemed amended pursuant to the Plan to permit and authorize the same). From and after the Effective Date, the Liquidation Trustee shall be the sole representative of and shall act for the Post-Effective Date Debtors and the Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Liquidation Trustee of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Liquidation Trust shall be deemed to be dissolved without any further action by the Liquidation Trustee, including the filing of any documents with the secretary of state for the state in which the Debtors are incorporated or formed or any other jurisdiction. Notwithstanding the foregoing, the Liquidation Trustee shall retain the authority to take all necessary actions to dissolve the Debtors in, and withdraw the Debtors from, applicable states and provinces to the extent required by applicable law.

**E.**    *Exemption from Registration*

The Debtors believe that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws ("Blue Sky Laws") exempt from federal and state securities registration requirements (i) the offering, issuance, exchange, distribution or sale of securities (to the extent Liquidation Trust Beneficial Interests are considered "securities" under applicable law) pursuant to the Plan and (ii) subsequent transfers of such securities.

The Liquidation Trust Beneficial Interests to be distributed to the Liquidation Trust Beneficiaries pursuant to this Plan shall be transferrable as set forth in the Liquidation Trust Agreement. The Liquidation Trust Beneficial Interests shall not be listed on any national exchange and shall have the consent and voting rights provided in the Liquidation Trust Agreement. The Liquidation Trust shall not take any steps to facilitate the development of a trading market in the Liquidation Trust Beneficial Interests.

1.    *Section 1145.* Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code or otherwise issued in reliance on section 4(a)(2) of the Securities Act ("Section 4(a)(2)") as elected by the Debtor, the issuance of the Liquidation Trust Beneficial Interests to Liquidation Trust Beneficiaries under the Plan (to the extent the Liquidation Trust Beneficial Interests are considered "securities" under applicable law) shall be exempt from registration under section 5 of the Securities Act (and any applicable Blue Sky Laws) under section 1145(a)(1) of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of securities under a chapter 11 plan from registration under section 5 of the Securities Act and state or local securities laws if the following three principal requirements are satisfied: (a) the securities must be offered and sold under a chapter 11 plan must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

To the extent the issuance and distribution of the Liquidation Trust Beneficial Interests are made under the requirements of section 1145 of the Bankruptcy Code (and, to the extent such Liquidation Trust Beneficial Interests are deemed securities under applicable law), such issuance and distribution are exempt from registration under the Securities Act and any state or local law requiring registration. The availability of the exemptions under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan. To the extent section 1145 of the Bankruptcy Code is applicable, the securities to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) in general are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act. In addition, securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance. Notwithstanding the foregoing, any securities or instruments issued under the Plan in reliance on section 1145(a) of the Bankruptcy Code remain subject to: (x) compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions in the Liquidation Trust Agreement on the transferability of the Liquidation Trust Beneficial Interests and (z) any other applicable regulatory approval.

2.      *Section 4(a)(2).*  To the extent securities are issued pursuant to the Plan in reliance on Section 4(a)(2), the offering, issuance, exchange, or distribution of such securities pursuant to the Plan shall be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act. Section 4(a)(2) exempts from section 5's registration requirements transactions not involving a public offering, and Regulation D under the Securities Act ("Regulation D") provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" within the meaning of Rule 501 under Regulation D ("Accredited Investors"). Such offering, issuance, exchange or distribution shall be structured to be available only to Holders who certify that they are Accredited Investors and who submit documentation allowing verification of their status as Accredited Investors. Any such securities shall be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and shall only be transferable if

registered under the Securities Act or if transferred pursuant to an exemption from the registration requirements of the Securities Act and other applicable securities laws.

3.      *DTC. S*hould the Liquidation Trust elect on or after the Effective Date to reflect any ownership of the Liquidation Trust Beneficial Interests through the facilities of DTC, it need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of transfers, exercise, removal of restrictions, or conversion of the Liquidation Trust Beneficial Interests under applicable U.S. federal, state or local securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Liquidation Trust Beneficial Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Liquidation Trust Beneficial Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

## F.      *Deemed Holders of Subordinated Note Claims*

The SC Trust I Declaration of Trust provides that SC Trust I will automatically terminate upon the bankruptcy of Silvergate Capital Corporation. [7] Upon such termination of SC Trust I, the terms of the SC Trust I Preferred Securities require the administrative trustee of the trust to distribute to holders of the SC Trust I Preferred Securities the SC Trust I Subordinated Debentures having a principal amount equal to the liquidation amount per security plus accumulated and unpaid distributions thereon to the date of payment, after satisfaction of liabilities to creditors of SC Trust I as provided by applicable law. [8] For purposes of this Plan, holders of the SC Trust I Preferred Securities shall be deemed to hold the SC Trust I Subordinated Debentures and thus such holders shall be deemed to hold the SC Trust I Claims.

The SC Trust II Declaration of Trust provides that SC Trust II will dissolve upon the bankruptcy of Silvergate Capital Corporation.[9] Upon such dissolution of SC Trust II, the terms of the SC Trust II Capital Securities require the institutional trustee of the trust to distribute to holders of the SC Trust II Capital Securities the SC Trust II Subordinated Debentures on a pro rata basis, after satisfaction of liabilities to creditors of SC Trust II as provided by applicable law.[10] For purposes of this Plan, holders of the SC Trust II Capital Securities shall be deemed to hold the SC Trust II Subordinated Debentures and thus such holders shall be deemed to hold the SC Trust II Claims.

---

[7] *See* Section 7.1(a)(ii) of the SC Trust I Declaration of Trust.

[8] *See* Annex I, Section 3 of the SC Trust I Declaration of Trust.

[9] *See* Section 7.1(a)(ii) of the SC Trust II Declaration of Trust.

[10] *See* Annex I, Section 3 of the SC Trust II Declaration of Trust.

**G.**     *Preservation of Insurance*

Nothing in the Plan or the Confirmation Order alters the rights and obligations of the Debtors (and their Estate), the beneficiaries of the Insurance Policies (including the Directors and Officers), or the Debtors' insurers (and third-party claims administrators), under the Insurance Policies or modifies the coverage or benefits provided thereunder, or the terms and conditions thereof, or diminishes or impairs the enforceability of the Insurance Policies. The Debtors shall be deemed to have assumed all Insurance Policies. All of the Debtors' rights and their Estates' rights under any Insurance Policies to which the Debtors and/or the Debtors' Estates may be beneficiaries shall vest with the Post-Effective Date Debtors for the benefit of the Post-Effective Date Debtors and all of the beneficiaries of such policies, including the Directors and Officers and any Holder entitled to recover from such policies pursuant to the Plan.  Notwithstanding the foregoing, the Debtors' rights to any recoveries from any of the Insurance Policies and the proceeds thereof, shall be deemed Liquidation Trust Assets and shall be distributed directly to the Liquidation Trust for distribution to the Liquidation Trust Beneficiaries.

Nothing in this Plan or Confirmation Order shall (a) constitute a finding or stipulation that any proceeds of any of the D&O Liability Insurance Policies are property of the Estate; (b) modify or supersede any provision (including but not limited to any priority of payments provision) of any of the D&O Liability Insurance Policies, or (c) otherwise preclude any party entitled to coverage under the D&O Liability Insurance Policies, from seeking and obtaining coverage thereunder.

