## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SILVERGATE CAPITAL CORPORATION, *et al*. | Case No. 24-12158 (KBO) (Jointly Administered) |
| Debtors. [1] | <u>Hearing Date</u>: TBD<br><u>Objection Deadline</u>: TBD |

### MOTION OF STILWELL ACTIVIST INVESTMENTS, L.P. FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER

Stilwell Activist Investments, L.P. ("<u>Stilwell</u>" or "<u>Movant</u>"), through its counsel, files this expedited Motion for the entry of an order, substantially in the form attached hereto, directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c) (the "<u>Motion</u>") with duties to investigate certain claims and causes of action held by the Debtors. In support thereof, the Movant respectfully represents:

### I.        PRELIMINARY STATEMENT

As this Court is aware, the Debtors[1] refused to hold an annual meeting for over two years for Debtor Silvergate Capital Corporation ("<u>Silvergate</u>") in an effort, in Stilwell's view, to stymie and freeze out their shareholders. Then, only after losing in the Maryland courts on multiple separate occasions, did the Debtors begrudgingly hold an annual meeting on Friday, September 27, 2024, two days after this Court denied the Debtors' request to enjoin the court-ordered annual meeting. The annual meeting was especially important because common shareholders were left in the dark for two years by a board of directors (the "<u>Board</u>") that led them into a catastrophic bank

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Silvergate Capital Corporation (7337), Silvergate Liquidation Corporation (4449) and Spring Valley Lots, LLC (0474). The Debtors' mailing address is 4225 Executive Square, Suite 600, La Jolla, CA 92037.

failure; a Board that they never re-elected in 2023. Rather than facilitate stockholder participation, the Board set the meeting—which could have been remote—for 8:00 AM Pacific Time, in person, in La Jolla California. Polls closed, and the annual meeting concluded, within five minutes of the start time.

It should come as no surprise that Joseph Stilwell was elected to the Board with more than 10.5 million votes, an overwhelming majority of all shares cast. Silvergate's slate of directors each received less than 10% of all votes cast.  Yet, what did come as a surprise to Stilwell is that not one sitting Board member deigned to attend the annual meeting and that prior to the meeting, the Board further disenfranchised shareholders by secretly amending a bylaw provision to eliminate the requirement for the Board to meet immediately after elections. In Stilwell's opinion, Debtors' continued efforts to obfuscate and delay, and to reward insiders at the expense of an open, transparent process that maximizes value for all stakeholders, necessitates the filing of this Motion.

Four of Silvergate's current directors—Paul D. Colucci, Thomas C. Dircks, Michael T. Lempres (Chairman), and Scott A. Reed—oversaw the demise of Silvergate Bank (the "Bank," n/k/a Silvergate Liquidation Corporation, a subsidiary of Silvergate). During their service, the Bank compromised its integrity to chase crypto industry profits, while failing to sufficiently monitor more than $1 trillion dollars in banking transactions and to implement proper due diligence processes to protect against the risks created by the Bank's crypto clientele.

Before the Bank's collapse, three of the legacy directors enriched themselves by selling Silvergate shares into the market. Together, those sales totaled nearly $53 million in proceeds,[2] according to Stilwell's review of public filings. These directors also oversaw prior management whom the U.S. Securities and Exchange Commission ("SEC") charged with committing

---

[2] *See* Table 1 (aggregating director stock sales), *infra*.

"negligence-based fraud"[3] in connection with that demise, including by misrepresenting to the public the Bank's operational and legal risks.

Absent an examiner, there will be no truly independent investigation of the circumstances leading to these Debtors' collapse and the potentially valuable claims against the insiders who oversaw the Debtors' demise. Rather than commit this critical investigation to a truly independent fiduciary, the Debtors recently formed a "Special Investigations Committee" (the "SIC") comprised of a purportedly disinterested director tasked with investigating claims and causes of action against, and vested with authority to settle and provide releases to, the people who newly hired her.[4] Yet, the SIC's independence is questionable at best—not only is the SIC comprised of only one member (Ms. Ivona Smith), its counsel also represents the Debtors—Richards, Layton & Finger. To date, Ms. Smith has not reached out to the only "true" independent member of the Board, with neither allegiances to historic management nor exposure to derivative claims, Mr. Stilwell.

The creation of the SIC is part of a familiar playbook to provide releases to insiders in exchange for favorable treatment to a preferred constituency that can be counted on to support the Debtors' fast-track resolution. The Debtors should not be able to use the RSA and the Plan as mere vehicles to obtain releases for insiders who engaged in, or who enabled, fraud and other wrongful acts. But this is no melting ice cube. The Debtors are solvent. Nonetheless, common shareholders are completely disenfranchised.

Appointment of an examiner under Bankruptcy Code section 1104(c) is not only warranted, but it is mandated under these circumstances, where Debtors have over $5 million in liabilities.

---

[3] *See* Press Release, U.S. Securities and Exchange Commission, *SEC Charges Silvergate Capital, Former CEO for Misleading Investors about Compliance Program* (July 2, 2024), https://www.sec.gov/newsroom/press-releases/2024-82.
[4] Disclosure Statement, D.I. 11, at 16.

Even if it were not, the appointment of an examiner is also the best way to avoid protracted, value-destructive litigation.  Moreover, the Debtors will not suffer prejudice by the appointment of an examiner at this early stage of the case, when their own investigation is at its infancy stage. Yet common shareholders will be severely disadvantaged without the appointment of an examiner to provide an independent view on the value of potential claims and causes of action against insiders and non-insider third parties. Although Mr. Stilwell is a member of the Board, he is merely one of the six-member Board, is not privy to the "Special Investigations Committee" and there is no independent statutory representative appointed in these cases to represent equity-holders' interests.

It is critical that stakeholders, including the shareholders of this *solvent* corporation, have the opportunity to evaluate a fully transparent and independent report untainted by secretive gamesmanship, understand the nature and extent of claims and causes of action that exist and which may be released (for no value under the Plan) and, with that information, attempt to negotiate a consensual resolution. Only an independent court-appointed examiner can dispel the heavy cloud of self-dealing and conflicts of interest here.

## II.    JURISDICTION, VENUE AND STANDING

0.    This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334. This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(a), 157(b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012. The statutory predicates for the relief requested are (*i*) §§ 1104(c) and 105(a) of the Bankruptcy Code and (*ii*) Bankruptcy Rules 2007.1 and 9014. Pursuant to Del. Bankr. L.R. 9013-1(f), Stilwell consents to the Court entering a final order in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

### III.    FACTUAL BACKGROUND

**A.    The Debtors' Businesses**

**Corporate Structure**

1.    Silvergate is a Maryland Corporation headquartered in La Jolla, California. From its formation in 2000 until July 1, 2024, Silvergate was a bank holding company whose main asset was Debtor Silvergate Liquidation Corporation (the "SLC," or, as appropriate, the "Bank").  From November 2019 to 2023, Silvergate's stock traded on the New York Stock Exchange ("NYSE") under the ticker "SI". In March 2023, Silvergate announced that it was voluntarily liquidating and winding down its Bank. Its delisting from NYSE was confirmed on May 11, 2023, and in January 2024, it completed the process of deregistering its stock with the SEC.  Silvergate's stock presently trades in the over-the-counter market.

