**Exhibit A**

Proposed Redacted Version

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| SILVERGATE CAPITAL CORPORATION, *et al.*,[1] | Case No. 24-12158 (KBO) |
| Debtors. | (Jointly Administered) |

Report of Stephanie Wickouski, as Examiner

**This Report is labeled "Confidential and Privileged - Contains Confidential Supervisory Information of the Board of Governors of the Federal Reserve System." The basis for confidential treatment includes, but is not limited to, the fact that this Report contains materials related to examination, operating, or condition reports prepared by an agency responsible for the supervision of financial institutions (as set forth in 5 U.S.C. sections 552(b)(4), 552(b)(6), 552(b)(7), and 552(b)(8) respectively). Disclosure of such information is not permitted absent regulatory approval. Unauthorized disclosure may result in monetary penalties and criminal liability or imprisonment.**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Silvergate Capital Corporation (7337), Silvergate Liquidation Corporation (4449) and Spring Valley Lots, LLC (0474). The Debtors' mailing address is 4225 Executive Square, Suite 600, La Jolla, CA 92037.

# TABLE OF CONTENTS

I.     INTRODUCTION AND EXECUTIVE SUMMARY ........................................................ 3

II.    BACKGROUND ............................................................................................................ 6

       A.    Litigation ....................................................................................................... 7

       B.    Chapter 11 Filing ........................................................................................ 10

       C.    Appointment of the Independent Director ............................................. 11

       D.    The Chapter 11 Cases ................................................................................ 12

       E.    The SIC Investigation ................................................................................ 13

       F.    The Examiner's Investigation ................................................................... 14

       G.    Limitations in the Examiner's Investigation .......................................... 15

III.   ANALYSIS OF SIC INVESTIGATION AND REPORT ............................................. 16

       A.    Investigation ............................................................................................... 17

             i.     Independence of Ivona Smith .................................................... 18

             ii.    The SIC's Retention of RLF as counsel .................................... 19

       B.    Report ......................................................................................................... 21

             i.     Duty of Loyalty (*Caremark* Claims) ......................................... 23

             ii.    Duty of Disclosure Claims .......................................................... 30

             iii.   Insider Trading Claims ............................................................... 34

             iv.    Other Potential Causes of Action .............................................. 35

             v.     The Releases ................................................................................. 37

IV.    CONCLUSIONS ........................................................................................................... 38

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

## I.    INTRODUCTION AND EXECUTIVE SUMMARY

This report is submitted by the Examiner, Stephanie Wickouski (the "Examiner"), pursuant to the *Order Directing the Appointment of an Examiner* [Docket No. 402] (the "Examiner Order"), entered on December 20, 2024, by the Court in the chapter 11 cases of Silvergate Capital Corporation ("Silvergate" or the "Debtors").[2]

The Examiner Order was entered following the Motion of Stilwell Activist Investments, L.P. ("Stilwell") *for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 130] (the "Examiner Request Motion"), filed on October 10, 2024.  After a hearing on the Examiner Request Motion, the Court directed the United States Trustee to appoint an examiner in the chapter 11 cases pursuant to 11 U.S.C. § 1104(c) to investigate and report on: "[t]he independence of Ivona Smith and the Debtors' 'Special Investigation Committee' (the 'SIC'), including but not limited to its investigation, the SIC's use and reliance on the Debtors' professionals, the thoroughness of the SIC's investigation, and [the] reasonableness of its conclusions with respect to potential claims of the estates."[3]

In accordance with the Examiner Order, the Examiner conducted this investigation as a meta-analysis of the prior investigation conducted by Ivona Smith, the independent director of the Board of Directors (the "Board") of Silvergate and the sole member of the SIC.  The Board appointed Ms. Smith as the sole member of the SIC for the following purposes: (i) "investigat[ing] any potential claims and causes of action of [Silvergate] against its current and former directors, officers, managers, insiders, principals, employees and other related parties, including, but not

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Report, as defined herein.

[3] Examiner Order at ¶ 2.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

limited to, those claims and allegations asserted in the [Nkonoki Derivative Action][4] and the Shareholder Demand Letter[5] and (ii) determin[ing] what actions, if any, should be taken with respect to any such potential claims and causes of action, including regarding initiation of litigation, entry into settlements or provision of releases" (the "SIC Investigation").

The SIC ultimately issued the *Report of the Internal Investigation Committee of the Board of Directors of Silvergate, Inc.*, dated December 24, 2024 (the "Report"), which concluded that it is in the best interests of the estate to (i) not pursue claims against, and (ii) provide releases to, Silvergate's current and former directors and officers.[6]

An examiner is disinterested and answers only to the Court.[7]   The Examiner reviewed the processes, materials, and interviews that the SIC relied upon in the SIC Investigation, as well as the findings and work product of the SIC Investigation, as outlined in the Report.   In evaluating the SIC Investigation, the Examiner reviewed the process by which Ms. Smith was appointed to the Board and as the sole member of the SIC, and assessed the independence of the SIC and its advisors.   The findings of that review[8] are discussed in detail in this report and summarized below as follows:

> (1)  Ms. Smith's appointment as the sole member of the SIC was proper and she met the criteria for independence at the time of her appointment.

---

[4]  *Nkonoki v. Karen F. Brassfield*, No. 2023-0000-8084 (Cal. Super. 2023) (the "Nkonoki Derivative Action").

[5]  Nikhil Bhayani, *Demand for Board Action*, March 6, 2023 (the "Shareholder Demand Letter").

[6]  Report at 2-3.

[7]  *See, e.g., FTX Trading Ltd. v. Vara*, No. 23-2297 (3d Cir. 2024) (citing *United States v. Schilling (In re Big Rivers Elec. Corp.)*, 335 F.3d 415, 432 (6th Cir. 2004) (quoting *In re Baldwin United Corp.*, 46 B.R. 314, 316 (S.D. Ohio 1985)); 11 U.S.C. § 1107(a).

[8]   In the course of its investigation, the Examiner collected information from a variety of sources, including two interviews with Ms. Smith and her counsel.   These interviews took place on February 20, 2025 (the "February Interview") and March 19, 2025 (the "March Interview").   The Examiner also made follow-up inquiries by email to Ms. Smith and her counsel on March 21, 2025.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

(2) The SIC's retention of the Debtors' counsel resulted in an inevitable conflict of interest, which potentially would affect both the conduct and outcome of the SIC Investigation.

(3) Ms. Smith's act of voting to approve the Plan and RSA after she had been appointed as the sole member of the SIC, but before the SIC Investigation was conducted, presented the appearance of a conflict of interest as well. Further, the fact that the Plan releases were agreed to and approved by the Board, including Ms. Smith, raises obvious questions as to the SIC's objectives.

Due to these structural and practical limitations in the SIC Investigation, most notably the absence of independent counsel, as well as gaps in the analysis contained in the Report, the Examiner concludes that the SIC's findings are not reasonable under these circumstances. In particular, the Report contains a number of gaps, both procedural and substantive, including:

(1) The Report discusses only certain potential estate causes of action, while overlooking others. The Report does not reflect a complete analysis of potential *Caremark*, *Malone*, and/or *Brophy*[9] claims against certain individuals.

(2) The Report concludes generally that certain claims are not "credible"[10]—a conclusion that is at odds with the fact that colorable and/or valuable claims may exist, as demonstrated by various suits filed before the chapter 11 case, some of which have withstood dismissal.

(3) The Report's recommendation to grant releases to Silvergate's directors and officers, does not necessarily follow from the Report's conclusion that certain claims against

---

[9] *Brophy* claims refer to insider trading claims arising under *Brophy v. Cities Service Co.*, 31 Del. Ch. 241 (Del. Ch. 1949).

[10] The Report repeatedly uses the term "credible" as the standard in assessing claims, skirting the questions that are generally raised in assessing estate claims, including whether the claims are colorable or have settlement value.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

directors and officers may not be cost-effective to bring.  Even if the estate does not

bring claims, it should not necessarily grant releases without any consideration.  The

Report does not discuss how the estate benefits, if at all, from granting releases,[11] and

likewise does not analyze whether the releases in the Plan meet the applicable legal

standard.

(4) While the Report relies on the existence of indemnification claims to justify the releases

in the Debtors' plan, the Report contains only broad generalizations about the

indemnification claims and lacks a detailed analysis of their merits.  The Report does

not discuss any defenses that the estate may have to indemnification claims, or how

releases might impact those defenses.

## II.    BACKGROUND

Silvergate is the parent company of Silvergate Bank,[12] a California bank that provided

unique services in the cryptocurrency industry (the "Bank," and unless otherwise indicated,

included in the terms "Silvergate" the "Debtors").[13]  In 2017, the Bank launched the Silvergate

Exchange Network (the "SEN"), a real-time payment system that allowed customers and

institutional clients to instantly transfer fiat currencies between internal Silvergate accounts at any

time.[14]  Unlike traditional bank wires, which can often take days to settle, the SEN supported the

---

[11] The Examiner was not provided any documents or information as to the negotiation of the Plan, including releases.

[12] Silvergate Bank was a subsidiary corporation of Silvergate Capital Corporation.  *Declaration of Elaine Hetrick in Support of the Debtors' Chapter 11 Petitions and Certain Motions* [Docket No. 9] at ¶ 5.  Silvergate Bank changed its name to Silvergate Liquidation Corporation as a condition of relinquishing its banking charter to the California Department of Financial Protection and Innovation (the "DFPI").  *Id.*  On July 8, 2024, Silvergate Liquidation Corporation formally relinquished its banking charter to the DFPI and thereby ceased its existence as a bank.  *Id.*

[13] *Declaration of Elaine Hetrick in Support of the Debtors' Chapter 11 Petitions and Certain Motions* [Docket No. 9] at ¶ 5.

[14] Report at 15.

CONFIDENTIAL    AND    PRIVILEGED    -    INCLUDES    CONFIDENTIAL    SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

cryptocurrency ecosystem[15] by enabling immediate transactions between crypto exchanges and investors.  Silvergate was likely the first regulated bank to offer this service.

As a regulated financial institution, the Bank was required to comply with the Bank Secrecy Act[16] (the "BSA") and maintain an effective anti-money laundering ("AML") compliance program.[17]  As the SEN increased in popularity, customers transferred hundreds of billions of dollars using the SEN over the ensuing years.[18]  Despite this increase in the volume of SEN transactions, internal communications reflect that transactions within the SEN were not being monitored during a certain period, resulting in deficient compliance with BSA and AML requirements.[19]

A.      Litigation

In November 2022, FTX Trading, Ltd. ("FTX"), a major customer of Silvergate, filed for chapter 11 bankruptcy in Delaware.[20]  Also in November 2022, Silvergate retained Cravath, Swaine & Moore LLP ("Cravath") in connection with "bank regulatory matters, government investigations, general corporate matters, litigation matters and restructuring-related matters."[21]  Subsequently, Cravath advised Silvergate and the Board on a range of matters including, *inter alia*, bank regulatory matters and the fiduciary and other obligations of the Board.[22]

---

[15] The SEN system was particularly attractive to cryptocurrency exchanges because (i) transactions involving cryptocurrency were typically slow to close and (ii) these time lags had the potential to impede the economic benefit of the transaction due to the frequent fluctuations in cryptocurrency value.

