**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SILVERGATE CAPITAL CORPORATION, *et al.*,[1] | Case No. 24-12158 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 11, 149, 795, 811, & 814** |

**NYDIG SERVICING LLC'S (A) REQUEST TO ADJOURN DISCLOSURE STATEMENT HEARING AND (B) OBJECTION TO MOTION OF DEBTORS FOR ENTRY OF ORDER (I) APPROVING PROPOSED DISCLOSURE STATEMENT AND FORM AND MANNER OF NOTICE OF DISCLOSURE STATEMENT HEARING, (II) ESTABLISHING SOLICITATION, VOTING AND TABULATION PROCEDURES, (III) SCHEDULING CONFIRMATION HEARING, (IV) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF PLAN, (V) ESTABLISHING CURE PROCEDURES; AND (VI) GRANTING RELATED RELIEF**

NYDIG Servicing LLC ("NYDIG"), by and through its undersigned counsel, hereby submits this objection (this "Objection") to the *Motion of Debtors for Entry of Order (I) Approving Proposed Disclosure Statement and Form of Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation, Voting and Tabulation Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Establishing Cure Procedures; and (VI) Granting Related Relief* [D.I. 149] (the "Disclosure Statement Approval Motion")[2] and requests that the hearing on such motion be adjourned until after the Court rules on NYDIG's claims, any expanded investigation by the Examiner is completed and the Debtors revise the Disclosure Statement to provide adequate information as

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Silvergate Capital Corporation (7337), Silvergate Liquidation Corporation (4449) and Spring Valley Lots, LLC (0474). The Debtors' mailing address is 4225 Executive Square, Suite 600, La Jolla, CA 92037.

[2] Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement Approval Motion, the Amended Plan (defined below) or the Disclosure Statement (defined below).

required by the Bankruptcy Code.  In support of this Objection,[3] NYDIG respectfully represents as follows:

## PRELIMINARY STATEMENT[4]

There are two roadblocks that must be overcome before the hearing on the Disclosure Statement can move forward.  First, resolution of the NYDIG Claim, which will determine the fulcrum debt in these cases.  Second, adjudication of NYDIG's motion to expand the Examiner's investigation into the appropriateness of the releases central to the Amended Plan.

From the outset of these cases, the Debtors have operated under a flawed assumption – that equity, not general unsecured creditors, are the fulcrum debt.  Despite having only $163.1 million to distribute as of the Petition Date and billions in asserted general unsecured claims as of the Bar Date, the Debtors propose a plan alleging general unsecured creditors will receive a full recovery without explaining in the Disclosure Statement how this is remotely possible.  The NYDIG Claim alone exceeds $88 million.  As detailed below, once the Court allows the NYDIG Claim, the Debtors will be *at least* $46.9 million short of meeting their obligations under the Amended Plan. With equity clearly out of the money, the Amended Plan will be patently unconfirmable because it, among other things:

> i.   violates the absolute priority rule by providing distributions and professional fee payments[5] to equity holders while lacking sufficient funds to pay senior classes in full;

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement or the Amended Plan (each as defined below), as applicable.

[4] Capitalized terms used but not otherwise defined in this Preliminary Statement are defined as set forth in the body of this Objection.

[5] The Disclosure Statement suggests that certain Ad Hoc Preferred Stockholder Group Expenses and Common Stock Sponsors' Expenses have been or may be paid prior to the Effective Date.  *See* Disclosure Statement, art. IV.B.2.c and e (stating that the Debtors shall pay all outstanding Ad Hoc Preferred Stockholder Group Expenses and Common Stock Sponsors' Expenses "to the extent not previously paid").  As the Debtors do not have authority to pay such amounts, NYDIG reserves all rights if it is determined through discovery or otherwise that unauthorized payments were made.

    ii.    is not feasible, given the insufficient cash available to satisfy the various obligations thereunder; and

    iii.    disenfranchises general unsecured creditors – who are both impaired and the fulcrum debt – by denying them the right to vote on the Amended Plan or participate in post-Effective Date governance.

For these reasons alone, the hearing on the Disclosure Statement must be adjourned until the Court rules on the NYDIG Claim and any appeals are resolved.

In addition, solicitation should not commence until NYDIG'S motion to expand the Examiner's investigation is ruled upon, if granted, such investigation is completed and the Debtors revise the Disclosure Statement to reflect the Examiner's findings. While examiner investigations may proceed in parallel to confirmation, it is not appropriate here. The Releases are the cornerstone of the Amended Plan, and the Examiner already has found them to be "unreasonable" in her initial investigation. It is essential that parties in interest have the benefit of a full investigation by an independent, neutral third party before deciding whether to opt-out or opt-in to the broad Releases proposed under the Amended Plan. This Court previously ruled that "[n]o settlement relating to any Claims against any members of the boards of the Debtors serving prior to the Petition or senior executive officers, current and former, of the Debtors shall be approved prior to the Examiner's completion of his or her Report." If the Court expands the Examiner's investigation, the hearing on the Disclosure Statement should be adjourned until the investigation is completed, the final report is issued, and the Disclosure Statement is revised to include the Examiner's findings and conclusions. This is critical here where there is no creditors' committee to review and preserve potential claims held by the Debtors' estates.

The fact that the initial plan sat on the docket for nine (9) months demonstrates the Debtors' lack of urgency. While not a melting ice cube, it is a case with finite resources as the Debtors have no operations or means to generate revenue. As such, the Debtors must advance the plan process

as efficiently as possible.  Proceeding with a hearing on the Disclosure Statement on a plan that likely is patently unconfirmable – once the NYDIG Claim is allowed – would be inefficient and a waste of limited resources.  Moreover, the Disclosure Statement cannot be deemed adequate when it lacks critical information needed for creditors to make an informed decision about the Releases central to the Global Settlement and Amended Plan, particularly given the potential expansion of the Examiner's investigation.

If the Court is not inclined to adjourn the hearing, it must deny approval of the Disclosure Statement Motion because the Disclosure Statement is woefully inadequate.  It contains numerous placeholders for vital information, including the Liquidation Analysis, the full impact of allowance of the NYDIG Claim, the estimated amount of claims asserted against the Debtors' estates and the Reserves required to be funded to meet significant document retention obligations and pay disputed claims once allowed.  Without this critical information, the projected recoveries – such as the purported one hundred percent (100%) recovery for general unsecured creditors – lack factual support and are undercut by dire warnings that "recoveries could be materially reduced or eliminated." *See* Disclosure Statement, art. VII.H.

In addition, while asking creditors to consider broad sweeping releases, the Disclosure Statement fails to provide basic information regarding exactly who and what is proposed to be released and what, if any, consideration these parties are providing to warrant such releases.  This is particularly egregious as the Amended Plan proposes no carveout for certain of the Released Parties' fraud, willful misconduct or gross negligence.  Moreover, NYDIG's motion to expand the scope of the Examiner's investigation is pending.  The failure to acknowledge the NYDIG motion to expand the Examiner's purview is outstanding combined with any acknowledgement of the possibility the investigation must be completed is a misstep at this stage of these cases.   The Disclosure Statement must be updated with the Examiner's findings before creditors can make

informed decisions about the adequacy of the Disclosure Statement, the appropriateness of the Releases and whether to exercise their opt-out or opt-in rights.

