**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>**SILVERGATE CAPITAL CORPORATION,**<br>*et al.*[1]<br><br>**Debtors.** | **Chapter 11**<br><br>**Case No. 24-12158 (KBO)**<br><br>**(Jointly Administered)**<br><br>Re: Docket Nos 969 & 1058 |

**DECLARATION OF IVONA SMITH IN SUPPORT OF**
**CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF**
**SILVERGATE CAPITAL CORPORATION AND ITS AFFILIATED DEBTORS**

I, Ivona Smith, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am an independent director of the board of directors (the "Board") of Silvergate Capital Corporation ("SCC") and have served in this capacity since August 23, 2024. I am also the sole member of the Internal Investigation Committee (the "Investigation Committee"). I am authorized to submit this declaration (this "Declaration") on behalf of SCC and its affiliated debtors in possession (collectively, the "Debtors").

2. I graduated from the New York University School of Business with a Masters in Business Administration and Fordham University with a Bachelor's Degree in Finance. I have more than thirty years of experience working in distressed situations, including restructurings and corporate finance. I am currently employed by Drivetrain, LLC, an independent

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Silvergate Capital Corporation (7337), Silvergate Liquidation Corporation (4449) and Spring Valley Lots, LLC (0474). The Debtors' mailing address is 4225 Executive Square, Suite 600, La Jolla, CA 92037.

fiduciary services firm that provides services to the distressed investment community including board service, chapter 11 plan administration, and litigation trust services. I previously worked as a portfolio manager for Fair Oaks Capital and as the co-founder and principal at Restoration Capital Management for eleven years.

3.      I submit this Declaration in support of the *First Amended Joint Chapter 11 Plan of Liquidation of Silvergate Capital Corporation and Its Affiliated Debtors* [Docket No. 1058] (as amended, modified or supplemented, the "<u>Plan</u>"),[2] including the Global Settlement and the Common Stock Settlement, which implements the liquidation of the Debtors' remaining obligations as set forth therein.  Additional information in support of confirmation of the Plan is set forth in the *Declaration of Ivona Smith in Support of the Releases Set Forth in the First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* (the "<u>Release Declaration</u>"), the *Declaration of Jeffrey Kopa in Support of the First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* (the "<u>Kopa Declaration</u>"), and the *Declaration of Clarissa D. Cu Regarding the Solicitation and Tabulation of Votes on the First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* (the "<u>Voting Declaration</u>"), each filed contemporaneously herewith.

4.      In my capacity as the sole member of the Investigation Committee, I was actively involved in and led the IC Investigation underpinning the releases set forth in the Global Settlement, which are incorporated into the Plan.  In my capacity as a director on the Board, I have also reviewed, and I am generally familiar with, the terms and provisions of the Plan, the Disclosure Statement, the documents comprising the Plan Supplement, the proposed Confirmation

---

[2]    Capitalized terms used but not otherwise defined in this Declaration have the respective meanings ascribed to them in the Plan, the Release Declaration or the Global Settlement Motion (as defined herein), as applicable.

2

Order, the Global Settlement, the Common Stock Settlement, the Kopa Declaration, the Voting

Declaration, and the requirements for confirmation of the Plan pursuant to sections 1123 and 1129

of the Bankruptcy Code.  Except as otherwise indicated, the facts set forth in this Declaration are

based upon the IC Investigation, my personal knowledge, my review of relevant documents and

the Debtors' books and records, my discussions with members of the Debtors' senior management,

my opinion based upon my experience and knowledge related to the Debtors' operations, business,

and financial condition, or upon information supplied to me by the Debtors' professionals and

advisors.  If I am called upon to testify, I would testify competently to the facts set forth herein.

5.      Additional information regarding the Debtors' business and affairs, capital

structure and prepetition indebtedness, and the events leading to the commencement of these

Chapter 11 Cases are set forth in detail in the *Declaration of Elaine Hetrick in Support of Debtors'*

*Chapter 11 Petitions and Certain Motions* [Docket No. 9] (the "First Day Declaration").

## I.      The Global Settlement

### A.      Background Regarding the Global Settlement

6.      As discussed in more detail in the *Motion of Debtors for Entry of an Order*

*(I) Approving Global Settlement, Including Debtors' Entry Into and Performance Under*

*Indemnification Settlement and Securities Litigation Settlement, Pursuant to Bankruptcy Rule*

*9019, and (II) Granting Related Relief* [Docket No. 664] (the "Global Settlement Motion") and

the Disclosure Statement, the Debtors have Indemnification Obligations owing in favor of the (i)

Indemnified Individuals under their corporate organizational documents or certain letter

agreements and (ii) Underwriters under the Underwriting Agreements.

