**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| **SILVERGATE CAPITAL CORPORATION,** *et al.*[1] | Case No. 24-12158 (KBO) |
| **Debtors.** | **(Jointly Administered)** |
| | Re: Docket Nos. 969 & 1058 |

**DECLARATION OF IVONA SMITH IN SUPPORT OF THE RELEASES SET FORTH IN THE FIRST AMENDED CHAPTER 11 PLAN OF SILVERGATE CAPITAL CORPORATION AND ITS AFFILIATED DEBTORS**

I, Ivona Smith, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.    I am an independent director of the board of directors (the "Board") of Silvergate Capital Corporation ("SCC") and have served in this capacity since August 23, 2024. I am also the sole member of the Internal Investigation Committee (the "Investigation Committee"). I am authorized to submit this declaration (this "Declaration") on behalf of SCC and its affiliated debtors in possession (collectively, the "Debtors").

2.    I graduated from the New York University School of Business with a Masters in Business Administration and Fordham University with a Bachelor's Degree in Finance. I have more than thirty years of experience working in distressed situations, including restructurings and corporate finance. I am currently employed by Drivetrain, LLC, an independent fiduciary services firm that provides services to the distressed investment community including

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Silvergate Capital Corporation (7337), Silvergate Liquidation Corporation (4449) and Spring Valley Lots, LLC (0474). The Debtors' mailing address is 4225 Executive Square, Suite 600, La Jolla, CA 92037.

board service, chapter 11 plan administration, and litigation trust services. I previously worked as a portfolio manager for Fair Oaks Capital and as the co-founder and principal at Restoration Capital Management for eleven years.

3.      I submit this Declaration in support of the releases set forth in the *First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* [Docket No. 1058] (as amended, modified or supplemented, the "Plan").[2] As discussed herein, the Plan contains a release of claims and Causes of Action against the Released Parties (a) held by the Debtors as set forth in Article IX.B of the Plan (the "Debtor Releases") and (b) held by the Releasing Parties, which includes certain non-Debtor third parties, as set forth in Article IX.C of the Plan (the "Third Party Releases" and, together with the Debtor Releases, the "Releases"). The Plan also includes an exculpation provision as set forth in Article IX.D of the Plan (the "Exculpation Provision"); and an injunction provision as set forth in Article IX.E of the Plan (the "Injunction Provision").

4.      Additional information in support of the Plan is set forth in the *Declaration of Ivona Smith in Support of the First Amended Joint Chapter 11 Plan of Silvergate Capital Corporation and Its Affiliated Debtors* (the "Confirmation Declaration"), filed contemporaneously herewith.

5.      Except as otherwise indicated, the facts set forth in this Declaration are based upon the IC Investigation (as defined herein), my personal knowledge, my review of relevant documents and the Debtors' books and records, my discussions with members of the Debtors' senior management, my opinion based upon my experience and knowledge related to the Debtors'

---

[2]    Capitalized terms used but not otherwise defined in this Declaration have the respective meanings ascribed to them in the Plan or the Global Settlement Motion (as defined herein), as applicable.

RLF1 33922843V.4

operations, business, and financial condition, or upon information supplied to me by the Debtors'

professionals and advisors.  If I am called upon to testify, I would testify competently to the facts

set forth herein.

## I.     The Investigation Committee and IC Investigation

6.     On August 16, 2024, the Board formed the Investigation Committee to

investigate potential claims or causes of action that SCC may have against its current and former

directors and officers (the "Potential Claims"), including, but not limited to, claims asserted in

pending derivative litigation and in a stockholder derivative suit demand (the "IC Investigation").

*Report of the Internal Investigation Committee of the Board of Directors of Silvergate, Inc.* (the

"IC Report") at p. 1.[3]  The Investigation Committee was further granted the full power and

authority of the Board to carry out the IC Investigation and take any responsive actions, including,

without limitation, the initiation of litigation, entry into settlements, or the provision of releases.

*Id.*

7.     The Board appointed me as the sole director on the Investigation

Committee. The Investigation Committee's legal counsel, Richards, Layton & Finger, P.A.

("RLF"), assisted the Investigation Committee in the performance of its investigative

responsibilities.  I selected RLF as an advisor after interviewing the firm, and because of my prior

experience with the firm, the expertise of its team, and the firm was a new advisor to the Debtors.