**H.**     *Indemnification Obligations*

Subject to the provisions of this Article V.G any obligations of the Debtors pursuant to their corporate charters and bylaws or agreements, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse or limit the liability of any Person pursuant to the Debtors' certificates of incorporation, bylaws, policy of providing employee indemnification, applicable state law or specific agreement in respect of any claims, demands, suits, causes of action or proceedings against such Persons based upon any act or omission related to such Persons' service with, for or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtors (the "Indemnification Claims") shall survive confirmation of the Plan provided that the Indemnification Obligations shall be deemed amended in all respects to provide that any rights with respect to any Indemnification Obligations shall be limited for all purposes, whether such obligations arose prepetition, postpetition or post-Effective Date, to recovery solely from (i) available insurance coverage and (ii) solely with respect to Indemnification Claims that are not Section 510(b) Claims, to the extent of the available Indemnification Reserve. For the avoidance of doubt, all monetary obligations of any kind or nature whatsoever under Article V.H of the Plan shall be limited solely to (i) available insurance coverage and (ii), solely with respect to Indemnification Claims that are not Section 510(b) Claims, the Indemnification Reserve, and neither the Post-Effective Date Debtors, the Liquidation Trustee, nor any of their respective assets shall be liable for any such obligations in any manner whatsoever in excess of the Indemnification Reserve.  Upon satisfaction of all Indemnification Claims from the Indemnification Reserve, all remaining Cash in the Indemnification Reserve shall vest in the Liquidating Trust and the Liquidating Trustee shall be authorized to distribute such funds to the holders of the Liquidation Trust Beneficial Interests in accordance with the Plan and the Liquidation Trust Agreement.

I.      *Cancellation of Existing Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan, the obligations of the Debtors under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest or equity in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be canceled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder.

J.      *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any Securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property or transfer of beneficial ownership of property pursuant to the Plan or the Plan Supplement, (iv) any assumption, assignment, or sale by the Debtors of their interests in Executory Contracts pursuant to section 365(a) of the Bankruptcy Code, and (v) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

## ARTICLE VI:
## LIQUIDATION TRUST

A.      *Liquidation Trust Agreement*

On or prior to the Effective Date, the Liquidation Trust will be established pursuant to the Liquidation Trust Agreement. The Liquidation Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidation Trust as a "liquidating trust" for United States federal income tax purposes.

B.      *Purpose of the Liquidation Trust*

The Liquidation Trust shall be established for the sole purpose of liquidating and distributing the Liquidation Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. The Liquidation Trust shall be deemed a successor-in-interest of the Debtors to the maximum extent necessary for the Liquidation Trust to execute its purpose, and shall not

otherwise be deemed a successor-in-interest to the Debtors for any purpose other than as specifically set forth in the Plan or in the Liquidation Trust Agreement.

The Liquidation Trust shall be established in accordance with the Liquidation Trust Agreement to administer post-Effective Date responsibilities of the Debtors, including, but not limited to, (a) being vested with and liquidating the Liquidation Trust Assets, (b) making Distributions to holders of Allowed Claims and Allowed Preferred Stock Interests in accordance with the terms of this Plan and the Liquidation Trust Agreement, (c) resolving all Disputed Claims and effectuating the Claims reconciliation process pursuant to the procedures prescribed in this Plan, (d) prosecuting, settling, and resolving Causes of Action that are Liquidation Trust Assets, (e) recovering, through enforcement, resolution, settlement, collection, or otherwise, assets on behalf of the Liquidation Trust (which such assets shall become part of the Liquidation Trust Assets), (f) taking any steps to dissolve, liquidate, bankrupt or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor, and (g) performing all actions and executing all agreements, instruments and other documents necessary to effectuate the purpose of the Liquidation Trust.

Notwithstanding anything to the contrary in this Article VI, the Liquidation Trust's primary purpose is liquidating the Liquidation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Liquidation Trust's liquidating purpose and reasonably necessary to conserve and protect the Liquidation Trust Assets and provide for the orderly liquidation thereof. Liquidation Trust Assets held by the Debtors to the Liquidation Trust, and all such assets shall vest in the Liquidation Trust on such date, to be administered by the Liquidation Trustee, in accordance with this Plan and the Liquidation Trust Agreement. The Debtors may take all actions as may be necessary or appropriate to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan.

## C.      *Liquidation Trust Assets*

On the Effective Date, the Liquidation Trust Assets shall be deemed irrevocably transferred to the Liquidation Trust, without further action from the Debtors or any of their respective managers, employees, officers, directors, members, shareholders, agents, advisors, or representatives. The Liquidation Trust Assets shall vest in the Liquidation Trust, free and clear of all Liens, Claims, charges, rights, or other encumbrances subject to and in accordance with the Plan and the Liquidation Trust Agreement. For purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidation Trust Assets to the Liquidation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. Upon delivery of the Liquidation Trust Assets to the Liquidation Trust, the Debtors and its predecessors, successors and assigns, and each other Entity released pursuant to Article IX.C herein shall be discharged and released from all liability with respect to the delivery of such distributions. Upon the transfer of the Liquidation Trust Assets and pursuant to the Liquidation Trust Agreement, the Debtors will have no reversionary or further interest in or with respect to the Liquidation Trust Assets.

**D.**     *Liquidation Trustee*

The Liquidation Trustee shall serve as the initial trustee of the Liquidation Trust. The Liquidation Trustee shall have no duties until the occurrence of the Effective Date, and on and after the Effective Date shall be a fiduciary and representative of each of the Liquidation Trust and the Post-Effective Date Debtors and their Estates. The powers, rights and responsibilities of the Liquidation Trustee shall be as specified in the Liquidation Trust Agreement and the Plan and shall include the authority and responsibility to fulfill the items identified in this Article VI.E of the Plan. Other rights and duties of the Liquidation Trustee and the Liquidation Trust Beneficiaries shall be as set forth in the Liquidation Trust Agreement.

**E.**     *Functions of the Liquidation Trustee*

On and after the Effective Date, the Liquidation Trustee shall carry out the functions set forth in this Article VI.E and may take such actions without further approval by the Bankruptcy Court, in accordance with the Liquidation Trust Agreement. Such functions may include any and all powers and authority to:

1.     take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims and Allowed Interests and to perform the duties assigned to the Liquidation Trustee under the Plan or the Liquidation Trust Agreement;

2.     comply with and effectuate the Plan and the obligations hereunder;

3.     employ, retain, or replace professionals to represent him or her with respect to his or her responsibilities;

4.     wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt, or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor;

5.     take any actions necessary to (i) resolve all matters related to the Liquidation Trust Assets and (ii) vest such assets in the Liquidation Trust;

6.     make Distributions of the Liquidation Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay Liquidation Trust Expenses, in accordance with the terms of this Plan;

7.     prepare and file appropriate tax returns and other reports on behalf of the Debtors and pay taxes or other obligations owed by the Debtors (including, without limitation, any Allowed Administrative Expense Claims and Allowed Priority Tax Claims);

8.     file, prosecute, settle, or dispose of any and all objections to asserted Claims;

9.     enter into and consummate any transactions for the purpose of dissolving the Debtors;

10.     comply with data retention obligation and legal obligations to produce documents in accordance with the DFPI C&D;