2.    Until July 2024, Debtor SLC was a California state-chartered bank named Silvergate Bank. On July 5, 2024, the Bank changed its name to Silvergate Liquidation Corporation; three days later it formally relinquished its banking charter to the California Department of Financial Protection and Innovation (the "DFPI") and ceased its existence as a bank.

3.    Debtor Spring Valley Lots, LLC is a Delaware limited liability company that is a subsidiary of SLC.

4.    Prior to filing the Petition, the Debtors and certain Silvergate executives were subject to intense scrutiny from federal and state regulators, including enforcement actions commenced by the Federal Reserve, the SEC, and DFPI.  As a result, in July 2024, Silvergate paid a combined $63 million in fines and penalties to these agencies and entered into consent orders.[5]

---

[5] In addition to the $50,000,000 penalty against Silvergate, the SEC Consent Order required Lane to pay a $1 million civil penalty and Fraher to pay a $250,000 civil penalty.

The allegations below are drawn from publicly filed documents related to those investigations as well as other public filings and news sources.

### Silvergate Targets Crypto Customers, Profits

5.      Until 2013, SLC was a small private commercial bank focused on real estate lending. Around 2013, Alan J. Lane ("Lane"), Silvergate's CEO and a former member of the Board, learned that cryptocurrency ("crypto") asset companies were struggling to find banking relationships because the banking industry viewed them as high-risk customers.[6]

6.      As Lane explained in 2019, "The biggest risk [in banking crypto clients] is that AML risk … making sure that you know who your customers are and making sure that you're not in any way providing funding, financing etc for illicit activity . . . ."[7]

7.      Lane—with the Board's approval—nonetheless pursued these customers. As part of that pursuit, the Bank launched the "Silvergate Exchange Network" ("SEN"), which Silvergate described in its Form S-1 as "a network of digital currency exchanges and digital currency investors that enables the efficient movement of U.S. dollars between SEN participants 24 hours a day, 7 days a week, 365 days a year."[8] SEN allowed the Bank's customers "virtually instantaneous" movement of U.S. dollars to other SEN clients outside of normal banking hours—which, due to the speed of its execution, was purported to significantly mitigate market participants' exposure to crypto asset pricing fluctuations.[9]

8.      Lane's strategy swelled Silvergate's coffers. As a Congressional Service Report noted, "Silvergate credited its [SEN] with its recent deposit surge. Between 2014 and 2021, the

---

[6] SEC Compl. ¶¶ 21-22.
[7] What Bitcoin Did Podcast, *Banking the Corporate Unbanked with Alan Lane* (July 16, 2019), https://www.whatbitcoindid.com/podcast/silvergates-alan-lane-on-banking-the-corporate-unbanked.
[8] SEC Compl. ¶ 24.
[9] *Id.* ¶¶ 27, 28.

share of Silvergate's crypto firm deposits increased from 1% of total deposits to a high of more than 98% at the end of 2021."[10] The total deposits jumped from approximately $2 billion on December 31, 2019, to over ***$14 billion*** as of December 31, 2021.[11] Before Silvergate went public in 2019, it had an annual net income of $7.6 million. By 2021, its net annual income had increased to $75.5 million.[12]

9.      The Bank profited by investing its deposits in low-risk securities that generated hundreds of millions in revenue for the Bank. In the first three quarters of 2022, the Bank held $11.9 billion in non-interest-bearing deposits—over 90 percent of which originated from crypto-asset clients. Those funds supported a $11.4 billion securities portfolio that generated more than $200 million in interest income for the Bank in the first three quarters of 2022.[13]

10.     Management and the Board knew that their strategy was risky, that maintaining compliance with federal and state banking and anti-money laundering ("AML") laws was essential to the Bank's mandate, and that these laws required banks to have a program with procedures for customer identification and conducting ongoing customer due diligence.

11.     In its Form S-1, Silvergate claimed to have "proprietary compliance capabilities" constituting "policies, procedures and controls designed to specifically address the digital currency industry," which it claimed were a "distinctive competitive advantage" for the Bank.[14] It claimed that these capabilities covered SEN. As further described below, management repeated these misrepresentations even when management knew that SEN was not being appropriately monitored and that the Bank faced major compliance failures.

---

[10] Paul Tierno, *The Role of Cryptocurrency in the Failures of Silvergate, Silicon Valley, and Signature Banks*, Congressional Research Service, at 2 (Apr. 25, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12148.
[11] *Id.* at 2, Figure 1.
[12] Silvergate Cap. Co., Annual Report (Form 10-K) (Feb. 28, 2022).
[13] *See* Silvergate Bank Income Statement, Call Reports for periods ending March 31, 2022, June 30, 2022, and September 30, 2022, at 8.
[14] SEC Compl. ¶ 34.

12.    Silvergate's stock price rose from $12 per share at the end of 2019 to over $200 per share in mid-2022. The escalating stock price greatly enriched Lane and other members of the Board, who—as evidenced by Silvergate's insiders' Section 16 filings—liquidated their shares into the market. From 2019 onward, it appears that directors and officers made approximately $142 million from selling Silvergate stock.[15] Over $104 million of these stock sales were conducted in or after 2021.[16]

| Table 1: Insider Stock Sales ($ in Actual USD) | | | | |
|---|---|---|---|---|
| Director / Officers | Role | Pre-2021 | 2021-Forward | Total |
| Alan J. Lane | CEO & Director | $            - | $    18,598,968 | $    18,598,968 |
| Ben Reynolds | President, Chief Strategy Officer | - | 1,878,743 | 1,878,743 |
| Dennis S. Frank | Former Lead Director | 8,457,181 | 26,519,133 | 34,976,314 |
| Derek J. Eisele | EVP | 374,551 | 20,638,805 | 21,013,356 |
| Karen F. Brassfield | Former Director | 90,000 | 2,417,814 | 2,507,814 |
| Kathleen Fraher | COO, CRO | 20,260 | 2,785,669 | 2,805,929 |
| Martin S. Friedman | Former Director | 4,292,225 | - | 4,292,225 |
| Michael Lempres | Current Director | - | - | - |
| Paul D. Colucci | Current Director | 936,234 | 4,303,241 | 5,239,475 |
| Robert Charles Campbell | Former Director | 1,662,661 | 573,319 | 2,235,980 |
| Scott A. Reed | Current Director | 19,868,860 | 14,476,707 | 34,345,567 |
| Son-jai Paik | Chief HR Officer | - | 1,096,900 | 1,096,900 |
| Thomas C. Dircks | Current Director | 2,439,626 | 10,934,745 | 13,374,371 |
| **Total** | | **$    38,141,598** | **$    104,224,044** | **$    142,365,642** |

## FTX Trading, Binance, and Other Crypto Companies Use Silvergate and SEN In Their Fraudulent or Criminal Schemes

13.    The Bank's customers included several high-profile crypto companies and their affiliated founders, several of which were later prosecuted or pled guilty to criminal conduct. The most infamous of these was Sam Bankman-Fried, whose fraudulent companies, FTX Trading, Ltd. ("FTX") and Alameda Research ("Alameda"), destabilized the crypto asset markets in late 2022.