[16] 31 U.S.C. § 5311 *et seq.*

[17] Report at 16; *see Silvergate Bank Secrecy Act, Anti-Money Laundering, and OFAC Sanctions Compliance Policy*, effective December 10, 2021.

[18] Report at 15.

[19] Report at 75-79.

[20] *In re FTX Trading Ltd., et al.*, Case No. 22-11068 (JTD) (Bankr. D. Del. 2024).

[21] *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Cravath, Swaine & Moore LLP as Co-Counsel to the Debtors* [Docket No. 163] (the "Cravath Retention Application") at ¶ 16.

[22] Cravath and Silvergate executed a number of engagement letters between November 2022 and 2024 concerning this representation.  *Id*. at ¶ 16-18, Ex. D.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

After FTX filed for bankruptcy in November 2022, an internal review of FTX's flow of funds in the SEN revealed a high volume of transfers—which the U.S. Securities and Exchange Commission (the "SEC") alleged[23] totaled approximately $9 billion—from FTX custodial accounts to related entities, including Alameda Research, and a high volume of wire transfers to FTX senior management, including Sam Bankman-Fried.[24] ██████████████████████

██████████████████████████████████████████

████████████████████[25] ███████████████████████

██████████████████████████████████████████

████████[26] ███████████████████████████████████

██████████████████████████████████████████

██████[27] Silvergate ultimately entered settlements with the FRB and DFPI for $43 million and $20 million, respectively, which offset the settlement payments stemming from the SEC Complaint.[28]

In the aftermath of FTX's chapter 11 filing, litigation against Silvergate and members of the Board ensued, including:

- On February 14, 2023, a putative class action was filed in the U.S. District Court for the Northern District of California captioned *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079 (S.D. Cal. 2024) (the "Bhatia Action"). The complaint filed in the Bhatia Action alleged

---

[23] *U.S. Secs. & Exchange Comm'n v. Silvergate Capital Corp., Alan J. Lane, Kathleen Fraher, and Antonio Martino*, 24 Civ. 4987 (S.D.N.Y. July 1, 2024) (the "SEC Complaint") at ¶ 3.
[24] Report at 19-20, 85.
[25] Report at 89.
[26] Report at 89.
[27] Report at 94.
[28] Report at 14.

CONFIDENTIAL    AND    PRIVILEGED  -  INCLUDES    CONFIDENTIAL    SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

that members of the Board breached their fiduciary duties by failing to establish and/or properly execute a due diligence program.[29]  The court denied the defendants' motion to dismiss on March 20, 2024.  *Bhatia*, 725 F. Supp. 3d at 1086.  The parties executed a settlement agreement, dated November 15, 2024, which provides for a payment of $10 million to the plaintiff class, subject to approval by the court.[30]

- On February 21, 2023, the Nkonoki Derivative Action was filed in the Superior Court of the State of California, San Diego County.[31]  The complaint alleged breach of fiduciary duty and insider trading based on (i) failure to ensure that the Bank operated in accordance with state and federal law and with adequate controls to manage risk and ensure compliance with applicable law and banking practices, (ii) materially misleading statements by members of the Board regarding Silvergate's compliance, risks, controls, reporting systems, and sustainability of its business model, and (iii) insider trading under the California Corporations Code as to certain defendants.[32]  The Nkonoki Derivative Action has been stayed as of the date of this report.[33]

- On July 1, 2024, the SEC commenced an action against Silvergate and the Board by filing the SEC Complaint.  The SEC Complaint alleged that for most of 2021 and 2022, Silvergate did not adequately monitor its platforms for suspicious activity and failed to detect nearly $9 billion in suspicious transfers by FTX and its related entities.[34]  Silvergate agreed to settle the SEC Complaint pursuant to a final judgment that (i) ordered Silvergate

---

[29] Report at 5; Disclosure Statement Art. II(C).
[30] Report at 5-6.
[31] Report at 8.
[32] Report at 8-9.
[33] Report at 9.
[34] Report at 12; SEC Complaint at ¶ 3.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

to pay $50 million in civil penalties and (ii) imposed a permanent injunction to settle the charges.[35]  Board members Alan Lane and Kathleen Fraher settled the charges against them without admitting or denying the allegations, and agreed to permanent injunctions, five-year officer-and-director bars, and civil penalties of $1 million and $250,000, respectively.[36]

- Additionally, various federal class action suits were filed against Silvergate between May 2019 through February 2023.[37]  Other investigations commenced as well, including a December 2022 inquiry launched by certain United States Senators regarding Silvergate's connections with FTX's activities.[38]  This inquiry may still be pending, as well as an ongoing investigation by the Department of Justice.[39]

B.      Chapter 11 Filing

As noted above, from November 2022 through 2024, Silvergate executed a series of engagement agreements with Cravath.  On March 8, 2023, Silvergate announced its intent to wind down operations and voluntarily liquidate.[40]  On March 24, 2023, Silvergate executed another engagement agreement with Cravath in connection with the formulation and implementation of a bankruptcy filing under chapter 11 of the Bankruptcy Code.  While Cravath continued to serve as lead counsel, Silvergate also entered an engagement letter with Richards Layton & Finger ("RLF")

---

[35] Report at 13.
[36] *Id.*
[37] Report at 3-9.
[38] On December 5, 2022, Senators Elizabeth Warren, John N. Kennedy and Roger W. Marshall sent a letter to Alan Lane, CEO of Silvergate Capital Corporation, seeking information as to Silvergate's role in FTX's activities and the transfer of FTX funds to Alameda.  Report at 91.
[39] Report at 12.
[40] Report at 94 n.303.

CONFIDENTIAL    AND    PRIVILEGED  -  INCLUDES    CONFIDENTIAL    SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

on or about July 2, 2024, retaining RLF as Delaware counsel in connection with the potential chapter 11 cases.[41]

Although the precise time period has not been disclosed, a Restructuring Support Agreement was negotiated between the Debtors, represented by Cravath, and an *ad hoc* group of preferred shareholders represented by Milbank, LLP ("Milbank").[42]  Through the RSA, this *ad hoc* group of preferred shareholders agreed to support a pre-arranged chapter 11 plan[43] that was incorporated into the RSA (the "Plan").[44]  Both the RSA and the Plan include provisions granting releases to all current and former directors and officers of Silvergate.[45]

### C.    Appointment of the Independent Director

On July 31, 2024, George Zobitz, a Cravath partner, contacted Ms. Smith by email regarding a potential role as an independent director on the Board.[46]  In telephone conversations on August 1, 2024, and August 9, 2024, Mr. Zobitz explained that Ms. Smith would be expected to conduct an investigation as an independent director.[47]  He also suggested that Ms. Smith work with RLF—which had been retained in connection with Silvergate's anticipated chapter 11 filing—in her investigation.[48]  During one of her interviews with the Examiner, Ms. Smith said

---

[41] *See Letter from Paul N. Heath, on Behalf of Richards Layton & Finger, P.A., Addressed to and Agreed by Paris Cribben, on Behalf of Silvergate Bank, Re: Engagement of Richards, Layton & Finger, P.A. – Representation of Silvergate Bank and Certain Affiliated Entities*, dated July 2, 2024 (the "RLF Engagement Letter"); *Debtors' Application Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) for Entry of an Order (I) Authorizing the Retention and Employment of Richards, Layton & Finger, P.A. as Co-Counsel to the Debtors Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 77] (the "RLF Retention Application"), Ex. B at ¶ 5.
[42] *Restructuring Support Agreement dated September 17, 2024* [Docket No. 9-1] (the "RSA").
[43] *See Joint Chapter 11 Plan of Silvergate Capital Corporation and its Affiliated Debtors* [Docket No. 10].
[44] *Id.*
[45] *Id.*; Plan Art. I(A)(108), IV(I).
[46] February Interview.
[47] *Id.*
[48] *Id.*  Ms. Smith, in her interviews, said she did not know what specific events prompted the need for an investigation, other than the Shareholder Demand Letter and the Derivative Action.

- 11 -

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

that while she would not normally, as an independent director, retain company counsel to act as board or special committee counsel, and had done so only once before, she did so here because RLF had not been representing the Debtors for very long.[49]

Ms. Smith was added to the Board on August 16, 2024.[50]  A week later, on August 23, 2024, the Board formed the SIC and appointed Ms. Smith its single member.[51]

> D.    The Chapter 11 Cases

Silvergate filed its voluntary petition for chapter 11 bankruptcy on September 17, 2024 (the "Petition Date").[52]  Four days prior, on September 13, 2024, the Board (including Ms. Smith) approved the RSA and the Plan.[53]  The Plan and Disclosure Statement[54] were filed on September 18, 2024, the day after the Petition Date.  While Ms. Smith had engaged and had preliminary discussions with RLF regarding the conduct of an investigation, no investigation had been commenced in earnest, much less completed, at the time the Petition and Plan were filed.

Notably, the Plan provided for broad releases by the Debtors and other parties of certain "Released Parties," which include the Debtors' former and current directors and officers.[55]  Neither the release provisions in the Plan nor the definition of Released Parties contain any exclusion or limitation based on the outcome of any investigation or action.[56]  Further, the Plan does not

---

[49] February Interview.
[50] Report at 29-30.
[51] *Resolutions of the Board of Directors of Silvergate Capital Corporation* (Aug. 23, 2024) (the "August 23 Board Resolution").
[52] *In re Silvergate Capital Corp.*, Case No. 24-12158 (KBO) (Bankr. D. Del. 2024).
[53] *See Verified Complaint for Injunctive Relief, Silvergate Capital Corp. v. Stilwell Activist Invs., L.P.*, Adv. Case No. 24-50132 (KBO) [Docket No. 1] at 6.
[54] *Disclosure Statement Pursuant to 11 U.S.C. § 1125 with Respect to Joint Chapter 11 Plan of Silvergate Capital Corporation and its Affiliated Debtors* [Docket No. 11] (the "Disclosure Statement").
[55] Plan Art. I(A)(108), IV(I).
[56] The Disclosure Statement's discussion of the SIC appears to be inconsistent with the clear release language in the Plan. The Disclosure Statement states:

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

preserve claims against directors and officers or provide any qualification or exception to the releases based on the completion of the SIC Investigation or the results thereof.[57]  Ms. Smith told the Examiner that she did not recall any Board or SIC discussion of releases, and that she considered the releases to be "boilerplate."[58]

E.    The SIC Investigation

On September 19, 2024—one day after the Plan was filed and less than one week after Ms. Smith voted with the Board to approve the Plan—Ms. Smith met with RLF to discuss next steps in conducting the SIC Investigation.  According to SIC minutes and the February Interview, Cravath flagged "key documents" for RLF, but RLF did not have access to Cravath's witness interview transcripts or notes of witness interviews.[59]  The Report relied primarily on documents and information provided by Cravath.[60]

The SIC interviewed only four individuals, each of whom were the subject of litigation discussed above: Alan Lane, Kathleen Fraher, Michelle Sabins, and Steven Dietz.[61]  Messrs. Lane

---

The Special Investigations Committee has been empowered by the board of Silvergate Capital Corporation to investigate and take all action to commence litigation, settle or release any claims held by the Debtors against their current or former directors, officers and employees . . . . The Special Investigations Committee has the full power and authority of the Board to carry out the [SIC Investigation] and take action in response to or with respect to the [SIC Investigation].  The Debtors understand that the [SIC] intends to resolve such claims…during the course of the Chapter 11 Cases or recommend such claims vest in the Liquidation Trust.  RLF (as defined below) is acting as counsel to the [SIC] with respect to the [SIC Investigation].  The [SIC Investigation] has been ongoing since on or about August 23, 2024.