Should the Debtors amend or supplement the Disclosure Statement to address the deficiencies identified herein, parties in interest must be provided with adequate time – at least twenty-eight (28) days' notice, as provided by Local Rule 3017-1(a) – to review, analyze and respond to the revised information regarding these significant issues. However, as explained above and below, the hearing on the Disclosure Statement should be adjourned until the roadblocks to solicit a confirmable plan have been resolved. Otherwise, the Debtors will be wasting finite resources soliciting a plan that is patently unconfirmable to the detriment of all stakeholders.

## BACKGROUND

***General Background***

1.      On September 17, 2024 (the "Petition Date"), Silvergate Capital Corporation ("SCC") and its debtor affiliates (collectively, the "Debtors") each commenced a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, and no statutory committees have been appointed in these Chapter 11 Cases.

3.      On the Petition Date, the Debtors filed the *Declaration of Elaine Hetrick in Support of the Debtors' Chapter 11 Petitions and Certain Motions* [D.I. 9] (the "First Day Declaration") to, among other things, provide an overview of the Debtors' businesses and to support certain motions and applications filed by the Debtors contemporaneously therewith. First Day Decl. ¶ 3.

As explained in the First Day Declaration, the Debtors have no ongoing business operations or revenue streams.  *Id.* ¶ 26.

***The Debtors' Special Investigations Committee and Examiner***

4.       Shortly before the Petition Date, the Board of SCC appointed the SIC.  *See* Disclosure Statement, art. II.G.7.  The SIC's authority included investigating and commencing litigation and settling or releasing claims held by the Debtors against their current or former directors, officers and employees.  *Id*.  At the conclusion of the SIC's investigation, the SIC "found that it was in the Debtors' best interest to provide releases to the Debtors' current and former directors and officers."  *Id.*

5.       On October 10, 2024, Stilwell Activist Investments, L.P. ("Stilwell") filed the *Motion of Stilwell Activist Investments, L.P. for Entry of an Order Directing the Appointment of an Examiner* [D.I. 130] (the "Examiner Appointment Motion").  By the Examiner Appointment Motion, Stilwell urged the Court to appoint an independent examiner to conduct a "truly independent investigation of the circumstances leading to these Debtors' collapse and the potentially viable claims against the insiders who oversaw the Debtors' demise."  Examiner Appt. Mot. at 3.

6.       On December 20, 2024, the Court entered the *Order Directing the Appointment of an Examiner* [D.I. 402] (the "Examiner Order").  The Examiner Order provides that the Examiner's scope of investigation would include the following:

> The independence of Ivona Smith and the Debtors' "Special Investigation Committee" (the "SIC"), including but not limited to its investigation, the SIC's use and reliance on the Debtors' professionals, the thoroughness of the SIC's investigation, and reasonableness of its conclusions with respect to potential claims of the estates.

Examiner Order ¶ 2.  Further, the Examiner Order states, "[i]f the SIC investigation is found not

to be reasonable or adequate with respect to any specific issue, the Examiner shall report its

findings to the Court, and to the extent the Court approves, expand its investigation as appropriate."

*Id.* ¶ 3.   The Court also directed that "[n]o settlement relating to any Claims against any members

of the boards of the Debtors serving prior to the Petition or senior executive officers, current and

former, of the Debtors shall be approved prior to the Examiner's completion of his or her Report."

*Id.* ¶¶ 6, 13.

7.      On January 31, 2025, the Court entered an order approving the appointment of

Stephanie Wickouski as the Examiner [D.I. 499].   On March 5, 2025, the Court entered an order

approving the Examiner's work plan and budget [D.I. 571].

8.      On April 4, 2025, pursuant to the Examiner Order, the Examiner filed the *Report*

*of Stephanie Wickouski, as Examiner* [D.I. 632, 634] (the "Examiner's Report").   After completing

her investigation to the best of her ability under the circumstances, the Examiner found that the

SIC's investigation was deficient in significant ways.   *See, e.g.,* Examiner's Report at 22 ("[T]he

[SIC's] Report fails to discuss potential settlement value of estate claims, which results in an

analysis that is, at best, incomplete.   Further the [SIC's] Report does not reflect a thorough

investigation of the directors' and officers' knowledge of the SEN Gap, the BSA and AML

compliance features, and the internal transfers between the FTX custodial accounts prior to

November 2022…. In addition, the [SIC's] Report did not analyze certain potential estate causes

of action against the directors and officers—for example, claims for breach of the duty of care

against Fraher, Lane and Pearson, among others.").   Additionally, the Examiner determined that

the SIC overlooked applicable bankruptcy law standards in granting releases of estate claims, as

contemplated by the Debtors' proposed plan.   *See id.* at 38 ("The [SIC's] Report does not discuss

how, if at all, the Plan releases meet the section 1123(b)(3) standard or why all potentially valuable

claims are not excluded from the release.   The [SIC's] Report also fails to assess the potential

settlement value of claims, *i.e.*, what consideration the Debtors may be able to negotiate in exchange for the releases.").

9.     In her report, the Examiner identified several unturned topics to be explored in connection with allegations of fraud, mismanagement and other allegations against the Debtors' directors and officers. *See* Report at B(i) (discussing the insufficiency of the SIC's argument that Silvergate's system of controls bars a *Caremark* claim against certain directors or officers of the Debtors for violations of the duty of loyalty); *see id.* at B(ii) (disagreeing with the SIC that claims against certain directors or officers of the Debtors for violating the duty of disclosure are not colorable); *see id.* at B(iii) (determining that the SIC's conclusion that there was no insider trading based on knowledge of FTX improprieties or issues with Silvergate's BSA/AML Compliance Program was unreasonable in light of information lacking from the analysis of those claims).

10.     In light of the Examiner's findings and conclusions, on April 29, 2025, Stilwell and Exploration Capital Fund LP (together as the "Common Shareholders") filed the *Joint Motion of Exploration Capital Fund LP and Stilwell Activist Investments, L.P., to Expand the Scope of the Examiner's Investigation* [D.I. 676] (the "Scope Expansion Motion") seeking to expand the Examiner's investigation.

11.     On May 5, 2025, Debtors' counsel, on behalf of the SIC,  filed the *Internal Investigation Committee's Statement in Response to the Report of Stephanie Wickouski, as Examiner* [D.I. 689] (the "SIC's Response") countering (i) the Examiner's position that the SIC's investigation was conflicted because Debtors' counsel also advised the SIC, (ii) that the SIC acted in bad faith because it approved a plan with release provisions before completing its investigation, and (iii) the Examiner's perceived mischaracterizations of the SIC's investigative report and its process. *See generally* SIC's Response.

12.    On May 6, 2025, the Debtors filed the *Debtors' Opposition to Stilwell Activist Investments, L.P.'s and Exploration Capital Fund LP's Joint Motion to Expand the Scope of the Examiner's Investigation* [D.I. 696], and the Ad Hoc Preferred Stockholder Group filed its *Objection and Joinder of the Ad Hoc Preferred Stockholder Group to Debtors' Opposition to the Joint Motion of Exploration Capital Fund LP and Stilwell Activist Investments, L.P. to Expand the Scope of the Examiner's Investigation* [D.I. 697].

13.    On May 8, 2025, the Common Shareholders filed their *Reply in Support of Joint Motion to Expand the Scope of the Examiner's Investigation* [D.I. 706].