7.      The Debtors' Indemnification Obligations generally arise from the

following claims, causes of action, and investigations commenced against the Debtors and certain

3

Indemnified Individuals relating to the prepetition operations of Debtors SCC and Silvergate Bank (*n/k/a* Silvergate Liquidation Corporation): (i) the Bhatia Litigation (*Bhatia, et al. v. Silvergate Capital Corporation, et al.*, No. 3-23-cv-01406-RBM-BLM (S.D. Cal.), (ii) the Word of God Litigation (*Word of God Fellowship, Inc. v. Silvergate Bank, et al.*, No. 37-2023-00024877-CU-FR-CTL (Cal. Super.)), (iii) the Derivative Action (*Nkonoki v. Karen F. Brassfield*, No. 37-2023-00008084-CU-SL-CTL (Cal. Super.)),[3] (iv) the Securities Litigation (*International Union of Operating Engineers, Local 793, Members of Pension Benefit Trust of Ontario v. Silvergate Capital Corp.*, No. 3:23-cv-00099-RSH-DEB (S.D. Cal.)), (v) the SEC Enforcement Action (*United States Securities and Exchange Commission v. Silvergate Capital Corporation, et al.*, No. 1:24-cv-04987-ALC (S.D.N.Y.), and (vi) the DOJ Investigation.  Each of these litigations (the "Litigations") gives rise to Indemnification Obligations owing in favor of the Indemnified Individuals and, with respect to the Securities Litigation, the Underwriters as well.  As a result of the Litigations, the Indemnified Individuals and the Underwriters filed and asserted Indemnification Claims based on the Debtors' Indemnification Obligations. In the aggregate, initial estimates provided by the Indemnified Individuals assert Indemnification Claims in an amount no less than $300 million.

8.      At the outset of the Chapter 11 Cases, the Debtors pursued several strategies as an integrated attempt to resolve their Indemnification Obligations.  First, under the initial version of the Plan [Docket No. 10] (the "Initial Plan"), the Debtors sought to establish an indemnification reserve that would cap distributions made to Indemnification Individuals.  Second, the Debtors commenced estimation proceedings for certain claims, filing motions to estimate the

---

[3]     On March 6, 2023, Nikhil Bhayani, as custodian for Krish Bhayani, a purported Silvergate stockholder, submitted to SCC a "Demand for Board Action" demanding that SCC investigate claims similar to those asserted in the Litigations.

claims asserted in the Word of God Litigation and the Indemnified Individuals' Indemnification Claims. And third, the Debtors objected to the Indemnification Claims arising out of the Securities Litigation seeking to subordinate such Indemnification Claims pursuant to section 510(b) of the Bankruptcy Code. Taken together, the Debtors expected that this strategy would limit their Indemnification Obligations and establish a reserve under the Initial Plan for go-forward Indemnification Obligations.

9.        In response to the Debtors' Initial Plan, the Indemnified Individuals and Underwriters each opposed the Debtors' requested relief and sought extensive discovery for the purpose of adjudicating the disputes. Given the costly and uncertain outcome of adjudicating their disputes with the Indemnified Individuals and Underwriters, in late 2024, the Debtors chose to adjourn the estimation and claims subordination proceedings in favor of engaging in further discussions with the Indemnified Individuals and Underwriters.

10.        Thereafter, the Debtors worked tirelessly with various constituencies, each with overlapping—and at times competing—interests, for months in an effort to bring the parties to a global resolution. On parallel tracks, the Debtors engaged with various combinations of the Indemnified Individuals, the Ad Hoc Preferred Stockholder Group, the Underwriters, the Insurance Carriers and the Securities Plaintiffs regarding potential resolution of the Indemnification Reserves under the Plan, on one track, and the Securities Litigation, on another track.

11.        By late 2024, though, it became clear to all parties that resolution of the Securities Litigation was a gating item to any global deal with respect to the Debtors' Indemnification Obligations and Indemnification Reserves under the Plan. With respect to the Litigations, all of them either were stayed against the Debtors, contingently resolved, estimated at

zero or otherwise proceeding against a single non-Debtor, except the Securities Litigation which remained active against numerous non-Debtors with rights to indemnification and involved significant litigation costs. As a result, to drive a global resolution without settlement, it would be necessary for the Debtors to liquidate the claims in the Securities Litigation to (i) quantify their own potential liability and (ii) quantify their potential Indemnification Obligations in favor of the Indemnified Individuals and the Underwriters. In the absence of capping the Debtors' Indemnification Obligations for the Securities Litigation through settlement or otherwise, the Debtors could not resolve the balance of their Indemnification Obligations and disputes over the remaining allocation of the Debtors' remaining proceeds from their D&O Liability Insurance Policies.

12.    On February 7, 2025, the parties to the Securities Litigation conducted a mediation session. At the conclusion of that mediation, the parties considered potential terms for a settlement of the Securities Litigation proposed by the mediator (the "Proposed Securities Litigation Settlement").

13.    On March 19, 2025, after months of intense negotiations, the Debtors, the Underwriters, and the Ad Hoc Preferred Stockholder Group reached an agreement in principle, subject to finalization of the terms of the Indemnification Settlement, proposing to resolve the Securities Litigation for $37.5 million, composed of (a) the remaining $27.5 million of coverage available under the Debtors' D&O Liability Insurance Policies (the "D&O Insurance Contribution"), (b) a $4.68 million payment by the Underwriters (the "Underwriter Contribution"), and (c) a $5.32 million payment from the cash distributions to be made by the Debtors to the preferred equity holders (the "Preferred Stock Interest Contribution"), which will be funded on the Effective Date of the Plan.

6

14.     As a result of the agreement in principle for the Securities Litigation Settlement, on March 27, 2025, after months of discussions and multiple rounds of negotiations, the Debtors, the Indemnified Individuals, and the Ad Hoc Preferred Stockholder Group reached agreement in principle on the Indemnification Settlement Term Sheet[4] for, among other things, the funding of the Indemnification Reserves under the Plan, which would resolve the Debtors' Indemnification Obligations.