In particular, the Debtors retained RLF about six weeks earlier, on July 2, 2024.  Until then, RLF

had no relationship with the Debtors.  Nor was RLF involved in any of the events giving rise to

the claims under investigation—by the time RLF was retained, all of the various pre-petition

---

[3]     A redacted copy of the IC Report is attached hereto as **Exhibit A.** On May 13, 2025, the Court entered an order
authorizing the filing of the IC Report under seal and in redacted form. *See* Docket No. 727.

actions had been filed. RLF also does not represent the Debtors' board of directors, any individual director, or any potential target of an investigation claim.

8. The Investigation Committee and its advisors conducted a comprehensive evaluation of the facts and law underlying the Potential Claims. This included an assessment of the claims asserted in already-pending litigation (the "Prior Proceedings")[4], which primarily, but not exclusively, concerned events that took place between May 2019 and February 2023. *Id.*

9. The Investigation Committee's investigation followed a thorough process that lasted four months. The Investigation Committee collected broad categories of documents from a variety of sources. These included the same electronic documents produced by the company to government regulators in the Prior Proceedings, and the Investigation Committee received access to and ran searches across an electronic database consisting of 4.7 terabytes of data (or 4.7 million megabytes). *Internal Investigation Committee's Statement in Response to Report of Stephanie Wickouski, as Examiner* [Docket No. 689] (the "Committee Response") at p. 5.[5] The documentary record ultimately included extensive records from the Debtors, including formal documents, emails, and text messages. It also included documents from public sources such as the litigation dockets of prepetition actions. The Investigation Committee received everything that

---

[4]   The Prior Proceedings consist of (i) the FTX federal class action (*Bhatia, et al. v. Silvergate Capital Corporation, et al.* and *Word of God Fellowship, Inc. v. Silvergate Bank, et al.*, No. 3-23-cv-01406-RBM-BLM (S.D. Cal.)), (ii) the Securities Litigation (*International Union of Operating Engineers, Local 793, Members of Pension Benefit Trust of Ontario v. Silvergate Capital Corp.*, No. 37-2023-00024877-CU-FR-CTL (Cal. Super.)), (iii) the stockholder derivative action (*Nkonoki v. Karen F. Brassfield*, No. 37-2023-00008084-CU-SL-CTL (Cal. Super.)), (iv) the stockholder derivative demand (Bhayani), (v) the SEC enforcement action (*United States Securities and Exchange Commission v. Silvergate Capital Corporation, et al.*, No. 1:24-cv-04987-ALC (S.D.N.Y.)), and (vi) the proceedings commenced by the Federal Reserve Board and California Department of Financial Protection and Innovation.

[5]   A redacted copy of the Committee Response is attached hereto as **Exhibit B.** The Committee Response is appended without its sole exhibit, the IC Report, which is already attached to this Declaration. On May 13, 2025, the Court entered an order authorizing the filing of the Committee Response under seal and in redacted form. *See* Docket No. 727.

governmental regulators had received, and more.  In addition, the Investigation Committee interviewed the four principal actors at SCC during the time period relevant to the topics of the IC Investigation.  I personally attended all four interviews.  *See IC Report* at p. 32.  Over the course of its investigation, the Investigation Committee met numerous times, including in ten formal meetings, to keep apprised of investigation topics, and its advisors performed more than 1,000 hours of work.

10.    Based on the documentary and interview record, the Investigation Committee developed key factual findings relating to Potential Claims, which it memorialized in the IC Report, that has since been filed with the Court.  The key Potential Claims included claims relating to (a) SCC's Bank Secrecy Act and Anti Money Laundering ("BSA/AML") compliance, including monitoring of the Silvergate Exchange Network (SEN), (b) public statements by officers of SCC regarding BSA/AML compliance programs, (c) the scope of SCC's relationship with FTX/Alameda and their affiliates and public statements regarding exposure to FTX/Alameda, and (d) trading by certain officers and directors of SCC allegedly based upon material non-public information.  *Id*. at p.14.