11.     take such actions as are necessary or appropriate to close any of the Debtors' Chapter 11 Cases;

12.     maintain the books and records and accounts of the Debtors; and

13.     take any other actions not inconsistent with the provisions hereof that the Liquidation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

## F.     *Preservation of Rights of Action*

Other than Causes of Action against an Entity that are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Debtors reserve any and all Causes of Action. On and after the Effective Date, the Liquidation Trustee shall have sole and exclusive discretion to pursue and dispose of any Causes of Action that are or become Liquidation Trust Assets, and the Liquidation Trustee shall have sole and exclusive discretion to pursue or dispose of any and all other Causes of Action. All Causes of Action that are or become Liquidation Trust Assets shall vest in the Liquidation Trust as provided for herein and the Liquidation Trustee may pursue any Causes of Action that are or become Liquidation Trust Assets in its sole discretion. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, and on and after the Effective Date, the Liquidation Trustee, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date and consummation of the transactions contemplated by the Plan. Prior to the Effective Date, the Debtors (and on and after the Effective Date, the Liquidation Trustee) shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party (except for, on and after the Effective Date, the Liquidation Trustee) or further notice to or action, order, or approval of the Bankruptcy Court.

Any settlement, release or other resolution of any Causes of Action by the Debtors during the Chapter 11 Cases shall be subject to the consent of the Required Preferred Stockholders; *provided*, however, that the Debtors shall be permitted (subject to Bankruptcy Court approval) to agree and implement, after consultation with the Supporting Preferred Stockholders, any settlement or resolution of derivative claims or Causes of Action of the Debtors against the current and former directors, officers and employees of the Debtors that is recommended by Silvergate Capital Corporation's Special Investigation Committee.

**G.**     *Substitution in Pending Legal Actions*

On the Effective Date, the Liquidation Trust shall be deemed to be substituted as the party to any pending litigation, including the Retained Cause of Action, in which the any Debtor is a party and shall be authorized, but not required, to file notices or other pleadings in such actions to effectuate its substitution for such Debtor. Such substitution shall not result in holders of Claims, including litigation Claims, against the Debtors receiving greater rights in or against the Liquidation Trust than they are otherwise entitled to under the Plan and Liquidation Trust Agreement on account of such Claims

**H.**     *Fees and Expenses of the Liquidation Trust.*

From and after the Effective Date, Liquidation Trust Expenses shall be paid from the Liquidation Trust Assets in the ordinary course of business, in accordance with the Plan and the Liquidation Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Liquidation Trustee, on behalf of the Liquidation Trust, may employ and pay in the ordinary course of business, the reasonable fees of any professional (including professionals previously employed by the Debtors) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Liquidation Trustee, are necessary to assist the Liquidation Trustee in the performance of the Liquidation Trustee's duties under the Plan and the Liquidation Trust Agreement.

**I.**     *Data Retention and Production Obligations*

The Liquidation Trustee will comply with the Data Retention and Production Obligations. The Data Retention and Production Reserve will be established on or prior to the Effective Date to ensure the Liquidation Trustee has sufficient resources to comply with the Data Retention and Production Obligations. If, in the reasonable judgment of the Liquidation Trustee, the funds in the Data Retention and Production Reserve exceed the expected cost of complying with the Data Retention and Production Obligations, then the Liquidation Trustee may distribute the amount of such excess in accordance with the terms of the Plan and the Liquidation Trust Agreement to the Liquidation Trust Beneficiaries. If, in the reasonable judgment of the Liquidation Trustee, the funds in the Data Retention and Production Reserve are expected to be insufficient to comply with the Data Retention and Production Obligations, then the Liquidation Trustee may use other Liquidation Trust Assets to pay for such costs. Any funds remaining in the Data Retention and Production Reserve on July 9, 2031, shall be promptly distributed in accordance with the Plan.

**J.**     *Creation and Maintenance of Trust Accounts*

On or prior to the Effective Date, appropriate trust accounts will be established and maintained in one or more federally insured domestic banks in the name of the Liquidation Trust. Cash deposited in the trust accounts will be invested, held and used solely as provided in the Liquidation Trust Agreement. The Liquidation Trustee is authorized to establish additional trust accounts after the Effective Date, consistent with the terms of the Liquidation Trust Agreement. After the initial funding of the trust accounts on or after the Effective Date, the trust accounts will be funded, as applicable, by Cash proceeds obtained through litigation or the disposition of Liquidation Trust Assets. Upon obtaining an order of the Bankruptcy Court authorizing final

Distribution or closure of the Debtors' Chapter 11 Cases, any funds remaining in the trust accounts shall be distributed in accordance with this Plan and the Liquidation Trust Agreement, and the trust accounts may be closed.

**K.**    ***Exculpation and Indemnification of Liquidation Trustee***

The Liquidation Trustee (and its agents and professionals) shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Liquidation Trustee or the Liquidation Trust, except those acts arising out of its or their gross negligence, actual fraud or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. The Liquidation Trustee (and its agents and professionals) shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the Liquidation Trustee or the Liquidation Trust, except for any actions or inactions involving gross negligence, actual fraud or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. Any indemnification claims of the Liquidation Trustee and the other parties entitled to indemnification under this subsection shall be satisfied from the Liquidation Trust Assets, as provided in the Liquidation Trust Agreement. The Liquidation Trustee shall be entitled to rely, in good faith, on the advice of its professionals.

**L.**    ***Insurance***

The Liquidation Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Liquidation Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Liquidation Trustee, which insurance coverage may, at the sole option of the Liquidation Trustee, be extended for a reasonable period after the termination of the Liquidation Trust Agreement.

**M.**    ***Records***

The Liquidation Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors necessary for the disposition of Liquidation Trust Assets, prosecution of the Retained Causes of Action, reconciliation of Disputed Claims and compliance with the Data Retention and Production Obligations.

**N.**    ***Liquidation Trust Tax Matters***

1.    *Tax Treatment; No Successor in Interest.*  The Liquidation Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust described in Treasury Regulation section 301.7701-4(d) and, if applicable, as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section 1.468B-9. For U.S. federal income tax purposes, the transfer of assets by the Debtors to the Liquidation Trust is expected to be treated (a) as a taxable transfer of assets by the Debtors to the holders of Allowed Interests, subject to any liabilities of the Debtors or the Liquidation Trust payable from the proceeds of such assets, followed by the tax-free transfer of such assets (subject to such liabilities) by such holders to the Liquidation Trust in exchange for the Liquidation Trust Beneficial Interests, and (b) to the extent applicable, as a tax-free transfer of assets by the Debtors to one or more Disputed Claims Reserves.

37

2.      *Liquidation Purpose of the Liquidation Trust*. The Liquidation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely Distributions to the Liquidation Trust Beneficiaries, and not unduly prolong the duration of the Liquidation Trust. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or the Liquidation Trust Agreement. The record holders of Liquidation Trust Beneficial Interests shall be recorded and set forth in a register maintained by the Liquidation Trustee expressly for such purpose.