---

[15] Table 1 is based on Stilwell's review of Section 16 filings and other public data. Data excludes (i) $360,253 of stock sales from an entity related to Alan Lane and (ii) $5,321,355 of stock sales from four entities related to Martin S. Friedman.

[16] *See* Table 1.

14.    FTX and its affiliates comprised one of the Bank's largest client groups. By the end of September 2022, FTX and related entities made up nearly 10 percent, or about $1.2 billion, of the $11.9 billion of noninterest bearing deposits at the Bank.[17] One former FTX employee called Silvergate "FTX's primary banking partner."[18] Indeed, Silvergate also benefited reputationally from FTX's endorsement. Prior to FTX's collapse, Silvergate's website touted a testimonial from Bankman-Fried: "Life as a crypto firm can be divided up into before Silvergate and after Silvergate. It's hard to overstate how much [the Bank] revolutionized banking for blockchain companies."[19]

15.    In November 2022, FTX catastrophically imploded. In his November 11, 2022 First Day Declaration, FTX's new CEO, a veteran of Enron and other bankruptcies, stated baldly: "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred [with the FTX debtors]."[20] His declaration detailed egregious asset-shuffling and improper disbursements by FTX and its affiliates—frequently performed without documentation.[21]

16.    Although other banks noted "immediately … the complete lack of a risk-management framework that [Alameda] could articulate in any meaningful way,[22] the Bank

---

[17] Press Release, Silvergate Cap. Corp., *Silvergate Provides Statement on FTX Exposure*, Nov. 11, 2022, https://www.businesswire.com/news/home/20221111005557/en/Silvergate-Provides-Statement-on-FTX-Exposure.
[18] Gretchen Morgenson, *Sen. Warren demands answers from Silvergate Bank about its business dealings with FTX*, NBC News (Dec. 6, 2022, 6:30 AM), https://www.nbcnews.com/tech/crypto/elizabeth-warren-ftx-silvergate-bank-crypto-rcna60147.
[19] Michelle Celarier, *The Crypto Industry's Favorite Bank is in Deep Trouble*, NY MAG. – Intelligencer (Jan. 24, 2023), https://nymag.com/intelligencer/2023/01/silvergate-crypto-industrys-favorite-bank-in-deep-trouble.html.
[20] Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Filings, at ¶ 5, Case No. 22-11068, D.I. No. 24, filed Nov. 17, 2022 (D. Del.).
[21] *See id.* ¶¶ 62-70.
[22] Patricia Kowsmann, *Troubles at Sam Bankman-Fried's Alameda Began Well Before Crypto Crash*, WALL ST. J. (Dec. 31, 2022, 8:00 AM), https://www.wsj.com/articles/alameda-sam-bankman-fried-ftx-crypto-crash-11672434101.

apparently did not. It not only maintained several accounts for Alameda and FTX, but also for related Bankman-Fried entities that showed obvious indications of fraud.

17.    North Dimension, Inc. is one example. In order to circumvent U.S. money transmission laws, Bankman-Fried initially used existing Alameda bank accounts to process FTX customer deposits and withdrawals—then created new, fraudulent entities that he used to open accounts at the Bank to continue to do the same.[23]  In April 2021, North Dimension, an Alameda subsidiary, opened two bank accounts at the Bank. Its due diligence questionnaire, signed by Bankman-Fried, stated falsely that North Dimension "trades on multiple cryptocurrency exchanges worldwide for its own account," and that the purpose of the North Dimension Bank account was "trading" and "market making."[24]

18.    Despite calling itself a trader "for its own account," by November 2021, North Dimension also had a typo-ridden website purporting to sell mobile phones, laptops, and other items out of the same Berkeley, California address as Alameda and FTX's U.S. branch. That website stated: "Our vision is to become [the] most popular website for purchasing mobile phones and electronics by offering complete product information and a transparent purchasing procedure."[25] There was no purchasing procedure. Not only were the electronics displayed "on sale" offered at hundreds of dollars above market price, any attempt to begin the purchasing process would merely generate a pop-up saying, "Feel free to send a message. We collaborate with ambitious brands and people; we'd love to build something great together."[26]

---

[23] Sentencing Memorandum, *USA v. Bankman-Fried*, S6 22 Cr. 673 (LAK), at 25, https://dd80b675424c132b90b3-e48385e382d2e5d17821a5e1d8e4c86b.ssl.cf1.rackcdn.com/external/sdny-22673-governmentsentencingmemo-may152024.pdf.
[24] *Id.* at 26.
[25] Gretchen Morgenson, *This little-known firm with a weird website was central to the misappropriation of FTX customers' money, regulators say*, NBC NEWS (Dec. 27, 2022), https://www.nbcnews.com/tech/crypto/north-dimension-ftx-bankman-fried-rcna63175.
[26] *Id.*

19.    The Bank's supposedly on-going due diligence apparently failed to detect that North Dimension was a fairly obvious cover organization. FTX directed its U.S. customers to send funds to FTX through North Dimension, which the Bank accepted. From April 2021 to January 2022, FTX customers transmitted billions of dollars to FTX through North Dimension's accounts. North Dimension then used SEN to transmit these funds to Alameda or other affiliates. The criminal trial of Bankman-Fried—as well as FTX's own bankruptcy filings—showed that funds from FTX customers were often misappropriated, either being dissipated by Alameda or embezzled for personal use by FTX officers.

20.    FTX is merely one example of the Bank's failure to monitor its risky clients and their transactions.[27] In addition to FTX, the Bank also served over a dozen crypto companies that came under investigation, shut down, were fined, or filed for bankruptcy.[28] These included the U.S. arm of Binance and affiliates, Bittrex, Voyager, Celsius, and BlockFi.[29]

21.    Binance, at one time marketed as the world's largest crypto exchange, is another example of a Bank crypto client that employed a "corporate strategy of regulatory evasion"[30] that used, among other methods, transfers on the Bank's network.[31] As with FTX, multiple affiliates of Binance had bank accounts with the Bank which were used as part of a scheme to evade U.S.