Disclosure Statement, Art. II(G)(7).  The Plan as drafted includes an exception to the releases for "fraud, willful misconduct, or gross negligence."  Plan Art. IX.B.  However, the Report does not indicate that the SIC found any claims that would come within this exception.

[57] In apparent contrast, the Disclosure Statement states that "the Debtors possess claims and causes of action against third parties . . . . These claims include . . . claims and causes of action against any non-released current or former employee, officer or director, pending completion of the investigation by the [SIC]."  Disclosure Statement, Art. II(C).

[58] March Interview.

[59] *Minutes of a Meeting of the Investigation Committee of the Board of Directors* (Sept. 11, 2024).

[60] Report at 31-32.

[61] Report at 32.

- 13 -

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

and Fraher were defendants and potential targets of estate claims, as well as proposed beneficiaries of releases under the Plan.[62]   The SIC only interviewed witnesses who were either (i) identified subjects or targets of the litigation or (ii) implicated in potential claims.[63]   Notably, the SIC did not interview Paris Cribben, Silvergate's general counsel.[64]   As part of an agreement related to the SIC interviews, RLF reviewed with each witness' counsel the factual findings relevant to each witness that would be placed in any final report.[65]

    The Report was issued, but not publicly filed, on December 24, 2024—four days after the entry of the Examiner Order.   The Report concludes that (i) it is not in the best interests of Silvergate to pursue potential claims against its current and/or former officers, directors, and employees, and (ii) it is in the best interests of Silvergate to provide releases to directors of any claims arising during the period 2019 through March 8, 2024, as well as releases to Lane, Fraher, Martino, and Pearson for claims against them in their capacities as officers during the same period, subject to a carve-out for repayment of advance legal expenses in the event it is later determined that they are not entitled to indemnification.[66]

    F.    The Examiner's Investigation

    On January 31, 2025, the Court entered an order approving the United States Trustee's Application to Approve Stephanie Wickouski as the Examiner.[67]   On March 5, 2025, the Court

---

[62] *See, e.g.*, Report at 27; *see also* Plan Art. I(A)(108).
[63] Report at 7, 32, 107.
[64] February Interview.
[65] *Minutes of a Meeting of the Investigation Committee of the Board of Directors* (Dec. 23, 2024).
[66] Report at 2-3.
[67] *See Order Approving Appointment of Examiner* [Docket No. 499]

CONFIDENTIAL   AND   PRIVILEGED  -  INCLUDES   CONFIDENTIAL   SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

entered an order approving the Examiner's proposed scope, work plan, and budget for the investigation.[68]

On January 31, 2025, the day the Court approved the appointment of the Examiner, the Examiner issued an initial set of diligence requests to the SIC and asked that all responsive materials and information be produced by February 7, 2025, so that the Examiner could timely complete its investigation (the "January Document Request").[69]

On February 7, 2025, the Examiner finally received and reviewed the Report and the documents cited in the Report. However, as of the date of this report, not all documents requested by the Examiner in the January Document Request have been produced.

G.    Limitations in the Examiner's Investigation

During Ms. Smith's interviews with the Examiner, RLF informed the Examiner that there are no transcripts of the SIC's witness interviews conducted in connection with the SIC Investigation, and that notes of counsel concerning these interviews would be withheld on the basis

---

[68] *Order Approving Examiner's Proposed Scope, Work Plan, and Budget for Investigation* [Docket No. 571] (the "Conduct Order"). Notably, the Conduct Order amends paragraph 6 of the Examiner Order to read:

> The Debtors and/or SIC shall provide to the Examiner all non-privileged documents and information within their possession that the Examiner deems relevant to perform the Investigation. If the Examiner seeks the disclosure of documents or information as to which the Debtors assert a claim or privilege, or otherwise objects to disclosing, including on the basis that the request is beyond the scope of the Investigation, and the Examiner and Debtors are unable to reach a resolution on whether or on what terms such documents or information should be disclosed to the Examiner, the matter may be brought before the court for resolution. The report of the Independent Investigation Committee and the documents cited therein shall be provided to the Examiner and the Examiner's counsel and retained professionals subject to and promptly upon applicable regulatory approval. For the avoidance of doubt (a) nothing in this Order shall be deemed to require any party to waive any applicable privilege and (b) *the disclosure of documents or information to the Examiner shall neither constitute nor be deemed a waiver by the disclosing party of, as applicable, work-product, attorney-client, or other privilege or the confidential nature of the information disclosed to the Examiner.*

*Id.* at ¶ 4 (emphasis added).
[69] A copy of the January Document Request is attached as Exhibit A.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

of attorney-client and/or work product privilege.[70]   Thus, the Examiner could not evaluate the adequacy of the interviews conducted by the SIC or determine if further interviews were necessary to fill gaps in the SIC Investigation.

Further, the Examiner was not provided access to communications between the SIC and RLF concerning the SIC Investigation, including any instructions given or any recommendations made by RLF to the SIC that would have allowed a more complete assessment of the independence of the SIC Investigation.  Similarly, the Examiner was not provided any work plan or analyses that were performed in connection with the SIC Investigation.[71]

Thus, the Examiner's evaluation of the investigation was limited in scope to (i) the information in the Report, (ii) the limited SIC Investigation notes provided by Ms. Smith, (iii) the information gleaned from the interviews[72] conducted by the Examiner, and (iv) the information that Silvergate did provide.

III.    ANALYSIS OF SIC INVESTIGATION AND REPORT

As to the SIC Investigation, the appointment of Ms. Smith as the sole member of the SIC was proper.  Ms. Smith met the criteria for independence at the time of her appointment and had no disqualifying connections to any parties in the case.  Ms. Smith did not have any material ties or relationships that could potentially influence her ability to act in the best interests of the estate. The propriety of Ms. Smith's status as the sole member of the SIC is supported by Delaware law.

---

[70] Further, on March 5, 2025, counsel for the Examiner received a written response and objection to the January Document Request, which is attached as Exhibit B (the "Production Objection").  The Production Objection included the assertion of attorney-client and work produce privileges, but no privilege log was provided in connection with the Production Objection.

[71] As noted above, Silvergate asserted privilege or work product objections to the Examiner's requests.

[72] The Examiner was required to limit witness interviews to Ivona Smith only.  Conduct Order at ¶ 3.

CONFIDENTIAL    AND    PRIVILEGED   -   INCLUDES    CONFIDENTIAL    SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

However, as discussed herein, the SIC's investigative process and the Report display significant gaps and deficiencies. Ms. Smith's retention of RLF as counsel to the SIC affected the independence of the SIC's investigation. RLF, as Debtors' counsel, was obligated under its engagement letter to solely represent the Debtors and prosecute the plan, which at the time of Ms. Smith's investigation, included releases of directors and officers. RLF's activity largely consisted of reviewing information provided by Cravath and RLF did not seek to expand the SIC's fact finding beyond the recycled information.

As to the Report, the SIC's conclusions as to the "credibility" of the causes of action analyzed in the Report are not entirely supported by the Report, based on the Examiner's review of the facts and the law. The SIC appears to have failed to conduct a thorough investigation of the directors' and officers' knowledge of the Verafin SEN Gap, the BSA and AML compliance failures, and the internal transfers between the FTX custodial accounts prior to November 2022. As a result, the Examiner cannot conclusively find that the *Caremark*, *Brophy*, and *Malone* claims against the directors and officers lack viability. In addition, the SIC appears to have failed to analyze the viability of other potential estate causes of action against the directors and officers— for example, claims for breach of the duty of care against Fraher, Lane and Pearson, among others.[73]

The SIC's recommendation to release the directors and officers is predicated on a fragmentary application of fact to law reflected in the Report. Moreover, the Report fails to discuss what consideration, if any, the estate would receive in return for the releases.

A.    <u>Investigation</u>

---

[73] This analysis is discussed in more detail in Section III(B)(i), *infra*.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

i.      <u>Independence of Ivona Smith</u>

Ivona Smith met the criteria for independence at the time of her appointment to the Board and the Special Investigation Committee.  A director is considered independent concerning a decision if that decision "is based on entirely on the merits of the transaction and is not influenced by personal or extraneous considerations.[74]  With respect to an individual director, the alleged "disqualifying self-interest or lack of independence must be material"—*i.e.*, "reasonably likely to affect the decision-making process of a reasonable person."[75]  Under Delaware law, "independent directors are presumed to be motivated to do their duty with fidelity."[76]  During the February Interview, Ms. Smith was questioned about her relationship with Silvergate and each party in interest in Silvergate's chapter 11 case.  Ms. Smith's answers confirmed that she has no connections with any of the parties in this case that would destroy her independence.[77]

The fact that Ms. Smith was the sole member of the SIC did not impact her independence or ability to conduct a special investigation.  Under Delaware law, a sole independent director can serve as a committee of one and direct an investigation.[78]  However, single member special investigation committees are held to a higher showing of independence.[79]  Here, Ms. Smith met that standard at the time of her appointment to the SIC.

---

[74] *O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*, 466 B.R. 596, 610 (Bankr. S.D.N.Y. 2012) (citation omitted).

[75] *Id.* (citation omitted).

[76] *In re BCG Partners, Inc. Derivative Litig.*, C.A. No. 2018-0722-LWW, 2021 Del. Ch. LEXIS 213, at *30 (Del. Ch. Sept. 20, 2021).

[77] February Interview.

[78] *See, e.g.*, *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) (citing *Zapata Corp. v. Maldonado*, 430 A.2d 779, 786 (Del. 1981)).

[79] *In re Baker Hughes*, C.A. No. 2019-0201-LWW, 2023 Del. Ch. LEXIS 88, at *22 (Del. Ch. Apr. 17, 2023) ([T]he SLC must prove its independence.  That burden is particularly hefty if a single member SLC is used."); *Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985) (rejecting single-member SIC and stating "[i]f a single member committee is to be used, the member should, like Caesar's wife, be above reproach."); *Sutherland v. Sutherland*, C.A. No. 2399-VCL, 2007 Del. Ch. LEXIS 91, at *8 n.10 (Del. Ch. July 2, 2007) ("[T]he sole member of a one-person special litigation committee" must "meet unyielding standards of diligence and independence.").