14.    At the May 13, 2025 hearing on the Scope Expansion Motion, the Ad Hoc Preferred Stockholder Group represented that it, the Debtors and the Common Shareholders negotiated "an allocation or a sharing of assets and recoveries between the preferred holders on the one hand and the common holders on the other hand."  May 13, 2025 Hr'g Tr. at 5:12–15.  In light of this agreement, the Common Shareholders tabled the Scope Expansion Motion and did not pursue its approval at the hearing.

15.    According to the Disclosure Statement, the Common Shareholders disagree with the SIC's belief that a release of the estates' derivative claims would be fair, reasonable and in the best interests of the Debtors.  Disclosure Statement, art. III.I.  However, after reaching an economic deal with the Debtors and the Ad Hoc Preferred Stockholder Group, the Common Shareholders have agreed to hold the Scope Expansion Motion in abeyance pending implementation of their settlement under the Amended Plan.  *See id.* at art. III.J.

16.    In light of the lack of prosecution of the Scope Expansion Motion, NYDIG filed a motion [D.I. 808] (the "Second Scope Expansion Motion") requesting that the Court expand the scope of the Examiner's investigation to address the various issues and concerns identified in her report.  The Second Scope Expansion Motion is scheduled to be heard on July 15, 2025 (the "July

Hearing"). The Disclosure Statement does not contain any information with respect to this pending motion. Moreover, while dedicating 16 paragraphs to the SIC's investigation and response to the Examiner's Report across multiple articles, the Disclosure Statement provides only a cursory description of the Examiner's investigation and findings. *See* Disclosure Statement, arts.II.G.7. and III.I.

***The Global Settlement***

17.     On April 22, 2025, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Approving Global Settlement, Including Debtors Entry into and Performance Under Indemnification Settlement and Securities Litigation Settlement, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [D.I. 664] (the "Global Settlement Motion"). The Global Settlement Motion sought approval of two interrelated settlements, the Indemnification Settlement and the Securities Litigation Settlement (together as the "Global Settlement"). "As a condition to each component of the Global Settlement, the Debtors have agreed not to pursue claims against, and provide releases to, the Indemnified Individuals, ***in accordance with the conclusions of the [SIC]***." *Id.* at 6 (emphasis added). The Indemnified Individuals consist of thirty-one (31) people whose current or former role with the Debtors generally are not identified. *See* Global Settlement Mot., Ex. A. None of these individuals (or any other specific parties receiving Releases) are identified in the Disclosure Statement.

18.     On May 14, 2025, the Court entered the *Preliminary Order (I) Approving Global Settlement, Including the Debtors' Entry into and Performance Under Indemnification Settlement and Securities Litigation Settlement, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [D.I. 732] approving the Global Settlement Motion on a preliminary basis (the "Preliminary Order"). The Preliminary Order does not approve any releases and fully reserves all rights with respect thereto and all plan issues. Preliminary Order ¶ 6.

***The Plan, the Disclosure Statement & the Disclosure Statement Approval Motion***

19.     On September 18, 2024, the Debtors filed the *Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* [D.I. 10] and the *Disclosure Statement Pursuant to 11 U.S.C. § 1125 With Respect to Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* [D.I. 11].

20.     On October 11, 2024, the Debtors filed the Disclosure Statement Approval Motion requesting, among other things, approval of a disclosure statement and procedures to solicit a plan.

21.     On June 24, 2025, the Debtors filed (i) the *First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* [D.I. 810] (the "Amended Plan") and (ii) the *Disclosure Statement Pursuant to 11 U.S.C. § 1125 with Respect to First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* [D.I. 811] (the "Disclosure Statement").

22.     On July 1, 2025, the Debtors filed the *Notice of Filing of Revised Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation, Voting and Tabulation Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Establishing Cure Procedures and (VI) Granting Related Relief* [D.I. 827] (the "Revised Disclosure Statement Approval Order").

23.     The Disclosure Statement asserts that the Amended Plan provides a one hundred percent (100%) recovery to, among others, Class 3 - General Unsecured Claims. *See* Disclosure Statement, art. IV. Despite this blanket assertion, the Disclosure Statement does not provide any information regarding the estimated amount or recovery for numerous unclassified and classified claims, including the estimated amount of Class 3 – General Unsecured Claims. *Id.*

24.    The Disclosure Statement also asserts that the Amended Plan requires the funding of certain reserves on or before the Effective Date, including: the Disputed Claims Reserve[6] and the Data Retention and Production Reserve[7] (collectively, the "Reserves").  *See* Plan, arts. V.O., VI.K.  The Disclosure Statement does not provide any estimate of the amounts required  to fund the Reserves.

25.    Critically, the Amended Plan provides for broad sweeping debtor and third-party releases in favor of the "Released Parties," including, in the case of Indemnified Individuals, releases for actual fraud, willful misconduct and gross negligence (collectively, the "Releases").  *See* Amended Plan, art. IX.B.–C.  Neither the term "Released Party"[8] nor "Releasing

---

[6] According to the definition contained in the Amended Plan, the Disputed Claims Reserve serves as a cap on available distributions to creditors or other parties in interest on account of Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed Secured Claims, Disputed General Unsecured Claims and the FTX Disputed Claims Sub-Reserve in connection with any distributions to be made on account thereof.  *See* Amended Plan, art. I.A.62.  The Disclosure Statement does not contain any information about the Disputed Claims Reserve serving as a cap on the claims reserved therein regardless of what such claims ultimately are judicially determined to be.

[7] According to the Disclosure Statement, the Data Retention and Production Reserve is to be used through July 8, 2031 to ensure that the Debtors fulfill their obligations under the Consent Order entered into between the Commissioner of Financial Protection and Innovation and Debtors SCC and SLC to preserve and maintain SLC's books and records for a period of seven (7) years.  *See* Disclosure Statement, art. II.F.

[8] "Released Party" is defined in the Amended Plan as:

> each of the following in their capacity as such: (i) the Debtors; (ii) Reorganized Silvergate; (iii) each of the Debtors' Estates; (iv) the Ad Hoc Preferred Stockholder Group and each of its members, in their capacity as such, (v) the Liquidation Trustee, (vi) the Liquidation Trust Board (vii) the SC Trusts Indenture Trustees; (viii) the Indemnified Individuals; (ix) the Underwriters, and (x) with respect to each of the foregoing Entities in clauses (i) through (viii), their respective current and former officers, directors, employees, attorneys, accountants, investment bankers, consultants and other professionals, agents, assigns, assignees, heirs, executors, estates, administrators, entities in which they have a controlling interest, partnerships, partners, members, trustees, trusts, immediate family members, insurers, and reinsurers, each in its capacity as such; *provided that*, notwithstanding anything in the foregoing, any Person or Entity that is entitled to vote on the Plan and (a) votes to accept the Plan and opts out of the releases in the Plan by checking the box on the Ballot indicating that they opt out of granting such releases in the Plan submitted on or before the Voting Deadline or (b) votes to reject the plan or abstains from voting on the Plan and, in each case, does not opt into the releases provided by the Plan by checking the box on the Ballot indicating that they opt into granting such releases in the Plan submitted on or before the Voting Deadline, shall not be a Released Party.

Amended Plan, art. I.A.155.

Party"[9] is defined in the Disclosure Statement. Despite containing generic statements that the Releases are "in the best interests of the Debtors and all Holders of Claims and Interests," "in exchange for the good and valuable consideration," and "fair, equitable and reasonable," the Disclosure Statement provides no information to support these positions. Disclosure Statement, art. IV.I.