15.     With an agreement in principle for the Securities Litigation and the Indemnification Settlement Term Sheet, the parties were able to finalize a term sheet for the Securities Litigation. To that end, on April 22, 2025, the parties entered into the Securities Litigation Settlement Term Sheet[5], through which the Silvergate Defendants, the Underwriters, Securities Plaintiffs, and the Ad Hoc Preferred Stockholder Group memorialized the final terms of the Securities Litigation Settlement.  Pursuant to the Securities Litigation Settlement, on behalf of themselves and the Class, the Securities Plaintiffs agreed to resolve the Securities Litigation in exchange for $37.5 million, comprising (a) the D&O Insurance Contribution, (b) the Underwriter Contribution, and (c) the Preferred Stock Interest Contribution.  That same day, the Debtors also filed the Global Settlement Motion seeking approval of both the Indemnification Settlement Term Sheet and the Securities Litigation Settlement Sheet under Bankruptcy Rule 9019.

16.     In seeking approval of the Securities Litigation Settlement under the Global Settlement, the Debtors proceeded in two phases. First, they sought approval of the Securities Litigation Settlement before the Court in the Global Settlement Motion, and on April 28, 2025,

---

[4]     The Indemnification Settlement Term Sheet is attached as <u>Exhibit 1</u> to the Preliminary Global Settlement Approval Order (as defined herein).

[5]     The Securities Litigation Settlement Term Sheet is attached as <u>Exhibit 2</u> to the Preliminary Global Settlement Approval Order (as defined herein).

the Debtors filed the *Debtors' Motion Pursuant to Section 362(d) of the Bankruptcy Code for Limited Relief From the Automatic Stay with Respect to the Securities Litigation Settlement* [Docket No. 669] (the "Securities Litigation Lift-Stay Motion") seeking entry of an order modifying the automatic stay for the limited purpose of allowing the Securities Plaintiffs to seek preliminary approval, class action certification, and final approval of the Securities Litigation Settlement before the S.D. Cal. District Court.

17.    On May 6, 2025, Stilwell Activist Investments, L.P. and Exploration Capital Fund LP (together, the "Common Stock Sponsors") objected to the Global Settlement Motion.

18.    After the Common Stock Sponsors objected to the Global Settlement Motion, the Debtors, the Ad Hoc Preferred Stockholder Group and the Common Stock Sponsors continued to engage in discussions regarding the Chapter 11 Cases. Discussions continued through the start of the hearing held on May 13, 2025 to consider the Global Settlement Motion (the "May 13 Hearing").  And at the start of the May 13 Hearing, the Debtors announced on the record that the Debtors, the Ad Hoc Preferred Stockholder Group and the Common Stock Sponsors had reached agreement in principle, and subject to further documentation, to a settlement framework (the "Common Stock Settlement") to be embodied in the Plan.  Importantly, the Common Stock Settlement secured the Common Stock Sponsor's support of the Plan and held their Motion to Expand in abeyance pending the Effective Date of the Plan. The Common Stock Settlement is discussed further herein.

19.    On May 13, 2025, the Court entered an order [Docket No. 728] granting the Securities Litigation Lift-Stay Motion, and on May 14, 2025, the Court entered the *Preliminary Order (I) Approving Global Settlement, Including the Debtors' Entry Into and Performance Under*

8

*Indemnification Settlement and Securities Litigation Settlement, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [Docket No. 732] (the "<u>Preliminary Global Settlement Approval Order</u>") preliminarily approving the Global Settlement, final approval of which remains subject to confirmation of the Plan and the Effective Date.

20.     In accordance with the Securities Litigation Settlement Term Sheet, on May 19, 2025, the parties to the Securities Litigation entered into the Securities Litigation Stipulation (the "<u>Securities Litigation Stipulation of Settlement</u>") memorializing the full terms contemplated by, and superseding, the Securities Litigation Settlement Term Sheet. On May 21, 2025, the Securities Plaintiffs filed an unopposed motion seeking, among other things, preliminary approval of the Securities Litigation Settlement and the Securities Litigation Stipulation of Settlement with the S.D. Cal. District Court, and on May 22, 2025, the S.D. Cal. District Court entered an order preliminarily approving the Securities Litigation Settlement and the Securities Litigation Stipulation of Settlement. On July 30, 2025, the Securities Plaintiffs filed a motion with the S.D. Cal. District Court seeking, among other things, final approval of the Securities Litigation Settlement and the Securities Litigation Stipulation of Settlement, and on September 3, 2025, the S.D. Cal. District Court approved the Securities Litigation Settlement and the Securities Litigation Stipulation of Settlement.

**B.      Approval of the Global Settlement Is A Sound Exercise of the Debtors' Business Judgement and in the Best Interest of Their Estates**

21.     I believe that the Debtors' entry into and performance under the Global Settlement, which is the result of extensive, good faith and arms'-length negotiations between the parties, is a valid exercise of the Debtors' business judgment.  In choosing to enter into the Global Settlement, the Debtors carefully considered the uncertainty, burden and expense associated with

continuing to litigate the Debtors' subordination and estimation proceedings, which would have required dozens of mini trials given the amount of affected Indemnified Individuals.