11.    The Investigation Committee ultimately assessed a range of Potential Claims against both directors and officers, including potential (i) breach of fiduciary duty claims against SCC's directors, including based on lack of oversight, (ii) breach of fiduciary duty claims against SCC's officers, including based on lack of oversight, (iii) insider trading claims against SCC's directors and officers, and (iv) claims related to public disclosures concerning the BSA/AML compliance program. *Id.* at pp. 96-125.  The best "fit" for a potential estate claim relating to BSA issues was a claim for breach of the duty of oversight ("*Caremark* claims").  *Id.* at 95–114.  In addition, the Investigation Committee thoroughly evaluated potential derivative

5

claims for breach of the duty of disclosure ("*Malone* claims") and insider trading ("*Brophy* claims").  *Id.* at 115–125.

12.     For the reasons stated in the IC Report, the Investigation Committee concluded that the potential estate claims were not meritorious enough to warrant the expense and risk of pursuit.  *Id.* at 95–126.  Along with the legal merits of the claims, the Investigation Committee also considered practical factors.  First, the Investigation Committee considered that there likely would be no available D&O insurance to collect against, as the Debtors' D&O Policies likely would be depleted by their numerous pending litigations.  *Id.* at 125–26.  Second, the Investigation Committee considered the Estates' potential Indemnification Obligations to the defendants in any litigation pursued by the Debtors.  If the Estates pursued claims against the defendants, it would likely give rise to Indemnification Obligations in favor of the defendants.  *Id.* at 126–27.  The Debtors would pay both sides of the litigation cost, and because creditors are to be paid in full in this case, indemnification claims would deplete the Estates at 100 cents on the dollar.  Both these practical considerations contributed to the Investigation Committee's weighing of the merits of the claims. For these reasons as well as those set forth in the IC Report and Committee Response, and as discussed further herein, I believe that the Releases contained in the Plan are appropriate and should be approved.

## II.     The Examiner Report and the Committee Response

13.     On October 10, 2024, Stilwell Activist Investments, L.P. ("Stilwell") filed a motion seeking the appointment of an examiner [Docket No. 130] (the "Examiner Motion"), which the Debtors and the Ad Hoc Preferred Stockholder Group opposed.

14.     After contested briefing, I understand that the Court held a hearing to consider the Examiner Motion and the submissions related thereto.  I further understand that on

December 20, 2024, the Court entered an order providing for an examiner with a limited scope

and budget under certification of counsel [Docket No. 402] (the "Examiner Order").

15.     The Examiner Order established the scope of the Examiner's investigation

(the "Examiner's Investigation"):

> His or her [I]nvestigation [] shall have the following scope (a) The
> independence of Ivona Smith and the Debtors' "[] Investigation
> Committee" (the "[Investigation Committee]"), including but not
> limited to its investigation, the [Investigation Committee]'s use and
> reliance on the Debtors' professionals, the thoroughness of the
> [Investigation Committee]'s investigation, and reasonableness of its
> conclusions with respect to potential claims of the estates.

Examiner Order ¶ 2.

16.     On January 10, 2025, pursuant to the Examiner Order, the U.S. Trustee filed

its application to appoint Stephanie Wickouski as the examiner [Docket No. 439], and on January

31, 2025, the Court entered an order appointing Stephanie Wickouski as examiner (the

"Examiner") in the Chapter 11 Cases [Docket No. 499].

17.     On April 4, 2025, the Examiner filed the corrected *Report of Stephanie

Wickouski, as Examiner* [Docket Nos. 632 & 634] (the "Examiner Report") setting forth the

Examiner's conclusions regarding the Examiner's Investigation. The Examiner first concluded

that my appointment as the sole member of the Investigation Committee was proper and that I

meet the criteria for independence. However, the Examiner then concluded that the IC

Investigation was not reasonable for reasons that I disagree with and believe are not supportable.

Among other things, the Examiner concluded that the investigation was "conflicted" because the

Investigation Committee was advised by Debtors' counsel.  The Examiner also concluded that the

Investigation Committee had questionable objectives because it approved the filing of the Plan

before concluding the IC Investigation—notwithstanding that the Plan expressly noted that the

defined term "Released Party" was subject to the ongoing investigation (language that the Examiner appeared to overlook, as she concluded that the Plan had no such carveout language).

18.     On May 5, 2025, the Investigation Committee filed the Committee Response in response to the Examiner Report. For those reasons set forth in the Committee Response, I believe that the Examiner Report does not undermine the findings and conclusions set forth in the IC Report and in this Declaration.   Accordingly, I believe that the Releases are appropriate notwithstanding the Examiner Report.