3.      *Cash Investments*. The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets, the proceeds thereof or any income earned by the Liquidation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code. The Liquidation Trustee may expend Liquidation Trust Cash (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Liquidation Trust during liquidation, (b) to pay the respective reasonable administrative expenses of the Liquidation Trust (including, but not limited to, any taxes imposed on the Liquidation Trust) and (c) to satisfy other respective liabilities incurred by the Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement (including, without limitation, the payment of any taxes).

4.      *Liquidation Trust as Grantor Trust*. The Liquidation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust. For all U.S. federal income tax purposes, all parties (including the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such assets by the Debtors to the holders of Allowed Interests, followed by a transfer by such holders to the Liquidation Trust. Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes.

5.      *Tax Reporting and Tax Payments*.

        a.      The Liquidation Trustee shall file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations and in accordance with <u>Article VI.N.5</u> of the Plan. The Liquidation Trustee also shall annually send to each holder of a Liquidation Trust Beneficial Interest a separate statement regarding the receipts and expenditures of the Liquidation Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward

38

the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

b.    As soon as practicable after the Effective Date, the Liquidation Trustee shall make a good faith determination of the fair market value of the Liquidation Trust Assets as of the Effective Date. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the assets of the Liquidation Trust. The Liquidation Trustee may elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment). The Liquidation Trustee shall be the administrator of any such applicable Disputed Claims Reserve within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all tax reporting and withholding required by any such Disputed Claims Reserve.

c.    The Liquidation Trust shall be responsible for payment, out of Liquidation Trust Assets, of any taxes imposed on the Liquidation Trust (including any Disputed Claims Reserve) or the Liquidation Trust Assets. More particularly, any taxes imposed on any Disputed Claims Reserve or its assets will be paid out of the assets of the Disputed Claims Reserve, and netted against any subsequent Distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in any Disputed Claims Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the Disputed Claims Reserve (including any income that may arise upon an actual or constructive Distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of the Disputed Claims Reserve (including those otherwise distributable) may be sold to pay such taxes.

a.    The Liquidation Trustee may request an expedited determination of taxes of the Liquidation Trust, including any Disputed Claims Reserve, and, in the case of the Liquidation Trustee, of the Debtors, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Liquidation Trust or the Debtors for all taxable periods through the dissolution of the Liquidation Trust.

## ARTICLE VII:
## PROVISIONS REGARDING DISTRIBUTIONS

A.    *Distributions Generally*

The Disbursing Agent shall make all Distributions under the Plan to the appropriate holders of Allowed Claims and Interests in accordance with the terms of the Plan.

**B.**    *Distribution Record Date*

Distributions shall only be made to the record holders of Allowed Claims and Interests as of the Confirmation Date (the "Distribution Record Date"). On the Confirmation Date, the Claims Register and Stock Register shall be closed and the Disbursing Agent shall be authorized and entitled to recognize only those Holders of Claims and Interests listed on the Claims Register and Stock Register as of the close of business on the Confirmation Date. Notwithstanding the foregoing, if a Claim or Interest is transferred twenty (20) or fewer days before the Confirmation Date, the Disbursing Agent, at the direction of the Debtors or, after the Effective Date, the Liquidation Trust, shall make distributions to the transferee (rather than the transferor) only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. The Distribution Record Date shall not apply to publicly held securities deposited with DTC and, in connection with any Distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors or the Liquidation Trust, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with Holders of Claims and Interests in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.

**C.**    *Disbursing Agent*

All Distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Post-Effective Date Debtors or Liquidation Trustee shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Liquidation Trustee) with the amounts of Claims and Interests and the identities and addresses of holders of Claims and Interests, in each case, as set forth in the Debtors', or Post-Effective Date Debtors, as applicable, books and records. The Post-Effective Date Debtors or Liquidation Trustee shall cooperate in good faith with the applicable Disbursing Agent (if other than the Liquidation Trustee) to comply with the reporting and withholding requirements outlined in Article VI.S of the Plan.

Notwithstanding any provision in the Plan to the contrary, distributions to the Holders of Subordinated Note Claims shall be made to or at the direction of the respective Indenture Trustees, which shall act as Disbursing Agent (or direct the Disbursing Agent) for distributions to the Holders of Subordinated Note Claims, respectively, in accordance with the Plan and the applicable Indentures.

**D.**    *Rights and Powers of Disbursing Agent*

From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of fraud, gross negligence or willful misconduct of such Disbursing Agent. No

40

holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (b) make all Distributions contemplated hereby; and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**E.**     *Post-Petition Interest*

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Petition Date; *provided*, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the Federal Judgment Rate on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

**F.**     *Delivery of Distributions*

The Disbursing Agent shall make all distributions, allocations, and/or issuances required under the Plan. In the event that any Distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.

**G.**     *Distributions after the Effective Date*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**H.**     *Unclaimed Property*

Undeliverable Distributions shall remain in the possession of the Liquidation Trust until such time as a Distribution becomes deliverable or holder accepts Distribution, or such Distribution reverts back to the Liquidation Trust and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of one hundred and twenty (120) days from the applicable date of Distribution. After such date, all unclaimed property or interest in property shall revert to and vest in Liquidation Trust and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

**I.**      *Time Bar to Cash Payments*

Checks issued by the Disbursing Agent in respect of Allowed Claims and Interests shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall immediately and irrevocably revert to the Liquidation Trust and any Claim or Interest in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for reissuance of any check prior to the expiration of the one hundred and twenty (120) day period from the date of issuance shall be made to the Disbursing Agent by the holder of the Allowed Claim or Interest to whom such check was originally issued.

**J.**      *Manner of Payment under Plan*

Except as otherwise specifically provided in the Plan, at the option of the Liquidation Trustee, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

**K.**      *Satisfaction of Claims*

Except as otherwise specifically provided in the Plan, any Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

**L.**      *Minimum Cash Distributions*

The Disbursing Agent shall not be required to make any Distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided*, that if any Distribution is not made pursuant to this Article VII.M, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.

**M.**      *Setoffs and Recoupments*

The Debtors or the Liquidation Trustee, as applicable, or such Entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim or Interest, and any Distribution to be made on account of such Claim or Interest, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Post-Effective Date Debtors, or the Liquidation Trustee may have against the holder of such Claim or Interest pursuant to the Bankruptcy Code or applicable non-bankruptcy law (other than the released Causes of Action in favor of the Released Parties); *provided*, that neither the failure to do so nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by a Debtor, Post-Effective Date Debtor, the Liquidation Trustee, or its successor of any claims, rights, or Causes of Action that a Debtor, a Post-Effective Date Debtor, the Liquidation Trustee, or its successor or assign may possess against the holder of such Claim (other than the released Causes of Action in favor of the Released Parties).

**N.**     *Claims or Interests Paid by Third Parties*

No distributions under the Plan shall be made on account of an Allowed Claim or Allowed Interest that is payable under one of the Debtor's Insurance Policies until the Holder of such Allowed Claim or Allowed Interest has exhausted all remedies with respect to such Insurance Policy.

Except as otherwise provided in the Plan, payments to Holders of Claims or Interests covered by an Insurance Policy and otherwise payable under the Plan shall be made from the proceeds of such Insurance Policy in accordance with the provisions of any such applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by Insurers.