---

[27] As described below, the SEC's charges against Silvergate and its senior officers included that they failed to monitor over $1 trillion in SEN transactions between the Bank's customers. At least $9 billion of these transfers were conducted by or to Bankman-Fried entities. Silvergate and two executives, Mr. Lane and Ms. Kathleen Fraher, who served as Silvergate's Chief Operating Officer until November 7, 2022, and then as its Chief Risk Officer, settled these claims. They did not deny the charges.

[28] Celarier, *supra* note 20.

[29] *See* Celarier, *supra* note 20.

[30] Press Release, Commodity Futures Trading Comm'n, *Binance and Its CEO, Changpeng Zhao, Agree to Pay $2.85 Billion for Willfully Evading U.S. Law, Illegally Operating a Digital Asset Derivatives Exchange, and Other Violations* (Nov. 21, 2023), https://www.cftc.gov/PressRoom/PressReleases/8825-23.

[31] Angus Berwick & Tom Wilson, *Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao*, Reuters (Feb. 16, 2023, 5:31 PM), https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/.

regulation, and commingled their funds with non-regulated affiliates through use of SEN.[32] In November 2023, Binance and its controller/founder Changpeng Zhao both pled guilty to money laundering and other criminal violations; Binance paid a criminal fine of $1.8 billion and forfeited an additional $2.5 billion in civil penalties as part of the plea bargain.[33]

### After FTX Collapses, Silvergate Receives Increased Regulatory Attention

22.     Starting on November 2, 2022, a leaked balance sheet from Alameda raised questions about FTX's business practices and incited FTX customers to withdraw over $6 billion from FTX.

23.     After close of business on November 7, 2022, in the midst of this market panic, Silvergate replaced its Chief Risk Officer—CEO Lane's son-in-law—with its Chief Operating Officer, Ms. Kathleen Fraher.

24.     On November 8, 2022, FTX paused all customer withdrawals. On November 11, 2022, FTX and related entities filed for bankruptcy.

25.     Silvergate quickly removed Bankman-Fried's endorsement from its website. On November 17, 2022, Silvergate's staff completed an analysis requested by Fraher that identified as suspicious over 300 transactions by FTX-related entities, which amounted to over $9 billion in suspicious transfers, occurring from January 2022 until November 2022.[34] "Most troubling," according to the SEC, were funds that flowed out of FTX custodial accounts to a series of non-

---

[32] *See id.*; *see also* Declaration of Sachin Verma, at ¶¶ 3-4, 8-9, *SEC v. Binance Holdings Ltd.*, C.A. 1:23-cv-01599-ABJ (D.D.C. June 7, 2023) (ECF No. 21) (showing that in 2019 to 2021, the Bank accepted over $22 billion in total deposits from Binance affiliates, and processed $22 billion in withdrawals out of the Bank to a foreign Binance affiliate).

[33] Press Release, U.S. D.O.J., Office of Public Affairs, *Binance and CEO Plead Guilty to Federal Charges in $4B Resolution* (Nov. 21, 2023), https://www.justice.gov/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution; *see also* Kyle Torpey, *Binance To Pay $4.3 Billion To Settle Criminal Charges As CEO Pleads Guilty, Steps Down*, INVESTOPEDIA (Nov. 21, 2023, 4:24 PM), https://www.investopedia.com/crypto-exchange-binance-charged-with-money-laundering-fined-usd4-3-billion-8405545.

[34] SEC Compl. ¶¶ 115-116.

custodial FTX entities accounts, which were followed by transfers of these funds to third parties, either through SEN or accounts external to the Bank.[35]

26.     Soon after the FTX bankruptcy, the Bank's own customers began to withdraw funds. Deposits at the Bank plunged by 52 percent in the last three months of 2022.[36] By the end of the year, withdrawals totaled $6.3 billion. Silvergate was required to sell billions of dollars in investment assets to honor those withdrawals, at a significant loss.[37]

27.     On December 5, 2022, three U.S. senators sent a letter to Silvergate noting that the Bank "appears to be at the center of the improper transmission of FTX customer funds" at FTX and Alameda.[38] It stated that Silvergate's "[B]ank's involvement in the transfer of FTX customer funds to Alameda reveals what appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients."[39] After Silvergate formally responded on December 19, 2022, the senators sent another letter in January calling Silvergate's initial response to their inquiry "evasive and incomplete."[40]

28.     As described below, management made false statements to the public on several occasions in late 2022, and early 2023, falsely assuring the public that the Bank was compliant with the BSA and AML regulations.

---

[35]  *Id.* ¶ 117.

[36]  Press Release, Silvergate Cap. Co., Silvergate Announces Select Preliminary Fourth Quarter 2022 Financial Metrics and Provides Business Update (Jan. 17, 2023), https://www.sec.gov/Archives/edgar/data/1312109/000131210923000020/ex991si4q22earningsrelease.htm.

[37] *See* SEC Compl. ¶¶ 163-74.

[38] Letter from U.S. Senators Elizabeth Warren, John Kennedy and Roger W. Marshall to Silvergate Bank, at 3 (Dec. 5, 2022), https://www.warren.senate.gov/imo/media/doc/2022.12.05%20Letter%20to%20Silvergate%20Bank%20re%20FTX.pdf.

[39] *Id.* at 4.

[40] Letter from U.S. Senators Elizabeth Warren, John Kennedy and Roger Marshall to Silvergate Bank, at 1 (Jan. 30, 2023), https://www.warren.senate.gov/imo/media/doc/2023.01.30%20Follow-up%20Letter%20to%20Silvergate%20Bank%20re%20Crypto%20Exposure%20and%20FTX%20Impropriety1.pdf.

29.     In March 2023, Silvergate announced that it was closing and voluntarily liquidating the Bank. In connection with that voluntary liquidation, on May 23, 2023, the Federal Reserve and DFPI issued a joint cease and desist order against Silvergate and the Bank, naming "numerous deficiencies," including with respect to the Bank's compliance with banking laws and regulations.[41]

30.     On July 1, 2024, Silvergate settled with the Federal Reserve, the SEC, and DFPI, paying penalties that totaled $63 million. Both the Federal Reserve and the SEC issued consent orders finding that the Bank had deficient internal transaction monitoring. Simultaneously, Silvergate, Lane, and Fraher also settled SEC's securities fraud claims against them.

**B.      Misconduct by the Debtors' Management and the Board**

**The Regulatory Obligations of the Bank**

31.     All U.S. banks have reporting and record-keeping obligations under the Currency and Foreign Transactions Reporting Act (commonly known as the Bank Secrecy Act or "BSA," 31 U.S.C. § 5311 *et seq.*) and subsequent related legislation and regulation. The BSA is designed to, amongst other goals, enable U.S. law enforcement and regulatory agencies to investigate potential criminal, tax, and regulatory violations (including money laundering and other financial crimes) by requiring banks to monitor and report suspicious transactions and maintain appropriate records of financial transactions.