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

ii.        The SIC's Retention of RLF as counsel

Cravath and RLF served as co-counsel for the Debtors during the chapter 11 case. RLF's retention application was approved by the Court on October 10, 2024.[80] Cravath's retention application was approved by the Court on November 13, 2024.[81] Both law firms' retention applications were approved as of the Petition Date.

RLF's engagement letter, dated July 2, 2024, stated in pertinent part:

> For all purposes of this matter, the client shall be the Company. All duties and responsibilities created and imposed by this agreement shall be owed to the Company and not to any officer, agent, partnership, other corporation, trustee, employee or third party individuals, unless expressly otherwise agreed, and then only after full and accurate disclosure to the court and other necessary parties.[82]

The Examiner was informed that RLF was retained as the SIC's counsel in August 2024, though there was no separate formal engagement letter with the SIC, and no conflict waiver or written consents to the dual representation by the Company.[83] RLF's fee applications, as counsel for the Debtors, include time entries associated with the SIC Investigation and drafting the Report in the category "Litigation/Adversary Proceedings," which is described as including "all matters

---

[80] *See Order (I) Authorizing the Retention and Employment Richards, Layton & Finger, P.A. as Co-Counsel to the Debtors Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 138].

[81] *See Order Authorizing the Retention and Employment of Cravath, Swaine & Moore LLP as Co-Counsel to the Debtors* [Docket No. 267].

[82] RLF Engagement Letter.

[83] The *Declaration of Paul Heath* dated October 24, 2024 (the "Heath Declaration"), filed in connection with RLF's retention application in this case, does not disclose RLF's representation of the SIC. On the contrary, the Heath Declaration states that except as specifically noted, RLF has no connection with parties listed on the parties in interest exhibit, which specifically lists Ms. Smith as a director. *Declaration of Paul N. Heath in Support of Debtors' Application Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) for Entry of an Order (I) Authorizing the Retention and Employment of Richards, Layton & Finger, P.A., as Co-Counsel to the Debtors Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 77-3].

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

related to litigation and adversary proceedings."[84]   There is no specific discussion of the SIC Investigation as such and no separate project category for the SIC Investigation.[85]

Delaware Courts have noted that "[s]pecial litigation committees serve an important function; they promote confidence in the integrity of corporate decision making by vesting the company's power to respond to accusations of serious misconduct by high officials in an impartial group of independent directors."[86]   Under Delaware corporate law, when a special litigation committee is formed, it is expected that the committee will retain its own counsel.[87]   Experienced corporate lawyers would acknowledge that it would be odd for an independent director or special committee to use company counsel to conduct an investigation of a derivative demand.[88]

A special committee should serve to protect the integrity of the investigative process when claims may be held by the corporation against the parties responsible for conducting the corporation's affairs.   "[A] well-functioning, *well-advised* special litigation committee, whose fairness and objectivity cannot be reasonably questioned, can serve to assuage concern among stockholders that the company's litigation assets are being managed properly."[89]

---

[84] *See, e.g.*, *Second Monthly Application of Richards, Layton & Finger, P.A. for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel for the Debtors and Debtors-in-Possession for the Period from October 1, 2024 through October 31, 2024* [Docket No. 337] at 15,  Ex. A [D.I. 337-2] at 36.

[85] *See id.*

[86] *Wenske v. Blue Bell Creameries, Inc.*, 214 A.3d 958, 963 (Del. Ch. 2019) (citing *Biondi v. Scrushy*, 820 A.2d 1148, 1156 (Del. Ch. 2003), *aff'd* 847 A.2d 1121 (Del. 2004)).

[87] "In reviewing the adequacy of a special litigation committee's investigation, courts will review (1) the length and scope of the investigation, (2) the committee's use of independent counsel and experts, (3) the corporation's or the defendants' involvement, if any, in the investigation, and (4) the adequacy and reliability of the information supplied to the committee." Joseph M. McLaughlin, *Essentials of a Special Litigation* Committee, SIMPSON THACHER & BARTLETT LLP at 5, 10 (Nov. 2003) (citing *Spiegel v. Buntrock*, 571 A.2d 767, 772 (Del. 1990); *Johnson v. Hui*, 811 F. Supp. 479, 487-89 (N.D. Cal. 1991); *Drilling v. Berman*, 589 N.W.2d 503, 509 (Minn. Ct. App. 1999); and *Lewis v. Boyd*, 838 S.W.2d 215, 224 (Tenn. Ct. App. 1992)).

[88] *See, e.g.*, Joseph M. McLaughlin, *Essentials of a Special Litigation* Committee, at 2 ("Once constituted, the SLC typically retains independent and reputable counsel . . . .").

[89] *Blue Bell*, 214 A.3d at 963 (emphasis added).

CONFIDENTIAL  AND  PRIVILEGED  -  INCLUDES  CONFIDENTIAL  SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

RLF's simultaneous role as both Debtors' counsel and SIC counsel presented a structural conflict.  As Debtors counsel, RLF was obligated to act on behalf of the Debtors, including advocating for confirmation of the Plan—which included granting releases to the directors and officers.[90]  On the other hand, RLF also represented the SIC, which was charged with conducting a neutral and disinterested investigation, requiring that the SIC identify and preserve (to the extent applicable) any valuable claims against directors and officers and determine whether certain directors and officers should be granted releases.  This is precisely the type of potential conflict that a special committee's retention of independent counsel seeks to avoid.

B.    Report

The Report analyzed: (i) potential *Caremark* claims against the Company's directors relating to the Company's BSA/AML Compliance Program; (ii) potential *Caremark* claims against Lane, in his officer capacity, relating to the Company's BSA/AML Compliance Program; (iii) potential *Caremark* claims against Fraher and Pearson, relating to the Company's BSA/AML Compliance Program; (iv) potential *Malone* claims against various directors and officers for alleged insider stock sales; (v) potential *Brophy* claims against Lane and Fraher for alleged materially misleading public statements; and (vi) potential claims against Martino based on the proper calculation of Silvergate's "other-than-temporary-impairment" ("OTTI") allegations.[91] The Report concludes that *Caremark* claims against the directors and Lane in both his director and officer capacity lack credibility, that the *Caremark* claims against Fraher and Pearson are unlikely

---

[91] The Examiner did not analyze the colorability of potential OTTI claims because the Report's analysis of these claims is incomplete.  *See* Report at 124-125.

- 21 -

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

to prevail, and that it would not be in the best interests of the estate to pursue the *Malone*, *Brophy*, and OTTI claims.

The Examiner cannot find that the SIC's conclusions regarding the strength of these claims are reasonable because of the factual deficiencies in the SIC's investigation and the incomplete analysis provided in the Report. Notably, the Report fails to discuss potential settlement value of estate claims, which results in an analysis that is, at best, incomplete. Further, the Report does not reflect a thorough investigation of the directors' and officers' knowledge of the SEN Gap, the BSA and AML compliance features, and the internal transfers between the FTX custodial accounts prior to November 2022.

The Report's conclusion that estate claims are not "credible" is at odds with the existence of derivative claims apparent from suits that were filed pre-petition. Some claims may be colorable and/or valuable, as demonstrated by the fact that some pre-petition suits have withstood dismissal or have been settled for significant sums. The Report does not appear to reflect a thorough investigation of the directors' and officers' knowledge of the SEN Gap, the BSA and AML compliance failures, and the internal transfers between the FTX custodial accounts prior to November 2022. In addition, the Report did not analyze certain potential estate causes of action against the directors and officers—for example, claims for breach of the duty of care against Fraher, Lane and Pearson, among others.[92]

The Examiner's scope did not include a comprehensive analysis and assessment of causes of action against the directors and officers, nor did it contemplate a factual investigation beyond the SIC's process and Report. Thus, this report is limited to identifying gaps or inconsistencies in

---

[92] This analysis is discussed in more detail in Section III(B)(i), *infra*.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

the SIC's analysis and assessing the reasonableness of the Report's conclusions.  The Examiner is prepared to address further questions or present an analysis of any claim or claims at the direction of the Court.

i.    Duty of Loyalty (*Caremark* Claims)

The Report states that under Maryland law and Silvergate's organizational documents, the directors are insulated from claims of breach of the duty of care, but are not insulated from other claims, including breach of the duty of loyalty, which encompasses claims for breach of the duty of oversight—referred to as "*Caremark*" claims.[93]  This is a correct analysis of Silvergate's organizational documents, which are governed by Maryland law.[94]

Maryland law affords a corporation broad discretion in exculpating its directors and officers.  Section 2-405.2 of the Maryland Corporations and Associations Code and Section 5-418 of the Maryland Courts and Judicial Procedure Code permit a corporate charter to include "any provision expanding or limiting liability"; however, a corporate charter generally may not limit liability for breaches of the duty of loyalty.[95]  Here, Article 9A of Silvergate's Certificate of Incorporation provides an exculpation for directors of the company.[96]  Claims against a director or officer for breach of the duty of oversight arise out of the duty of loyalty and the duty of care.[97]  *Caremark* claims arise out of the duty of loyalty.[98]  Thus, *Caremark* claims are not subject to the

---

[93] Report at 38-40.

[94] *See* Silvergate Articles of Incorporation § 9A (June 24, 2011).

[95] MD. CODE ANN. CTS. & JUD. PROC. § 5-418; MD. CODE ANN. CORPS. & ASS'NS § 2-405.2.

[96] Although permitted under Maryland law, Silvergate's Articles of Incorporation do not provide an exculpation for the company's officers.  The Articles provide that "[a] director of the Corporation shall not be personally liable for monetary damages for any action taken, or any failure to take any action, as a director except to the extent that by law a director's liability for monetary damages may not be limited."  Silvergate Articles of Incorporation § 9A (June 24, 2011).

[97] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 971 n.16 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004).

[98] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

exculpation provisions.[99]  Accordingly, the exculpation provisions do not shield Lane, Fraher, or Pearson from potential *Caremark* claims.

*Caremark* claims—which are based on the landmark Delaware Chancery court case *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996)—allege that directors or officers breached their fiduciary duty of loyalty by failing to act in good faith in overseeing the company's operations.[100]  The Delaware Supreme Court has noted that these claims are "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[101]  To successfully plead a *Caremark* Claim, the plaintiff must demonstrate that the directors and officers either: (i) utterly failed to implement any reporting or information system or controls (the "First Prong"); or (ii) having implemented such a system or controls, consciously failed to monitor or oversee its operations, thus disabling themselves from being informed of risks or problems requiring their attention (the "Second Prong").[102]

Facts recited in the Report indicate that the SEN was not being properly monitored for years, during a time when hundreds of billions were being run through the SEN.  Nevertheless, the Report argues that the Bank had a system of controls, barring a *Caremark* claim.[103]  This argument fails to consider whether the fact the lack of a monitoring transactions within the SEN would give rise to a First Prong *Caremark* claim.