26.     While the Disclosure Statement indicates that the Organizational Chart and Liquidation Analysis are attached as Exhibits B and C thereto, they have not been filed to date. *See* Disclosure Statement, arts. II.B. and VIII.A.; *id.* at Ex. B and C (omitted).

---

[9] The Amended Plan defines "Releasing Party" as:

> each of the following in their capacity as such: (i) the Released Parties (other than the Debtors, Reorganized Silvergate, the Debtor's Estates, the Liquidation Trustee and the Liquidation Trust Board), (ii) all Holders of Claims or Preferred Stock Interests that vote to accept the Plan and do not opt-out of the third party releases provided for in Article IX.C by checking the box on the Ballot indicating that they opt out of granting such releases in the Plan submitted on or before the Voting Deadline; (iii) all Holders of Claims or Preferred Stock Interests that are entitled to vote on the Plan who either (a) abstain from voting or (b) vote to reject the Plan and, in each case, opt into the third party releases provided for in Article IX.C by checking the box on the Ballot indicating that they opt into granting such releases in the Plan submitted on or before the Voting Deadline, (iv) all Holders of Claims or Interests that are deemed to accept the Plan and opt into the third party releases provided for in Article IX.C by checking the box on the applicable form indicating that they opt into granting such releases in the Plan submitted on or before the Voting Deadline; and (v) with respect to each of the foregoing Entities in clauses (i), (ii), (iii), and (iv), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in its capacity as such; *provided, however*, that the Entities identified in part (v) shall be Releasing Parties only to the extent the corresponding Entities in parts (i), (ii), (iii), and (iv) are legally able to bind such Entities in part (v) to the releases contained in the Plan under applicable non-bankruptcy law. For the avoidance of doubt, (i) the Securities Plaintiffs' entry into the Securities Litigation Stipulation of Settlement shall not be construed as having deemed the Securities Plaintiffs or any Securities Litigation Class Members as Releasing Parties or having opted into the third party releases provided in Article IX.C; and (ii) the releases granted by the Securities Plaintiffs and Securities Litigation Class Members, in their capacity as such, in the Securities Litigation pursuant to the Securities Litigation Stipulation of Settlement shall be governed by and implemented pursuant to the terms thereof and the Securities Litigation Final Approval Order.

*The NYDIG Claim & Pending Litigation*

27.    As set forth in NYDIG's initial and amended proofs of claim (claim nos. 103 and 154 respectively), NYDIG asserts a general unsecured claim against Debtor Silvergate Liquidation Corporation in the amount of no less than $88,745,570 (the "NYDIG Claim").  The Debtors have objected to the NYDIG Claim and an evidentiary trial currently is scheduled for July 29, 2025.

28.    As set forth in the Disclosure Statement, "[u]nder certain circumstances, an adverse ruling against the Debtors and in favor of NYDIG may provide the Ad Hoc Preferred Stockholder Group with the option to exercise the Opt-Out Condition [], which would modify the vesting of Assets and funding for Reorganized Silvergate."  Disclosure Statement, art. III.L.3.  The Disclosure Statement further explains that the Opt-Out Condition can be exercised in the event of a "material adverse change." *Id.* art. IV.E.4.f.  The Disclosure Statement does not define what constitutes a "material adverse change."

29.    The Disclosure Statement also fails to inform parties in interest that if the NYDIG Claim is allowed (which NYDIG believes it will be) there will not be any cash available for distributions to equity or to fund certain obligations under the Amended Plan.  As illustrated by the chart below, if the Debtors' objection is overruled and the NYDIG Claim is allowed in full, General Unsecured Creditors are impaired, equity holders are out of the money and the Amended Plan is neither feasible nor confirmable:

| | |
|---|---|
| **Debtors' Available Cash (as of May 31, 2025)** | **$132,634,927**[10] |
| **Bhatia Litigation Settlement Amount** | **($10,000,000)**[11] |
| **"known, liquidated and valid general unsecured claims"** | **($30,000,000)**[12] |
| **The NYDIG Claim** | **($88,745,570)** |
| **Martino Reserve for SEC Litigation** | **($22,500,000)**[13] |
| **The Dedicated Indemnity Reserves & Shared Indemnity Reserve** | **($12,750,000)**[14] |
| **DOJ Indemnification Reserve** | **($5,000,000)**[15] |
| **Go-Forward Chapter 11 Budget** | **($7,450,000)**[16] |
| **Common Stock Sponsors' Expenses** | **($1,500,000)**[17] |
| **Reorganized Silvergate Cash Funding** | **($1,600,000)**[18] |
| <div align="right">**Remaining Cash**</div> | **($46,910,643)** |

Notably, the remaining cash figure set forth above does not include (at a minimum): (i) the

---

[10] *See* Balance Sheet attached to Monthly Operating Report for Silvergate Capital Corporation for reporting period ended May 31, 2025 [D.I. 804] (identifying the Debtors' current cash and cash equivalents in the amount of $149,073,507 and the Debtors' current accounts payable and accrued liabilities in the amount of $16,438,580).

[11] *See Order (I) Authorizing and Approving the Debtors' Entry Into, and Performance Under, the Settlement Agreement Resolving the Bhatia Litigation and (II) Granting Related Relief* [D.I. 561] (approving payment of $10,000,000 to settle the Bhatia Litigation).

[12] *See* Global Settlement Mot. at 2 (explaining that "[w]hen the Debtors arrived in chapter 11, they did so with … roughly $30 million of known, liquidated and valid general unsecured claims…."). It is unknown whether this figure includes any amounts proposed to be settled under the Global Settlement.

[13] *See id*. ¶ 44(iii).

[14] *See id.* ¶ 44(iv).

[15] *See id.* ¶ 44(v).

[16] *See id.* ¶ 44(vi). Note, this figure does not include additional amounts that may be required to be paid from estate cash under the Indemnification Settlement for "the incurred and reasonable and documented fees and expenses of the Indemnified Individuals, if any, through the effective Date of the Chapter 11 Cases, under certain other limited circumstances…."

[17] *See* Amended Plan, art. I.A.38. (defining Common Stock Sponsors' Expenses as "all reasonable and documented fees and expenses for counsel and consultant fees incurred by the Common Stock Sponsors in an aggregate amount not to exceed $1.5 million, which shall be apportioned between Stilwell Activist and Exploration Capital by their mutual agreement").

[18] *See id.*, art. I.A.161. (defining Reorganized Silvergate Cash Funding as "an amount of Cash equal to $1.6 million to be retained by Reorganized Silvergate on the Effective Date; provided that, if the Bankruptcy Court determines that NYDIG has an allowed unsecured claim and the Opt-Out Condition has not been exercised, then such amount shall be reduced by an amount equal to 50% of the allowed amount of the NYDIG claim, but such reduction shall not exceed $1.1 million").

unknown amount of unliquidated General Unsecured Claims, (ii) the unknown amount necessary for the Debtors to purchase the DOJ Insurance Policy of $15,000,000 as required by the Indemnification Settlement, (iii) the unknown million(s) necessary to fund the Data Retention and Production Reserve,[19] (iv) any amounts related to unpaid Administrative Expense Claims as such claims are not due to be filed until 30 days following the Effective Date (*see* Amended Plan, Art. I.A.3 and 4), and (v) the administrative costs that accrued after the filing of the May 2025 monthly operating reports and that will continue to accrue until the effective date of a plan.