22.    The Global Settlement resolves all the Debtors' material Indemnification Obligations.  Without the Global Settlement, confirmation of the Plan may not be possible, merely given the size and complexity of the asserted Indemnification Obligations.  In addition, with no Global Settlement, the Debtors would be forced to expend significant time and resources litigating numerous contested matters and litigation.  Navigating these litigations would likely take years, cost multiple tens of millions of dollars in professionals' fees, severely deplete scarce estate resources, and the ultimate outcome would be highly uncertain.  And even assuming the Debtors succeeded in every contested matter and litigation, no distributions will have been made in the interim, all of which is to the detriment of the Debtors and their stakeholders.

23.    The Global Settlement removes all of these obstacles and preserves the value of the Debtors' Estates for the benefit of their stakeholders.  Among other things, the Global Settlement (i) resolves the Securities Litigation on fair and reasonable terms, (ii) eliminates the need to litigate the estimation and subordination proceedings, (iii) obviates challenging plan objections and a motion to dismiss the Chapter 11 Cases, (iv) provides the framework for the Indemnification Settlement, which resolves the Debtors' Indemnification Obligations, including dozens of related proofs of claim, (v) secures support for the Plan, and (vi) saves millions of dollars on administrative fee burn.  In addition, the Global Settlement has the support of the Ad Hoc Preferred Stockholder Group, the Indemnified Individuals, the Underwriters and the Securities Plaintiffs.

24.    After evaluating the benefits provided under the Global Settlement, and considering the risks associated without the settlements thereunder, and my discussions with the

10

Debtors' advisors regarding the Global Settlement, I believe that the Global Settlement enables the Debtors to conserve valuable resources and maximize the value of their Estates. Accordingly, on balance, the Global Settlement represents a substantial net benefit to the Debtors' Estates. As such, I believe that the Global Settlement is in the best interests of the Debtors, their Estates, and all their stakeholders and should be approved on a final basis.

## II.     The Common Stock Settlement

### A.     Background Regarding the Common Stock Settlement

25.     Since the outset of these Chapter 11 Cases, the Common Stock Sponsors have been active participants in these cases. On September 19, 2024, the Debtors commenced an adversary proceeding, including a motion for temporary restraining order, against Stilwell seeking to enjoin an annual meeting of SCC's shareholders, which the Court denied. Thereafter, the Debtors and the Common Stock Sponsors engaged in weeks of discovery. As discussed further in the Release Declaration, on October 10, 2024, Stilwell filed the Examiner Motion. After the parties litigated the Examiner Motion, and as required given the size of the Chapter 11 Cases, the Court approved appointment of an Examiner with a limited scope and budget as requested by the Debtors. On April 4, 2025, the Examiner filed the Examiner's Report, which acted as a catalyst for the Common Stock Sponsors to file the Motion to Expand and for opposing the Global Settlement Motion.

26.     Given the litigation history with the Common Stock Sponsors, in the absence of settlement, the Debtors believed that the Common Stock Sponsors would continually challenge the Debtors through each step of the solicitation and confirmation process, increasing costs, adding delay, and jeopardizing the consummation of the Global Settlement, which would imperil the Plan. As such, given the costs and risks in proceeding without settlement, the Debtors

pushed parties toward reaching settlement in late April 2025 with discussions intensifying in the leadup to the May 13 Hearing, which finally led to the Common Stock Settlement announced on the record made thereon.

27.     In resolving the Common Stock Sponsors' objections to the Plan and holding the Motion to Expand in abeyance, the Debtors agreed to (i) allow the Debtors to continue to exist by reinstating Common Stock Interests, (ii) transfer the Reorganized Silvergate Assets to Reorganized Silvergate, and (iii) provide payments for the Common Stock Sponsors' Expenses. These provisions have been built into the Plan and, as a result, the Common Stock Sponsors support the Plan and have opted into the Third Party Releases, all in accordance with the Common Stock Settlement.

### B.     Approval of the Common Stock Settlement Is A Sound Exercise of the Debtors' Business Judgement and in the Best Interest of Their Estates

28.     I believe that the Common Stock Settlement is the result of extensive, good faith and arms'-length negotiations between the parties, and is a valid exercise of the Debtors' business judgment. Since the Petition Date, the Debtors and the Common Stock Sponsors have engaged in various litigation, contested matters and extensive negotiations for the nine months prior to the Preliminary Global Settlement Approval Order.  Thereafter, the Debtors continued to engage with the Common Stock Sponsors in months of discussions regarding the current Plan structure and implementation of the Common Stock Settlement.  The Common Stock Settlement is a carefully constructed settlement that allows Common Stock Interests to retain their interests in Reorganized Silvergate and transfers the Reorganized Silvergate Assets to Reorganized Silvergate.  In receiving this consideration, the Common Stock Sponsors agreed to support the Plan and hold in abeyance their Motion to Expand, each of which removes significant litigation risks and costs, and provides a pathway to a consensual plan process with the Debtors' key

12

stakeholders.  In the absence of the Common Stock Settlement, I believe that there would have been significant litigation involving the Motion to Expand, and I believe that confirmation proceedings would have been heavily contested, potentially involving significant discovery, delay, and expense.