## III.     The Motion to Expand the Examiner's Scope

### A.     Common Stock Sponsors' Motion to Expand

19.     As a result of the Examiner Report, on April 29, 2025, the Common Stock Sponsors filed a joint motion [Docket No. 676] (the "Motion to Expand") seeking to expand the scope of the Examiner's Investigation.

20.     On May 6, 2025, the Debtors filed their opposition to the Motion to Expand [Docket No. 696] (the "Expansion Objection"), which further rebutted the Examiner Report and detailed the deficiencies with the Motion to Expand. A copy of the Expansion Objection is attached hereto as **Exhibit C**.[6, 7]

21.     For the reasons set forth in the Expansion Objection, I believe that the Motion to Expand does not undermine the findings and conclusions set forth in the IC Report and

---

[6]     The Expansion Objection is appended without its exhibits, which are the Committee Response and the IC Report, each of which is already attached to this Declaration.

[7]     At the start of the hearing held on May 13, 2025 to consider, among other things, the Motion to Expand, the Debtors announced on the record that the Debtors, the Ad Hoc Preferred Stockholder Group and the Common Stock Sponsors reached agreement on a settlement framework to be embodied in the Plan (the "Common Stock Settlement"), which is discussed further in the Confirmation Declaration. As a result of the Common Stock Settlement, the Court did not make any ruling with respect to the Motion to Expand.

in this Declaration. Accordingly, I believe that the Releases are appropriate notwithstanding the Motion to Expand.

      **B.**      **NYDIG's Motion to Expand**

      22.      On June 24, 2025, in the middle of claims litigation with the Debtors, NYDIG Servicing LLC filed a motion seeking to expand the Examiner's scope [Docket No. 808] (the "<u>NYDIG Examiner Motion</u>") that generally mirrored the Motion to Expand that had been filed by the Common Stock Sponsors. On July 8, 2025, the Debtors and the Ad Hoc Preferred Stockholder Group opposed the NYDIG Examiner Motion. *See* Docket Nos. 832 and 833, respectively. On July 15, 2025, the Bankruptcy Court held a hearing (the "<u>July 15 Hearing</u>") at which, among other things, the Court considered the NYDIG Examiner Motion. At the conclusion of the July 15 Hearing, the Court denied the NYDIG Examiner Motion.  Accordingly, I believe that the NYDIG Examiner Motion does not undermine the findings and conclusions set forth in the IC Report and in this Declaration and that the Releases are appropriate notwithstanding the NYDIG Examiner Motion.

**IV.**      **The Chapter 11 Plan, the Global Settlement and the Releases**

      23.      As discussed in more detail in the Confirmation Declaration and the *Motion of Debtors for Entry of an Order (I) Approving Global Settlement, Including Debtors' Entry Into and Performance Under Indemnification Settlement and Securities Litigation Settlement, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [Docket No. 664] (the "<u>Global Settlement Motion</u>"), the Debtors have Indemnification Obligations owing in favor of the (i) the Indemnified Individuals under their corporate organizational documents or certain letter agreements and (ii) the Underwriters under the Underwriting Agreements.

24.     In reaching a resolution for these Chapter 11 Cases, including their Indemnification Obligations, the Debtors have always considered that properly vetted releases may be necessary to reach a settlement, which was a factor in appointing the Investigation Committee, to ensure that any potential releases would be appropriate and only provided after a complete evaluation of the Potential Claims.

25.     After the submission of the IC Report, which concluded that the Releases were appropriate after a thorough investigation, the Debtors engaged in months of intense negotiations with various parties, which resulted in the Debtors entering into the Global Settlement, which is composed of two interrelated settlements, each of which is discussed further in the Confirmation Declaration and in the Global Settlement Motion: the Indemnification Settlement and the Securities Litigation Settlement. The Global Settlement contains releases that are carried into the Plan, and the releases in the Global Settlement and the Releases set forth in the Plan are part and parcel with one another. In the absence of the Releases, there is no Global Settlement, and without the Global Settlement, there is no Plan.

26.     On May 14, 2025, the Court entered the *Preliminary Order (I) Approving Global Settlement, Including the Debtors' Entry Into and Performance Under Indemnification Settlement and Securities Litigation Settlement, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [Docket No. 732] approving the Global Settlement on a preliminary basis.