To the extent a Holder of Claims or Interests receives a payment on account of a Claim or Interest from a party that is not the Debtor, the Liquidation Trust or a Disbursing Agent on account of such Claim or Interest, the Debtors or the Liquidation Trust, as applicable, shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim or Interest by the amount of the third-party payment, and such Claim or Interest shall be disallowed or deemed satisfied, as applicable, to the extent of such third party payment without an objection having to be filed, but subject to the filing of a notice with the Bankruptcy Court and service of such notice on any affected Holder. Any Holder of Claims or Interests that receives full or partial payment on account of such Claim from an Entity that is not the Debtor, the Liquidation Trust or a Disbursing Agent shall provide notice of the date and amount of such payment to the Debtors or, after the Effective Date, the Liquidation Trust within five (5) Business Days of receipt of such payment. Such Creditor shall repay and/or return to the Debtors or, after the Effective Date, the Liquidation Trust any Distribution received on account of the portion of its Claim that was satisfied by such third-party payment within thirty (30) days.

**O.**     *Allocation of Distributions between Principal and Interest*

Except as otherwise required by law (as reasonably determined by the Liquidation Trust), Distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

**P.**     *No Distribution in Excess of Allowed Claim*

Except as provided in Article VII.F of the Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

**Q.**     *Distributions Free and Clear*

Except as provided herein, any distributions under the Plan shall be free and clear of and Liens, Claims, and encumbrances, and no other Entity, including the Debtors, the Post-Effective

Date Debtors, the Liquidation Trust, or the Liquidation Trustee, shall have any interest, legal, beneficial, or otherwise, in Assets transferred pursuant to the Plan.

**R.**      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Liquidation Trustee and the Liquidation Trust shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Liquidation Trustee and the Liquidation Trust shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Liquidation Trustee and the Liquidation Trust reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

## ARTICLE VIII:
## PROCEDURES FOR DISPUTED CLAIMS AND INTERESTS

**A.**      *Objections to Claims*

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may only be interposed and prosecuted by the Liquidation Trustee. Such objections and requests for estimation shall be served and filed on or before the Claims Objection Deadline.

**B.**      *Allowance of Claims*

After the Effective Date, the Liquidation Trust shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim against a Debtor, except with respect to any Claim deemed Allowed under this Plan. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

**C.**      *Resolution of Claims*

Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Liquidation Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Liquidation Trust may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. From and after the Effective Date, the

44

Liquidation Trustee may settle or compromise any Disputed Claim without the approval of the Bankruptcy Court.

**D.      *Adjustment to Claims Register Without Objection***

Any duplicate Claim or Interest, any Claim (Filed or scheduled) or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Liquidation Trustee, as applicable, upon stipulation or any agreement in writing, including email correspondence, between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**E.      *Disallowance of Claims***

All Proofs of Claim must be Filed on or before the applicable Bar Date. If Proofs of Claim are not Filed on or before the applicable Bar Date, except in the case of certain exceptions explicitly set forth in the Bar Date Order, the Holders of the underlying Claims shall, absent further Order of the Bankruptcy Court Allowing such Claims, be barred from asserting such Claims against the Debtors and precluded from voting on the Plan and/or receiving Distributions from the Debtors on account of such Claims in the Chapter 11 Cases.

**F.      *Estimation of Claims***

The Debtors or the Liquidation Trustee may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, or the Liquidation Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

**G.      *Amendments to Proofs of Claim***

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, and unless the Bar Date with respect to a Claim has not passed, a Claim or Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Liquidation Trustee, and any such new or amended Claim or Proof of Claim Filed after the Effective Date shall be deemed Disallowed in full and expunged without any further action or notice to the Bankruptcy Court; *provided that* the filing of an unauthorized amendment shall not affect the underlying Claim or Proof of Claim. Nothing in this paragraph shall remove any claimant's ability to seek leave from the Bankruptcy Court to amend a Claim or Proof of Claim.

**H.** *No Distributions Pending Allowance and Disputed Interest Reserves*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

**I.** *Allowed and Disputed Claims Reserves*

The Liquidation Trustee shall, subject to the conditions set forth in this <u>Article VII.I</u> below, establish a Disputed Claims by withholding 100% of the Distributions to which Holders of such Disputed Claims would be entitled if such Disputed Claims were Allowed Claims or, if applicable, the estimated amount as determined by <u>Article V.C</u> hereof.

**J.** *Distributions After Allowance*

Subject to <u>Article VII.H</u> hereof, after such time as a Disputed Claim or Interest becomes, in whole or in part, an Allowed Claim or Interest, the Liquidation Trustee (or Disbursing Agent) shall distribute to the Holder thereof Distributions, as applicable, if any, to which such Holder is then entitled under the Plan, within thirty (30) days of such Claim or Interest becoming Allowed. Any such Distributions shall be made in accordance with the Plan and the Liquidation Trust Agreement. To the extent such Disputed Claim or Interest is Disallowed, any corresponding reserved amount shall be distributed to other Allowed Claims or Interests as provided for in the Plan and the Liquidation Trust Agreement.

## ARTICLE IX:
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

**A.** *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. In addition, the Plan incorporates all settlements pursuant to Bankruptcy Rule 9019 that are otherwise approved by the Bankruptcy Court.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of and except as set forth in the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidation Trustee may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

**B.**     *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, the Debtors and their Estates, the Post-Effective Date Debtors and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law), the Liquidation Trustee, the Liquidation Trust, and any and all other Entities who may purport to assert any Cause of Action by, through, for, or because of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, in each case, whether prepetition or postpetition (including any derivative Claims asserted or that may be asserted on behalf of the Debtors, their Estates, the Post-Effective Date Debtors or the Liquidation Trust), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the conduct of their business (in each case, whether prepetition or postpetition), the formulation, preparation, dissemination, negotiation of the Plan, the Disclosure Statement, any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (in each case, whether prepetition or postpetition) related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this <u>Article IX.B</u> shall not release (i) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (ii) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases described in this Article IX.B by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article IX.B is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to implementing the Plan; (ii) a good-faith settlement and compromise of the Claims released by the Debtor; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the Debtors' business judgment; and (vii) a bar to any of the Debtors, their respective Estates or the Liquidation Trustee on behalf of the Liquidation Trust, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

C.    *Releases by Holders of Claims and Interests*

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Debtor, Post-Effective Date Debtor, the Liquidation Trustee, the Liquidation Trust and other Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (in each case, whether prepetition or postpetition), including any derivative Claims asserted or that may be asserted on behalf of the Debtors, their Estates, the Post-Effective Date Debtors, the Liquidation Trustee or the Liquidation Trust that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the conduct of their business (in each case, whether prepetition or postpetition), the formulation, preparation, dissemination, or negotiation of the Plan, the Disclosure Statement, any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (in each case, whether prepetition or postpetition) related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this <u>Article IX.C</u> shall not release (i) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (ii) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases described in this Article IX.C by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this <u>Article IX.C</u> is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to implementing the Plan; (ii) a good-faith settlement and compromise of the Claims released by the holders of Claims and Interests; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the Debtors' business judgment; and (vii) a bar to any of the Debtors, their respective Estates or the Liquidation Trustee on behalf of the Liquidation Trust, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