32.     The Bank had obligations under the BSA both as a banking institution and a "money transmitter." The BSA required the Bank to develop, implement, and maintain an effective AML program that is reasonably designed to prevent the Bank from being used to facilitate money laundering and the financing of terrorist activities. 31 U.S.C. § 5318(h)(1); 31 C.F.R.

---

[41] SEC Compl. ¶ 162.

§ 1020.210(a). An AML program must include assessing the money laundering risks; applying risk-based procedures and controls designed to detect money laundering activity, including through periodic review of account activity sufficient to determine its consistency with expected activity. A bank also must maintain a due diligence program that ensures it takes reasonable steps to ascertain the identity of all nominal and beneficial owners of a private banking account, the source of funds being deposited in the account, and the purpose and expected use of the account. It should also review the activity of the account to ensure it is consistent with the information obtained about the client's source of funds with the stated purpose and expected use of the account as needed to guard against money laundering and report any known or suspected money laundering or suspicious activity conducted to, from, or through a private banking account. 31 C.F.R. §§ 1010.620(a)-(b), 1020.210(a). As part of that ordinary due diligence, banks will routinely search the web for negative information about their clients. When the bank detects improper conduct, it must take actions that may include reporting that improper conduct or closing the account.

33.     Through the operation of SEN, Silvergate, through the Bank, was also a "money transmitter" as defined by the BSA and related regulations. 31 C.F.R. § 1010.100(ff). In addition to developing, implementing, and maintaining effective AML programs, the Bank was required to integrate its compliance procedures into any automated data processing systems it uses – including SEN. *See* 31 CFR § 1022.210(d).

**Management Completely Failed to Ensure a Compliant BSA/AML Program**

34.     According to the SEC's complaint against Silvergate, Lane, Fraher, and Silvergate's former Chief Financial Officer Antonio Martino ("Martino"), in April 2021, Silvergate implemented a new automated transaction monitoring system (the Automated Transaction Monitoring System B, or "ATMS-B"), which used "intelligence-based surveillance"

and had "behavioral analytics capabilities," as required by Silvergate's own internal policies. ATMS-B was the Bank's primary automated transaction monitoring system between April 2021 and its closure in March 2023.[42] The Bank switched from ATMS-A to ATMS-B precisely because of the risk posed due to what it called its "unique clientele," and the "inherently higher-risk Cryptocurrency Industry."[43]

35.    On several occasions prior to November 2022, "Lane and Fraher—and through them, [Silvergate]—became aware that the Bank had serious deficiencies in its BSA/AML compliance program."[44] The Bank's BSA staff provided information that put Fraher on notice that SEN had not been subjected to automatic monitoring through at least September 1, 2022.[45] As early as January 2021, a BSA officer knew and informed Fraher that the Bank should be monitoring SEN transactions given that its customers were transferring billions of dollars through SEN, but that ATMS-B did not, at that time, apply to SEN.[46]

36.    In January 2022, that officer told Fraher that she was concerned that the Federal Reserve Bank of San Francisco ("FRBSF") would ask about whether the Bank had adequate monitoring of SEN, and she texted Fraher that ATMS-B could not "take SEN transactions [into] consideration for risk rating purposes."[47] Through 2022, that BSA officer sent several additional warnings to Fraher showing that SEN was not properly monitored. In September 2022, the Bank's staff prepared a report concluding that ATMS-B had not been monitoring SEN transactions "as expected because [ATMS-B] does not consider internal transfers as risky activity within any

---

[42] SEC Compl. ¶¶ 54-55.
[43] *Id.* ¶ 57.
[44] *Id.* ¶ 58.
[45] *Id.* ¶¶ 59-60.
[46] *Id.* ¶¶ 66-67.
[47] *Id.* ¶¶ 68, 70.

financial crime typologies."[48] By that time, SEN had already been used to improperly transfer billions in funds from Alameda and/or North Dimension to FTX, as well as other problematic acts.

37.     The SEC charged Silvergate with failing to monitor "more than $1 trillion dollars of SEN transactions … for suspicious activity for a period of at least 15 months" – specifically, for at least August 2021 through November 2022.[49] During this time, "Silvergate was essentially not conducting adequate 'on-going monitoring of customer activities,' nor did it employ 'system monitoring rules tailored to digital currency activities' that could 'adequately screen and monitor [its] customers associated with the digital currency initiative for their compliance with anti-money laundering laws.'"[50] The Bank's BSA staff admitted this failure in its September 12, 2022 written report.[51]

38.     Moreover, government bank examiners from the FRBSF and the DFPI informed Lane and Fraher multiple times in 2022 that the Bank's BSA compliance program was insufficient given the Bank's risk profile.[52] As the SEC explained in its complaint, "the weaknesses identified by the FRBSF demonstrated that Silvergate's BSA compliance program had not used 'thorough … due diligence … in connection with onboarding new customers or monitoring existing customers,' nor had it used 'enhanced procedures to screen and monitor these customers … for their compliance with [AML] laws.'"[53]

**Management Lied to the Market**

39.     In the wake of the FTX collapse, Lane and other members of management sought to allay investor concerns. Despite knowing that its BSA program was insufficient and flawed, and

---

[48] *Id.* ¶ 75.
[49] *Id.* ¶ 99, 101.
[50] *Id.* ¶ 101.
[51] *Id.* ¶¶ 73, 99.
[52] *Id.* ¶ 76.
[53] *Id.* ¶ 100.

that the Bank had therefore failed to monitor billions of dollars of transactions by its crypto asset clients, management misled the market with public statements claiming that the Bank's BSA/AML program was sound.

40.    Specifically, Lane and Silvergate made statements falsely claiming that the Bank's BSA compliance program was sound and that the BSA program had appropriately assessed FTX-related accounts and transaction activity.[54] These falsehoods were made to investors in November 2022, as well as included in its December 2022 responses to the senators and documents publicly filed with the SEC.[55]

## C.    Potential Misconduct by the Debtors' Board

### The Board Fails to Respond to Red Flags

41.    One of the Board's central functions is to oversee the management of Silvergate. The Board was aware of the AML risks posed by the Bank's "unique clientele," and the importance to a bank of ensuring BSA/AML compliance. Given it is management's duty to keep the Board informed, the Board was also likely made aware of the extent of the serious AML/BSA compliance issues since at least April 2021.