---

[99] MD. CODE ANN. CTS. & JUD. PROC. §§ 2-405.2, 5-418.

[100] Delaware law also provides that officers owe a duty of oversight as to matters within their own responsibility and may be held liable under a *Caremark* theory.  *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 363 (Del. Ch. 2023).

[101] *Marchand v. Barnhill*, 212 A.3d 805, 820 n.99 (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).

[102] *Marchand v. Barnhill*, 212 A.3d at 821.

[103] Report at 97.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

The Report suggests that Silvergate's (and the directors' and officers') compliance failures—and the Bank's failure to know that FTX was engaged in billions of dollars of suspicious activity using the SEN—were due to the Bank's having the wrong software.[104] Transactions within the SEN were not being flagged by Silvergate using the Verafin cloud software, a situation labeled by the Report as the "Verafin SEN Gap"—implying that BSA/AML failures were the fault of a third-party vendor.[105] The Report states that the SIC found no evidence that directors knew of the gap or ignored red flags.[106] The facts and documents cited in Report, however, reflect that at least by January 2022, internal discussions confirmed that Silvergate executives were aware that SEN transactions were not being flagged for suspicious activity.[107] These facts raise questions as to whether Silvergate executives ignored known compliance risks despite clear internal warnings. To put this in context, according to the SEC Complaint, over a trillion dollars in transactions were conducted in the SEN, primarily by crypto-asset trading platforms.[108] Silvergate's business model and value grew very rapidly after the Company launched the SEN and attracted crypto exchanges like FTX as customers.[109] The SEC Complaint alleged that Lane and Fraher had evidence of critical deficiencies in the Bank's BSA/AML compliance program and thus should have known of

---

[104] Report at 104-106.

[105] Report at 71.

[106] Report at 103.

[107] Internal discussions reflect that SEN transactions were not considered risky and thus were not flagged. For example, in an email to Pearson and Fraher on January 27, 2022, Michelle Sabins wrote, "Internal transfers are not a transaction type that can be utilized in building a risk model"—a fundamental systematic compliance failure, as all SEN transactions were internal. Report at 111.

[108] *See* SEC Complaint at ¶¶ 3, 57 .

[109] Report at 59-60 ("Following the launch of the SEN in 2017, Silvergate grew very rapidly as it attracted numerous new customers in the virtual currency space. Indeed, from 2017 to 2021, cash deposits at Silvergate by customers in the virtual currency industry grew from approximately $770 million to approximately $14.1 billion.").

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

the deficiencies.[110]  The facts alleged in the *Bhatia* complaint even suggest Silvergate's lack of monitoring was knowing, if not intentional.[111]

A First Prong *Caremark* claim must demonstrate that the directors and/or officers of a corporation "utterly failed to implement any reporting system or controls."[112]  Although Silvergate maintained a BSA/AML Compliance System for the entire period in question,[113] the Report indicates a question of fact exists as to whether the requisite reporting system or controls existed to monitor transactions taking place within the SEN—*i.e.*, SEN-to-SEN transfers—for the duration of the SEN Gap period.[114]  Based on the information available to the Examiner, the absence of a compliance and monitoring system for the SEN is plausibly an "utter failure."

For the Second Prong of *Caremark* liability, Delaware courts have held that a complaint will be sustained where: (i) the directors knew or should have known that the corporation was violating the law; (ii) that the directors acted in bad faith by failing to prevent or remedy those violations; and (iii) that such failure resulted in damage to the corporation.[115]  Second Prong *Caremark* claims need only demonstrate that the board knew of the red flags pointing to misconduct and consciously chose to ignore them.[116]

The SIC concluded that a Second Prong *Caremark* claim would not be colorable against the Board because "the Board's monitoring of its internal control systems was reasonable and that

---

[110] SEC Complaint at ¶¶ 60, 143.

[111] *See Bhatia*, 725 F. Supp. 3d at 1098.

[112] *See, e.g.*, *Stone v. Ritter*, 911 A.2d 362, 370 (D. Del. 2006); Report at 42.

[113] Report at 60.

[114] *See* Report at 111-12.  The Report states that during the SEN Gap period, "no alerts were being generated solely due to transactions occurring on the SEN."  Report at 71.

[115] *Rojas v. Ellison*, C.A. No. 2018-0755-AGB, 2019 Del. Ch. LEXIS 281, at *26 (Del. Ch. July 29, 2019);  *In re Lendingclub Corp. Derivative Litig.*, C.A. No. 2018-12984-VCM, 2019 Del. Ch. LEXIS 1347 (Del. Ch. Oct. 31, 2019); *In re Qualcomm Inc.*, C.A. No. 2017-11152-VCMR, 2017 Del. Ch. LEXIS 106 (Del. Ch. June 16, 2017).

[116] *See Okla. Firefighters Pension & Ret. Sys. v. Corbat.*, C.A. No. 12151-VCG, 2017 Del. Ch. LEXIS 848, at *46 (Del. Ch. Dec. 18, 2017).

CONFIDENTIAL   AND   PRIVILEGED  -  INCLUDES   CONFIDENTIAL   SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

it did not ignore red flags,"[117] citing the actions of the Board prior to FTX's collapse.  However, none of those cited actions address the central issue in the Second Prong *Caremark* analysis— whether the Board was aware of the SEN Gap and consciously failed to remedy it.  For example, the Report relies upon RSM audit findings to support the Board's oversight efforts, noting that these audits did not address the presence of the SEN Gap.[118]  That reliance warrants closer examination due to critical limitations acknowledged in the audits themselves.

The initial RSM audit was a broad, bank-wide review covering a period from March 1, 2020, through June 30, 2021.[119]  The initial RSM report was issued in December 2021, and Verafin was implemented in April 2021—toward the end of this period.[120]  The audit's transactional testing comprised of only 30 incoming and 30 outgoing transfers, which was said to include SEN transactions.[121]  However, given that some SEN transfers were entirely internal customer-to-customer transactions within the Bank, it is unclear whether this limited sample meaningfully assessed SEN activity.[122]  As a result, the audit—which was conducted mostly before Verafin's implementation and relied on a limited sample—may not have been well-suited to identify systemic monitoring failures like the SEN Gap.[123]

A subsequent RSM audit more directly focused on Verafin but also contained constraints.[124]  At Silvergate's request, RSM excluded all Model Governance activities—the very

---

[117] Report at 103.
[118] *See* Report at 73, 99.
[119] *See* Report at 71-72; Email from J. Lester re: AML Validation Final Report, dated December 29, 2021 (attaching RSM deck, titled "Bank Secrecy Act/Anti-Money Laundering Report," dated December 22, 2021, at 2).  The results of the initial RSM audit were issued in December 2021.  Report at 71-72.
[120] Report at 68, 71-72.
[121] *See* Email from J. Lester re: AML Validation Final Report, dated December 29, 2021 (attaching RSM deck, titled "Bank Secrecy Act/Anti-Money Laundering Report," dated December 22, 2021, at 12).
[122] *See* Report at 71, 73.
[123] *See* Report at 68; Email from J. Lester re: AML Validation Final Report, dated December 29, 2021 (attaching RSM deck, titled "Bank Secrecy Act/Anti-Money Laundering Report," dated December 22, 2021, at 2).
[124] Report at 72.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

controls and oversight processes that could have flagged the SEN Gap—from the scope of its audit, as the Company was in the process of implementing a model governance program.[125]   RSM also noted that Silvergate had not conducted a detailed, customer-level analysis of customer risk ratings to ensure that the system-generated risk ratings aligned with the bank's preexisting expectations of customer risk before Verafin's go-live.[126]   This is a critical lapse that the Report failed to address.

These shortcomings are significant because actual knowledge of a fraud is not needed for a successful *Caremark* claim; only knowledge of "red flags" indicating potential violation of law is necessary.

In particular, the Report does not sufficiently consider the viability of a Second Prong *Caremark* claim against Lane and Fraher.  Similar to the analysis regarding the Silvergate Board, the Report states that its investigation "revealed no reason to suspect that the officers were complicit in or had actual knowledge of the FTX/Alameda fraud prior to public reports of potential fraud."[127]  The Report further states: "[n]or did the Investigation reveal any reason to suspect that the officers intentionally turned a blind eye toward compliance issues with regard to FTX/Alameda and their affiliates."[128]   The Report states that both Lane and Fraher only obtained actual knowledge of the Verafin SEN Gap on December 6, 2022 ███████████████████[129]

Rather, the Report places the blame on Sabins for failing to disclose to the Board and upper

---

[125] *See* Email from J. Lester re: AML Validation Final Report, dated  January 26, 2022 (attaching RDM deck, titled "Anti-Money Laundering (AML) Model Validation Services," dated January 24, 2022, at 6, 8).
[126] *See* Email from J. Lester re: AML Validation Final Report dated January 26, 2022 (attaching RDM deck, titled "Anti-Money Laundering (AML) Model Validation Services," dated January 24, 2022, at 4-5).
[127] Report at 109.
[128] Report at 109.
[129] Report at 91, 110.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

management that the SEN Gap existed.[130]  The Report concludes there are no actionable claims

against Lane and Fraher under Delaware law.[131]

Implicit in the Report's conclusion is the premise that Lane and Fraher could not have

known of the SEN Gap—specifically, that the Verafin software was not adequately monitoring

FTX intercompany transfers occurring within the SEN—prior to December 6, 2022.   The

documents cited in the *Bhatia* complaint and the SEC Complaint suggest that both Lane and Fraher

knew or should have known of "red flags" and the failure to monitor the SEN transactions.[132]

Further, the SEC Complaint alleges that Lane and Fraher had ample evidence of critical

deficiencies in the Bank's BSA/AML compliance program relating to the SEN Gap.[133]

The Report does not discuss the bearing of the decision in *Bhatia v. Silvergate Bank*, No.