30.     Thus, the allowed amount of the NYDIG Claim must be determined before the Debtors waste finite estate resources soliciting a plan that is patently unconfirmable, not feasible and subject to significant and material changes.

## OBJECTION

## I.     THE DISCLOSURE STATEMENT HEARING MUST BE ADJOURNED

31.     The circumstances of these cases compel adjournment of the hearing on the Disclosure Statement.  Before creditors are asked to vote on the Amended Plan or decide whether to opt-in or opt-out of the Releases, the NYDIG Claim must be resolved and the Examiner must complete a thorough investigation and issue a final report.  Both are critical to evaluating the Amended Plan's feasibility and reasonableness.  Rushing to solicitation without addressing these issues risks serious consequences and depletion of limited resources.  Allowance of the NYDIG Claim will render the Amended Plan unconfirmable.  Parties in interest – and the Court – deserve the benefit of a fully informed process and adequate disclosures, including with respect to the results of the Examiner's independent examination.  As such, for these reasons and as more fully explained herein, the Court should adjourn the hearing on the Disclosure Statement until the

---

[19] *See id.*, art I.A.49. (defining Data Retention and Production Reserve as an undetermined million-dollar figure, "which amount shall be determined by the Debtors and the Required Preferred Stockholders").

NYDIG Claim is fully adjudicated and the Examiner's final report on any expanded investigation is issued and disclosed in the Disclosure Statement.

**A. The NYDIG Claim must be resolved before solicitation of votes can occur.**

32.    Before the Debtors expend significant resources soliciting the Amended Plan, the NYDIG Claim must be fully adjudicated.  As illustrated above, once the NYDIG Claim is allowed, the Debtors are short *at least* $49.6 million of meeting their obligations under the Amended Plan, rendering it unconfirmable because of the Bankruptcy Code's absolute priority rule and feasibility requirement.

33.    With equity out of the money but receiving recoveries and general unsecured creditors impaired, the Amended Plan violates the absolute priority rule and is unconfirmable. Bankruptcy Code section 1129(b) requires that in order for a plan to be fair and equitable with respect to an impaired and dissenting class of unsecured claims, the plan must: (1) pay the class's claims in full, or (2) not allow holders of any junior claims or interests to receive or retain "any property" on account of such claims or interests. 11 U.S.C. § 1129(b)(2)(B)(ii); *see also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 199-200 (1988) (reversing order confirming plan because the plan provided that equity holders would retain their equity interests over impaired dissenting claimholders and thus violated the absolute priority rule); *In re Armstrong World Indus.*, 432 F.3d 507, 513 (3d Cir. 2005) ("The absolute priority rule, as codified, ensures that 'the holder of any claim or interest that is junior to the claims [of an impaired dissenting] class will not receive or retain under the plan on account of such junior claim or interest any property….The plain language of the statute makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired[.]"); *1199SEIU Nat'l Benefit Fund v. Akorn, Inc. (In re Akorn, Inc.)*, C.A. No. 20-1254 (MN), 2021 U.S. Dist. LEXIS 180788, at *19 (D. Del. Sept. 22, 2021) ("In the absence of creditor consent, distributions under a chapter 11 plan are governed

by the 'absolute priority rule,' which provides that junior classes of claims cannot obtain recovery until senior classes of claims are paid in full and that equity holders cannot retain any value unless all creditors are paid in full."); *see*, *e.g. In re Mallinckrodt PLC*, 639 B.R. 837, 896 n.198 (Bankr. D. Del. 2022) (noting that shareholders were not entitled to a recovery because all creditors are not being paid in full under the plan).

34.    As currently proposed, the Amended Plan disenfranchises general unsecured creditors by denying them, in their capacity as an impaired class and the fulcrum debt, the right to vote on the Amended Plan or have any say in or oversight over post-Effective Date governance. *See Reorganized Debtors v. Hertz Corp. (In re Hertz Corp.)*, Nos. 23-1169 & 23-1170, 2024 U.S. App. LEXIS 34433, at *30 (3d Cir. Nov. 6, 2024) ("Unlike unimpaired creditors, whose rights are left unaltered and thus are 'conclusively presumed' to accept a proposed plan, [11 U.S.C. § 1126(f)], impaired creditors may vote on it."); *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) ("[Section 1129(a)(10) of the Bankruptcy Code] requires that a plan of reorganization pass muster in the opinion of creditors whose rights to repayment from the debtor are implicated by the reorganization.  By providing impaired creditors the right to vote on confirmation, the Bankruptcy Code ensures the terms of the reorganization are monitored by those who have a financial stake in its outcome."); *W.R. Grace & Co.*, 468 B.R. 81, 211 (D. Del. 2012) ("The distinction between impaired and unimpaired claims is important because only impaired classes have a right to vote to accept or reject a reorganization plan."); *cf. Hertz Corp.*, 2024 U.S. App. LEXIS 34433, at *31-32 ("A creditor is impaired if its treatment violates the absolute priority rule because every creditor has a right to treatment consistent with that principle….[T]he Bankruptcy Code entitles every creditor—not just the dissenting impaired creditors who can invoke § 1129(b)—to treatment consistent with the absolute priority rule absent a clear statement to the contrary.").

35.     The Amended Plan also is unconfirmable because it fails to satisfy the feasibility requirement of Bankruptcy Code section 1129(a)(11) due to the impairment of general unsecured creditors.  This provision requires that confirmation not be followed by liquidation or further financial reorganization, unless such is proposed in the plan.  11 U.S.C. § 1129(a)(11).  Although the Amended Plan contemplates a liquidation, it is not workable and likely will require further financial restructuring or a revised liquidation scheme.  Given the lack of sufficient cash for distributions, the Debtors will be unable to consummate the Amended Plan.  Critically, the Amended Plan's core—the Global Settlement—requires the Debtors to fund millions to meet various obligations and the Ad Hoc Preferred Stockholder Group to contribute millions from their recoveries.  As shown, the Debtors lack the cash to meet these commitments, and the Ad Hoc Preferred Stockholder Group will receive no recovery under a confirmable plan.  *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (finding the plan not feasible and therefore unconfirmable because the plan's funding was contingent on speculative litigation proceeds); *see also In re Quigley Co., Inc.*, 437 B.R. 102, 157 (Bankr. S.D.N.Y. 2010) (finding the proposed plan unconfirmable because it was "not reasonably likely to succeed", and that "the feasibility issue cannot be cured" as "no plan will work without the [contemplated source of funding derived from wholly speculative litigation proceeds]").  Accordingly, the Amended Plan is not feasible, and the Court should not allow the Debtors to solicit votes on it.

36.     Thus, it is axiomatic that the dispute over the NYDIG Claim must be resolved before a confirmable plan can be proposed let alone solicited.  Accordingly, adjournment of the hearing on the Disclosure Statement until the NYDIG Claim is fully adjudicated is in the best interest of all of the Debtors' stakeholders.