29.     On balance, the benefits afforded by the Common Stock Settlement are significant.  In addition, as reflected in the Voting Declaration, the Voting Classes have voted in favor of the Plan, including Holders of Interests in Class 8 (Preferred Stock Interests), the Class immediately senior to Common Stock Interests. As such, I believe that the Common Stock Settlement is in the best interests of the Debtors, their Estates, and all their stakeholders and should be approved.

## III.    The Plan Satisfies the Bankruptcy Code's Requirements for Confirmation.

30.     Based on my understanding of the Plan, the events that have occurred throughout these Chapter 11 Cases, and discussions I have had with the Debtors' professionals regarding the requirements of the Bankruptcy Code, I believe that the Plan satisfies all of the applicable provisions of sections 1123 and 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law and should therefore be confirmed.

### A.    The Plan Satisfies Bankruptcy Code Section 1129(a)(1).

31.     I understand that section 1129(a)(1) of the Bankruptcy Code requires the Plan to comply with the applicable provisions of the Bankruptcy Code.  As detailed below, I believe that the Plan satisfies this requirement.

13

**i.     Classification of Claims and Interests Complies with Bankruptcy Code Section 1122.**

32.     Except for Administrative Expense Claims, Professional Fee Claims, Ad Hoc Preferred Stockholders Group Expenses, SC Trusts Indenture Trustee Fees, Common Stock Sponsors' Expenses, Quarterly Fees and Priority Tax Claims, which I understand need not be designated as Classes under the Plan, the Plan designates Claims against and Interests in the Debtors into the following Classes: Class 1 (Other Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims), Class 4 (Subordinated Notes Claims), Class 5 (Indemnified Individuals Indemnifiable Claims), Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), Class 8 (Preferred Stock Interests), Class 9 (Common Stock Interests), Class 10 (Section 510(b) Claims), and Class 11 (Bhatia Litigation Class Claim).

33.     The separate classification of Claims against and Interests in the Debtors is based upon the differences in legal nature and/or priority of such Claims and Interests.  I believe that such Classes do not unfairly discriminate between Holders of Claims and Interests.  I also understand that all Claims and Interests within each Class have the same or substantially similar rights as the other Claims and Interests in that Class as required by section 1122 of the Bankruptcy Code.

**ii.     The Plan Complies with Bankruptcy Code Section 1123(a).**

34.     It is my understanding that the Plan fully complies with each of the applicable requirements of section 1123(a) of the Bankruptcy Code.

a.     <u>Section 1123(a)(1) of the Bankruptcy Code</u>.  As previously stated, the Plan designates Classes of Claims, other than Claims of the type described in sections 507(a)(2), 507(a)(3), and 507(a)(8) of the Bankruptcy Code, and Classes of Interests, as required by section 1123(a)(1).

14

RLF1 33832938V.2

b. <u>Section 1123(a)(2) and (a)(3) of the Bankruptcy Code</u>.  In addition, Article III of the Plan identifies each Class of Claims and Interests that is Impaired or Unimpaired under the Plan, which I understand satisfies the requirements of 1123(a)(2) and (3) of the Bankruptcy Code.

c. <u>Section 1123(a)(4) of the Bankruptcy Code</u>.  I understand that the Plan also complies with section 1123(a)(4) of the Bankruptcy Code, as the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class (except as otherwise agreed to by a Holder of a particular Claim or Interest).

d. <u>Section 1123(a)(5) of the Bankruptcy Code</u>.  I believe that the Plan, including the various documents and agreements set forth in the Plan Supplement, provides adequate and proper means for its implementation, which I understand is required by section 1123(a)(5) of the Bankruptcy Code.  Among other things, the Plan provides for: (i) sources of consideration for Distributions under the Plan, (ii) the Global Settlement, (iii) the Common Stock Settlement, (iv) the transfer and vesting of the Reorganized Silvergate Assets in Reorganized Silvergate, (v) the terms of the governance of Reorganized Silvergate and the manner of selection of its officers and directors, (vi) the formation of the Liquidation Trust for the benefit of the Holders of First Priority Liquidation Trust Beneficial Interests, and the Second Priority Liquidation Trust Beneficial Interest, (vii) the transfer and vesting of the Liquidation Trust Assets to the Liquidation Trust, and (viii) the appointment of a Liquidation Trustee to effectuate Distributions to Holders of First Priority Liquidation Trust Beneficial Interests and the Second Priority Liquidation Trust Beneficial Interest, to resolve all Disputed Claims, effectuate the Claims reconciliation process, to prosecute, settle, abandon, or compromise the Liquidation Trust Retained Causes of Action, and to manage the Debtors obligations under the DFPI C&D.