**A.     The Releases**

27.     The Global Settlement and the Releases under the Plan are the foundation of the Plan.  The Plan provides for: (i) the Debtor Releases in Article IX.B of the Plan; (ii) the Third Party Releases in Article IX.C of the Plan; (iii) the Exculpation Provision in Article IX.D of the Plan; and (iv) the Injunction Provision in Article IX.E of the Plan.  The Debtor Releases, Third

10

Party Releases, Exculpation Provision, and Injunction Provision are integral components of the Plan, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and otherwise comply with applicable law.  As such, each of the Debtor Releases, Third Party Releases, Exculpation Provision, and Injunction Provision should be approved.

        i.    The Debtor Releases

28.    I understand from counsel that Courts in this jurisdiction may evaluate the appropriateness of a debtor release under the business judgment standard and/or by applying the *Zenith* factors.[8]  Under either analysis, I believe that the Debtor Releases represent a valid exercise of the Debtors' business judgment and are fair, reasonable, and in the best interests of the Debtors' Estates and otherwise satisfy the *Zenith* factors to the extent that they apply.

        1.    *Business Judgment*

29.    The Debtor Releases constitute a sound exercise of the Debtors' business judgment.  First, the Debtor Releases are the product of good faith, arm's length negotiations among the Debtors' key stakeholders.  Second, the Released Parties have contributed to these Chapter 11 Cases by supporting the plan process, and with respect to the parties to the Global Settlement, by maximizing the value of the Debtors' Estates by negotiating and implementing the Global Settlement, which resolves all the Debtors' material Indemnification Obligations.  Absent the Global Settlement, which requires the Debtor Releases in the Plan, confirming a chapter 11 plan may not be possible, merely given the size and complexity of the asserted Indemnification Obligations. In addition, as discussed in the Global Settlement Motion, without the Global Settlement, the Debtors would be forced to divert their attention from their Chapter 11 Cases and expend significant time and resources litigating the Amended Estimation Motion, which would involve conducting numerous

---

[8]    The *Zenith* factors may also be referred to as the *Master Mortgage* factors.

mini trials, prosecuting the 510(b) Claim Objection, defending the Securities Litigation, responding to cumbersome discovery, and likely contesting a motion to dismiss and challenging plan objections. Navigating these litigations would likely take years, cost multiple tens of millions of dollars, severely deplete scarce estate resources, and the ultimate outcome would be highly uncertain. And even assuming the Debtors succeeded in every contested matter and litigation, no distributions will have been made in the interim, all of which is to the detriment of the Debtors and their stakeholders.

30.    The Global Settlement, which is underpinned by the Releases in the Plan, eliminates these obstacles and preserves the value of the Debtors' Estates for the benefit of their stakeholders. The benefits afforded by the Global Settlement, and by extension the Debtor Releases, cannot be overstated.  In negotiating for the key benefits provided under the Global Settlement, a critical component of inducing the Global Settlement was the agreement to provide the Debtor Releases, which in turn ensures that the remaining value in the Estates will go to the Estates' residual interest holders and not be used for costly and uncertain litigation.

31.    Importantly, at all times in these Chapter 11 Cases, the Debtor Releases remained subject to the IC Investigation, the results of which fully support the Debtor Releases. After faithfully and thoroughly completing the IC Investigation, the Investigation Committee concluded that the Debtor Releases are appropriate in a 128-page report that is the culmination of more than 1,000 hours of investigative work. The Investigation Committee had access to, and ran searches on, millions of documents, reviewed the allegations and facts underlying the Prior Proceedings, and conducted interviews with key witnesses and did not identify any strong claims against the Debtors' current and former directors and officers. In addition, the Investigation Committee considered the impact that the Debtors' unresolved Indemnification Obligations to the

12

defendants in any litigation could have on their pursuit of potential estate claims. If the Estates pursued claims against the defendants, it would likely give rise to Indemnification Obligations in favor of the defendants. The Debtors would pay both sides of the litigation cost, and because creditors are to be paid in full in this case, indemnification claims would deplete the Estates at 100 cents on the dollar. This practical reality further underscores the reasonableness of entering into the Global Settlement and granting the Plan's contemplated Releases. Finally, the IC Investigation did not reveal any credible claims for fraud, gross negligence or willful misconduct.