D.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Cause of

Action for any claim related to any act or omission from the Petition Date to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, in whole or in part, the Debtors, the formulation, preparation, dissemination, negotiation, of the Plan, the Disclosure Statement, any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan or the distribution of Cash under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to the fullest extent permitted by law to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon Consummation of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.    *Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR DISTRIBUTIONS REQUIRED TO BE PAID OR DELIVERED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE (1) BEEN RELEASED PURSUANT TO ARTICLE IX.B OR ARTICLE IX.C OR (2) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, THE LIQUIDATION TRUST OR THE RELEASED PARTIES (TO THE EXTENT OF THE RELEASES PROVIDED PURSUANT TO ARTICLE IX.B OR ARTICLE IX.C WITH RESPECT TO THE RELEASED PARTIES), OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE IX.D WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (IV) EXCEPT TO THE EXTENT REQUIRED TO RENDER HOLDERS OF CLASS 5 UNIMPAIRED, ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH

**ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT (WHICH MAY BE A PROOF OF CLAIM) FILED WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH THE TERMS OF THIS PLAN EXPLICITLY PRESERVING SUCH SETOFF.**

F.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Liquidation Trust or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to or discriminate with respect to such a grant against the Liquidation Trust, or another Entity with whom the Liquidation Trust has been associated, solely because the Debtors have been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case), or have not paid a debt that is dischargeable in the Chapter 11 Case.

G.      *Setoffs*

In no event shall any Holder of a Claim be entitled to set off against such Claim any claim, right, or Cause of Action of the Debtors or the Liquidation Trust, as applicable, unless such Holder actually has provided notice of such setoff in writing to the Debtors on or before the Confirmation Date, which notice may be provided in a timely filed Proof of Claim.

**ARTICLE X:**
**EXECUTORY CONTRACTS**

A.      *Rejection of Executory Contracts*

As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (a) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (b) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (c) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (d) is a contract, release, or other agreement or document entered into in connection with the Plan, (e) is an Insurance Policy; or (f) is identified for assumption on the Assumption Schedule included in the Plan Supplement, which schedule shall be in form and substance reasonably acceptable to the Required Preferred Stockholders.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Liquidation Trust has provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Liquidation Trust in accordance with its terms,

except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

**B.**     *Rejection Damages Claims*

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 3 (General Unsecured Claims). Such Claim shall be forever barred and shall not be enforceable against the Debtors, their respective Estates, the Post-Effective Date Debtors or the Liquidation Trust, or their respective properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Claims and Noticing Agent and served upon counsel for the Debtors or Liquidation Trust, as applicable, by the later of (a) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (b) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.**

**C.**     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Amount due under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date (or as soon as reasonably practicable thereafter), subject to the limitation described below, by the Debtors or the Liquidation Trust, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (a) the amount of the Cure Amount, (b) the ability of the Liquidation Trust or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease, or (c) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment (as applicable); *provided*, that the Debtors or the Liquidation Trust (as applicable) may settle any dispute regarding the amount of any Cure Amount without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

**Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

**D.**     *Assignment*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

**E.**     *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is listed in the Assumption Schedule shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

**F.**     *Reservation of Rights*

The Debtors may amend the Assumption Schedule and any cure notice until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (a) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment and/or (b) amend the proposed Cure Amount; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing. The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, or the Liquidation Trust, or their respective affiliates have any liability thereunder.

Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Liquidation Trust, under any executory or non-executory contract or any unexpired or expired lease.

Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Liquidation Trust, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

## ARTICLE XI:
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND THE EFFECTIVE DATE

**A.**     *Conditions to Confirmation of the Plan*

Confirmation of the Plan shall not occur unless and until each of the following conditions has occurred or has been waived pursuant to Article XI.B of the Plan:

1.      The Disclosure Statement Order shall have been entered;

2.      The Plan Supplement and all of the schedules, documents and exhibits contained therein shall have been filed;

3.      The RSA shall not have been terminated and shall be in full force and effect; and

4.      The Disputed Claims Reserve and Indemnification Reserve shall have been set by agreement with the Required Preferred Stockholders or as set forth in Article V.C of the Plan;

**B.**     *Conditions to Occurrence of the Effective Date*

The Effective Date of the Plan shall not occur unless and until each of the following conditions has occurred or has been waived pursuant to Article XI.B of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order, in form and substance materially consistent with the Plan and otherwise reasonably acceptable to the Debtors and the Required Preferred Stockholders, which shall not be stayed pending appeal;

2.      the Professional Fee Escrow Account shall have been established and fully funded as set forth herein;

3.      All Ad Hoc Preferred Stockholder Group expenses invoiced in accordance with Article II.C shall have been paid in full in Cash;

4.      the Debtors shall have established such reserves for Allowed and Disputed Claims as required pursuant to Article V.C. and Article VIII.I of the Plan;

5.      all documents, agreements and other instruments which are exhibits to the Plan or included in any Plan Supplement shall be acceptable to the Debtors and the Required Preferred Stockholders and shall have been executed and delivered by the parties thereto;

6.      all actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been effected or executed;

7.    all appropriate notices shall have been given and all other appropriate actions shall have been taken to preserve all applicable Insurance Policies, including any "tail policy," notices required to be provided.

## C.    *Waiver of Conditions to Confirmation and Effective Date*

The conditions to the Effective Date set forth in Article XI.A of the Plan may be waived by the Debtors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided*, that the Debtors may not waive the condition set forth in Article XI.A., other than Article XI.2, without the consent of the Required Preferred Stockholders (e-mail of counsel being sufficient).

## D.    *Effect of Failure of Conditions to the Effective Date*

In the event the conditions specified in Article XI.A and B of the Plan have not been satisfied or waived in accordance with Article XI.C of the Plan, and upon notification submitted by the Debtors to the Bankruptcy Court (a) the Confirmation Order shall be vacated; (b) no Distributions shall be made; (c) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all of the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any proceedings further involving the Debtors. Neither the Disclosure Statement, any statement contained in the Disclosure Statement nor the Plan may be used in these Chapter 11 Cases, or in any action, other than in connection with confirmation of the Plan. In the event that the Plan is not confirmed, or is confirmed but does not become effective, the Disclosure Statement, any statements contained in the Disclosure Statement and the Plan shall have no force or effect, and neither the Disclosure Statement, any statements contained in the Disclosure Statement nor the Plan shall be admissible in any court or legal forum for any purpose whatsoever.

## ARTICLE XII:
## MODIFICATION OF THE PLAN

## A.    *Plan Modifications*

Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors may alter, amend or modify the Plan with the consent of the Required Preferred Stockholders, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date. After the Confirmation Date and before substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

After the Confirmation Date, but before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan with the consent, not to be unreasonably withheld, of the Required Preferred Stockholders, including the Plan Supplement, without further order or approval of the Bankruptcy Court; *provided*, that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code.

**B.**      *Effect of Confirmation on Modification*

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## ARTICLE XIII:
## EFFECT OF CONFIRMATION

**A.**      *Deemed Consent*

By voting to accept the Plan or forbearing from opting out of the releases set forth in the Plan, each Holder of a Claim will be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the exculpations, releases and injunctions set forth in the Plan; provided that this Article XIII.A. shall not limit or impact the enforceability of any exculpation, release, or injunction provisions of the Plan in accordance with their terms.