42.    Yet, it appears that the Board ignored red flags until after FTX's bankruptcy, when it was too late.  As one example, the SEC's complaint describes that the FRBSF and the DFPI identified material internal control weaknesses over BSA/AML compliance in April 2022, and alleges that Lane and Fraher understood the seriousness of these weaknesses.[56] The Board likely also was apprised of these findings in late spring 2022.

---

[54] *Id.* ¶ 119.
[55] *Id.* ¶¶ 136-45, 151.
[56] *Id.* ¶¶ 82-83.

43.     Six months later, the Board met on October 7, 2022 to review the preliminary findings of a September 2022 target exam by the FRBSF and the DFPI into the Bank's compliance systems. The regulators had found "severe deficiencies in the Bank's BSA compliance program," during the September target exam, including that ATMS-B "was not configured commensurately to the Bank's risk profile."[57] They told the Bank to immediately improve its suspicious activity monitoring.  At that October meeting, the Board discussed the possibility of a bank examiner enforcement action or sanctions for the Bank's BSA compliance program deficiencies.[58]

44.     Nonetheless, it was not until FTX's collapse in November 2022 that Silvergate replaced its Chief Risk Officer, Tyler Pearson. Mr. Pearson, Lane's son-in-law, had no apparent experience or qualifications for his role.[59] The Board knew this and knew that regulators found that the Bank had deficient risk monitoring and internal control problems (since at least spring 2022); yet the Board did not take action to replace Mr. Pearson until the very weekend that FTX, one of the Bank's largest clients, publicly imploded in connection with allegations of improper fund transfers and potential fraud. This inaction raises questions as to whether the Board ignored other red flags regarding the Bank's BSA/AML compliance.

45.     According to the SEC, the Board also did not request an audit of the Bank's Know Your Customer, Enhanced Due Diligence and transaction monitoring as it related to the FTX relationship until Silvergate was experiencing "continued fallout from the FTX collapse."[60]

---

[57] *Id.*  ¶¶ 85-86, 127.
[58] *Id.* ¶ 86.
[59] According to LinkedIn, Mr. Pearson's immediate prior employment was as a Senior Financial Analyst for Pacific Union Financial, LLC. *See also* Mike Dalton, *Silvergate Denies Nepotism Before U.S. Senators*, CRYPTOSLATE (Dec. 21, 2022, 9:47 PM), https://cryptoslate.com/silvergate-denies-nepotism-before-u-s-senators/.
[60] SEC Compl. ¶ 128.

**Directors and Officers May Have Extracted Improper Profits From Silvergate**

46.    Silvergate's insiders' Section 16 filings reveal that members of the Board and management appear to have profited greatly by selling their shares into the market. For example, based on Stilwell's analysis of these filings[61]:

- Current director Scott A. Reed has sold over $34 million in shares of Silvergate stock.

- Current director Paul Colucci has sold over $5 million in shares of Silvergate stock.

- Current director Thomas C. Dircks has sold over $13 million in shares of Silvergate stock.

- Former director Dennis S. Frank has sold over $34 million in shares of Silvergate stock.

- Former executive vice president of Silvergate Derek J. Eisele has sold over $21 million in shares of Silvergate stock.

- Former director and CEO Alan J. Lane has sold over $18 million in shares of Silvergate stock.

- Former lead director Robert C. Campbell has sold over $2 million in shares of Silvergate stock.

- Former director Karen F. Brassfield has sold over $2 million in shares of Silvergate stock.

- Former Chief Operating Officer and Chief Risk Officer Kathleen Fraher sold over $2.8 million in shares of Silvergate stock.

- Former Chief Strategy Officer Ben Reynolds sold over $1.8 million in shares of Silvergate stock.

47.    It is essential that an examiner investigate independently whether these sales occurred when the directors were in possession of material adverse non-public information. From its IPO, Silvergate told the market that it had "proprietary" systems in place to respond to the

---

[61] See Table 1, *supra*.

12652878-14

special risks posed by the Bank's digital currency industry clients, and that misuse of the Bank's resources or SEN was safeguarded by these systems.

48.     It is now clear that these representations were false and very likely that the Board knew they were false before November 2022. "[E]quity requires disgorgement of [] profit[s]" from any sales a fiduciary undertakes while possessing confidential corporate information that he or she improperly used to make trades. *Kahn v. Kolberg Kravis Roberts Co.*, 23 A.3d 831, 838 (Del. 2011). Whether any director or officer improperly derived profits using confidential corporate information requires a thorough investigation by an examiner.

49.     In addition, the Debtors' recently filed Statements of Financial Affairs indicates that large payments were made to insiders during the one-year lookback preceding the Petition Date (defined below), including (i) $5.1 million paid in bonuses to current and former insiders and (ii) $17.6 million in legal expenses paid on behalf of insiders for indemnification and advancement of their legal costs (including Lane and Fraher). *See* D.I. 102 at 17; *see generally* D.I. 106. These large insider transfers warrant independent examination.

**D.     The Debtors' Chapter 11 Cases**

50.     On September 18, 2024 (the "Petition Date"), Silvergate and the other Debtors each commenced a voluntary case under Chapter 11 of the Bankruptcy Code. See Voluntary Petitions (D.I. 1); Declaration of Elaine Hetrick (D.I. 9). On September 18, 2024, the Court entered an Order directing that these cases be jointly administered. (D.I. No. 23.)

51.     As discussed above, the proposed Plan will pay back all creditors in full and partially pay the preferred shareholders. Common holders will receive nothing—not even a vote. The Plan attributes no value to over $2.6 billion in NOLs, Silvergate's technologies Diem and SEN, as well as potentially valuable claims against insiders or third parties. It contains releases for insiders. The Plan was assembled without apparent consideration for common shareholders. It

privileges preferred holders at common equity's expense, in contravention of the principle that "generally it will be the duty of the board … to prefer the interests of the common stock—as the good faith judgment of the board sees them to be—to the interests created by the special rights, preferences ... of preferred stock." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 41 (Del. Ch. 2013) (quoting *Equity-Lined Investors, L.P. v. Adams*, 705 A.2d 1040 (Del Ch. 1997)).

52.     A first day hearing was held on September 19, 2024, granting certain interim relief. (D.I. 37.)

53.     The Debtors did not initially file a customary motion to preserve NOLs, a fact that Stilwell raised with Silvergate on September 21, 2024. That motion was not filed until September 24, 2024. (*See* D.I. 76.)

54.     On September 25, 2024, this Court held a hearing in the adversary proceeding *Silvergate Capital Corporation v. Stilwell Activist Investments, L.P.*, Adv. Proc. No. 24-50132 (Bankr. D. Del.), during which it denied Silvergate's request to enjoin its upcoming annual meeting.

55.     On September 27, 2024, Mr. Stilwell was elected to the Board.  To date, he has not received any outreach from Ms. Smith, the purportedly independent director.