3:23-cv-00667-AGT (N.D. Cal. 2024), on the *Caremark* analysis.[134]   In *Bhatia*, the plaintiffs

sufficiently pled that Silvergate had actual knowledge of the FTX fraud and intentionally ignored

red flags.[135]  While the case was settled and thus the allegations were never adjudicated, the Court

found the allegations legally sufficient and declined to dismiss the complaint.[136]

The *Bhatia* complaint specifically alleges that Lane knew that unauthorized funds were

being siphoned from the FTX custodial accounts and into the hands of Alameda and other Sam

Bankman-Fried related entities.[137]  It further alleges that Lane was aware of certain "red flags"

including that Alameda did not observe ordinary corporate formalities, did not have an outside

---

[130] Report at 102-106.
[131] Report at 107, 111, 114.  The Report also concludes that it is not in the best interests of Silvergate to pursue claims against Sabins, Dietz, or Pearson.  Report at 107 n.342, 114-115.
[132] *See* SEC Complaint at ¶ 60; *Bhatia*, 725 F. Supp. 3d at 1118-19.
[133] SEC Complaint at ¶ 76.
[134] *See* Report at 96-115.
[135] *Bhatia*, 725 F. Supp. 3d at 1124.
[136] *Id.*; Report at 5-6.
[137] *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d at 1097-98.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

auditor, and did not generate "any semblance of audited financial statements."[138]  According to the *Bhatia* complaint, Lane and the Company intentionally allowed corporate malfeasance by FTX and Alameda to continue the astronomic growth of Silvergate's deposits and share price.[139]

The Report only provides a cursory overview of the causes of action asserted in the *Bhatia* complaint, and is silent on the substance of these allegations.[140]  The Report posits that Lane was never made aware by Sabins or Dietz of the SEN gap prior to FTX's collapse and relied on the reports of his subordinates as to BSA compliance.[141]

There is a gross disparity between the factual allegations in *Bhatia* and the Report regarding Lane's knowledge of the FTX intercompany transfers prior to October 2022.  However, the Report fails to adequately address the allegations included in the *Bhatia* complaint or opinion.  The Report's conclusion that Lane had no knowledge of, or was willfully blind to, the FTX intercompany transfers on the SEN is therefore not compelling.[142]

  ii.  <u>Duty of Disclosure Claims</u>

The duty of candor arises as a subset of each of a director's duties of care, loyalty, and good faith.[143]  The duty of candor will implicate the duty of loyalty where the disclosure evidences bad faith or self-interest on the fiduciary's part.[144]

For a plaintiff to successfully allege a breach of the duty of candor, the complaint must specifically identify the misstatements or omissions, why the facts or omissions are "material,"

---

[138] *Id.* at 1097-98.
[139] *Id.* at 1120.
[140] Report at 4-6.
[141] *See* Report at 75-76, 110.
[142] *See* Report at 118.
[143] *In re Nationwide Health Props.*, Case No. 24-C-11-001476, 2011 Md. Cir. Ct. LEXIS 3 (Md. Cir. Ct. May 27, 2011).
[144] *See In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 361 (Del. Ch. 2008).

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

and how the disclosure caused injury to the plaintiff.[145]  An omitted fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.[146]

If the duty of candor claims do not arise out of a request for shareholder action, the complaint must plead the additional element of scienter.[147]  This category of duty of disclosure claims are known as *Malone* claims.[148]  A Delaware Court will infer scienter for a *Malone* claim where the plaintiff adequately pleads that (i) the directors had knowledge that any disclosures or omissions were false or misleading, or that the directors acted in bad faith in not adequately informing themselves, and (ii) the directors were sufficiently involved in the preparation of the disclosures or were otherwise responsible for the disclosures.[149]

The exculpatory provisions allowed under Maryland law and the director exculpations included in Section 9A of the Silvergate Articles of Incorporation will preclude director liability for duty of candor claims that arise out of the duty of care.[150]  However, duty of candor claims arising out of the duty of loyalty (such as *Malone* claims) will not be barred.

The Report concluded that any claims asserted by the Debtors against the relevant directors and officers would have a low likelihood of success.[151]  However, the facts recited in the Report

---

[145] *In re Nationwide Health Props.*, Case No. 24-C-11-001476, 2011 Md. Cir. Ct. LEXIS 3, at *63 (Md. Cir. Ct., May 27, 2011) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1086-87 (Del. 2001)).

[146] *Nationwide*, 2011 Md. Cir. Ct. LEXIS 3, at *63 (citation omitted).

[147] *In re Camping World Holdings, Inc. Stockholder Derivative Litig.*, C.A. No. 2019-0179-LWW, 2022 Del. Ch. LEXIS 24, at *33 (Del. Ch. Jan 31, 2022), *aff'd*, 285 A.3d 1204 (Del. 2022).

[148] *Malone* claims are so titled in reference to the Delaware Supreme Court's 1998 decision in *Malone v. Brincat*, 722 A.2d 5 (Del. 1998).

[149] *In re Camping World Holdings Inc.*, 2022 Del. Ch. LEXIS, at *34.

[150] Silvergate Articles of Incorporation § 9A (June 24, 2011).

[151] Report at 119.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

indicate colorable, if not potentially meritorious, *Malone* claims, based on the following disclosures:

- November 7, 2022:  The Company Form 10-Q for Q3 2022, signed by Lane, notes that there have no material changes to the risk factors discussed in the 10-K issued on December 21, 2021.[152]  The SEC Complaint alleges that this statement was made despite the risk factors raised by the examiners in the two 2022 investigations.[153]

- November 21, 2022:  Lane makes a public statement (with input from Reynolds, Lane, Meyers and Fraher) on Twitter (now X), stating that "once Silvergate approves a new customer, if the activity in their account does not match the activity that we expect based on our initial approval, we take immediate action up to and including terminating that relationship."[154]

- November 30, 2022:  Lane makes a public statement (with input from Meyer, Fraher and Dietz) on CNBC, stating that monitoring is done to pick up activity that is inconsistent with the purported use of the account, but that if the activity is consistent with the purported use, then there is "nothing else we would do."[155]

- December 5, 2022:  A letter, signed by Lane, is sent to Silvergate's customers (outside counsel and multiple Silvergate individuals also worked on the statement), stating that Silvergate conducted due diligence on FTX "both during the onboarding process and

---

[152] Report at 20.
[153] SEC Complaint at ¶ 103.
[154] Report at 21.
[155] Report at 22, 87.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

through ongoing monitoring, in accordance with our risk management policies and procedures . . . ."[156]

- December 19, 2022:  Lane, on behalf of Silvergate, responds to a letter from Senator Warren, stating that Silvergate conducted significant due diligence on the FTX entities, that Silvergate operates in accordance with the BSA and Patriot Act, and that Silvergate monitors transaction activity for every account.[157]

- January 5, 2023:  During a public earnings call, Lane states that Silvergate follows the BSA and Patriot Act for every account that they open and the Company conducts ongoing monitoring.[158]



[161] From these facts, it would be reasonable for a court to infer that Lane had the necessary scienter to mislead the market and create a false sense of security regarding Silvergate's safety protocols.

---

[156] Report at 91.
[157] Report at 23.
[158] Report at 23-24.
[159] Report at 75-76.
[160] Report at 80-82.
[161] *Id.*

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

Claims may also exist against Fraher for her contribution to Lane's November 7, 2022 and November 21, 2022 public statements, and against Lane for his December 19, 2022 statement to Senator Warren. All three of these statements arguably misrepresented or omitted a material fact because they painted a misleading impression of the then-current state of Silvergate's BSA/AML compliance system in light of the SEN Gap. The facts in the Report suggest that Lane and Fraher knew about the SEN Gap before the December 6, 2022 date provided in the Report.[162] The SEN Gap is a material fact that a reasonable investor would have considered to significantly alter the total mix of information available regarding Silvergate. Thus, the Examiner cannot agree with the Report's conclusion that the *Malone* claims are not colorable.

iii.    Insider Trading Claims

The Nkonoki Derivative Action alleges approximately $125 million in insider trades.[163] Both the complaint in the Nkonoki Derivative Action and the Shareholder Demand Letter were specifically referenced in the August 23 Board Resolution and were within the scope of the SIC's delegation of authority from the Board to investigate.[164] Yet the Report reflects little, if any, investigation or analysis of these claims.

According to the Report, stock sales by CEO and director Alan Lane and director Scott Reed together totaled approximately $30 million in 2021.[165] Without discussing those sales specifically, and without any further explanation or detail, the Report concludes summarily that there is no evidence of insider trading based on knowledge of FTX improprieties or issues with

---

[162] *See* Section III(B)(i), *supra*.
[163] *See* Report at 27; Complaint at ¶ 96, *Nkonoki v. Karen F. Brassfield*, No. 2023-0000-8084 (Cal. Super. Feb. 21, 2023) [Docket No. 1].
[164] *See* August 23 Board Resolution.
[165] Report at 133-36.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

Silvergate's BSA/AML Compliance Program.[166]  The SIC justified this conclusion, in part, based on Lane's statement during his interview that the sales were not motivated by any concern about Silvergate's compliance programs.[167]

The Report discusses only sales occurring after ███████████████████████ ███ and states that these sales were primarily motivated by personal financial needs, not by insider information.[168]  The Report did not state whether the sales were made pursuant to properly filed 10b5-1 plans[169] and pursuant to a company trading policy.[170]  During the February Interview, counsel from RLF stated that RLF did not find any filed 10b5-1 plans or policy.

The factual inquiry reflected by the Report was insufficient for the SIC to reasonably conclude that the subject trading was not driven by insider information.  The Report's analysis of insider trading claims is abridged and provides an insufficient basis for the Examiner to assess the reasonableness of the SIC's conclusions.[171]

       iv.      Other Potential Causes of Action

The Report fails to consider the validity of multiple other derivative causes of action.  These claims include: (i) breach of the duty of care against Lane (in his capacity as CEO) and Fraher; (ii) aiding and abetting breach of fiduciary duty against Lane (in his capacity as CEO), Fraher, Sabins and Dietz; (iii) unjust enrichment against all directors and officers; (iv) and conversion against all directors and officers.

---

[166] Report at 115-16.
[167] Report at 118.
[168] Report at 117-18.
[169] Rule 10b5-1 allows company insiders to sell their company's stock, provided they set up a predetermined plan and certify that they do not have access to material nonpublic information about the company or its securities.  The Rule creates a safe harbor from insider trading.  17 C.F.R. 240.10b-5.
[170] The Report does state that Fraher and Lane received "preclearance" to conduct these trades, but it does not elaborate on the substance of this process.  Report at 118 n.354.
[171] This includes the SIC's conclusions as to potential *Brophy* claims.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

There strongest of these non-considered claims are the duty of care claims. There may be viable duty of care claims against Lane, Fraher, Sabins and Pearson that are not subject to exculpation. The Silvergate Articles of Incorporation exculpate directors for liability based on the duty of care; the Articles do not exculpate Silvergate's officers.[172]  Under Delaware law, directors and officers breach the duty of care when they act with gross negligence.[173]  Specifically, where directors are informed of potentially unlawful acts in way that puts them on notice of systemic wrongdoing, and they nonetheless act in a manner that demonstrates a reckless indifference toward the interest of the company, the directors may be liable for breach of the duty of care.[174]  Unlike duty of oversight claims, a duty of care claim only requires reckless indifference—not knowledge as *Caremark* claim does.