**B. Creditors and the Court should have the benefit of the results of any expanded investigation by the Examiner before they can make an informed decision on the Amended Plan and the Releases therein.**

37.     Given the central role of the Releases in the Global Settlement and, by extension, the Amended Plan, parties in interest – and the Court – must have the benefit of a complete, transparent, untainted, and impartial report on the prepetition conduct of the Debtors' current and former directors and officers, the potential claims and causes of action against them, and the reasonableness of the Releases proposed in their favor.  As explained above and set forth in great detail in the Second Scope Expansion Motion, the Examiner already has deemed the Debtors' provision of releases here for no consideration "unreasonable."  The need for an independent and neutral third-party report on the Releases is particularly necessary where, as here, the Debtors propose to release claims against certain parties for actual fraud, willful misconduct and gross negligence.  Thus, it is critically important that creditors (and the Court) have the benefit of this information in the Disclosure Statement *before* casting their vote to accept or reject the Amended Plan and making a decision on whether to opt-in or opt-out of the Releases.

38.     While the Third Circuit has held that the confirmation process can occur concurrently with an examiner's investigation,[20] the significance of the proposed Releases here necessitate that the Court wait to consider approval of the Disclosure Statement until the Examiner completes any expanded investigation and the findings and conclusions of her report are added to the Disclosure Statement.  The conflicted nature of the investigation undertaken by the SIC[21] and the Debtors attempts to sweep the Examiner's initial findings under the rug exacerbates the need

---

[20] *In re FTX Trading Ltd.*, 91 F.4th 148, 156 (3d Cir. 2024) ("[T]he bankruptcy court has the discretion to continue with the confirmation process without receiving the examiner's findings or public report.").

[21] *See* Examiner's Report at 21 ("RLF's simultaneous role as both Debtors' counsel and SIC counsel presented a structural conflict…. This is precisely the type of potential conflict that a special committee's retention of independent counsel seeks to avoid.").

for solicitation to follow a truly independent investigation by the Examiner with her findings incorporated into the Disclosure Statement in a neutral and fulsome manner.

39.     Further, in addition to considering confirmation of the Amended Plan itself, the Court must conduct its own independent assessment of the appropriateness of the Releases and the reasonableness of the settlements that remain subject to confirmation of the Amended Plan.  Thus, adjourning the hearing on the Disclosure Statement serves the best interests of the Debtors' estates and their stakeholders and will assist the Court in completing its own neutral assessment regarding the adequacy of the disclosures regarding the Releases in the Amended Plan.  For these reasons, the hearing on the Disclosure Statement must be adjourned.

## II.    THE DISCLOSURE STATEMENT APPROVAL MOTION MUST BE DENIED

40.     The Disclosure Statement Approval Motion must be denied because the Disclosure Statement fails to provide vital – let alone adequate – information sufficient to enable parties in interest to make informed decisions on whether to object to confirmation of the Amended Plan, vote to accept or reject the Amended Plan, or opt-in or opt-out of the Releases set forth therein. As detailed below, the Debtors' disclosures regarding (i) estimated claim amounts and recoveries, (ii) necessary reserve funding, (iii) liquidation analyses, (iv) the findings of the Court-appointed Examiner and the potential expansion of her investigation, (v) the proposed Releases and (vi) the impact on the Amended Plan when the NYDIG Claim is allowed, are woefully inadequate, if not missing altogether.  Unless and until the Disclosure Statement is amended to remedy these deficiencies, the Court cannot find that it contains "adequate information" sufficient to enable creditors to make an informed judgment about the Amended Plan.  To the extent the Debtors amend or supplement the Disclosure Statement to address the deficiencies raised herein or otherwise, parties in interest should be given sufficient time – at least twenty-eight (28) days as

required by Local Rule 3017-1(a) – to consider and respond to the adequacy of the amended

Disclosure Statement and any supplemental information concerning these material issues.

**A. The Applicable Legal Standard**

41.      Section 1125 of the Bankruptcy Code requires that a disclosure statement

containing "adequate information" be transmitted to holders of a claim or interest before

solicitation of votes on a plan can occur.  *See* 11 U.S.C. § 1125(b).  "Adequate information" is

defined in section 1125(a)(1) of the Bankruptcy Code as:

> information of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the
> condition of the debtors' books and records, including a discussion
> of the potential material Federal tax consequences of the plan to the
> debtor, any successor to the debtor, and a hypothetical investor
> typical of the holders of claims or interest in the case, that would
> enable such a hypothetical investor of the relevant class to make an
> informed judgment about the plan, but adequate information need
> not include such information about any other possible or proposed
> plan and in determining whether a disclosure statement provides
> adequate information, the court shall consider the complexity of the
> case, the benefit of additional information to creditors and other
> parties in interests, and the cost of providing additional
> information[.]

11 U.S.C. § 1125(a)(1).

42.      "[A] disclosure statement is intended to be a source of factual information upon

which one can make an informed judgment about a [] plan…." *In re Avianca Holdings S.A.*, 632

B.R. 124, 130 (Bankr. S.D.N.Y. 2021) (internal citation and quotation omitted); *see also In re

Maxus Energy Corp.*, 639 B.R. 51, 66 (Bankr. D. Del. 2022) (explaining that "the purpose of a

disclosure statement is … making sure people have the knowledge they need to vote") (internal

citation and quotation omitted); *In re Indianapolis Downs, LLC,* 486 B.R. 286, 293 (Bankr. D.

Del. 2013) (noting that "a disclosure statement is intended to provide stakeholders with 'adequate

information' to permit a creditor [to make] an informed decision").  The Third Circuit has

explained that "we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code['s] standard of adequate information." *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3d. Cir. 1988).

43.      "Adequate information" is a flexible standard, based on the facts and circumstances of each case. *See Oneida Motor Freight*, 848 F.2d at 417 ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."). Courts consider a non-exhaustive list of factors that should be disclosed when determining the sufficiency of a disclosure statement:

> (1)The events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a non-bankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

*Avianca Holdings,* 632 B.R. at 130; *see also In re Phoenix Petroleum*, 278 B.R. 385, 406 n.6 (Bankr. E.D. Pa. 2001); 7 Collier on Bankruptcy ¶ 1125.02[2] (16th ed. 2024).

**B. The Disclosure Statement Fails to Provide Adequate Information for Parties to Make an Informed Judgment About the Amended Plan**

**i. The disclosures regarding claim amounts and estimated recoveries are inadequate.**

44.     The Debtors' disclosures regarding the estimated amount of claims, recoveries thereon and reasoning for deeming certain claims "unimpaired" under the Amended Plan are grossly lacking in the Disclosure Statement.  The Disclosure Statement fails to identify either the estimated amount or recovery for the following claims:

- Administrative Claims - no estimated amount
- Professional Fee Claims - no estimated amount
- Ad Hoc Preferred Stockholder Group Expenses - no estimated amount
- SC Trusts Indenture Trustee Fees - no estimated amount
- Common Stock Sponsors' Expenses - no estimated amount
- Statutory Fees - no estimated amount
- Priority Tax Claims - no estimated amount
- Other Priority Claims - no estimated amount
- Secured Claims - no estimated amount
- General Unsecured Claims - no estimated amount
- Preferred Stock Interests - no estimated recovery

*See* Disclosure Statement., art. IV.  Before the Disclosure Statement can be found to contain adequate information, the Debtors must update it to provide this basic claim and recovery information, including an explanation of how unsecured creditors will receive a full recovery given that the Debtors' primary asset is Cash estimated to total $132.6 million as of the end of May 2025 and claims asserted against the Debtors are in the billions.