15

With respect to the limited substantive consolidation for purposes of distribution in Article V, I believe the limited substantive consolidation is appropriate. First, prepetition, I believe that many of the Debtors' creditors effectively treated the Debtors as a single entity. Second, while the Debtors did observe appropriate corporate formalities and separateness during the prepetition period, I understand that as a practical matter the Debtors' business was operated as an integrated enterprise. Third, I believe that the overall effect of substantive consolidation will be beneficial to creditors and will allow for greater efficiencies and simplification in administering the Plan. Fourth, I also understand that, as set forth in the Voting Declaration, the Voting Classes overwhelmingly voted to accept the Plan and no Holders of Claims or Interests or any other party in interest in these Chapter 11 Cases have objected to the substantive consolidation proposed in the Plan. Accordingly, I believe that such substantive consolidation should be approved.

e.    <u>Section 1123(a)(6) of the Bankruptcy Code</u>. I have been informed that the New Organizational Documents will prohibit the issuance of non-voting equity securities and set forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

f.    <u>Section 1123(a)(7) of the Bankruptcy Code</u>. In addition, I understand that, in accordance with section 1123(a)(7) of the Bankruptcy Code, the Plan provides that the Debtors will disclose as part of the Plan Supplement the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Silvergate in accordance with section 1129(a)(5) of the Bankruptcy Code, which will be selected by the Common Stock Sponsors. On October 8, 2025, the Debtors disclosed the initial board of Reorganized Silvergate in connection with the filing of the *Notice of Filing of First Plan Supplement in Connection with*

*First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* [Docket No. 1012]. In addition, on October 13, 2025, the Debtors disclosed the identity of the Liquidation Trustee and the members of the Liquidation Trust Board in connection with the filing of the *Notice of Filing of Second Plan Supplement in Connection with First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* [Docket No. 1017]. I believe that these provisions are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code.

35.     Accordingly, I believe the applicable requirements of section 1123(a) of the Bankruptcy Code have been satisfied.

### iii.     The Plan Complies with Bankruptcy Code Section 1123(b).

36.     I have been advised that section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan and, as discussed in more detail below, I believe that each of the provisions of the Plan is consistent with section 1123(b).

a.     <u>Section 1123(b)(1) of the Bankruptcy Code</u>. As contemplated by section 1123(b)(1) of the Bankruptcy Code, Article III of the Plan provides that the following Classes are Impaired: Class 5 (Indemnified Individuals Indemnifiable Claims), Class 8 (Preferred Stock Interests), and Class 10 (Section 510(b) Claims). The Plan also provides that Class 1 (Other Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims), Class 4 (Subordinated Notes Claims), Class 7 (Intercompany Interests), Class 9 (Common Stock Interests), and Class 11 (Bhatia Litigation Class Claim) are Unimpaired under the Plan. Class 6 (Intercompany Claims) may be Impaired or Unimpaired at the election of the Debtors, as plan proponents, with the consent of the Common Stock Sponsors.

b.   <u>Section 1123(b)(2) of the Bankruptcy Code</u>.   With respect to section 1123(b)(2) of the Bankruptcy Code, I understand that Article X.A of the Plan provides that, as of the Effective Date, each Executory Contract is deemed automatically rejected unless such Executory Contract (i) has been assumed or rejected by prior order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date, (iv) is a contract, release, or other agreement or document entered into in connection with the Plan, (v) is an Insurance Policy, or (vi) is identified for assumption on the Assumption Schedule included in the Plan Supplement.

c.   <u>Section 1123(b)(3) of the Bankruptcy Code</u>.   As I understand is permitted by section 1123(b)(3) of the Bankruptcy Code, the Plan provides for the Debtor Releases, which are discussed in greater detail in the Release Declaration.   In addition, the Plan preserves (i) the Liquidation Trust Retained Causes of Action for the Liquidation Trust and (ii) the Reorganized Silvergate Retained Causes of Action for Reorganized Silvergate.

d.   <u>Section 1123(b)(5) of the Bankruptcy Code</u>.   As I understand is permitted by section 1123(b)(5) of the Bankruptcy Code, Article IV of the Plan modifies the rights of holders of Claims in Class 5 (Indemnified Individuals Indemnifiable Claims), Class 8 (Preferred Stock Interests) and Class 10 (Section 510(b) Claims), which are Impaired under the Plan. The Plan leaves Unimpaired the rights of Holders of Claims in Class 1 (Other Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims), Class 4 (Subordinated Notes Claims), Class 7 (Intercompany Interests), Class 9 (Common Stock Interests) and Class 11 (Bhatia Litigation Class Claim), which are Unimpaired under the Plan.   The Plan provides that Claims in

18

Class 6 (Intercompany Claims) may be Impaired or Unimpaired at the election of the Debtors, as plan proponents, with the consent of the Common Stock Sponsors.

e. <u>Section 1123(b)(6) of the Bankruptcy Code</u>.  It is my understanding that section 1123(b)(6) of the Bankruptcy Code provides that a plan may include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.  As discussed in the Release Declaration, the Plan contains Releases that were integral components of the Global Settlement, as well as an Exculpation Provision and Injunction Provision. Based on my knowledge of the Global Settlement, these provisions are fair and reasonable, supported by good and valuable consideration, and necessary to the realization of the Plan.

37.      Accordingly, I believe that each of the foregoing permissive provisions is consistent with section 1123(b) of the Bankruptcy Code.

**B.      The Plan Satisfies Bankruptcy Code Section 1129(a)(2).**

38.      To the best of my knowledge and belief, based on discussions with the Debtors' advisors, I believe that the Debtors have complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code, regarding disclosure and plan solicitation.  The Debtors, with the assistance of their professionals, spent a significant amount of time and effort preparing the Disclosure Statement.  In addition, it is my understanding that the Debtors' solicitation and tabulation of votes with respect to the Plan was proper and conformed with the Debtors' solicitation procedures, which were approved by the Court in the Disclosure Statement Order, and with the requirements of the Bankruptcy Code.