32.     Given the benefits afforded by the Global Settlement, which requires the Debtor Releases under the Plan, coupled with the findings of the IC Investigation, I believe that the Debtor Releases satisfy the business judgment standard and should be approved.

2.     *Zenith* Factors

33.     I've also been advised by counsel that, in addition to, or in the alternative to, the business judgment rule, the Court may apply the *Zenith* factors to the Debtor Releases. In applying the *Zenith* factors, I understand that the Court will evaluate whether (i) there is an identity of interest between the debtor and the non-debtor such that a suit against the non-debtor will deplete the estate's resources, (ii) the non-debtor has provided a substantial contribution to the plan, (iii) the release is a necessity to the plan, (iv) creditors and interest holders affected by the release overwhelming support the plan; and (v) the plan provides for the payment of all or substantially all of the claims of the creditors and interest holders. After considering the *Zenith* factors, I believe that the Debtor Releases are appropriate.

34.     First, the Debtors have an identity of interest with the Released Parties. Each of the Released Parties shares the common goals of resolving their competing and interrelated Claims and Interests and achieving fair and equitable distributions to creditors and interest holders

13

under the Plan.  In addition, as a result of the Debtors' Indemnification Obligations, the Debtors

share an identity in interest with the Released Parties.  In particular, an action against the

Indemnified Individuals or the Underwriters would result in the Debtors incurring Indemnification

Obligations. Given the number of Prior Proceedings and the complexities involved, these

Indemnification Obligations would likely be significant, deplete estate resources, and as a result

of being a co-defendant in many instances, the Debtors would also be forced to litigate the Prior

Proceedings so as to liquidate the claims therein, resulting in further costs and distraction.

35.     Second, I believe that the Released Parties have provided a substantial

contribution (in the form of both cash and non-cash components) in exchange for the Debtor

Releases.  All of the Released Parties have worked collaboratively with the Debtors in formulating

the Plan.  In addition, under the Global Settlement, (i) the Indemnified Individuals have agreed to

limit their Indemnification Claims, as set forth in, and in exchange for the treatment provided

under, the Plan, (ii) the Underwriters have agreed to provide $4.68 million to assist in resolving

the Securities Litigation under the Global Settlement, and (iii) the Ad Hoc Preferred Stockholder

Group has been instrumental in assisting the Debtors in negotiating the Global Settlement and

prosecuting the Plan and will also contribute their *pro rata* share of the Preferred Stock Interest

Contribution. Without these significant contributions, the Global Settlement would not be possible,

which would make confirming a chapter 11 plan exceedingly difficult.

36.     Third, I believe that the Debtor Releases are essential to the success of the

Plan.  As noted in the Confirmation Declaration, the Global Settlement, among other things,

resolves the Securities Litigation, which, in turn, allows for the resolution of the Indemnified

Individuals' Indemnifiable Claims.  Without the Global Settlement, which requires that the Plan

contain the Debtor Releases, it may be impossible for the Debtors to successfully navigate the

14

myriad issues resolved by the Global Settlement. Thus, in the absence of the Debtor Releases, there would be no Global Settlement and little prospect of a confirmable chapter 11 plan that returns value to stakeholders.

37. Fourth, I understand that every Class entitled to vote on the Plan has voted to accept the Plan and that no holder of a Claim or Interest in the Voting Classes has objected to the Plan or the Releases provided for therein, including the Debtor Releases.  In addition, under the Common Stock Settlement, the Debtors' former adversaries, the Common Stock Sponsors, have agreed to support the Releases. I believe this overwhelming support for the Plan is a significant endorsement of the Debtor Releases, and reinforces and affirms the Debtors' determination that the Debtor Releases are a valid exercise of the Debtors' business judgment and are in the best interest of their Estates.