**B.**      *No Waiver*

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, CONFIRMATION OF THE PLAN SHALL NOT RELEASE, NOR BE DEEMED TO RELEASE, ANY CLAIM OR CAUSE OF ACTION THAT ANY DEBTOR MAY HOLD AGAINST ANY PERSON OR ENTITY (INCLUDING ANY RELEASED PARTY) RELATED TO, ARISING UNDER, OR IN ANY WAY WITH RESPECT TO ANY OF THE RETAINED CAUSES OF ACTION.**

**C.**      *Disallowed Claims and Disallowed Interests*

On and after the Effective Date, Post-Effective Date Debtors and the Liquidation Trust shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a Disallowed Interest. The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims against and Interests in the Debtors to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims against the Debtors for penalties, punitive damages or any other damages not constituting compensatory damages.

**ARTICLE XIV:**
**RETENTION OF JURISDICTION**

On and after the Effective Date, the Bankruptcy Court shall retain and have jurisdiction over all matters arising in, arising under, or related to the Chapter 11 Cases, or that relate to any of the following:

1.      To Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or Allowance of Claims or Interests.

2.      To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

3.      To hear and determine all applications for the payment of Professional Fee Claims.

4.      To resolve any matters related to (i) the assumption, assumption and assignment or rejection of any Executory Contract to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or any other matter related to such Executory Contract; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or unexpired.

5.      To adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims.

6.      To hear and determine any dispute or reconcile any inconsistency arising in connection with the Plan, including any Plan Supplement, or the Confirmation Order or the interpretation, implementation or enforcement of the Plan, any Plan Supplement, the Confirmation Order, any transaction or payment contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing.

7.      To hear and determine any matter concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

8.      To adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code.

9.      To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

10.     To hear and determine any rights, Claims or Causes of Action, including without limitation Claims or Causes of Action identified on the Schedule of Retained Causes of Action,

56

held by, transferred to or accruing to the Liquidation Trust pursuant to the Bankruptcy Code, including any settlement or compromise thereof.

11.     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof) with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court.

12.     To take any action, and issue such orders as may be necessary or appropriate, to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation.

13.     To resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

14.     To ensure that all Distributions are accomplished as provided herein.

15.     To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim.

16.     To enter, implement or enforce such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated.

17.     To enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code.

18.     To recover all Assets of the Estates, wherever located.

19.     To hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code.

20.     To determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code.

21.     To enter a Final Decree closing the Chapter 11 Cases.

22.     To determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date.

23.     To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Plan and these Chapter 11 Cases.

24.     To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, any Plan Supplement or any other contract, instrument, release or other agreement or document related to the Plan or the Disclosure Statement.

25.     To adjudicate any adversary proceedings pending before the Bankruptcy Court on or after the Petition Date or any other disputes relating to any Retained Cause of Action that the Post-Effective Date Debtors may bring thereafter.

26.     To hear and determine any dispute or suit regarding setoff or recoupment.

27.     Adjudicate all other matters over which the Bankruptcy Court has jurisdiction.

### ARTICLE XV:
### MISCELLANEOUS PROVISIONS

**A.**     *Payment of Statutory Fees*

All Quarterly Fees due and payable prior to the Effective Date shall be paid by the Debtors, in full, in Cash, on or before the Effective Date. All Quarterly Fees that arise after the Effective Date (including, without limitation, in connection with funding the Professional Fee Escrow Account) shall be paid by the Estates or the Post-Effective Date Debtors in full, in Cash when due and payable.

**B.**     *Notices*

Any notices, requests, and demands to or upon the Debtors or the Post-Effective Date Debtors, to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered to the following:

Silvergate Capital Corporation
4225 Executive Square, Suite 600,
La Jolla, CA 92037
Attn:  Paris Cribben

-and-

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn:    Paul N. Heath
   Michael J. Merchant
   David T. Queroli
   Emily R. Mathews
   heath@rlf.com
   merchant@rlf.com
   queroli@rlf.com
   mathews@rlf.com

-and-

Cravath, Swaine & Moore LLP
375 Ninth Avenue
New York, NY 10001
Attn:    George E. Zobitz
   Paul H. Zumbro
   Alexander Gerten
   jzobitz@cravath.com
   pzumbro@cravath.com
   agerten@cravath.com

**C.**    *Headings*

The headings and other captions used in the Plan are for reference purposes only, and shall not affect the meaning or interpretation of the Plan in any way.

**D.**    *Governing Law*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a document in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**E.**    *Notice of Entry of Confirmation Order and Relevant Dates*

Promptly upon entry of the Confirmation Order, the Debtors shall file on the docket and serve upon parties who have entered their appearance a notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan.

**F.**    *Revocation, Withdrawal or Non-Consummation of Plan*

If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors, or if confirmation or consummation of the Plan does not occur as to any Debtor, then, as to such Debtor, (a) the Plan shall be null and void in all respects and (b) any settlements and compromises embodied in the Plan, and any document or agreement executed pursuant the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained in the Plan and no acts taken in preparation for consummation of the Plan shall (i) constitute or be deemed to constitute a waiver or release of any Claims against or Interests in such Debtor or any other Person, (ii) prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor or (iii) constitute or be deemed to constitute an admission of any sort by the Debtors or any other Person. None of the filing of the Plan, the taking by the Debtors or other party in interest of any action with respect to the Plan or any statement or provision contained herein shall be or be deemed to be an admission by the Debtors or other party in interest against interest, or be or be deemed to be a waiver of any rights, Claims or remedies that the Debtors or other party in interest may have, and until the Effective Date all such rights and remedies are and shall be specifically reserved. In the event the Plan is not confirmed and the Confirmation Order is not entered, the Plan and any Plan Supplement, and any statement contained herein or therein, may not be used by any Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof) against the Debtors and other parties in interest. The Debtors shall consult with the Required Preferred Stockholders with respect to the revocation or withdrawal of the Plan with respect to any one or more of the Debtors.

## G.  *Binding Effect*

The Plan shall be binding upon and inure to the benefit of the Debtors and the Post-Effective Date Debtors and the Holders of all Claims and Interests and their respective successors and assigns.

## H.  *Severability of Plan Provisions*

If, prior to the Effective Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors in with the consent, not to be unreasonably withheld, of the Required Preferred Stockholders, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## I.  *No Admissions*

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTION, THE PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

## J.  *Time*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 as in effect on the Petition Date shall apply. With regard to all dates and the periods of time set forth or referred to in the Plan, time is of the essence.

## K.  *Successors and Assigns*

The rights, benefits and obligations of any Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof) named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof).

**L.**   ***Conflict between Plan, Disclosure Statement and Plan Documents***

In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Disclosure Statement, or any Plan Supplement, the terms and provisions of the Plan shall control and govern.

**M.**   ***Substantial Consummation***

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**N.**   ***Plan Exhibits***

Any and all exhibits to the Plan or other lists or schedules not filed with the Plan shall be filed with the Clerk of the Bankruptcy Court at least seven (7) Business Days prior to the Plan Objection Deadline, unless the Plan provides otherwise. Upon such filing, such documents may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of any such document upon written request to the Debtors or online at https://cases.stretto.com/silvergate. The Debtors explicitly reserve the right to, in the exercise of its sole and absolute discretion, modify or make additions to or subtractions from any schedule to the Plan and to modify any exhibit to the Plan prior to the Plan Objection Deadline.