## IV.     BASIS FOR RELIEF

### A.     The Appointment of an Examiner Is Mandated

56.     Under 11 U.S.C. § 1104(c), if the Court has not ordered the appointment of a chapter 11 trustee, then:

> [O]n request of a party in interest or the United States trustee, and after notice and a hearing, the court **shall** order the appointment of an examiner to conduct such an investigation of the [Debtors] as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the [Debtors] of or by current or former management of the [Debtors], if -

(1)    such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; *or*

(2)    the [Debtors'] fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

57.    The Third Circuit Court of Appeals recently stated that in the context of Bankruptcy Code section 1104(c), "[t]he meaning of the word 'shall' is not ambiguous. It is a 'word of command[.]'" *In re FTX Trading Ltd.*, 91 F.4th 148, 153 (3d Cir. 2024).

58.    Based on the information in the Debtors' petitions and in Elaine Hetrick's first day declaration, the Debtors' fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, substantially exceed the $5 million threshold of the Bankruptcy Code section 1104(c)(2). As of the Petition Date, the Debtors had funded debt of approximately $18.3 million of unsecured debentures consisting of (i) approximately $14.8 million of debentures issued under an indenture, dated July 16, 2001, and (ii) approximately $3.5 million of debentures issued under an indenture, dated January 27, 2005. Hetrick Decl. ¶¶ 31-35;*see also* Schedule E/F, Schedules of Assets and Liabilities for Silvergate Capital Corporation, D.I. 101, at 56.

59.    Accordingly, the appointment of an examiner under section 1104(c) to investigate the affairs of the Debtors is mandatory. *See In re FTX*, 91 F.4th at 153 (Congress made plain its intention to mandate the appointment of an examiner by using the word "shall," as in the Bankruptcy Court "shall" appoint an examiner if the terms of the statute have been met); *see also Morgenstern v. Revco D.S., Inc.* (*In re* Revco D.S., Inc.), 898 F.2d 498, 500-01 (6th Cir. 1990) ("[Section 1104(c)(2)] plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million, if the U.S. trustee requests one."); *Loral S'holders Protective Comm. v. Loral Space & Commc'ns Ltd.* (*In re* Loral Space & Commc'ns Ltd.), No. 04 Civ. 8645, 2004 WL 2979785, at *4, 5 (S.D.N.Y. Dec. 23, 2004)

(reversing bankruptcy court's decision denying appointment of examiner where $5 million debt threshold under section 1104(c)(2) was met and parties seeking appointment had standing to do so); *In re UAL Corp.*, 307 B.R. 80, 83-86 (Bankr. N.D. Ill. 2004) ("best reading of the statute" is that appointment of an examiner is mandatory if the requirements of section 1104(c)(2) are satisfied); *see also In re Mechem Fin. of Ohio, Inc.*, 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988); *In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass. 1987); *In re 1243 20th Street, Inc.*, 6 B.R. 683, 685 n.3 (Bankr. D.D.C. 1980); *In re Lenihan*, 4 B.R. 209, 211 (Bankr. D.R.I. 1980).

60.     As the Court of Appeals in *FTX* observed, although this Court has authority under Bankruptcy Code section 1104(c)(2) to specify the appropriate scope of an examination, the "as is appropriate" language in that statutory subsection does not confer discretion to decide, in the first instance, whether an examiner should be appointed once the statute's monetary threshold has been met. *See In re FTX*, 91 F.4th at 153-54 ("the phrase 'as is appropriate' modifies the words that immediately precede it–which are 'to conduct such an examination of the debtor,' not 'shall order the appointment of an examiner.'"); *see also Loral*, 2004 WL 2979785, at *5 ("it is the [Bankruptcy Court's] duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings."); *UAL Corp.*, 307 B.R. at 84, 85 n.2 (noting that construing the "as is appropriate" language in section 1104(c)(2) to vest discretion in the bankruptcy court would nullify its mandate). Here, given that there is a substantial basis to believe that officers and directors of the Debtors mismanaged the Debtors and/or engaged in misconduct and fraudulent conduct, this Court should authorize an examiner to investigate "any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor[s] of or by current or former management of the debtor[s]." 11 U.S.C. § 1104(c).

61.    This is especially true here, where Debtors have filed a chapter 11 plan that not only includes presumptive releases to various insiders, but also places other causes of action in the hands of a director, who is handpicked by the same directors and empowered to investigate and take all action to **settle or release** any claims held by the Debtors against their current or former directors, officers, and employees, including claims made in the derivative action.[62]

**B.    Discretionary Appointment of an Examiner Is Warranted and Beneficial**

62.    Even assuming arguendo such appointment were not mandatory (which it is), appointment of an examiner is also warranted under section 1104(c)(1) of the Bankruptcy Code.

63.    Discretionary appointment of an examiner is warranted if, as here, it is in the best interests of unsecured creditors and other interests of the estates. The Third Circuit has examined the language for discretionary appointment of a trustee under 11 U.S.C. § 1104(a)(2), which language is identical to that of section 1104(c)(1) concerning discretionary appointment of an examiner. In *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998), the Third Circuit noted that the statute "envisions a flexible standard," and gives the court "discretion to appoint [an examiner] when to do so would serve the parties' and estate's interests." *Id.* at 474 (internal quotations omitted).

64.    As outlined at length above, there is ample indication of misconduct, dishonesty, fraud, and irregularity at Silvergate, which warrants the appointment of an examiner under section 1104(c)(1). The SEC and other regulators have articulated damning evidence of fraud and misconduct by senior managers and a pervasive pattern of evasiveness on the part of the Debtors. An independent investigation by an examiner may well expose further irregularities arising from the mismanagement of the Debtors, their slide into chapter 11, and the supervision and decision-

---

[62] Disclosure Statement, D.I. 11, at 16.

making of the Board. It is critical that an examiner provide an independent view on the value of potential claims and causes of action against insiders and non-insider third parties, which is essential here in light of the SIC's proposed ability to agree to valuable releases to insiders under the Plan.

65. Under similar circumstances—where corporate value has evaporated because of alleged mismanagement or fraud—bankruptcy courts will appoint examiners. *See, e.g.*, Order Approving Appointment of Examiner, *In re FTX Trading Ltd., et al.*, Case No. 22-11068 (Bankr. D. Del. 2024) (D.I. 9882); *see In re FTX*, 91 F.4th at 157 ("In addition to providing much-needed elucidation, the investigation and examiner's report ensure that the bankruptcy court will have the opportunity to consider the greater public interest when approving the FTX Group's reorganization plan"); Order of December 23, 2020, *In re Cred Inc.*, 20-bk-12836 (Bankr. D. Del.) (D.I. 281) (appointing examiner to investigate allegations of fraud, dishonesty, incompetence, mismanagement, or irregularity in the management of the affairs of the debtors in the crypto asset industry).