The Report states that neither Lane (nor any other officer) had "actual knowledge of the FTX/Alameda fraud prior to public reports of a potential fraud" and that the "investigation [did not] reveal any reason to suspect that the officers intentionally turned a blind eye toward compliance issues with regard to FTX/Alameda and their affiliates."[175]  The Report does not provide any analysis as to what extent Lane may have been aware of red flags regarding the transfer from the FTX custodial accounts to Alameda and the other Bankman-Fried affiliated accounts that were identified in the *Bhatia* complaint.[176]  These pled facts, if true, may satisfy the gross negligence standard for officer breach of duty of care claims. Similarly, there may be colorable

---

[172] Silvergate Articles of Incorporation § 9A (June 24, 2011).
[173] *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, C.A. No. 12151-VCG, 2017 Del. Ch. LEXIS 848, at *4 (Del. Ch. Dec. 18, 2017).
[174] *Id*. at *3-4.  *Corbat* does not provide whether this standard also applies to officers.  *See id.*
[175] Report at 108-09.
[176] *See Bhatia v. Silvergate Bank*, 725 F. Supp. 3d at 1094.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

arguments that Fraher, Sabins, and/or Pearson demonstrated gross negligence in their failure to take action or report the SEN Gap for months after learning of it.[177]

v.    <u>The Releases</u>

The SIC recommends that the estate grant "releases to Silvergate's directors for any claims arising during the period of 2019 through March 8, 2023, and further supports the provision of releases to Lane, Fraher, Martino and Pearson in their capacity as officers for the same period."[178] The Report attempts to justify its recommendation by concluding that the claims considered in the Report are weak, that the litigation costs to pursue the claims are high, and that collection from any remaining D&O policy would be uncertain at best.[179] The Report's recommendation that the Debtors release claims, especially derivative causes of action, without consideration from the parties to be released, is not reasonable.

Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[180] A debtor may also release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[181]

Delaware bankruptcy courts typically consider five factors that are relevant in determining whether to approve a debtor's release: "(1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial

---

[177] *See supra* note 56.
[178] Report at 126.
[179] *Id.*
[180] *In re Alecto Healthcare Servs., LLC*, Case No. 23-10787, 2024 Bankr. LEXIS 670, at *13 (Bankr. D. Del. Mar. 20, 2024) (citations omitted).
[181] *Id.*

- 37 -

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan."[182]

The Report does not adequately support the grant of releases under the applicable bankruptcy law standards. The Report does not discuss how, if at all, the Plan releases meet the section 1123(b)(3) standard or why all potentially valuable claims are not excluded from the release.[183] The Report also fails to assess the potential settlement value of claims, *i.e.*, what consideration the Debtors may be able to negotiate in exchange for the releases.[184]

IV. CONCLUSIONS

Based on the Examiner's investigation, the Examiner concludes that (1) Ivona Smith's appointment to the Board and as the sole member of the SIC was proper, and she met the required standard for independence at the time of appointment; (2) the SIC's use and reliance on the Debtors' professionals colored its independence; (3) the SIC's investigation had significant gaps and was not sufficiently thorough; and (4) the analysis set forth in the Report does not support the reasonableness of its conclusions with respect to potential claims of the estates.


Respectfully Submitted,

Stephanie Wickouski

---

[182] *In re Alecto Healthcare Servs.*, 2024 Bankr. LEXIS 670, at *25 (citations omitted).
[183] *See* Report at 126-27. As noted above, the Plan, as written, does not release claims arising from actual fraud, willful misconduct, or gross negligence. Plan Article IX.B.
[184] *See* Report at 126-27.

CONFIDENTIAL AND PRIVILEGED - INCLUDES CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

# Exhibit A

# WILLKIE FARR & GALLAGHER LLP

BRETT H. MILLER
212-728-8268
bmiller@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax: 212 728 8111

January 31, 2025

Paul Heath
Richards, Layton & Finger LLP
920 North King Street, Suite 200, Wilmington DE 19801
Silvergate Capital Corporation, *et al.*, (Case No. 24-12158)

Paul,

As you are aware, we represent Stephanie Wickouski, the Examiner in the above-captioned chapter 11 cases of Silvergate Capital Corporation and its affiliated debtors.  Please see attached as Exhibit A an initial set of diligence requests directed to the Special Investigation Committee of the Debtors.  We would ask you to produce all responsive materials and information on a rolling bases to be completed by no later than February 7, 2025, so that the Examiner may timely complete the investigation.

We are available to meet and confer regarding the Examiner's diligence requests at your convenience.

Best Regards,

Brett H. Miller

121839525.1

## EXHIBIT A – DILIGENCE REQUESTS TO SPECIAL INVESTIGATION COMMITTEE

### DEFINITIONS

Notwithstanding any definition stated below, each word, term, or phrase used in the Requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure, the Local Rules for the United States District Courts for the District of Delaware, and the Procedures for Cases Assigned to the Hon. Karen B. Owens.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Order Directing the Appointment of an Examine*r (the "Examiner Order").  [Docket No. 402].

1.      The terms "**all**" "**any**," and "**each**" shall each be construed as encompassing any and all.

2.      The terms "**and**" or "**or**" shall be construed either disjunctively or conjunctively or both, as necessary to bring within the scope of any request for admission all responses which might otherwise be construed to be outside the scope.

3.      The term "**communications**" shall have the broadest possible meaning under the Federal Rules of Civil Procedure, and shall mean any oral, written, or other exchanges or transmissions of information (in the form of facts, ideas, inquiries, or otherwise) whether in person, by telephone, by electronic means, or otherwise, including any conversation, meeting, conference, correspondence, or other written or oral transmission by letter, facsimile, telephone, e-mail, text message, social media, or any other medium, whether formal or informal.

4.      The term "**concerning**" is to be understood in its broadest sense and means describing, constituting, identifying, evidencing, summarizing, commenting upon, referring to, regarding, relating to, arising out of, digesting, reporting, listing, analyzing, studying, discussing, stating, setting forth, reflecting, interpreting, concerning, recording, including, negating,

121839525.1

manifesting, containing, or comprising the subject matter identified.

5.      The term "**Debtors**" shall mean Silvergate Capital Corporation and its debtor affiliates in the Chapter 11 Cases pending before the United States Bankruptcy Court for the District of Delaware.

6.      The term "**document**" or "**documents**" means and includes any medium upon which intelligence or information can be recorded, maintained or retrieved, including, without limitation, the original or a copy thereof, regardless of the origin and location, of any writing or recording of any type or description, however produced or reproduced, which is in your or your representatives' possession, custody or control, or to which you have or had access, or of which you have knowledge or which you have a right or privilege to examine upon request or demand, and includes any and all writings and recordings as the term is used in Federal Rule of Evidence 1001 and includes the original (or a copy if the original is not available) and any nonidentical copies (whether different from the original because of notes made on the copy or otherwise).

7.      The term "**including**" shall mean "including, but not limited to" and "including, without limitation."  It shall not be construed to limit the scope of any definition or Request herein.

8.      The terms "**person**" or "**persons**" means any natural person (including current and former employees, officers, directors, partners, agents, brokers, representatives, and accountants), corporation, corporate division, firm, partnership, other unincorporated association, company, trust, fund, government agency, or entity.

9.      The terms "**relate or pertain to**" and "**pertaining to**" as used herein shall mean mentioning, discussing, including, summarizing, describing, reflecting, containing, referring to, relating to, depicting, connected with, embodying, evidencing, constituting, concerning, reporting, purporting or involving an act, occurrence, event, transaction, fact, thing, or course of dealing.

121839525.1

10.     The term "**Restructuring Support Agreement**" shall have the definition ascribed to it in the *Declaration of Elaine Hetrick in Support of the Debtors' Chapter 11 Petitions and Certain Motions.* [Docket No. 9].

11.     The term "**Report**" shall mean the unredacted report of the Special Investigation Committee provided to the Silvergate board of directors on December 24, 2024, regarding any causes of action held by the Debtors against their current or former directors, officers and employees.

12.     The term "**you**" or "**your**" means and includes the Special Investigation Committee.

13.     The singular form of a word should be interpreted as plural and the plural should be interpreted as singular to give the word or words the broadest possible meaning.

## INSTRUCTIONS

1.     This set of requests (collectively, the "Requests," and each one individually, a "Request") is for all responsive documents that are in the  possession, custody, or control of the Special Investigation Committee including any person or entity purporting to act on the Special Investigation Committee's behalf.

2.     All terms defined above have the meanings set forth therein, whether capitalized in the Request or not.

3.     For each document produced, identify the custodian of the document.

4.     For any document withheld pursuant to a claim of privilege, provide a log that sets forth the following information: the names and positions (job titles) of the author and sender of the document; the date of the document; a brief description of the nature and subject matter of the document; and the basis upon which a claim of privilege is asserted.

5.     If a document contains information that you believe to be privileged than you must

121839525.1

disclose any material in the document that you do not believe is privileged to the fullest extent possible. If a privilege is asserted with regard to part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document has been redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration and the date of the redaction or alteration. Any redaction must be clearly visible on the redacted documents.

6.      If no document exists that is responsive to a particular request, state so in writing.

7.      If any document was but is no longer in the Special Investigation Committee's possession or custody or otherwise subject to the Special Investigation Committee's control, please state and specify in detail for each such document the: date; sender; recipient; persons to whom copies were provided together with their job titles; information contained therein; date upon which it ceased to exist or be in the Special Investigation Committee's possession, custody, or control; disposition that was made of it; and the identity of all persons having knowledge of the contents thereof.

8.      If any objection is made to any of these Requests, the response shall state whether documents are being withheld from inspection and production on the basis of such objection, or whether inspection or production of the responsive items will occur notwithstanding such objection. If any part of any of the Requests is subject to an objection, all documents that are responsive to the portions of any of the Requests to which the objection does not apply shall be produced, and the nature of and ground(s) for the objection shall be stated.

9.      The present tense shall be construed to include the past tense and the past tense to include the present tense as necessary to bring within the scope of these Requests any information that might otherwise be construed to be outside their scope.

121839525.1

10.     The singular shall be construed to include the plural and the plural to include the singular as necessary to bring within the scope of these Requests any information that might otherwise be construed to be outside their scope.

11.     Documents shall be produced in the order in which they are found, and shall not be rearranged.  Documents that are found stapled, clipped or otherwise fastened together shall be produced in such form.  Moreover, if the documents are kept in a file with a file label, a copy of that label shall be produced together with the documents in the file.

12.     Unless otherwise stated, these Requests cover the time period beginning on August 23, 2024 (the "Relevant Period").

13.     These Requests are deemed to be continuing. You shall supplement any production of documents made in response to any of the following Requests and produce promptly any and all responsive documents that are received, discovered, or created after any of your responses to the Requests, or that are otherwise within your possession, custody, or control, wherever located, including those in the custody of your representatives, agents, professionals, affiliates, or anyone acting on your behalf.

## REQUESTS

1.     The unredacted Report of the Special Investigation Committee.

2.     The Restructuring Support Agreement.

3.     All minutes or meeting materials of the Special Investigation Committee.

4.     All documents considered by the Special Investigation Committee in preparing the report.

5.     Any analysis, discussion or recommendation to the Special Investigation Committee.

- 6 -

121839525.1

6.      Any analysis, discussion or recommendation to the Silvergate board regarding claims held by the Debtors against current or former officers, directors or employees.

7.      The names and contact information (both phone number and email address) of all persons who the Special Investigation Committee communicated with concerning or in connection with the Special Investigation Committee's function, including its investigation.

8.      The names and contact information (both phone number and email address) of all persons who may have information or knowledge concerning any claims or potential claims of the Debtors against its current or former officers, directors or employees.