45.     While failing to explain the impact allowance of the NYDIG Claim will have on the Amended Plan, the Debtors include various warnings throughout the Disclosure Statement that provide serious cause for concern that Class 3 - General Unsecured Claims (and potentially other classes) may not recover the currently projected one hundred percent (100%) recovery on their claims.  Specifically, the Debtors warn that:

> **ACTUAL RECOVERIES (INCLUDING WITH RESPECT TO GENERAL UNSECURED CLAIMS) COULD BE HIGHER OR LOWER, DEPENDING ON THE OUTCOME OF THE CLAIMS RECONCILIATION PROCESS.**

*Id.*, art. IV.C.1. (emphasis in original); *see also id.*, art. VII.H. ("[R]ecoveries to Holders of Claims and Interests will be affected by the amount of Claims and Interests ultimately Allowed against the Debtors…. Further, recoveries to a Holder of a Claim or Interest in a particular class will be affected by the amount of Allowed Claims required to be paid by the Debtors pursuant to the Plan, which are *pari passu* or senior to the Claim or Interest held by such Holder*….[I]t is possible that the amount of Allowed Claims will be materially higher than any range of possible Allowed Claims the Debtors have considered to date, and thus recoveries could be materially reduced or eliminated.*")[22] (emphasis added).

46.     If any one of the Debtors' various warnings regarding the ultimate amount of Allowed Claims come to pass and, in return, recoveries with respect to General Unsecured Claims are "materially reduced or eliminated," then Class 3 (and potentially other classes) will be impaired and should be entitled to vote on the Amended Plan.

47.     Absent a comprehensive analysis of the estimated amount of all claims and projected recoveries grounded in facts,[23] the Disclosure Statement cannot meet the standard for "adequate information" within the meaning of section 1125 of the Bankruptcy Code.  *See Avianca Holdings*, 632 B.R. at 130 (explaining that "disclosure statements must contain factual support for any opinions contained therein since opinions alone do not provide the parties voting on the plan

---

[22] Notably, neither this "range of possible Allowed Claims the Debtors have considered to date" nor any similar information or analysis is included in the Disclosure Statement.

[23] Presumably, the Debtors are unable to provide the estimated amount of General Unsecured Claims until after the NYDIG Claim is fully adjudicated.  This only underscores the need to adjourn the hearing on the Disclosure Statement at this time.

with sufficient information upon which to formulate decisions") (quotations and citation omitted);

*see also In re Civitella*, 15 B.R. 206 (Bankr. E.D. Pa. 1981) (opining that "mere allegations or

opinions, unsupported by factual information, do not meet the required standard" for providing

adequate information in a disclosure statement).

> **ii.    The information in the Disclosure Statement regarding the Reserves is inadequate.**

48.    The Disclosure Statement cannot be approved as containing adequate information

without any estimates regarding certain of the Reserves required to be funded under the Amended

Plan on or before the Effective Date.  These Reserves may be significant drains on the cash

available to satisfy Allowed Claims and knowing the amount necessary to fund them is necessary

to determine whether the Amended Plan is feasible.

49.    Specifically, the Amended Plan requires the Debtors to fund the Data Retention and

Production Reserve on or prior to the Effective Date.  *See* Amended Plan*.*, art. VI.K.  Pursuant to

the Data Retention and Production Obligations, the Debtors must preserve and maintain the

records of Debtor SLC in a form accessible by the Commissioner of Financial Protection and

Innovation, the Federal Reserve Board of Governors, law enforcement, and other state and federal

regulators until July 8, 2031.  *Id.*  The cost to preserve what likely includes massive amounts of

data over a period of seven (7) years will be substantial.  However, the Disclosure Statement fails

to provide any information regarding the estimated costs of meeting the Debtors' Data Retention

and Production Obligations and the corresponding amount that will need to be funded into the Data

Retention and Production Reserve to do so.

50.    Similarly, the Debtors have provided no information in the Disclosure Statement

regarding the amount necessary to fund the Disputed Claims Reserve or certain risks associated

therewith.  Specifically, according to the definition in the Amended Plan, the Disputed Claims

Reserve serves as a cap on available distributions to creditors or other parties in interest on account of Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed Secured Claims, Disputed General Unsecured Claims and the FTX Disputed Claims Sub-Reserve in connection with any distributions to be made on account thereof. *See id.*, art. I.A.62. The Disclosure Statement omits this definition and fails to inform parties in interest that, if the Disputed Claims Reserve is underfunded, their claim distributions will be capped – regardless of the amounts ultimately allowed by the Court.

51. Given the Debtors' lack of revenue streams and finite cash on hand, it is imperative that the Disclosure Statement inform parties in interest of how much cash will need to be allocated to fund all of the Reserves and what, if any, impact such funding requirements will have on projected recoveries and the risks of underfunding.

### iii. The Debtors have failed to provide the Liquidation Analysis.

52. A disclosure statement must provide a "liquidation analysis" comparing the likely recoveries by creditors under the Plan against the recoveries under a Chapter 7 liquidation of the debtors' estates. *In re Diversified Invs. Fund XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988) ("Case law holds that in order to provide adequate information, the disclosure statement must contain a liquidation analysis which compares the proposed plan of reorganization with a Chapter 7 liquidation."); *see also In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984); *In re Malek*, 35 B.R. 443 (Bankr. E.D. Mich. 1983) ("The Debtor … is nonetheless bound by the requirements of 11 U.S.C. § 1125(a)(1) and must provide a disclosure statement in conformity with the letter and spirit of the [Bankruptcy] Code. The Debtor is required, at a minimum, to provide a disclosure statement containing the following information: … [a] LIQUIDATION ANAYSIS….") (emphasis in original). Despite the Debtors' awareness that a liquidation analysis

is an essential component of the Disclosure Statement and representing it is attached as an exhibit, the Debtors omitted it.[24]   *See* Disclosure Statement, Ex. C (omitted).

53.   Moreover, the Court must require that the Liquidation Analysis that ultimately is filed be realistic, based on facts and not mere conclusory assertions.   Currently, the only information in the Disclosure Statement regarding the Debtors' missing Liquidation Analysis consists of unsubstantiated statements that creditors are better off under the Amended Plan than in a Chapter 7 scenario because (1) "additional administrative expenses … would be incurred with priority over General Unsecured Claims under section 507(a)(1) of the Bankruptcy Code and would materially reduce creditor and Preferred Stock Interest Holder recovery" and (2) "[d]istributions would likely be substantially delayed, while expenses of administration would continue to grow."   *Id.*, art. VIII.A.   These conclusory statements do not constitute adequate information under the Bankruptcy Code.   "Adequate information" requires more than mere opinions.   *See In re Fierman*, 21 B.R. 314, 315 (Bankr. E.D. Pa. 1982).   "[O]pinions without factual support are not proper context of a disclosure statement and do not provide the parties voting on the plan with adequate information."   *Id.* (quoting *In re East Redley Corp.*, 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982)).

54.   The Court should not approve the Disclosure Statement until a liquidation analysis grounded in fact is filed and creditors are afforded sufficient time to analyze it and comment on its adequacy.