**C.      The Plan Has Been Proposed in Good Faith in Compliance with Bankruptcy Code Section 1129(a)(3).**

39.      The Debtors, with the assistance of their advisors, have proposed the Plan in good faith and not by any means forbidden by law.  The Plan is the culmination and the direct

result of the Debtors' extensive negotiations with its key creditor and equity constituencies regarding a plan structure that ameliorates significant litigation risk and correspondingly maximizes the recoveries of its creditors and equityholders.  Accordingly, I believe that the Plan has been proposed by the Debtors in good faith and solely for the legitimate and honest purpose of maximizing recoveries to all of the Debtors' stakeholders.

> **D.     The Plan Complies with Bankruptcy Code Section 1129(a)(4).**

40.     I understand that payments made or to be made by the Debtors for services provided in connection with these Chapter 11 Cases must be approved by the Court as reasonable pursuant to final fee applications.  Accordingly, I believe that the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

> **E.     The Plan Complies with Bankruptcy Code Section 1129(a)(5).**

41.     In accordance with the Plan, as part of the Plan Supplement, the Debtors disclosed the identity and affiliations of (i) any person proposed to serve on the initial board of directors of Reorganized Silvergate, (ii) the Liquidation Trustee, and (iii) the members of the Liquidation Trust Board.  Accordingly, I believe that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

> **F.     The Plan Does Not Contain Any Rate Changes.**

42.     I understand that, because the Plan does not provide for any rate changes by the Debtors, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan.

> **G.     The Plan Is in the Best Interests of All Creditors and Interest Holders.**

43.     I have been advised that the Bankruptcy Code requires that, with respect to each Impaired Class of Claims and Interests, each Holder of such Claim or Interest must either (i) accept the Plan or (ii) receive or retain under the Plan on account of such Claim or Interest property having a present value, as of the Effective Date, that is not less than the amount that such

Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

44.     As further set forth in the Kopa Declaration, the liquidation analysis attached to the Disclosure Statement as Exhibit C thereto demonstrates that all Claims or Interests will recover value equal to or in excess of what such Claims or Interests would receive in a hypothetical chapter 7 liquidation.  In addition, no creditor or equity security holder has objected to the Plan and, as set forth in the Voting Declaration, each Class of Impaired Claims and Interests voted to accept the Plan.  Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

**H.     The Plan Complies with Bankruptcy Code Section 1129(a)(8)**

45.     I understand that the Plan satisfies all of the applicable requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8).  I have been advised that where a chapter 11 plan has not been accepted by all impaired classes, the Bankruptcy Code requires the plan proponent to show that the plan does not discriminate unfairly and is fair and equitable with respect to the non-accepting impaired class(s). Here, the Plan does not discriminate unfairly and is fair and equitable with respect to any rejecting Class, as noted below.

46.     All Claims and Interests in Class 1, Class 2, Class 3, Class 4, Class 7, Class 9, and Class 11 are Unimpaired under the Plan.  Claims in Class 5 (Indemnified Individuals) and Interests in Class 8 (Preferred Stock Interests), which are the only Impaired Classes that are entitled to vote on the Plan, have voted to accept the Plan.  As set forth in the Voting Declaration (i) 100% of Holders of Claims in Class 5 (Indemnified Individuals) in number and in dollar amount voted to accept the Plan; and (ii) Holders of Interests holding 99.8% of voting Interests in Class 8 (Preferred Stock Interests) voted to accept the Plan.  With respect to Claims in Class 6

21

(Intercompany Claims), the Intercompany Claims may be Impaired or Unimpaired at the election of the Debtors, as plan proponents, with the consent of the Common Stock Sponsors.

47.    The Plan does not discriminate unfairly and is fair and equitable with respect to the Class 10 (510(b) Claims), as required by sections 1129(b)(1) and (b)(2) of the Bankruptcy Code. First, no Holder of any Claim or Interest that is junior to such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and no Holder of a Claim or Interest in a Class senior to such Classes is receiving more than 100% recovery on account of its Claim or Interest. Second, although Holders of Interests in Class 9 (Common Stock Interests) are receiving a recovery and have the same priority as Class 10 (510(b) Claims), the Debtors have a valid justification for the separate treatment with respect to Class 9 and Class 10. Despite having the same priority, the Claims and Interests in these Classes are dissimilar. Class 9 (Common Stock Interests) consists of funded, undisputed rights arising from common stock, whereas any Class 10 (510(b) Claims) consist of contingent and disputed litigation claims. In obtaining the Common Stock Settlement, which paves the way for a consensual confirmation hearing, a key component of the consideration provided by the Debtors in reaching the settlement was the reinstatement of Common Stock. No such settlement basis exists with respect to Class 10 (510(b) Claims).  Third, the Debtors are not aware of any timely filed claims solely on account of 510(b) Claims. Finally, no party has objected to the treatment of Class 10 (510(b) Claims).

48.    Accordingly, the Plan does not discriminate unfairly in contravention of section 1129(b)(1), and the Plan may be confirmed notwithstanding the deemed rejection by the lone Impaired Class. No party contends otherwise.