38. Fifth and finally, the Plan provides significant recoveries for all Classes affected by the Releases, including the Debtor Releases.  Indeed, Holders of Allowed Claims will recover in full, and value will flow to Holders of Interests. I believe that, absent the Global Settlement and the Debtor Releases, the Debtors would have been subject to protracted litigation, which would have significantly impaired the Estates' limited resources and led to diminished recoveries and benefits for all Holders of Claims and Interests.  Accordingly, I believe that the Debtor Releases are appropriate and meet the applicable standard for approval.

ii.    The Third Party Releases

39. I have been advised of the applicable standard for approval of consensual third-party releases established in the Third Circuit, and I am familiar with the requirements outlined by the Third Circuit in connection with such releases. For Holders of Claims in Class 5

15

(Indemnified Individuals) and Holders of Interests in Class 8 (Preferred Stock Interests),[9] such Holders will be deemed to grant the Third Party Releases only if they either (i) vote in favor of the Plan and do not opt out of the Third Party Releases by checking the opt-out box on the ballot or (ii) abstain or vote to reject the Plan, but check the opt-in box on the ballot. Importantly, all Holders of Claims in Class 5 and Interests in Class 8 retain the right to opt-out of the Third Party Releases even if they vote in favor of the Plan, and if such Holder rejects the Plan or abstains from voting on the Plan, such Holder will only be deemed to grant the Third Party Releases if they affirmatively opt into the Third Party Releases. Thus, in order for the Third Party Releases to be binding on a member of a Voting Class, a party in interest must take an affirmative step to demonstrate its consent to the Third Party Releases. Finally, with respect to the Non-Voting Classes that are deemed to accept the Plan, the Third Party Releases will only bind parties in such Class if they affirmatively opt into such releases.  Accordingly, the Third Party Releases are entirely voluntary and consensual.

40.     The Third Party Releases were integral in developing the Plan, and are contemplated by both the RSA and the Global Settlement.  I believe the Third Party Releases are a sound exercise of the Debtors' business judgment and offer protection to parties who constructively participated in the Debtors' Chapter 11 Cases by, among other things, supporting the Plan and/or participating in the Global Settlement. Further, the Third Party Releases are voluntary and therefore consensual.  For these reasons, I believe that the Third Party Releases are reasonable and appropriate and should be approved.

---

[9]     The Initial Plan (as defined in the Confirmation Declaration) was appended to the RSA and, as discussed in the Committee Response, the Releases in the Initial Plan always remained subject to the IC Investigation. *See Committee Response* at pp.21-24.  With respect to Holders of Interests in Class 8 that are party to the RSA, such Holders have an obligation to grant the Third Party Releases.

16

**B.     The Exculpation Provision**

41.     In addition to the Releases, I understand that the Plan contains the Exculpation Provision, which exculpates the Exculpated Parties for certain acts or omissions during the Chapter 11 Cases.  I also understand that the Exculpation Provision is limited in scope and does not exculpate acts or omissions that constitute actual fraud, gross negligence or willful misconduct and is limited to estate fiduciaries.

42.     I believe that the Exculpation Provision is important because the Exculpated Parties have participated in these Chapter 11 Cases in good faith, and such provision is necessary to protect them from collateral attacks related to any good faith acts or omissions in connection with, or related to, among other things, the Chapter 11 Cases, the Plan, the Global Settlement, and the Common Stock Settlement.  As such, I believe the Exculpation Provision is appropriate and necessary under the circumstances and should be approved.

**C.     The Injunction Provision**

43.     I believe that the Injunction Provision is necessary to, among other things, enforce the Debtor Releases, the Third Party Releases and the Exculpation Provision contained in the Plan.  The Injunction Provision implements the Debtor Releases, the Third Party Releases, and Exculpation Provision, in part, by enjoining all persons and entities from commencing or continuing in any manner any claim that was released or exculpated pursuant to such provisions. As such, I believe the Injunction Provision is appropriate and necessary under the circumstances and should be approved.

**<u>Conclusion</u>**

44.     Based on the foregoing, I believe that each of the Debtor Releases, the Third Party Releases, the Exculpation Provision, and the Injunction Provision is an integral component

of the Plan, is appropriate and necessary under the circumstances, and I have been advised that such provisions are consistent with the Bankruptcy Code and otherwise comply with applicable law.

45.    Accordingly, I believe that each of the Debtor Releases, the Third Party Releases, the Exculpation Provision, and the Injunction Provision should be approved.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  November 10, 2025
        New York, New York


                                                    /s/  *Ivona Smith*
                                                    Ivona Smith
                                                    Independent Director and Sole
                                                    Member of the Internal Investigation
                                                    Committee of Silvergate Capital
                                                    Corporation