[Signature on following page.]

Respectfully Submitted, as of September 17, 2024

Silvergate Capital Corporation
on behalf of itself and each Debtor

By:   _____

       Name:
       Title:

**Exhibit B**

**Case Budget**

**Alix**Partners

# Silvergate

Cash Flow Forecast Update

**September 17, 2024**

# Cash Flow Forecast Overview

## Key assumptions

- The forecast assumes a Chapter 11 filing date of 9/17/2024 and an illustrative Chapter 11 emergence date of 12/15/2024
- Operating disbursements are driven by the company's analysis of vendor spend by month
- The forecast does not include any asset sale proceeds or litigation recoveries
- Legal fees for ongoing litigation / investigations are a significant component of the operating disbursement forecast and reflect the Company's current legal fee estimates

## Significant risks to the forecast include

- The actual costs associated with the bankruptcy filing
- Legal fees for on-going litigation and litigation exposure
- Extended duration of bankruptcy case, litigation or regulatory matters

# Silvergate Consolidated Weekly Cash Flow Forecast

## For the 13-week period 9/22 through 12/15

13 Week Cash Flow Forecast
($USD in 000s)

| | Petition* | Postpetition | | | | | | | | | | | | |
| Week Number<br>Week Ending | Forecast<br>1<br>09/22/24 | Forecast<br>2<br>09/29/24 | Forecast<br>3<br>10/06/24 | Forecast<br>4<br>10/13/24 | Forecast<br>5<br>10/20/24 | Forecast<br>6<br>10/27/24 | Forecast<br>7<br>11/03/24 | Forecast<br>8<br>11/10/24 | Forecast<br>9<br>11/17/24 | Forecast<br>10<br>11/24/24 | Forecast<br>11<br>12/01/24 | Forecast<br>12<br>12/08/24 | Forecast<br>13<br>12/15/24 | Forecast<br>13 Weeks<br>Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Interest Income | $    - | $    - | $    524 | $    - | $    - | $    - | $    391 | $    - | $    - | $    - | $    386 | $    - | $    - | $    1,301 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Receipts | - | - | 524 | - | - | - | 391 | - | - | - | 386 | - | - | 1,301 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Salaries & Benefits | - | (60) | - | (120) | - | (120) | - | (120) | - | (120) | - | (120) | - | (662) |
| Occupancy & FFE | - | (1) | - | - | - | - | - | (1) | - | - | - | - | - | (4) |
| Communications & Data Processing | (21) | - | (62) | - | - | (25) | - | (45) | - | (47) | - | (113) | - | (314) |
| Professional Services | (336) | (215) | (235) | (235) | (359) | (243) | (228) | (225) | (349) | (225) | (180) | (180) | (180) | (3,191) |
| Other G&A | (20) | (141) | (28) | (25) | (25) | (25) | (38) | (25) | (25) | (25) | (36) | (20) | (20) | (454) |
| Total Operating Disbursements | (377) | (418) | (326) | (381) | (384) | (413) | (267) | (416) | (374) | (418) | (218) | (434) | (200) | (4,625) |
| **Net Operating Cash Flow** | **(377)** | **(418)** | **199** | **(381)** | **(384)** | **(413)** | **124** | **(416)** | **(374)** | **(418)** | **168** | **(434)** | **(200)** | **(3,324)** |
| **Non-Operating Items** | | | | | | | | | | | | | | |
| Retained Professional Fees | (1,137) | - | - | - | - | - | - | - | (1,010) | - | - | - | (2,262) | (4,409) |
| US Trustee Fees | - | - | - | - | - | (16) | - | - | - | - | - | - | - | (16) |
| Total Non-Operating Items | (1,137) | - | - | - | - | (16) | - | - | (1,010) | - | - | - | (2,262) | (4,425) |
| **Net Cash Flow** | **(1,514)** | **(418)** | **199** | **(381)** | **(384)** | **(429)** | **124** | **(416)** | **(1,384)** | **(418)** | **168** | **(434)** | **(2,462)** | **(7,749)** |
| Beginning Cash Balance | 164,266 | 162,752 | 162,334 | 162,533 | 162,153 | 161,769 | 161,339 | 161,463 | 161,047 | 159,663 | 159,245 | 159,413 | 158,979 | 164,266 |
| Net Cash Flow | (1,514) | (418) | 199 | (381) | (384) | (429) | 124 | (416) | (1,384) | (418) | 168 | (434) | (2,462) | (7,749) |
| DIP Revolver Draws/(Payments) | | | | | | | | | | | | | | |
| **Ending Cash Balance** | **$162,752** | **$162,334** | **$162,533** | **$162,153** | **$161,769** | **$161,339** | **$161,463** | **$161,047** | **$159,663** | **$159,245** | **$ 159,413** | **$ 158,979** | **$ 156,517** | **$ 156,517** |

*Note: The forecast assumes an illustrative Chapter 11 filing date of 9/17/2024.*

### Footnotes

- Interest income reflects 4% interest for August & September and 3% for October through December, earned on cash held at Silvergate accounts
- Salaries and benefits includes employee salary and benefit disbursements for 11 employees retained through the forecast period
- Communications and data processing includes on-going software maintenance and other data services costs
- Professional services are materially comprised of legal fees for non-retained company counsel and counsel for indemnified individuals. Fees from retained professionals are reflected in the Retained Professional Fees line
- Payments to counsel contained within the professional services line are assumed to paid one month in arrears
- Retained Professional Fees: Subject to interim and final fee application approval, the 11/15 distribution reflects payment for services rendered from 9/16 to 9/29 paid at 100% and the 12/15 distribution reflects payment for services from 9/30 to 12/15, paid net of remaining retainer balances. Prepetition unpaid fees are assumed to be netted against retainers at the timing of the petition filing

AlixPartners

3

**<u>Exhibit C</u>**

**Form of Joinder**

**Form of Joinder Agreement**

This joinder (this "Joinder") to the Restructuring Support Agreement (the "Agreement"),[2] dated as of [●], 2024, by and among (i) SCC, SLC and SVL, and (ii) the Supporting Preferred Stockholders, is executed and delivered by [_____] (the "Joining Party") as of [_____].

      1.    <u>Agreement to be Bound.</u> The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as Annex 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Supporting Preferred Stockholders, as applicable.

      2.    <u>Representations and Warranties.</u> The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in <u>Section 2</u> of the Agreement to each other Party.

      3.    <u>Governing Law.</u> This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require or permit the application of the law of any other jurisdiction.

      4.    <u>Notice.</u> All notices and other communications given or made pursuant to the Agreement shall be sent to:

      To the Joining Party at:
      [JOINING PARTY]
      [ADDRESS]
      Attn:
      Facsimile: [FAX]
      EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to it in the Agreement.

[JOINING PARTY]

By:_____

Name:

Title:

Holdings: $_____ of
Preferred Stock

## ANNEX 1

**Restructuring Support Agreement**

# Exhibit B

## Organizational Chart



☐ Debtor entity

☐ Non-debtor entity

*Silvergate Capital Trust I and Silvergate Capital Trust II are Delaware statutory trusts wholly owned by SCC, which issued preferred securities commonly known as TruPS as part of pooled offerings to third party investors.