66. The Debtors are certain to oppose this Motion with claims that the SIC will suffice to investigate any claims and that the examiner will merely duplicate her efforts. Yet, Ms. Smith was only appointed in connection with the imminent bankruptcy petitions which propose to reward preferred holders (at the common's expense) in exchange for insider releases.

67. Additionally, doubts arise as to whether this one-member SIC can be truly independent because it is advised by the same law firm as the Debtors. Specifically, the SIC is comprised of one director, Ms. Smith, who was handpicked by the four incumbents shortly before the deadline for holding the court-ordered annual meeting. Single-member special committees are subject to "a higher level of scrutiny." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1149 (Del. Ch.

2006). They must, like "Caesar's wife, be above reproach." *Lewis v. Fuqua*, 502 A.2d 962, 936 (Del. Ch. 1985). A single-member committee that has "any possible issue of fact" material to its independence will not suffice. *Id.*

68.     Here, the SIC has not even bothered to retain independent legal counsel. Ms. Smith is advised by Richards, Layton & Finger, the same firm that represents the Debtors and its directors. Common sense dictates that special committees tasked with investigating potential claims against insiders should "be represented by independent counsel." *In re Par Pharm., Inc. Deriv. Litig.*, 750 F. Supp. 641, 647 (S.D.N.Y. 1990) (special litigation committee that relied on attorneys also representing the corporation and board was not sufficiently independent); *see Gesoff*, 902 A.2d at 1166-67  (finding a special committee of one that also retained corporation's outside counsel "[did] not appreciate the serious and evident conflicts of interest that burdened [counsel's] representation of the special committee"); *Stepak ex rel. Southern Co. v. Addison*, 20 F.3d 398, 404-05 (11th Cir. 1994) (noting greater-than-reasonable doubt that counsel conducting investigation could be considered independent when it also represented the corporation's officers and directors in prior proceeding arising out of the same conduct at issue in the plaintiff's demand).

69.     Moreover, courts and academics have expressed significant skepticism regarding the independence of repeat independent directors such as Ms. Smith. *See, e.g.*, *Goldstein v. Denner*, No. 2020-1061, 2022 WL 1671006, at *48 (Del. Ch. May 26, 2022) ("[S]cholars argue that the dynamics of a small network of repeat players and the prospect of future engagements are sufficient to call into question the directors' independence.… A long-standing history of interactions would not be necessary for the carrot to have an effect. All that would be needed is a director's desire to cultivate such a relationship. Nor would there need to be an explicit *quid pro*

*quo*."); *see also* Jared A. Ellias et al., *The Rise of Bankruptcy Directors*, 95 S. CAL. L. REV. 1083, 1129 (2022).

70.     There is also a real question whether the continuing directors, Ms. Smith included, have acted consistently with their fiduciary duties. Favoring creditors or preferred shareholders over common holders of a solvent corporation may itself be a breach of fiduciary duty. *Trados*, 73 A.3d at 41; *see Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182-84 (Del. 1986).

71.     Moreover, "it has been thought that having directors who actually owned a meaningful, long-term common stock stake was a useful thing, because that would align the interests of the independent directors with the common stockholders and give them a personal incentive to fulfill their duties effectively." *LC Cap. Master Fund, Ltd. v. James*, 990 A.2d 435, 452 (Del. Ch. 2010).   None of the directors hold any meaningful equity in the Debtors. Additionally, none of Ms. Smith or any of the other incumbent holders who agreed on a Plan with no recovery for common holders were voted in by a majority of the shares voted in the recent annual meeting. They further collectively acted to avoid cooperation with the new and independent director, Mr. Stilwell, by failing to attend the meeting (after calling an in-person meeting in California) and quietly eliminating the traditional new directors' meeting provision in the bylaws ahead of the election—after attempting in three different courts to enjoin enforcement of the election itself. The additional fact that Ms. Smith—who is purportedly an independent director—has not reached out to Mr. Stilwell is, at the very least, troubling.

72.     "The conduct of bankruptcy proceedings not only should be right but must seem right." *Knapp v. Seligson* (*In re* Ira Haupt & Co.), 361 F.2d 164, 168 (2d Cir. 1966); *accord In re*

*Coram Healthcare Corp.*, 271 B.R. 228, 235 (D. Del. 2001). Appointing an independent examiner would eliminate all doubt and circumvent the need for costly litigation into decisions of the SIC.

73.    Such an examiner will be able to issue a legitimate and transparent report, upon which all parties can negotiate to achieve a resolution. The formulation and promulgation of a viable and confirmable plan of reorganization requires such an independent investigation. The current Plan serves as nothing more than a transparent vehicle to shed liability of the insiders, while also cabining and curtailing the investigation and prosecution of various claims and causes of action by any other party in interest.

74.    Examiners have helped move cases forward by allowing parties to negotiate off an independent examiner report. *See, e.g.*, *Dynegy Holdings, LLC*, Case No. 11-38111 (Bankr. S.D.N.Y. Dec. 29, 2011) (D.I. 276) (appointing examiner to investigate prepetition conduct of debtors' board; chapter 11 plan later confirmed); *In re Caesars Enter. Operating Co., Inc.*, Case No. 15-01145 (Bankr. N.D. Ill. Mar. 12, 2015) (D.I. 675) (appointing examiner to investigate avoidable transfers; chapter 11 plan later confirmed); *In re Cenveo, Inc.*, Case No. 18-22178 (Bankr. S.D.N.Y. Mar. 15, 2018) (D.I. 203) (appointing examiner to investigate insider transactions; chapter 11 plan later confirmed).

## V.    <u>CONCLUSION</u>

WHEREFORE Stilwell requests that this Court enter an order directing the appointment of an examiner and such other and further relief as the Court finds just and appropriate.

12652878-14

Dated: October 10, 2024

SAUL EWING LLP

/s/ Evan T. Miller

Thomas J. Fleming
Adam H. Friedman
Jacqueline Y. Ma
**OLSHAN FROME WOLOSKY LLP**
1325 Avenue of the Americas
New York, NY 10019
Tel.: (212) 451-2300
tfleming@olshanlaw.com
afriedman@olshanlaw.com
jma@olshanlaw.com

Evan T. Miller (No. 5364)
John D. Demmy (No. 2802)
Nicholas Smargiassi (No. 7265)
1201 N. Market St., Ste 2300
Wilmington, DE 19801
Tel.: (302) 421-6864
evan.miller@saul.com
john.demmy@saul.com
nicholas.smargiassi@saul.com

- and -

Steven C. Reingold
**SAUL EWING LLP**
131 Dartmouth St., Ste 501
Boston, MA 02116
Tel.: (617) 912-0940
steven.reingold@saul.com

*Counsel to Stilwell Activist Investments, L.P.*