9.      The names and contact information for all persons with knowledge of any of the matters referred to in Paragraph 2(a) of the Examiner Order.  Please identify specifically the scope of any person's knowledge.

10.      Transcripts or notes of any interviews or communications conducted by or on behalf of the Special Investigation Committee.

11.      Any engagement letters entered by the Special Investigation Committee with any professionals.

12.      All engagement letters of Richards, Layton & Finger with the Debtors or related to the Debtors.

13.      The names of all professionals retained or consulted by the Special Investigation Committee (including the name of the firm and the individual professional.

14.      All documents relating to matters referred or elated to or encompassed in Para 2(a) of the Examiner Order.

15.      The Debtors' articles of incorporation and by-laws.

16.      All documents and communications from January 1, 2022 onwards relating to the

121839525.1

appointment of independent director(s) and/or a special committee, including the selection and

appointment of Ivona Smith.

# Exhibit B

**RICHARDS
LAYTON &
FINGER**

Brock E. Czeschin
302-651-7751
Czeschin@RLF.com

March 5, 2025

**VIA ELECTRONIC MAIL**

Donald Burke
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
dburke@willkie.com

Re: <u>Responses and Objections to Examiner's Diligence Requests</u>

Dear Donald:

Per your request, enclosed please find the Internal Investigation Committee's written responses and objections to the Examiner's diligence requests. These responses reflect the information and positions that we conveyed during our teleconferences on February 4 and 25, 2025. Further, as we explained during those calls, the Investigation Committee looks forward to continuing to cooperate with the Examiner as she performs her review. Accordingly, if the Examiner has any additional requests, please let us know and we'll work to get responses as soon as possible.

Sincerely,

*/s/ Brock E. Czeschin*

Brock E. Czeschin

BC/jlf
Enc.

## INTERNAL INVESTIGATION COMMITTEE'S RESPONSES AND OBJECTIONS TO EXAMINER'S DILIGENCE REQUESTS

The Internal Investigation Committee (the "Investigation Committee") hereby responds and objects to the diligence requests (each a "Request" and, collectively, the "Requests") of Stephanie Wickouski, in her capacity as Examiner, as follows:

## GENERAL OBJECTIONS AND OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

The Investigation Committee makes the following General Objections and Objections to Definitions and Instructions, each and every one of which shall be incorporated into the Investigation Committee's responses to the individual Requests.

1.      The Investigation Committee objects to the Requests to the extent that they purport to impose obligations that are broader than, or inconsistent with, those required or authorized by the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Rules"), or other applicable laws, rules, court orders, regulations, or agreements.

2.      The Investigation Committee objects to the Requests to the extent that they exceed the scope of the investigation provided for by the Order Directing the Appointment of an Examiner (the "Examiner's Order"), entered by the United States Bankruptcy Court for the District of Delaware on December 20, 2024.

3.      The Investigation Committee objects to the Requests to the extent that

they purport to require it to conduct anything beyond a reasonable and diligent search for readily accessible information, assuming any search or production were required under the circumstances. The Investigation Committee will provide documents or information available to it following a reasonable search.

4.      The Investigation Committee objects to the Requests to the extent they seek information that is publicly available, already in the possession, custody or control of the Examiner, or otherwise is equally obtainable by the Examiner from other sources.

5.      The Investigation Committee objects to the Requests to the extent they purport to require it to produce documents or information not within its possession, custody, or control.

6.      The Investigation Committee does not in any way waive or intend to waive, but rather preserves and intends to preserve: (a) all rights to object on any ground to the use of any document or information produced in response to the Requests or the subject matter thereof, in any proceeding; and (b) all rights to object on any ground to any request for further responses to the Requests or any other document request.

7.      The Investigation Committee objects to the Requests to the extent that they seek documents or information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, exemption, or

immunity ("Privileged Information"). The Investigation Committee will produce only responsive, non-privileged documents and information. Inadvertent disclosure of any privileged or otherwise protected documents or information shall not constitute a waiver of any claim of privilege, protection, exemption, or immunity.

8.    The Investigation Committee objects to the Requests to the extent that they seek documents or information containing confidential supervisory information of the Board of Governors of the Federal Reserve System (the "FRB"), as set forth in 5 U.S.C. §§ 552(b)(4), 552(b)(6), 552(b)(7), and 552(b)(8), respectively. Disclosure of such information is not permitted absent express approval from the FRB and unauthorized disclosure may result in monetary penalties and criminal liability or imprisonment.

9.    The Investigation Committee objects to Instruction Nos. 3, 7, 11 and 13 on the grounds that they make the Requests overly broad and unduly burdensome and to the extent they exceed the requirements of the Rules.

10.    The Investigation Committee objects to Instruction Nos. 4 and 5 on the grounds that they are overly broad and unduly burdensome in the circumstances. The Investigation Committee is willing to meet and confer regarding any documents or information withheld on the grounds of privilege or other protection from disclosure.

## OBJECTIONS TO SPECIFIC REQUESTS

1.      The unredacted Report of the Special Investigation Committee.

**RESPONSE:**  The Investigation Committee produced to the Examiner an unredacted copy of the Report of the Internal Investigation Committee of the Board of Directors of Silvergate, Inc. (the "Report") on February 5, 2025.

2.      The Restructuring Support Agreement.

**RESPONSE:**  The Investigation Committee states that the Restructuring Support Agreement ("RSA") was publicly filed as an exhibit to the Declaration of Elaine Hetrick in Support of the Debtors' Chapter 11 Petitions and Certain Motions (the "First Day Declaration") on September 18, 2024.  The Investigation Committee further produced to the Examiner a copy of the First Day Declaration, along with the RSA, on February 11, 2025.

3.      All minutes or meeting materials of the Special Investigation Committee.

**RESPONSE:**  The Investigation Committee produced to the Examiner minutes of all meetings of the Investigation Committee on February 6, 2025.  No further "meeting materials" of the Investigation Committee exist.

4.      All documents considered by the Special Investigation Committee in preparing the report.

**RESPONSE:**  The Investigation Committee objects to the term "considered by the Special Investigation Committee" as vague and ambiguous.  The Investigation

Committee further objects to this Request as overly broad and unduly burdensome to the extent it can be read to require the production of all documents reviewed by the Investigation Committee and/or its counsel during the investigation. The Investigation Committee also objects on the grounds that, although Silvergate sought authorization to disclose to the Examiner any Confidential Supervisory Information contained in documents reviewed by the Investigation Committee, the FRB only authorized disclosure of Confidential Supervisory Information contained in documents cited in the Report. Nonetheless, to the extent the Examiner is interested in the production of discrete documents or categories of documents, the Investigation Committee is willing to meet and confer.

5.    Any analysis, discussion or recommendation to the Special Investigation Committee.

**RESPONSE:** The Investigation Committee states that the principal documents responsive to this Request are the Investigation Committee's Report and meeting minutes, which have already been produced to the Examiner. Any additional documents responsive to this Request are protected from disclosure by the attorney-client privilege and/or work product doctrine.

6.    Any analysis, discussion or recommendation to the Silvergate board regarding claims held by the Debtors against current or former officers, directors or employees.

**RESPONSE:** The Investigation Committee is not aware of any documents responsive to this Request other than the Report, which has already been produced

to the Examiner.

7.      The names and contact information (both phone number and email address) of all persons who the Special Investigation Committee communicated with concerning or in connection with the Special Investigation Committee's function, including its investigation.

**RESPONSE:** The Investigation Committee provided its written response to this Request on February 11, 2025.  No further information responsive to this Request exists.

8.      The names and contact information (both phone number and email address) of all persons who may have information or knowledge concerning any claims or potential claims of the Debtors against its current or former officers, directors or employees.

**RESPONSE:** The Investigation Committee objects to this Request as overly broad and unduly burdensome.  The Investigation Committee has already provided the names and contact information for those persons interviewed in connection with its investigation.   To the extent additional persons may have information or knowledge of potential claims, such persons may be identified through the Report and documents cited therein, which have also been produced to the Examiner.

9.      The names and contact information for all persons with knowledge of any of the matters referred to in Paragraph 2(a) of the Examiner Order.  Please identify specifically the scope of any person's knowledge.

**RESPONSE:** The Investigation Committee objects to this Request as overly broad, unduly burdensome and duplicative of the other Requests.  To the extent the Examiner seeks any specific documents or information not already contained in the documents produced, the Investigation Committee is willing to meet and confer.

10.     Transcripts or notes of any interviews or communications conducted by or on behalf of the Special Investigation Committee.

**RESPONSE:**  The Investigation Committee will produce to the Examiner notes taken by Ms. Smith during the witness interviews.   Notes taken by the Investigation Committee's counsel during the witness interviews are protected from disclosure by the attorney-client privilege and/or work product doctrine and, as such, will not be produced.   The Investigation Committee is not aware of any other documents responsive to this Request.

11.     Any engagement letters entered by the Special Investigation Committee with any professionals.

**RESPONSE:**  The Investigation Committee states that it did not separately enter into engagement letters with any professionals, but rather relied on the prior engagement letter between Richards, Layton & Finger, PA ("RLF") and Silvergate Bank and certain affiliated entities, and the Investigation Committee's oral retention of RLF during its August 24, 2024 meeting, as reflected in the minutes thereof.

12.     All engagement letters of Richards, Layton & Finger with the Debtors or related to the Debtors.

**RESPONSE:** The Investigation Committee produced to the Examiner a copy of the RLF engagement letter with Silvergate Bank and certain affiliated entities on February 11, 2025.

13.     The names of all professionals retained or consulted by the Special Investigation Committee (including the name of the firm and the individual professional.

**RESPONSE:** The Investigation Committee states that it retained and consulted with RLF, including the following professionals at RLF: (i) Lisa A. Schmidt; (ii) Brock E. Czeschin; (iii) Paul N. Heath; (iv) Matthew Perri; (v) Cassandra L. Thompson; and (vi) Elizabeth J. Freud.

14.    All documents relating to matters referred or related to or encompassed in Para 2(a) of the Examiner Order.

**RESPONSE:** The Investigation Committee objects to this Request as overly broad, unduly burdensome and duplicative of the other Requests. To the extent the Examiner seeks any specific documents or information not already contained in the documents produced, the Investigation Committee is willing to meet and confer.

15.    The Debtors' articles of incorporation and by-laws.

**RESPONSE:** The Investigation Committee produced to the Examiner all documents responsive to this Request that were in its possession, custody or control on February 19, 2025.

16.    All documents and communications from January 1, 2022 onwards relating to the appointment of independent director(s) and/or a special committee, including the selection and appointment of Ivona Smith.

**RESPONSE:** The Investigation Committee objects to this Request as beyond the scope of the Examiner's investigation and authority to the extent it concerns any director other than Ivona Smith. The Investigation Committee further objects to the extent this Request seeks information not within its possession, custody or control. Subject to these objections, the Investigation Committee states that documents

concerning the selection and appointment of Ivona Smith as a director of Silvergate were produced to the Examiner on February 6, 2025.