---

[24] The Debtors also represent that the Organization Chart is attached as an exhibit to the Disclosure Statement, but no such chart has been filed to date.

iv.     **The disclosures regarding the Examiner's Report and the pending motion to expand her investigation are inadequate or missing.**

55.     The Disclosure Statement lacks adequate information regarding the findings and conclusions set forth in the Examiner's Report.   There is no substantive discussion in the Disclosure Statement regarding the categories of data, documents or communications that the Examiner reviewed or was denied access to by the Debtors.   There is no recitation of all of the Examiner's factual findings and conclusions.   As noted above, the Debtors gloss over the information contained in the Examiner's Report in two paragraphs while dedicating more than sixteen paragraphs across multiple articles to the SIC's investigation and their defense thereof. The Examiner's Report should be attached as an exhibit to the Disclosure Statement or explained in a more neutral and robust manner.   Otherwise, parties in interest do not have sufficient information to evaluate the Releases proposed under the Amended Plan.

56.     The Disclosure Statement also needs to be revised to include information about the Second Scope Expansion Motion and, to the extent such motion is granted, the findings of any expanded investigation undertaken in connection therewith.   This again underscores the need to adjourn the hearing on the Disclosure Statement until the Court rules on the motion, any expanded investigation is completed and the Examiner's findings and conclusions are made available in the Disclosure Statement for parties in interest to consider.

57.     Thus, until the Disclosure Statement is amended to address these issues, it lacks adequate information.

v.     **The information in the Disclosure Statement concerning the Releases is not adequate.**

58.     The Disclosure Statement fails to provide the most basic information regarding the broad sweeping Releases proposed to be provided to the Released Parties under the Amended Plan. As an initial matter, the Disclosure Statement does not include any definitions for the terms

"Released Parties" or "Releasing Parties."   Moreover, the definitions in the Amended Plan for these terms do not provide the specific identity for all these parties either.  As an example, the Disclosure Statement does not identify who is a member of the Ad Hoc Preferred Stockholder Group or who "their respective current and former officers, directors, employees, attorneys, accountants, investment bankers, consultants and other professionals" are.  Without knowing the identity of the parties proposed to be released under the Amended Plan, creditors cannot make an informed judgment regarding the appropriateness of the proposed Releases as they relate to them.

59.     Further, the Disclosure Statement fails to provide parties in interest with details regarding (i) the claims and causes of action proposed to be released under the Amended Plan, (ii) the merits of such claims and causes of action or (iii) the value thereof.  Courts have held that a disclosure statement is inadequate where it fails to provide affected parties with "any information regarding the merits or value of the potential claims" that would be released under the plan.  *See In re Lower Bucks Hosp.*, 471 B.R. 419, 459 (Bankr. E.D. Pa. 2012).  Simply including bald statements that the SIC found provision of the Releases to be in the Debtors' best interests is wildly insufficient.

60.     The Disclosure Statement also summarily concludes that the Released Parties deserve the Releases in their favor on account of their "contributions to implementing the Plan." *See* Disclosure Statement, art. IV.I.2.–3.  To make factual findings regarding releases, a court must consider, among other things, whether the third party who will be protected by the release has made a substantial contribution to the reorganization.  *See Lower Bucks*, 471 B.R. at 462 (citing *Gillman v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 203 F.3d 203, 214 (Bankr. D. Del. 2000)).  The Disclosure Statement must be revised to identify what substantial contributions each of the Released Parties actually has provided, or will provide, in exchange for

the Releases the Debtors have proposed in their favor. Otherwise, parties being asked to make a decision whether to opt-in or out of the Releases cannot make an informed decision.

61.     In sum, if the Court is not inclined to adjourn the hearing on the Disclosure Statement, it must deny the Disclosure Statement Approval Motion and require the Debtors to amend the Disclosure Statement to address the issues identified herein and provide adequate information as required by section 1125 of the Bankruptcy Code to enable creditors and parties in interest to make informed judgments about the Amended Plan and the Releases proposed thereunder.

**C.  The solicitation and confirmation schedule does not permit adequate time for parties in interest to make informed decisions regarding the Amended Plan.**

62.     After adjourning the hearing on the Disclosure Statement multiple times since the Fall of 2024 and finally filing the Amended Plan and Disclosure Statement, the Debtors filed a revised order on July 1, 2025, and proposed (i) July 8, 2025 as the deadline to object to approval of the Disclosure Statement, (ii) July 18, 2025 as the date to mail solicitation materials to parties entitled to vote on and pursuant to the Amended Plan, (iii) August 18, 2025 as the deadline for votes to be submitted and to object to confirmation of the Amended Plan, and (iv) September 5, 2025 as the hearing date to consider confirmation of the Amended Plan.  *See* Revised Disclosure Statement Approval Order, Ex. 1 ¶ 2.

63.     As set forth above, several roadblocks need to clear before votes on the Amended Plan should be solicited and confirmation of the Amended Plan should be considered by the Court. In the Examiner's Report, the Examiner noted that she had limited access to the documents, facts, circumstances, information and related data concerning her investigation.  *See* Examiner's Report at II.G (discussing the limitations of the Examiner's investigation).  Given the limited access that the Examiner had during her initial investigation and the need for an expanded investigation, the

solicitation date, voting deadline and confirmation objection deadline must be pushed back to permit the Examiner to conclude any expanded investigation, publish a final report and include such information in the solicitation materials for creditors.

64.     Further, parties in interest are entitled to request discovery relating to confirmation of the Amended Plan, and the Debtors' proposed timeline does not allow sufficient time for the meet-and-confers and responses to objections to discovery requests that are likely to follow any discovery requested of the Debtors and other parties.  The ability to form any meaningful objection to confirmation of the Amended Plan is contingent upon the substance of information that an objector can obtain after having the benefit of the Examiner's final report and information derived from any confirmation-related discovery.   For all these reasons, the Court should require solicitation of votes to commence after the Examiner's final report is issued, the Debtors have amended the Disclosure Statement to include her findings and conclusions, parties in interest have had notice and an opportunity to be heard on any remaining deficiencies in the Disclosure Statement and the Court finds that the Disclosure Statement, as updated, provides adequate information for parties in interest to make an informed decision on the Amended Plan and the Releases proposed therein.

## <u>RESERVATION OF RIGHTS</u>

65.     NYDIG reserves its rights to object to any amended, modified or revised version of the Disclosure Statement and the Debtors' Amended Plan.  NYDIG reserves its rights to amend and/or supplement this Objection and to make all arguments at the hearing on the Disclosure Statement as may be applicable, including, but not limited to, as a result of information learned subsequent to the filing of this Objection.

## CONCLUSION

WHEREFORE, NYDIG respectfully requests that the Court enter an order adjourning the hearing on the Disclosure Statement or, alternatively, denying the Disclosure Statement Approval Motion at this time and requiring the Debtors to amend the Disclosure Statement and provide sufficient time for creditors and other parties in interest to review the revised Disclosure Statement prior to its approval, to address the concerns and deficiencies raised in this Objection, and granting such other and further relief as the Court deems just and proper.

Dated:  July 8, 2025
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Kimberly A. Brown (No. 5138)
Colin R. Robinson (No. 5524)
Jennifer L. Cree (No. 5919)
Joshua B. Brooks (No. 6765)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: brown@lrclaw.com
      robinson@lrclaw.com
      cree@lrclaw.com
      brooks@lrclaw.com

- and -

**ANDERSON KILL P.C.**
Jonathan Kortmansky (admitted *pro hac vice*)
Douglas Curran (admitted *pro hac vice*)
1251 Avenue of Americas
New York, NY 10022
Telephone: (212) 278-1000
Facsimile: (212) 278-1733
Email: jkortmansky@andersonkill.com
      dcurran@andersonkill.com

*Counsel to NYDIG Servicing LLC*