22

**I.**     **The Plan Provides for Payment in Full of All Allowed Priority Claims.**

49.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code because it provides that (i) subject to the Administrative Expense Claims Bar Date, Holders of Allowed Administrative Expense Claims under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code will be paid in full, in Cash either: (a) on the Effective Date, (b) if the Administrative Expense Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which an order Allowing such Administrative Expense Claim becomes a Final Order, or as soon thereafter as reasonably practicable, or (c) if the Allowed Administrative Expense Claim is based on a liability incurred by the Debtors in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed Administrative Expense Claim, without any further action by the Holders of such Allowed Administrative Expense Claim and without any further notice to, or action, order, or approval of, the Bankruptcy Court; and (ii) unless a Holder agrees to less favorable treatment, Allowed Other Priority Claims under section 507(a) of the Bankruptcy Code (excluding Priority Tax Claims under section 507(a)(8)) shall receive payment in full of the amount of their Allowed Other Priority Claims.  It is my understanding that, for these reasons, the Plan satisfies the requirements of sections 1129(a)(9)(A) and (B).

50.     I further understand that the Plan also satisfies the requirements of section 1129(a)(9)(C) in respect of the treatment of Priority Tax Claims.  Pursuant to the Plan, except as otherwise may be agreed, Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

J.      **The Plan Satisfies Bankruptcy Code Section 1129(a)(10).**

51.     I understand that the Plan satisfies Bankruptcy Code section 1129(a)(10), which I understand requires the affirmative acceptance of the Plan by at least one class of Impaired claims, determined without including any acceptance of the Plan by any insider.   It is my understanding that the Debtors have met this standard because Holders of Claims in Class 5 (Indemnified Individuals), which is Impaired under the Plan, voted 100% in number and 100% in dollar amount to accept the Plan, as determined without including any acceptance of the Plan by any insider holding a Claim or Interest in that Class.

K.      **The Plan Is Feasible.**

52.     As set forth more fully in the Kopa Declaration, I understand that the Plan satisfies the requirement of section 1129(a)(11) of the Bankruptcy Code because the Debtors are able to make the payments required under the terms of the Plan from the existing Cash of the Debtors.

L.      **The Plan Complies with Bankruptcy Code Section 1129(a)(12).**

53.     I understand that the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code because it provides that all fees due and payable under section 1930 of title 28 of the United States Code shall be paid (i) by the Debtors on the Effective Date and (ii) thereafter, as may be required, by the Liquidation Trust and Reorganized Silvergate.

M.      **Bankruptcy Code Section 1129(a)(13) Is Inapplicable to the Plan.**

54.     I understand that, because the Debtors do not provide any "retiree benefits" as such term is defined in section 1114 of the Bankruptcy Code, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.

RLF1 33832938V.2

**N.      Bankruptcy Code Section 1129(a)(14) Is Inapplicable to the Plan.**

55.      I understand that, because the Debtors are not required to pay any domestic support obligations, section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan.

**O.      Bankruptcy Code Section 1129(a)(15) Is Inapplicable to the Plan.**

56.      I understand that, because the Debtors are not individuals, section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Plan.

**P.      There Is Only One Plan.**

57.      I understand that, because no other plan has been filed in these Chapter 11 Cases and neither the Debtors nor any other party is presently seeking confirmation of any plan other than the Plan, the Plan complies with section 1129(c) of the Bankruptcy Code.

**Q.      The Principal Purpose of the Plan Is Valid.**

58.      I understand that, because the principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**R.      The Plan Is Dated and Identifies Its Proponent.**

59.      I understand that, because the Plan is dated and identifies the proponent of the Plan as the Debtors, the Plan satisfies the requirements of Bankruptcy Rule 3016(a).

**S.      The Plan Identifies Enjoined Acts.**

60.      I understand that, because the Plan describes in specific and conspicuous bold language all acts to be enjoined and identifies the entities that would be subject to the injunction, the Plan satisfies the requirements of Bankruptcy Rule 3016(c).

**IV.     Cause Exists to Waive the Stay of the Confirmation Order.**

61.      I understand that, generally, Bankruptcy Rule 3020(e) imposes a 14-day stay of the effectiveness of an order confirming a chapter 11 plan, unless the bankruptcy court

25

orders otherwise. I believe that a waiver of the stay, which would permit the Debtors to consummate the Plan and commence its implementation without delay after the entry of the Confirmation Order, is in the best interests of the Estates and creditors and will not prejudice any parties in interest. Further, because no party objected to the Plan, no party will be prejudiced if such waiver is granted.

## Conclusion

62.     In light of the foregoing, I believe that: (i) each of the Global Settlement and Common Stock Settlement is fair, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests; (ii) the Plan has been proposed by the Debtors in good faith and satisfies the applicable provisions of sections 1123 and 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law; and (iii) confirmation of the Plan is in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties in interest in these Chapter 11 Cases.

63.     Accordingly, I believe that the Plan satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules, and other applicable non-bankruptcy laws, as they have been explained to me, and should be approved.

RLF1 33832938V.2

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  November 10, 2025
       New York, New York

/s/  *Ivona Smith*

Ivona Smith
Independent Director and Sole
Member of the Internal Investigation
Committee of Silvergate Capital
Corporation
