## Exhibit A

**IC Report**



**REPORT OF THE INTERNAL INVESTIGATION COMMITTEE
OF THE BOARD OF DIRECTORS OF SILVERGATE, INC.**

**December 24, 2024**

RICHARDS LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

**This Report is labeled "Confidential -- Contains Confidential Supervisory Information of the Board of Governors of the Federal Reserve System." The basis for confidential treatment includes, but is not limited to, the fact that this Report contains materials related to examination, operating, or condition reports prepared by an agency responsible for the supervision of financial institutions (as set forth in 5 U.S.C. sections 552(b)(4), 552(b)(6), 552(b)(7), and 552(b)(8) respectively). Disclosure of such information is not permitted absent regulatory approval. Unauthorized disclosure may result in monetary penalties and criminal liability or imprisonment.**

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS..............................................................................................i

INTRODUCTION AND EXECUTIVE SUMMARY ...........................................................1

I.   PRIOR PROCEEDINGS AND SUMMARY OF PRINCIPAL ALLEGATIONS ...............3

   A.   Prior Proceedings, Including Stockholder Derivative Demand .......................3

      1.   Federal Class Actions by FTX Investors and Traders .................................4

      2.   Federal Securities Class Actions...................................................................6

      3.   The Stockholder Derivative Action ................................................................8

      4.   The Stockholder Derivative Demand..............................................................9

      5.   The SEC Investigation ..................................................................................11

      6.   Federal Reserve Board and California Department of Financial Protection and Innovation Proceedings........................................................................13

   B.   Principal Allegations in the Prior Proceedings .............................................14

      1.   The Company's Silvergate Exchange Network...........................................15

      2.   Allegations of Deficiencies in the Company's BSA/AML Compliance Programs...16

      3.   Silvergate's Relationship with FTX and Alleged Failure to Detect Suspicious Activity in FTX Accounts.........................................................19

      4.   Purportedly False or Misleading Public Statements Regarding Silvergate's BSA/AML Compliance Program.............................................20

      5.   The SEC Challenged Silvergate's OTTI Calculations and Disclosures in January 2023.................................................................................................24

      6.   Alleged Trading by Directors and Officers Based on Material Non-Public Information .................................................................................................27

II.   THE COMMITTEE'S PROCESS ...........................................................................29

   A.   Formation and Authority of the Committee....................................................29

   B.   Committee Member Ivona Smith....................................................................30

   C.   The Investigation ...........................................................................................30

      1.   Document Review..........................................................................................31

      2.   Interviews With Relevant Witnesses ............................................................32

III.   LEGAL FRAMEWORK.........................................................................................32

   A.   Fiduciary Duties of Directors Under Maryland Law .....................................33

      1.   The Business Judgment Rule .......................................................................35

      2.   Duty of Care of Directors ............................................................................37

      3.   Duty of Loyalty of Directors........................................................................39

i

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

4.      Duty of Oversight of Directors ................................................41

5.      Duty of Disclosure of Directors ..............................................44

6.      Other Relevant Maryland Statutory Provisions .....................49

B.  Fiduciary Duties of Officers ..............................................................52

C.  Breach of Fiduciary Duty Based on Insider Trading ........................53

D.  The Framework for Derivative Claims ..............................................56

IV.  THE COMMITTEE'S KEY FACTUAL FINDINGS .......................................58

A.  Silvergate's Shift to Providing Banking Services to Customers in the Virtual Asset Industry ...........................................................................58

B.  Silvergate's BSA/AML Compliance Program Generally ...................60

1.      Procedures for Onboarding New Clients .................................61

2.      Ongoing Customer Monitoring and Enhanced Due Diligence Reviews ..................62

3.      Automated Transaction Monitoring.........................................63

C.  Gabeire as BSA Officer and the Decision to Change Silvergate's Automated Transaction Monitoring System.......................................64

D.  Sabins' Tenure as BSA Officer...........................................................68

1.      The Verafin SEN Gap ..............................................................70

2.      ████████████████████████████████..........73

3.      K2 Integrity Discovers the Verafin SEN Gap.........................76

4.      The Special Verafin Agents for the SEN are Implemented ████████████ ████████ ..........................................................79

5.      ████████████████████ Sabins and Dietz Decide to Leave the BSA Department and Silvergate Begins the Search for a New BSA Officer .....................80

E.  The Collapse of FTX and the BSA Department's Flow of Funds Review...............84

F.  The Effects on Silvergate of the FTX Collapse and Resulting Turmoil in the Virtual Currency Markets...........................................................85

G.  Silvergate's Ongoing Engagement with Its Regulators .....................88

H.  Silvergate Issues a Public Letter to Customers and Receives a Public Letter from Certain U.S. Senators ........................................................90

I.  ████████████████████████████████████ ..........91

J.  Further Statements by Silvergate Concerning Its Compliance Programs.....................93

K.  ████████████████████████████ ..........94

V.  ANALYSIS OF POTENTIAL CLAIMS ..........................................................95

A.  Lack of Oversight Claim Against the Directors ................................96

ii

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

1. Silvergate's Board had Established a Reasonable System of Controls and Reporting with Regard to BSA/AML Compliance ...................................................97

2. The Silvergate Board Reasonably Monitored the System of Controls and Did Not Ignore Red Flags ...........................................................................103

B. Lack of Oversight Claim Against Officers ...............................................................107

1. Potential Lack of Oversight Claim Against Lane .....................................................109

2. Potential Lack of Oversight Claim Against Fraher.................................................111

3. Potential Lack of Oversight Claim Against Pearson .............................................114

C. Insider Trading Claims Against Directors and Officers ...........................................115

D. Claims Related to Public Disclosures Concerning the BSA/AML Compliance Program.......................................................................................................................119

E. Claims Related to Silvergate's OTTI Calculations and Disclosures ..........................124

F. Additional Practical Concerns Related to Potential Litigation ..................................125

G. Considerations in Favor of Providing Releases ........................................................126

VI. CONCLUSION................................................................................................................127

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

# INTRODUCTION AND EXECUTIVE SUMMARY

The Board of Directors (the "Board") of Silvergate Capital Corporation ("Silvergate" or the "Company") formed an Internal Investigation Committee of the Board (the "Committee") on August 16, 2024 to investigate potential claims or causes of action that the Company may have against its current and former directors and officers and other related parties, including claims asserted in pending derivative litigation and in a stockholder derivative suit demand (the "Investigation"). The Committee was granted the full power and authority of the Board to carry out the Investigation and to take action in response to or with respect to the Investigation, including initiation of litigation, entry into settlements, or the provision of releases. The process of review also contemplated the preparation of this investigation report ("Report").

This Report was prepared at the behest of the Committee by its counsel, Richards, Layton & Finger, P.A. ("RLF"). The Report proceeds as follows: Part I summarizes the prior litigations, investigations, and regulatory actions that relate to the subject matter of the Investigation; Part II details the Committee's process, including its formation and the conduct of the Investigation; Part III sets forth the legal framework applicable to potential claims; Part IV summarizes the Committee's key factual findings; Part V includes the Committee's analysis of potential claims; and Part VI summarizes the Committee's conclusions.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

As set forth in more detail below, based on its investigation the Committee has reached the following conclusions:

First, the Committee determines that Silvergate does not have credible claims against its directors for breach of oversight duties relating to the Company's BSA/AML Compliance Program.

Second, the Committee likewise determines that Silvergate does not have a credible claim against Alan Lane, in his officer capacity, for breach of oversight duties relating to the Company's BSA/AML Compliance Program.

Third, the Committee determines that it is unlikely Silvergate would prevail on claims that Kathleen Fraher and/or Tyler Pearson, in their officer capacities, breached oversight duties with respect to the Company's BSA/AML Compliance Program.

Fourth, the Committee finds no basis for and determines that it would not be in the best interests of Silvergate to pursue any claims against the directors or officers for alleged insider stock sales.

Fifth, the Committee determines that it is not in the best interests of Silvergate to pursue claims against the directors or officers based on the challenged public statements concerning the Company's compliance programs.

2

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Sixth, the Committee determines that it would not be in the best interest of Silvergate to pursue claims against Antonio Martino based on the "OTTI" allegations.

Finally, the Committee determines that it is in the best interests of Silvergate to provide releases to the Company's directors for any claims arising during the period of 2019 through March 8, 2023, as well as provide releases to Lane, Fraher, Martino, and Pearson for claims against them in their capacities as officers during the same period. However, all such releases should expressly carveout the directors' and officers' obligations to repay any amounts that have been advanced to them for their legal expenses should it ultimately be determined that they are not entitled to indemnification.

## I.   PRIOR PROCEEDINGS AND SUMMARY OF PRINCIPAL ALLEGATIONS

### A.   Prior Proceedings, Including Stockholder Derivative Demand

The prior proceedings and stockholder derivative demand focus primarily on events that occurred between May 2019 and February 2023, including actions by the Company and its directors and officers between November 2022 and January 2023. During this period, the Company, through its wholly owned subsidiary Silvergate Bank (the "Bank" and, unless otherwise indicated, included in the terms "Silvergate" and the "Company"), held and maintained accounts associated with FTX Trading, Ltd. and its affiliates (collectively, "FTX") and Alameda Research, LLC

3

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

("Alameda"), both of which collapsed in November 2022. Events related to the collapse of FTX/Alameda, as well as a concurrent collapse in the value of the cryptocurrency market, became the subject of several lawsuits against the Company. Separately, the Company became the subject of various regulatory investigations, including by the United States Securities and Exchange Commission ("SEC"), the California Department of Financial Protection and Innovation ("DFPI"), and the Federal Reserve Board ("FRB"), which were focused on the Company's Bank Secrecy Act ("BSA") and anti-money laundering ("AML") compliance program. These matters are summarized below.

### 1.    Federal Class Actions by FTX Investors and Traders

Following the FTX/Alameda collapse, various FTX investors, traders and those with interests in cryptocurrencies filed federal class actions against the Company and its directors, officers, and other executives. Those federal class actions include the following: *Zuleta, et al. v. Silvergate Capital Corp., et al.*, No. 22-cv-1901L-AGS (S.D. Cal.)[1]; *Gonzalez v. Silvergate Bank*, No. 222-cv-1981-

---

[1] In *Zuleta, et al. v. Silvergate Capital Corp., et al.*, No. 22-cv-1901L-AGS (S.D. Cal.), purported FTX account users and cryptocurrency traders Jose Tomas Sepulveda Zuleta, Michael Lehrer, and Tristan Newman brought purported class claims against the Company; Alan J. Lane; Christopher M. Lane; Tyler J. Pearson; and Jason Brenier. The *Zuleta* complaint alleged claims of fraud, fraudulent concealment and inducement, civil conspiracy, negligence, unfair competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and quasi-contract and unjust enrichment.

4

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

BEN-WVG (S.D. Cal.)[2]; and *Bhatia v. Silvergate Bank*, No. 3:23-cv-00667-AGT

(N.D. Cal.).    The *Zuleta* and *Gonzalez* actions were voluntarily dismissed in

February 2023.[3]

In the *Bhatia* action (the "FTX Aiding & Abetting Action"), purported FTX

account user and cryptocurrency trader Soham Bhatia asserts, on behalf of himself

and all others similarly situated, claims against the Company and Alan J. Lane

(former director and former CEO of Silvergate).    Specifically, the complaint in the

FTX Aiding & Abetting Action alleges that the Company and Lane aided and

abetted acts of fraud and breaches of fiduciary duty by FTX and its insiders, as well

as a claim for unjust enrichment against the Company.[4]    The FTX Aiding & Abetting

Action was subject to a motion to dismiss filed on June 19, 2023, which was denied

on March 20, 2024.[5]    The parties subsequently executed a settlement agreement,

dated November 15, 2024, in the FTX Aiding & Abetting Action, which provides

---

[2] In *Gonzalez v. Silvergate Bank*, No. 22-cv-1981-BEN-WVG (S.D. Cal.), purported FTX account user and cryptocurrency trader Joewy Gonzalez bought purported class claims against the Company and Alan J. Lane.  The *Gonzalez* complaint alleged claims of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and unjust enrichment as to the Company.

[3] *See Zuleta*, Notice of Voluntary Dismissal Without Prejudice, Feb. 9, 2023, ECF No. 17 and Minute Order, Feb. 10, 2023, ECF No. 18; *Gonzalez*, Notice of Voluntary Dismissal Without Prejudice, Feb. 10, 2023, ECF No. 12; and *Gonzalez*, Minute Order, Feb. 13, 2023, ECF No. 13.

[4] *See Bhatia v. Silvergate Bank*, No. 3:23-cv-00667-AGT (N.D. Cal.) Complaint at ¶¶ 101–17.

[5] *Bhatia*, Def.'s Mot. to Dismiss, June 19, 2023, ECF No. 16; *Bhatia*, Order Denying Def.'s Mot. to Dismiss, Mar. 20, 2024, ECF No. 25.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

for a payment to the plaintiff class of $10 million. The settlement agreement remains subject to approval by the court.

Additionally, on June 14, 2023, Word of God Fellowship, Inc. filed a complaint in the Superior Court of California, County of San Diego, captioned *Word of God Fellowship, Inc. v. Silvergate Bank, et al.*, 2023-00024877 asserting claims against Silvergate, the Bank and Lane on a substantially similar basis as those claims asserted in the FTX Aiding & Abetting Action on behalf of a single plaintiff. Plaintiff Word of God Fellowship, Inc. is a class member in the FTX Aiding & Abetting Action but has stated it would opt out of any settlement of that case. On March 15, 2024, the court granted defendants' motion to stay the *Word of God Fellowship* action and, on September 11, 2024, plaintiff filed a petition for writ of mandate or other appropriate relief in the California Court of Appeal seeking to vacate the stay order. The *Word of God Fellowship* action currently remains stayed. Further, in the pending bankruptcy action, the debtors sought to estimate the *Word of God Fellowship* action claims for allowance and distribution purposes at $0, which the court granted on October 24, 2024.

### 2. Federal Securities Class Actions

Following the FTX/Alameda collapse, as well as the related collapse of the cryptocurrency markets, the Company and its subsidiary bank experienced a massive withdrawal of deposits, an associated liquidity crisis, and a significant drop in the

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

value of the Company's stock. These events resulted in the filing of several federal

securities actions by Company stockholders against the Company and its directors,

officers, and other executives, including the following: *Rosa v. Silvergate Capital

Corp.*, No. 3:22-cv-01936-CAB-MSB (S.D. Cal.)[6]; *Guz v. Silvergate Capital Corp.*,

No. 3:22-cv-01968-AJB-BGS (S.D. Cal.)[7]; *Thomas v. Silvergate Capital Corp.*, No.

3:23-cv-00043-LL-NLS (S.D. Cal.)[8]; and *International Union of Operating

Engineers, Local 793, Members of Pension Benefit Trust of Ontario v. Silvergate

Capital Corp.*, No. 3:23-cv-00099-RSH-DEB (S.D. Cal.).[9]  These actions were

---

[6] In the *Rosa* action, purported stockholder Steven Rosa filed a class action complaint for violation of the federal securities laws on behalf of himself and all others similarly situated against the Company; Alan J. Lane; and Antonio Martino. The *Rosa* complaint alleged claims of violations of Section 10(b)-5 of the Exchange Act and violations of Section 20(a) of the Exchange Act.

[7] In the *Guz* action, purported stockholder Jacob Guz filed a class action complaint for violation of the federal securities laws on behalf of himself and all others similarly situated against the Company; Alan J. Lane; and Antonio Martino. The *Guz* complaint alleged claims of violations of Section 10(b)-5 of the Exchange Act and violations of Section 20(a) of the Exchange Act.

[8] In the *Thomas* action, purported stockholder John Thomas filed a class action complaint for violation of the federal securities laws on behalf of himself and all others similarly situated against the Company; Alan J. Lane; and Antonio Martino. The *Thomas* complaint alleged claims of violations of Section 10(b)-5 of the Exchange Act and violations of Section 20(a) of the Exchange Act.

[9] In the *International Union* action, purported stockholder International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, a Canadian registered pension plan, filed a class action complaint for violation of the federal securities laws on behalf of itself and all others similarly situated against the Company; Alan J. Lane; Antonio Martino; Kathleen M. Fraher; Benjamin C. Reynolds; Dennis S. Frank; Michael Lempres; Karen F. Brassfield; Robert C. Campbell; Paul D. Colucci; Thomas C. Dircks; Scott Reed; Colleen Sullivan; Aanchal Gupta; Goldman Sachs & Co., LLC (underwriter and joint-book running manager of several SPO offerings at Silvergate); Keefe, Bruyette & Woods, Inc. (underwriter and joint-book running manager of several

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

subsequently consolidated into an action captioned *In re Silvergate Capital Corp. Securities Litigation*, No. 3:22-cv-1936-MSB (S.D. Cal.) (the "Consolidated Securities Action"). The Consolidated Securities Action is the subject of a pending motion to dismiss, which has been briefed, argued, and taken under advisement by the court.[10] Accordingly, the Consolidated Securities Action remains pending as of the date of this Report.

### 3.    The Stockholder Derivative Action

On February 21, 2023, purported stockholder Randy Nkonoki filed a shareholder derivative action in the Superior Court of the State of California, San Diego County, against the Company; Alan J. Lane (former director and former CEO); Karen F. Brassfield (now a former director); Thomas C. Dircks (director); Scott Reed (director); Paul D. Colucci (director); Michael Lempres (chairman and director); Aanchal Gupta (now a former director) (collectively "Then Current

---

SPO offerings at Silvergate); Canaccord Genuity, LLC (underwriter and joint-book running manager of several SPO offerings at Silvergate); Compass Point Research and Trading, LLC (former underwriter of several SPO offerings at Silvergate); Craig-Hallum Capital Group, LLC (former underwriter of several SPO offerings at Silvergate); J.P. Morgan Securities, LLC (former underwriter and joint-book running manager of several SPO offerings at Silvergate) and Wedbush Securities, LLC (former underwriter for an SPO offering at Silvergate). The *International Union* complaint alleged claims of violations of Section 10(b)-5 of the Exchange Act against all defendants; violations of Section 20(a) of the Exchange Act against the officer and director defendants; violations of Section 11 of the Securities Act against all defendants; violations of Section 12(a)(2) of the Securities Act against the underwriter defendants; and violations of Section 15 of the Securities Act against Lane and the director defendants.

[10] *In re Silvergate*, Minute Entry, Mot. to Dismiss Consolidated Securities Action Complaint, Nov. 29, 2023, ECF No. 98.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Director Defendants"); Colleen Sullivan (former director); Dennis S. Frank (former chairman and director); Robert C. Campbell (former director) (collectively "Former Director Defendants"); Kathleen Fraher (former Chief Risk Officer); Ben Reynolds (former Chief Strategy Officer); Derek J. Eisle (former Executive Vice President); and Paik Son Jai (former Chief Human Resources Officer) (collectively "Non-Director Officer Defendants"), initiating a case captioned *Nkonoki v. Karen F. Brassfield*, No. 2023-0000-8084 (Cal. Super.) (the "Derivative Action").[11] The complaint filed in the Derivative Action (the "Derivative Complaint") alleges, derivatively on behalf of the Company, claims of breach of fiduciary duty against the director defendants and claims of insider trading against certain director defendants (seeking disgorgement under Cal. Corp. §§ 25402 and 25502).[12] The Derivative Action has been stayed pending the resolution of the Consolidated Securities Action.[13]

### 4. The Stockholder Derivative Demand

On March 6, 2023, Nikhil Bhayani, as custodian for Krish Bhayani, a purported Silvergate stockholder, submitted to the Company a "Demand for Board Action," demanding that the Company investigate and, if appropriate, initiate claims for breach of fiduciary duty and/or other wrongdoing against its current and former

---

[11] *Nkonoki v. Karen F. Brassfield*, No. 2023-0000-8084 (Cal. Super.).

[12] Derivative Complaint at ¶¶ 139–50.

[13] *Nkonoki*, Docket Report, Sept. 16, 2024; *Nokoniki*, Minute Order, July 12, 2024.

9

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

directors and officers with respect to "Silvergate's failure to comply with numerous laws, its role in the collapse of the cryptocurrency exchange FTX, and its failure to detect and report instances of money laundering" (the "Derivative Demand").[14]  In particular, the Derivative Demand focused on the Company's obligations under the Bank Secrecy Act and the USA PATRIOT Act (the "Patriot Act") (including those provisions related to AML and know your customer ("KYC") requirements), as well as certain public statements made by the Company and then-CEO Alan Lane concerning the Company's compliance with the foregoing laws.  Further, the Derivative Demand notes the Company's prior and existing litigation exposure related to the FTX/Alameda collapse and potential violations of the federal securities law and banking laws, citing claims asserted in the *Zuleta* action, the *Gonzalez* action, the FTX Aiding & Abetting Action, the *International Union* action, and the Consolidated Securities Action.[15]  The Derivative Demand also references ongoing regulatory scrutiny from the Department of Justice and correspondence from United States Senators Elizabeth Warren, Roger Marshall, and John Kennedy.[16]

Company counsel contacted Mr. Bhayani's counsel at Grant & Eisenhofer P.A. about the Derivative Demand on August 18, 2023.  During this discussion and

---

[14] *See* Derivative Demand at 1.

[15] Derivative Demand at 12.

[16] *See id.* at 13.  The Derivative Demand also expressed concern with the Company's purported violation of its anti-nepotism policy in the hiring of various executives with familial connections to then-Company CEO Alan Lane.

10

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

in subsequent communications, Company counsel explained that the Company was fully occupied with its wind-down process and voluntary liquidation and that, accordingly, immediate action on the Derivative Demand would not be taken until the wind-down process had made substantial progress.[17]

### 5. The SEC Investigation

As noted above, following the FTX/Alameda collapse and related events, the SEC initiated an investigation of Silvergate. The SEC issued Wells Notices to Silvergate on April 2, 2024 and April 22, 2024, and the Company submitted a Wells Notice response on April 30, 2024.[18]

On July 1, 2024, the SEC filed an enforcement action and complaint (the "SEC Complaint") in the United States District Court for the Southern District of New York against the Company, Alan J. Lane, Kathleen Fraher, and Antonio Martino, initiating a case captioned *United States Securities and Exchange Commission v. Silvergate Capital Corporation, et al.*, No. 1:24-cv-04987-ALC (S.D.N.Y.).

---

[17] *See* Email from D. Wissbroecker to J. Stigi, Aug. 18, 2023 (summarizing and memorializing telephone conversation on Aug. 18, 2023 regarding Derivative Demand); Letter from John P. Stigi III, Aug. 25, 2023; Email from D. Wissbroecker to J. Stigi, Nov. 29, 2023; Email from J. Stigi to D. Wissbroecker, Nov. 30, 2023; Letter from John P. Stigi III, Dec. 11, 2023; Letter from John P. Stigi III, Mar. 19, 2024; and Letter from John P. Stigi III, June 26, 2024.

[18] *See In the Matter of Silvergate Capital Corporation* (NY-10658), Letter of John Buretta, Apr. 30, 2024 [hereinafter "Company Wells Response"].

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

The SEC Complaint alleged violations of the Securities Act Section 17(a)(2) and 17(a)(3) against Silvergate; violations of the Securities Act Section 17(a)(2) and 17(a)(3) against Defendant Lane; violations of the Securities Act Section 17(a)(3) against Defendant Fraher; violations of the Securities Act Section 17(a) against Defendant Martino; violations of the Exchange Act Section 10(b) and Rule 10(b)-5 thereunder against Defendant Martino; aiding and abetting violations of the Securities Act Section 17(a)(2) against Defendant Martino; aiding and abetting violations of the Exchange Act Section 10(b) and Rule 10(b)-5 thereunder against Defendant Martino; violations of the Exchange Act Section 13(a) and Rules 12(b)-20, 13(a)-1, 13(a)-11, and 13(a)-13 against Defendant Silvergate; violations of the Exchange Act Section 13(b)(5) against Defendant Martino; violations of the Exchange Act Section 13(b)(2)(A) against Defendant Silvergate; violations of the Exchange Act Section 13(b)(2)(B) against Defendant Silvergate; violations of the Exchange Act Rule 13(b)2-1 against Defendant Martino; and aiding and abetting violations of the Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) and Rules 12(b)-20 and 13(a)-11 against Defendant Martino.

As of the date of this Report, the SEC Complaint remains pending only as to the claims against Martino.[19]   The other defendants in the SEC Complaint—

---

[19] SEC Complaint Docket Report, Sept. 16, 2024; Aislinn Keely, *Silvergate to Pay $63M Over Internal Monitoring 'Deficiencies'*, Law360, July 1, 2024.

12

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Silvergate, Lane, and Fraher—resolved the claims against them through entry into consent orders dated July 8, 2024.[20] Pursuant to the consent orders, among other things, Lane consented to a five-year officer and director bar and a $1,000,000 civil penalty; Fraher consented to a five-year officer and director bar and $250,000 civil penalty; and Silvergate consented to a $50,000,000 civil penalty.[21]  However, pursuant to the Silvergate consent order, the amount of the civil penalty would be offset by payments Silvergate and/or the Bank made to the FRB and/or the DFPI to satisfy any penalties by those agencies.  Thus, because Silvergate entered into settlements with the FRB and DFPI (discussed below) for amounts greater than the civil penalty due to the SEC, such amounts fully offset Silvergate's civil penalty in the SEC action.  Furthermore, in the consent orders, the defendants neither admitted nor denied the allegations in the SEC Complaint.

### 6. Federal Reserve Board and California Department of Financial Protection and Innovation Proceedings

The FRB and the DFPI initiated investigations of Silvergate focused on its BSA/AML compliance programs, including, in particular, the monitoring of the Silvergate Exchange Network ("SEN").  The proceedings with these agencies were

---

[20] Final Judg. as to Def. Alan J. Lane, July 8, 2024, ECF No. 19; Final Judg. as to Def. Silvergate Capital Corporation, July 8, 2024, ECF No. 20; Final Judg. as to Def. Kathleen Fraher, July 8, 2024, ECF No. 21.

[21] *See* Lane Final Judg., Jul. 8, 2024; Silvergate Final Judg., Jul. 8. 2024; Fraher Final Judg., July 8, 2024.

13

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

resolved in June 2024 through consent orders pursuant to which Silvergate agreed to pay monetary penalties in an aggregate amount of $63 million. Specifically, on or about June 4, 2024, Silvergate consented to an Order of Assessment of Civil Money Penalty with the FRB regarding an investigation by the FRB, which had "identified deficiencies in Silvergate's monitoring of internal transactions through the SEN," and agreed to pay a civil monetary penalty of $43 million to the FRB. On or about June 26, 2024, Silvergate entered into a consent order with the Commissioner of the DFPI concerning an investigation by the DFPI, which had "identified deficiencies with respect to Silvergate's monitoring of internal transactions," and agreed to a civil monetary penalty of $20 million to be paid to the DFPI.

B.    **Principal Allegations in the Prior Proceedings**

The principal allegations, claims, and other concerns expressed in the prior proceedings, including the Derivative Demand, fall within the following general categories: (1) BSA/AML compliance at the Company, including monitoring of the SEN; (2) public statements by officers of the Company regarding its BSA/AML compliance programs; (3) the scope of the Company's relationship with FTX/Alameda and their affiliates and public statements regarding exposure to FTX/Alameda; (4) trading by certain officers and directors of the Company allegedly based upon material non-public information; and (6) the Company's

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

determination and disclosures regarding other than temporary impairment ("OTTI") calculations.[22]

## 1. The Company's Silvergate Exchange Network

The SEN was a "network of digital currency exchanges and digital currency investors that enable[d] the efficient movement of U.S. dollars between SEN participants 24 hours a day, 7 days a week, 365 days a year."[23] The SEN was first launched by the Company in 2017, which also represented the Company's early shift into working with cryptocurrency companies.[24] Effectively, the SEN permitted the exchange of instant transfers from customer accounts held by the Company to any other SEN account holder, facilitating the exchange of fiat currency to cryptocurrency exchanges and brokerage firms at any hour.[25] The SEN became a major part of the Company's profitability and brand, with crypto customer deposits of nearly $14.1 billion at one point and $784.7 billion in U.S. dollar transfers performed on the SEN in 2021.[26] The SEC, as well as the FRB and DFPI, asserted that the SEN was not monitored appropriately consistent with the Company's obligations under BSA/AML compliance laws.[27]

---

[22] Except for the discussion of the Derivative Complaint, the following summary is drawn principally from the SEC Complaint.

[23] SEC Complaint at ¶ 24.

[24] See id. at ¶ 23.

[25] See id. at ¶ 25.

[26] See id. at ¶¶ 32–33.

[27] See id. at ¶¶ 114–18.

15

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

## 2.   Allegations of Deficiencies in the Company's BSA/AML Compliance Programs

Under federal law, the Company is required to comply with the BSA, including the AML provisions associated therewith.[28]  The alleged lack of BSA and AML compliance was raised as a key concern in the prior proceedings and the Demand.  The BSA and other related federal provisions require that U.S. banks and financial institutions maintain an effective anti-money laundering program.[29]  The USA PATRIOT Act also requires compliance with AML programs, including the implementation of internal policies, procedures, and controls and the appointment of employees who will oversee compliance with the BSA and with other relevant federal statutory requirements.[30]  BSA compliance programs must further include a customer identification program, as well as procedures for conducting ongoing customer due diligence and monitoring.[31]  In general, a bank's BSA program must be tailored to the bank's size, complexity, and particular risk profile.[32]  This includes implementation of a risk-based transaction monitoring program, which provides for additional screening of higher-risk customers.[33]

---

[28] *See id.* at ¶¶ 35–36.
[29] *See id.* at ¶¶ 37–38.
[30] *See id.* at ¶ 39.
[31] *See id.* at ¶ 40.
[32] *See id.* at ¶ 43.
[33] *See id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

A central allegation in the SEC Complaint, as well as the other proceedings and the Derivative Demand, is that Silvergate's BSA/AML compliance program was deficient.   In particular, the allegations focus on the Silvergate's automated transaction monitoring systems, including whether they provided adequate monitoring of the SEN.  For example, the SEC alleged that Silvergate switched to a new automated monitoring system in April 2021.[34]   The SEC asserted that, as early as January 2021, the BSA Officer recognized that, because the Bank's customers were transferring billions of dollars via the SEN, the Company needed to monitor SEN transactions.[35]   However, the BSA Officer, working with employees of the third-party vendor that supplied the automated monitoring system, was unable to timely develop a solution by which the automated system would monitor the SEN.[36]  The BSA Officer allegedly expressed her concerns regarding SEN monitoring to Fraher in January 2022.[37]   The SEC Complaint cites several communications between Fraher and the BSA Officer, which the SEC alleged "indicat[e] that Fraher knew or should have known that [SEN] monitoring was not occurring."[38]

The SEC also asserted that Silvergate's bank examiners from the FRB and DFPI made findings throughout 2022 which should have "made it apparent to Lane

---

[34] *See id.* at ¶¶ 52-57.
[35] *See id.* at ¶ 66.
[36] *See id.* at ¶ 67.
[37] *See id.* at ¶ 68.
[38] *See id.* at ¶ 69.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

and Fraher that the Bank's BSA compliance program was insufficient given its risk profile."[39]  The SEC Complaint references the examiner's April 2022 Exam Report, which reviewed the Company's operations during 2021 and purportedly found "material control weaknesses over BSA/AML compliance."[40]  The SEC also focused on a September 2022 targeted examination of aspects of Silvergate's BSA program, which, among other things, found that the Company's automated monitoring system "was not configured commensurately to the Bank's risk profile, and that Silvergate's BSA compliance program continued to inadequately dispose of suspicious activity alerts."[41]  The preliminary findings from this review were communicated to Silvergate's Board and senior management in October 2022.  At that time, the SEC asserted that Fraher recommended that the BSA Officer be replaced and thereafter took on more responsibility and oversight of the BSA program.[42]  Silvergate, including Fraher, remained in frequent communications with the examiners through the remainder of 2022, including through the issuance of their final report for the targeted examination on November 23, 2022.[43]

---

[39] *See id.* at ¶ 76.
[40] *See id.* at ¶¶ 81-83.
[41] *See id.* at ¶¶ 84-85.
[42] *See id.* at ¶ 87.
[43] *See id.* at ¶¶ 89-93.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

### 3. Silvergate's Relationship with FTX and Alleged Failure to Detect Suspicious Activity in FTX Accounts

The SEC Complaint and other proceedings also focused on Silvergate's relationship with FTX. The SEC asserted that "FTX, at the time one of the largest crypto asset trading platforms in the world, held bank accounts at Silvergate, as did many related to FTX—including Alameda Research ('Alameda'), crypto asset hedge fund owned by Sam Bankman-Fried ('Bankman-Fried'), the CEO of FTX."[44] The SEC noted that in early November 2022 public allegations surfaced raising concerns about the financial relationship between FTX and Alameda, which led to many of FTX's customers withdrawing their funds from the platform.[45] This resulted in a solvency crisis at FTX, which declared bankruptcy on November 11, 2022.[46] The SEC asserted that following the FTX bankruptcy and ensuing volatility in the crypto currency markets, Silvergate's customers began removing their deposits from the Company's accounts.[47] By November 15, 2022, the SEC alleged that "Silvergate was in the midst of an existential bank run."[48]

The SEC contends that, shortly after the FTX collapse, Silvergate's BSA staff completed an analysis of the Bank's relationship with FTX and "identified as

---

[44] *See id.* at ¶ 104.
[45] *See id.* at ¶ 107.
[46] *See id.* at ¶ 108.
[47] *See id.* at ¶ 109.
[48] *See id.* at ¶ 110.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

suspicious over 300 transactions by FTX-related entities in Silvergate accounts from January 2022 until November 2022."[49]  The SEC asserted that the analysis showed "FTX-related entitles had engaged in roughly $9 billion in suspicious transfers—some of which occurred over the SEN—during that period."[50]  The SEC alleged that "[m]ost troubling to the BSA staff was the trend of funds that flowed from FTX's custodial accounts—which held FTX customer funds—to a series of non-custodial FTX-related entities' accounts, followed by transfers of these funds to other third parties—either through the SEN or to accounts external to the Bank."[51]

### 4. Purportedly False or Misleading Public Statements Regarding Silvergate's BSA/AML Compliance Program

The prior proceedings also focused on the Company's and its officers' (in particular, Lane's) public statements concerning Silvergate's BSA/AML compliance programs following the FTX collapse.  For example:

- On November 7, 2022, the Company's Form 10-Q for the third-quarter of 2022, signed by Lane, indicated that there have been "no material changes to the risk factors disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2021, as filed with the SEC on February 28, 2022."[52] The SEC alleged that this statement was made despite the increased risk factors raised by the examiners in two investigations in 2022.[53]

---

[49] See id. at ¶ 115.
[50] See id. at ¶ 116.
[51] See id. at ¶ 117.
[52] See id. at ¶ 95.
[53] See id. at ¶ 80.

20

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

- The Form 10-K, signed by Lane and filed with the SEC on February 28, 2022, also included statements to investors about "enhanced procedures" utilized by the Company to maintain BSA/AML compliance, including due diligence reviews, enhanced procedures and screen and monitor transactions, including crypto currency transactions, and proprietary compliance technologies to monitor the flow of funds from clients to customers.[54]

The SEC questioned the veracity of these public statements, as well as other statements concerning Silvergate's BSA/AML compliance programs.

For example, the SEC focused on public statements made by Lane on November 21, November 30, and December 5, 2022, purportedly seeking to assuage customer concerns and limit withdrawals from the Bank.[55]  Fraher allegedly reviewed and approved at least some of these statements.[56] The November 21, 2022 statement, distributed on LinkedIn and X (formerly Twitter), in pertinent part, read as follows:

> Our business starts by knowing our customers, their business and the activity they plan to conduct at our institution. Once we approve a new customer, if the activity in their account does not match the activity that we expect based on our initial approval, we take immediate action up to and including terminating that relationship. No exceptions. The U.S. Bank Secrecy Act requires us to develop a robust compliance and risk management program. It's a responsibility we take very seriously.[57]

---

[54] *See id.* at ¶ 97.
[55] *See id.* at 121.
[56] *See id.*
[57] *See id.* at ¶ 122.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

This statement was purportedly misleading given the failure to adequately monitor SEN transactions and the review of FTX account activity which demonstrated suspicious transfers that had been conducted by BSA staff on November 17.[58]

On November 30, 2022, Lane—on behalf of the Company—appeared on CNBC for an interview on its "Squawk on the Street" television program, making, in pertinent part, the following statements regarding the Company's compliance in light of the FTX collapse:

- The next step is we also then have to be monitoring on an ongoing basis the activity that is moving across the SEN . . . We monitor for activity that would be inconsistent with the purported use of the account. But as long as the activity is consistent, then there . . . is nothing else that we would do.

- Again, we built this business compliance first. We satisfy all the regulatory requirements. And we have also, in the past, we have offboarded customers if we see activity that is inconsistent and if they can't correct it or can't explain it, then we offboard those customers.[59]

This statement was purportedly misleading given the alleged failure to detect suspicious activity and the alleged failure to detect suspicious transfers in FTX accounts.[60]

---

[58] *See id.* at ¶¶ 123–25.
[59] *See id.* at ¶¶ 131–32.
[60] *See id.* at ¶¶ 133–34.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

On December 19, 2022, in response to a letter from U.S. Senator Elizabeth Warren and other public officials, Lane—on behalf of the Company—stated, in pertinent part, that:

- Silvergate operates in accordance with the BSA and the Patriot Act.

- Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage.

- After accounts are open, we continue to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags.

- By performing our risk management procedures and fulfilling our regulatory obligations, Silvergate plays a key role in helping law enforcement identify bad actors. We take this responsibility seriously.

- Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures and the requirements outlined above.[61]

These statements were purportedly misleading given the alleged failure to detect suspicious activity and the alleged failure to detect suspicious transfers in FTX accounts.[62]

In addition, on January 5, 2023, Lane stated during a public earnings call that "[Silvergate] follow[s] the Bank Secrecy Act, the USA PATRIOT Act for every

---

[61] *See id.* at ¶¶ 138–40.
[62] *See id.* at ¶¶ 142–44.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

account that we open and we conduct ongoing monitoring."[63]  This statement was purportedly misleading given that the Company's system did not conduct automated monitoring of SEN transactions from April 2021 to September 2022.[64]

### 5. The SEC Challenged Silvergate's OTTI Calculations and Disclosures in January 2023

The SEC Complaint also focuses on the Company's calculations and disclosures around the proper calculation of "other-than-temporary impairment" ("OTTI") as to the Company's investments.  OTTI, an accounting concept, references a significant decline in the fair-market value of an investment and that investment's limited chance of recovery in the short-term.[65]  OTTI is also a component in accurate calculations of balance sheets when securities are being sold, as it forms a basis for valuation and for risk assessments by investors and by the Company.[66]  A bank such as the Company, as part of the process of calculating its balance sheet, would routinely assess its financial position by its "Tier 1 Leverage Ratio," calculated by dividing the Company's "Tier 1 Capital" by its total average assets.[67]  OTTI comes into play when a security is designated as "available-for-sale" ("AFS").[68]  During the relevant time, Silvergate allegedly had many of its assets

---

[63] *See id.* at ¶¶ 157–58.
[64] *See id.* at ¶ 160.
[65] *See id.* at ¶¶ 175-76.
[66] *See id.* at ¶¶ 180-82.
[67] *See id.* at ¶ 180.
[68] *See id.* at ¶¶ 175-79.

24

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

listed as AFS, particularly those which were distressed.[69]  A company or bank with a Tier 1 Leverage Ratio above 5% can report that it is "well-capitalized," a positive indicator of financial and investment health.[70]

The SEC alleged that Silvergate excluded several liabilities from its publicly-released OTTI calculations, including: $81 million in sales, with $7 million in OTTI losses, in the first week of January 2023; a $1.7 billion projection in security sales that excluded additional debt maturing in February from the Federal Home Loan Bank of San Francisco; and not accounting for any change in asset or deposit levels.[71]  Effectively, the SEC alleged that the Company failed to account for significant securities sales that were anticipated after early January 2023.[72]

The SEC alleged that, on January 6, 2023, Martino approved an OTTI calculation for Silvergate less than previous estimates—of $134 million based on $1.7 billion in expected securities sales.[73]  During Silvergate's January 17, 2023 earnings call and related securities filings, Silvergate disclosed this $1.7 billion sales figure and $134 million OTTI calculation.[74]  The SEC has alleged that, given the

---

[69] *See id.* at ¶ 197.
[70] *See id.* at ¶ 199.
[71] *See id.* at ¶¶ 236–37, 239.
[72] *See id.*
[73] *See id.* at ¶ 246.
[74] *See id.* at ¶¶ 258, 262–65.

25

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Company's financial position in December 2022, then-Company CFO Martino and the Company knew or shown have known that these disclosures were inaccurate.[75]

The January 17, 2023 call also included public statements from Martino regarding the existing leverage ratio and OTTI calculations, including the following which the SEC alleged to be false:

> As we disclosed, we anticipated selling approximately $1.7 billion of securities and had recorded an impairment charge for that sale, which is part of the loss. And as Alan [Lane] said, we're only 2 weeks into the year, but we did execute on that plan. We've sold $1.5 billion of the $1.7 billion that we have earmarked. And so that's transpired in the first 2 weeks of the year. And beyond that, as Alan said, it's early, it's too early in the quarter to guide further. But as we said, we have earmarked those securities for sale. The purpose was primarily to reduce borrowings, and that's what we've done at this point in time.[76]

Additionally, during the call, Martino indicated that the Tier 1 leverage ratio remained at 5.36%.[77] Effectively, the SEC alleges that the disclosure and reliance on a figure of $1.7 billion and a corresponding OTTI was unrealistic given Silvergate's obligations that would require additional asset sales.[78] In this regard, the SEC asserts that the Company ultimately sold an additional $1 billion in securities through February 2023, bringing total sales to approximately $2.6 billion in the first quarter.[79]

---

[75] *See id.*

[76] *See id.* at ¶ 281.

[77] *See id.* at ¶ 283.

[78] *See id.* at ¶¶ 289–96.

[79] *See id.* at ¶¶ 308-09.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

### 6. Alleged Trading by Directors and Officers Based on Material Non-Public Information

The Derivative Complaint, filed on February 21, 2023, alleges insider trading claims against various board members and officers of the corporation, amounting to $125,224,147 in proceeds.[80]

Specifically, the Derivative Complaint alleges insider sales by Alan Lane (former Director and CEO of Silvergate) on February 18, 2021, June 8, 2021, and July 21, 2022 amounting to $18,805,830 in proceeds.[81] The Derivative Complaint alleges insider sales by Kathleen Fraher (former Chief Risk Officer and Chief Operating Officer of Silvergate) on November 30, 2020, August 2, 2021, August 4, 2021, August 27, 2021, November 19, 2021, and April 21, 2022 amounting to $2,805,929 in proceeds.[82] The Derivative Complaint alleges insider sales by Karen F. Brassfield (former director of Silvergate) on December 1, 2020, February 22, 2021, May 17, 2021, June 1, 2021, and February 22, 2022 amounting to $2,507,814 in proceeds.[83] The Derivative Complaint alleges an insider sale by Son-Jai Paik (former Chief Human Resources Officer of Silvergate) on November 9, 2021 amounting to $1,096,900 in proceeds.[84]

---

[80] Derivative Complaint at ¶ 96.

[81] *See id.* at ¶¶ 98–101.

[82] *See id.* at ¶¶ 102–03.

[83] *See id.* at ¶¶ 104–05.

[84] *See id.* at ¶¶ 106–07.

27

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Further, the Derivative Complaint alleges insider sales by Dennis S. Frank (director of Silvergate) on March 16, 2021, August 4, 2021, August 13, 2021, August 13, 2021, September 10, 2021, September 15, 2021, November 5, 2021, and November 9, 2021 amounting to $26,519,133 in proceeds.[85] The Derivative Complaint alleges insider sales by Ben Reynolds (former Chief Strategy Officer of Silvergate) on August 6, 2021, November 5, 2021, and November 5, 2021 amounting to $2,538,743 in proceeds.[86] The Derivative Complaint alleges insider sales by Paul Colucci (director of Silvergate) on November 20, 2020, August 4, 2021, September 15, 2021, and November 5, 2021 amounting to $4,604,069 in proceeds.[87] The Derivative Complaint alleges insider sales by Derek Eisele (former Executive Vice President of Silvergate) on December 3, 2020, December 8, 2020, February 25, 2021, February 26, 2021, March 11, 2021, August 10, 2021, August 13, 2021, October 26, 2021, and November 5, 2021 amounting to $20,861,812 in proceeds.[88] The Derivative Complaint alleges insider sales by Scott Reed (director of Silvergate) on December 15, 2020, February 23, 2021, February 25, 2021, March 12, 2021, May 28, 2021, August 4, 2021, August 9, 2021, September 8, 2021, October 22, 2021, October 26, 2021, and November 3, 2021 amounting to

---

[85] *See id.* at ¶¶ 108–09.
[86] *See id.* at ¶¶ 110–11.
[87] *See id.* at ¶¶ 112–14.
[88] *See id.* at ¶¶ 115–16.

28

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

$31,536,227 in proceeds.[89] The Derivative Complaint alleges insider sales by Thomas Dircks (director of Silvergate) on December 9, 2020, May 28, 2021, and October 22, 2021 amounting to $13,374,371 in proceeds.[90] The Derivative Complaint alleges an insider sale by Charles Campbell (former director of Silvergate) on August 9, 2021 amounting to $573,319 in proceeds.[91]

## II.    THE COMMITTEE'S PROCESS

### A.    Formation and Authority of the Committee

The Board formed the Committee by resolution adopted on August 16, 2024. The Committee was delegated the authority to investigate "any potential claims or causes of action against the Company's current and former directors, officers, managers, insiders, principals, employees and other related parties, including, but not limited to, those claims and allegations asserted in the Derivative Complaint and the Shareholder Demand Letter."[92] The Committee was further granted the full power and authority of the Board to carry out its Investigation and take any responsive actions, including, without limitation, the initiation of litigation, entry into settlements, or the provision of releases.[93] Furthermore, pursuant to the Board's

---

[89] *See id.* at ¶¶ 117–18.

[90] *See id.* at ¶¶ 119–21.

[91] *See id.* at ¶¶ 121–22.

[92] Written Consent of the Board of Directors of Silvergate Capital Corporation, Aug. 16, 2024.

[93] *Id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

resolutions, (i) the Committee shall continue in existence until such time as the Committee shall recommend to the Board that it be dissolved and (ii) the determinations made by the Committee as to matters within the scope of its charge shall not be subject to review by the Board.[94]  The Board also vested the Committee with power to retain advisors, including legal counsel.[95]

### B.  **Committee Member Ivona Smith**

The Committee consists of independent and outside director Ivona Smith.[96] Ms. Smith is an experienced fiduciary with more than 30 years of financial services industry experience.  Ms. Smith is currently employed at Drivetrain, LLC, managing post-bankruptcy trusts and providing other fiduciary services.  Ms. Smith also specializes in independent board seat representation.  Ms. Smith earned her MBA from New York University's Stern School of Business and her Bachelor of Science from Fordham University.  Ms. Smith was elected to the Board as an independent director in August 2024 and had no previous relationship with the Company prior to election.

### C.  **The Investigation**

The Committee engaged Richards, Layton & Finger, P.A. ("RLF") as its counsel to assist with the Investigation.  As more fully detailed below, in connection

---

[94] *Id.*
[95] *Id.*
[96] *Id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

with the Investigation, the Committee and RLF have: (1) requested, received, and reviewed documents from the Company, Company counsel, counsel for certain former employees, and publicly available sources; (2) confirmed that the Company was preserving documents and electronically stored information; (3) researched and considered applicable law; (4) reviewed the dockets, select filings, and other documents regarding the prior proceedings; (5) interviewed certain former directors, officers and/or employees of the Company; and (6) met numerous times to consider the issues raised in the prior proceedings and the Investigation, including on August 21, 2024, September 11, 2024, September 19, 2024, October 3, 2024, October 14, 2024, October 22, 2024, November 11, 2024, December 6, 2024, December 16, 2024, and December 23, 2024.

### 1. Document Review

RLF, on behalf of the Committee, reviewed various Company documents and public filings, including, but not limited to:

- Formation and governing documents for the Company and the Bank;
- Board documents from 2018-2024, including agendas, minutes, board books, and other materials (including materials from the Audit Committee, Director Risk Committee, and Regulatory Oversight Committee);
- Dockets, complaints, briefs, and other documents from the prior proceedings;
- Correspondence regarding the shareholder Derivative Demand;
- Copies of requested employment agreements;
- Copies of requested separation agreements;
- All documents referenced in the SEC Complaint; and

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

- The Company's Insider Trading Policy and Policies related to BSA/AML compliance.

RLF was further provided access to a large database of documents that had been produced in response to requests from the SEC and government regulators. Using this database, RLF was able to and did perform targeted searches for additional documents relevant to particular issues in the Investigation.

### 2. Interviews With Relevant Witnesses

In connection the Committee's Investigation, the Committee conducted interviews of the following former directors, officers and/or employees: (i) Kathleen Fraher on November 12, 2024; (ii) Alan Lane on November 13, 2024; (iii) Michelle Sabins on November 25, 2024; and (iv) Steven Dietz on November 26, 2024. Although RLF took the lead during the interviews, Ms. Smith also attended each of the interviews and would, at times, ask questions directly and/or communicate with RLF during breaks about issues of interest. Ms. Smith also met with RLF following each interview to discuss impressions and other issues related to the interviews.

## III. LEGAL FRAMEWORK

The following is a discussion of the key legal principles and authorities relevant to claims that Silvergate may have against its officers and directors based on the matters raised in the prior proceedings and the Investigation.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

## A.  **Fiduciary Duties of Directors under Maryland Law**

The Company is a Maryland corporation.[97]  Under Maryland law, "[a]s a general rule, the business and affairs of a corporation are managed under the direction of its board of directors. Except to the extent that a transaction or decision must, by law or by virtue of the corporate charter, be approved by the shareholders, the directors, either directly or through the officers they appoint, exercise the powers of the corporation."[98]  In the exercise of such managerial authority, it is well-settled that the directors "[o]ccupy a fiduciary relation to the corporation and its stockholders."[99]  Further, the "confidence reposed in [the directors], and the position they occupy towards the corporation and its stockholders, require a strict and faithful discharge of duty, and they are not allowed to derive from their position, either

---

[97] The Bank, a wholly owned subsidiary of Silvergate Capital Corporation, is a California corporation.  During the relevant period, Silvergate Capital Corporation and the Bank had overlapping boards of directors and executive officers.  As noted herein, California law concerning the fiduciary duties of directors and officers is broadly consistent with the law of Maryland.  Thus, to the extent any claim could potentially be brought under California law, this Report assumes that it would be subject to essentially the same legal principles.

[98] *Werbowsky v. Collomb*, 362 Md. 581, 598–99 (2001).

[99] *Storetrax.com, Inc. v. Gurland*, 397 Md. 37, 58 (2007); *accord Booth v. Robinson*, 55 Md. 419, 436–37 (1881); *see Merchants Mortg. Co. v. Lubow*, 275 Md. 208, 215 (1975); *Cumberland Coal & Iron Co. v. Parish*, 42 Md. 598, 605–06 (1875); *see also Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("The directors of Delaware corporations stand in a fiduciary relationship not only to the stockholders but also to the corporations upon whose boards they serve.") (citing *Guth v. Loft*, 5 A.2d 503, 510 (Del.1939)).  California law also recognizes the existence of fiduciary duties owed from directors to the corporation and the corporation's shareholders. *See, e.g., Bancroft-Whitney Co. v. Glen*, 64 Cal.2d 327, 345 (1966).

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

directly or indirectly, any profit or advantage whatever, except it be with the full knowledge and concurrence of the company, represented by others than themselves."[100]

Further, pursuant to the Maryland Corporations and Associations Code, the fiduciary duties of a director of a corporation have been codified, such that a director must "perform his duties . . . . (1) [i]n good faith; (2) [i]n a manner he reasonably believes to be in the best interests of the corporation; and (3) [w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances."[101] This precept, enshrined in § 2–405.1(c), includes the common law duties of care and loyalty expected by directors of a corporation.[102] However, despite the admonition in § 2–405.1(i)(1) that § 2–405.1 is the "sole source of duties of a director to the corporation or the stockholders of the corporation," Maryland courts have separately held that given that "fiduciary duties are not born of statutory

---

[100] *Booth*, 55 Md. at 437.

[101] Md. Code Ann. Corps. & Ass'ns § 2–405.1(c). Until the 2016 amendments to the Maryland General Corporation Law, "officers" were included within the scope of the statutory fiduciary duties outlined in § 2–405.1(a); *accord Shenker v. Laureate Educ.*, 411 Md. 317, 337 (2009); *see also Mona v. Mona Elec. Grp., Inc.*, 176 Md. App. 672, 695–96 (2007). The *Shenker* decision also left open undefined "additional common law duties" beyond the scope of § 2–405.1(a). Following the 2016 amendments, "officers" were removed from the statute.

[102] *Devereux v. Berger*, 264 Md. 20, 29 (1971) (holding that individual "as an officer and director . . . owed duties of loyalty and care to [the corporation] and these required him to use his best abilities and to discharge faithfully his obligations.").

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

language—the underlying fiduciary duties pre-exist the statutes, and those duties exist as such unless limited by statute."[103]

### 1. The Business Judgment Rule

Maryland courts have long recognized that "courts generally will not interfere with the internal management of a corporation and that the conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of the board properly exercises its business judgment, the directors are not ordinarily liable."[104] Thus, interpreting Maryland law, the Fourth Circuit has recognized that "[i]n all cases, the business judgment rule creates the presumption that directors act in good faith."[105]

The business judgment rule in Maryland has been codified at § 2–405.1(g), which provides that "an act of a director of a corporation is presumed to be in accordance with subsection (c) of this section."[106] In other words, a director of a Maryland corporation receives a statutory presumption that their action was taken

---

[103] Md. Code Ann. Corps. & Ass'ns § 2–405.1(i)(1); *Plank v. Cherneski*, 469 Md. 548, 572 (2020). *But see* James J. Hanks, Jr., MARYLAND CORPORATION LAW § 6.06(b) (Nov. 2023) ("All of these varying formulations of "fiduciary relationship," "bad faith," "total neglect," "utter indifference" and "fraud" were superseded in 1976 by the enactment of Section 2-405.1(c), based on Section 8.30(a) of the Model Business Corporation Act.").

[104] *See Devereux*, 264 Md. at 31–32 (internal quotation marks omitted).

[105] *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986).

[106] Md. Code Ann. Corps. & Ass'ns § 2–405.1(g); *see also Werbowsky*, 362 Md. at 609 n.7. Similarly, California law recognizes, both at common law and as codified in California Corporations Code section 309(a), the existence of and application of the business judgment rule. *See* Cal. Corp. Code § 309(a); *Gaillard v. Natomas Co.*, 208 Cal.App.3d 1250, 1269 (1989).

35

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

"in good faith, in a manner he reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances."[107]   Further, because Maryland's business judgment rule "is a product of legislation," "absent ambiguity or constitutional infirmity[,] . . . [it] is not subject to interpretation or revision by judicial gloss."[108]

Under § 2–405.1(e), a director who acts "in accordance with the standard of conduct provided by § 2–405.1(c)," has "immunity from liability."[109]   The immunity embodied in the phrase "no liability" extends to both monetary damages and equitable relief.[110]

---

[107] Md. Code Ann. Corps. & Ass'ns § 2–405.1(c).   The Court of Appeals of Maryland has likewise recognized Delaware's formulation of the business judgment rule as persuasive, citing positively the language of the Delaware Supreme Court in *Aronson v. Lewis*:

> It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.

*Boland v. Boland*, 423 Md. 296, 328 (2011) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

[108] *See Boland v. Boland*, 194 Md. App. 477, 502 (2010), *rev'd on other grounds*, 423 Md. 296 (2011).

[109] Md. Code Ann. Corps. & Ass'ns § 2–405.1(e).

[110] Hanks, MARYLAND CORPORATION LAW § 6.10 (Nov. 2023).

36

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

However, directors are only entitled to take advantage of the deferential business judgment rule standard when they are disinterested.[111]   Therefore, "directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[112]   In order to avoid an application of the rule, a shareholder-plaintiff must "show either that the board or committee's investigation or decision was not conducted independently and in good faith, or that it was not within the realm of sound business judgment."[113]

### 2.    Duty of Care of Directors

As to directors, § 2–405.1(c)(3) of the Maryland Corporations and Associations Code establishes a statutory duty of due care in its expectation that directors perform their duties "[w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances."[114] Thus, Maryland recognizes that due care requires "merely the conduct of the reasonable person of ordinary prudence under the circumstances, and the greater danger, or the greater

---

[111] *See Werbowsky*, 362 Md. at 609.

[112] *See id.* Likewise, the California courts have recognized that transactions in which the directors have an interest are subject to "rigorous scrutiny" rather than business judgment rule review. *See, e.g., Mueller v. Macban*, 62 Cal.App.3d 258, 274 (1976).

[113] *Bender v. Schwartz*, 172 Md. App. 648, 666 (2007).

[114] Md. Code Ann. Corps. & Ass'ns § 2–405.1(c)(3); *accord Werbowsky*, 362 Md. 581. California Corporations Code section 309(a) similarly provides that directors, in the performance of their duties, shall act with such care "as an ordinarily prudent person in a like position would use under similar circumstances."

37

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

responsibility, is merely one of the circumstances, demanding only an increased amount of care."[115]  Therefore, "directors are required . . . to use ordinary diligence; and by ordinary diligence is meant, that degree of care demanded by the circumstances."[116]

As to directors, § 2–405.1(c)(2) of the Maryland Corporations and Associates Code also mandates—as part of his or her exercise of care—that a director complete his/her actions "in a manner the director reasonably believes to be in the best interests of the corporation."[117]  Such a reasonable belief must be predicated on evidence that could support a "good corporate purpose."[118]

Further, under § 2–405.1(d)(1) of the Maryland Corporations and Associations Code, directors are entitled to rely in good faith on any "information, opinion, report, or statement, including any financial statement or other financial data" which is presented by an (1) officer or employee of the corporation; (2) a

---

[115] *Billman v. State of Md. Deposit Ins. Fund Corp.*, 88 Md. App. 79, 107 (1991).

[116] *Id.*; *see also Sadler v. Retail Prop. of Am., Inc.*, No. 12 C 5882, 2014 WL 2598804, at *8 (N.D. Ill. June 10, 2014) (interpreting Maryland law and holding that, outside of § 2–405.1, "only claims based on fiduciary duties *not* codified in § 2–405.1(a), as well as claims that allege harms that are separate and distinct from any to the corporation, may be brought in a direct cause of action against corporate directors.") (emphasis in original).

[117] Md. Code Ann. Corps. & Ass'ns § 2–405.1(c)(2).

[118] *Martin Marietta Corp. v. Bendix Corp.*, 549 F. Supp. 623, 633–34 (D. Md. 1982).

38

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

lawyer, certified public accountant, or other person; and (3) a committee of the board on which the director does not serve.[119]

### 3. Duty of Loyalty of Directors

As to directors, § 2–405.1(c)(1) of the Maryland Corporations and Associations Code mandates a statutory duty of loyalty in its expectation that directors perform their duties "[i]n good faith."[120] Further, Maryland courts have recognized that "[a] fiduciary relationship carries with it the requirement of utmost good faith and loyalty and the obligations . . . to make full disclosure of all known information that is significant and material to the affairs . . . [of] the fiduciary relationship."[121] Maryland courts have also specifically recognized Delaware law in the context of discerning the duty of loyalty, reasoning that the "duty of loyalty embodies two related but distinct requirements . . . first, in exercising judgment

---

[119] Md. Code Ann. Corps. & Ass'ns § 2–405.1(d)(1)–(i-iii); *accord Billman*, 88 Md. App. at 105; *see also* Cal. Corp. Code § 309(a) (requiring directors to act "in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders"); *Frances T. v. Vill. Green Owners Ass'n*, 42 Cal.3d 490, 513 (1986) ("This fiduciary relationship is governed by the statutory standard that requires directors to exercise . . . undivided loyalty for the interests of the corporation.").

[120] Md. Code Ann. Corps. & Ass'ns § 2–405.1(c)(1); *see also Hudson v. Prime Retail, Inc.*, No. 24-C-03-5806, 2004 WL 1982383, at *11 (Md. Cir. Ct. Apr. 1, 2004) ("Directors' obligations to perform their duties 'in good faith' and in a manner reasonably believed to be 'in the best interests of the corporation' impose a duty of loyalty to the corporation); *see also United Wire, Metal & Machine Health & Welfare Fund v. Bd. of Sav. & Loan Ass'n Comm'rs*, 316 Md. 236, 245 (1989).

[121] *Dixon v. Trinity Joint Venture*, 49 Md. App. 379, 382–83 (1981) (internal quotation marks and citations omitted); *accord Kline v. Knight*, 134 Md. App. 732 (2000).

39

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

directors must decide matters independently, and second, directors generally may not have a material personal interest in the transaction."[122]

Maryland has recognized that "[t]he extent of the duty of loyalty is not necessarily the same in all fiduciary relations, and what constitutes a violation of duty by one kind of fiduciary does not necessarily constitute a violation of duty by another kind of fiduciary."[123] Even so, in the corporate context, it has been held that a director "bore the same obligations to [the corporation] as an agent bears to his principal and a trustee bears to the beneficiaries of his trust."[124] Thus, Maryland courts have found breaches of the duty of loyalty in the context of accepting an illicit payment to approve a loan application[125] and in an action for loss to the value of stock by subverting the interests of the corporation in favor of personal interests.[126] "Whether a corporate fiduciary has breached the duty of loyalty to the corporation in a transaction with it is ordinarily determined as of the time of the transaction, and not by hindsight."[127]

---

[122] *See Hudson*, 2004 WL 1982383, at *11 (citing *Orman v. Cullman*, 794 A.2d 5, 19–25, n.50 (Del. Ch. 2002)); *see also Shapiro v. Greenfield*, 136 Md. App. 1, 13–15 (2000).

[123] *See Wittman v. Crooke*, 120 Md. App. 369, 375 (1998) (quoting *Parish v. Md. and Va. Milk Producers Ass'n, Inc.*, 261 Md. 618, 680 (1971)).

[124] *Levin v. Levin*, 43 Md. App. 380, 390 (1979); *see also Pritchard v. Myers*, 174 Md. 66, 76 (1938) ("the relation between a corporation and its directors is generally that of principal and agent").

[125] *Merchants Mortg. Co. v. Lubow*, 275 Md. 208 (1975).

[126] *Waller v. Waller*, 187 Md. 185, 190 (1946).

[127] *Gay v. State of Md. Deposit Ins. Fund Corp.*, 308 Md. 707, 724 (1987).

40

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

### 4.    Duty of Oversight of Directors

Maryland law has not expressly addressed whether a fiduciary duty of oversight exists. Nonetheless, by statute, directors of a Maryland corporation are vested with the authority to manage or oversee "all business and affairs of a corporation."[128] Maryland courts have similarly recognized that "responsibility for managerial oversight of a corporation lies with its board of directors."[129]

In the absence of controlling Maryland authority, Maryland courts "often look to Delaware law for guidance on issues of corporate law."[130] Indeed, Maryland courts have often noted the "'respect properly accorded Delaware decisions on corporate law' ordinarily in our jurisprudence," particularly when there is a paucity of controlling authority.[131] Thus, Delaware law may be instructive regarding the duty of oversight applicable to directors of a Maryland corporation. In Delaware, the duty of oversight is not an independent fiduciary duty but "stems from the core

---

[128] Md. Code Ann. Corps. & Ass'ns § 2-401(a).

[129] *Eastland Food Corp. v. Mekhaya*, 486 Md. 1, 22 (2023).

[130] *Oliveira v. Sugarman*, 226 Md. App. 524, 538 n.10 (2016), *aff'd*, 451 Md. 208 (2017). The California courts also have not directly addressed a duty of oversight by directors of California corporations. However, the California courts often look to Delaware law for guidance on corporate law matters and have held that "we may properly rely on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes." *Oakland Raiders v. NFL*, 93 Cal.App.4th 572, 586 n.5 (2001).

[131] *See Shenker*, 411 Md. at 338 n.14 (quoting *Werbowsky*, 362 Md. at 618).

41

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

fiduciary duties of care and loyalty,"[132] which are both expressly recognized in Maryland. Directors under Delaware law have a duty of oversight, which requires them to "exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary operations."[133]

A claim that directors of the corporation have failed to exercise proper oversight and should therefore be responsible to the corporation for losses suffered as a result of mismanagement or wrongdoing at the corporation is commonly known as a "*Caremark*" claim and has historically been among the most difficult claims to establish under Delaware corporate law.[134] The Delaware Supreme Court has held that liability could be imposed on directors in connection with their duty of oversight where either "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling

---

[132] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 971 n.16 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004).

[133] *In re Caremark Int'l Deriv. Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996); *see also In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 358 (Del. Ch. 2023).

[134] *See, e.g.*, *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006) ("[A] claim that directors are subject to personal liability for employee failures is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." (internal quotation marks omitted)).

42

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

themselves from being informed of risks or problems requiring their attention."[135] In order to satisfy their fiduciary duties, "directors must make a good faith effort to implement an oversight system and then monitor it."[136]

"In a typical *Caremark* case, plaintiffs argue that the defendants are liable for . . . fail[ing] to properly monitor or oversee employee misconduct or violations of law."[137] The standard of liability for a failure of oversight resulting in corporate loss is high. Specifically, although the duty of oversight is "a prod towards the greater exercise of care by directors in monitoring their corporations' compliance with legal standards," liability for failures of oversight "requires a showing that the directors breached their duty of *loyalty* by failing to attend to their duties in good faith."[138]

Claims based on the duty of oversight are rarely successful under Delaware law. In 2019, however, in *Marchand v. Barnhill*, the Delaware Supreme Court overturned a decision granting a motion to dismiss a *Caremark* claim.[139] Since that decision, a small number of *Caremark* claims have survived a motion to dismiss. Those cases have been under both of *Caremark*'s two prongs and have shown an increased focus on the board's oversight of key compliance risks and have provided

---

[135] *Id.* at 370 (emphasis in original).

[136] *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019).

[137] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009).

[138] *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003) (emphasis added).

[139] *Marchand*, 212 A.3d 805.

43

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

additional guidance regarding a board's duty of oversight.[140]  Such decisions have

made clear that, while boards of directors have broad discretion in designing an

oversight and reporting system, the board must be able to show that it made a good

faith effort to put in place a reporting system at the board level that will reasonably

be expected to inform the board of key business risks and compliance issues, and

that actions were taken to address any "red flags" that such reporting system may

bring to the attention of the board.

### 5.  Duty of Disclosure of Directors

Maryland generally recognizes a duty of disclosure in the context of fiduciary

relationships, including in the corporate context.[141]  The duty of disclosure has also

been termed a "duty of candor," and Maryland courts have routinely held that "[i]t

is clear that officers and directors of a corporation stand in a sufficiently confidential

relation to the corporation's stockholders to impose a duty upon them to reveal all

---

[140] *See id.* at 821–24 (finding that plaintiff adequately alleged the board of directors of Blue Bell Creameries had not made a good faith effort to establish a reporting and monitoring system at the board level and that nominal compliance with applicable regulations and general board-level discussions about the company's operations was not sufficient to establish that the board had met its oversight duties); *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *13–15 (Del. Ch. Oct. 1, 2019) (finding plaintiffs' allegations sufficiently demonstrated that the board had failed to monitor its oversight systems and emphasizing that "when a company operates in an environment where externally imposed regulations govern its 'mission critical' operations, the board's oversight function must be more rigorously exercised").

[141] *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 323 (1978) (holding that Maryland recognizes a fiduciary duty of disclosure and "[s]uch a duty may arise out of a fiduciary relationship").

44

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

facts material to the corporate transactions."[142]  In determining information which must be disclosed, the Circuit Court of Maryland has held that "it is well-established that an omitted fact is considered material only if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" and such information is material when it "affect[s] the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities," such as any fact which "might affect the value of the corporation's stock."[143]

Additionally, Maryland courts have held that they look to Delaware law when discerning the limits of a corporate fiduciary's duty of disclosure.[144]  For example,

---

[142] *See Storetrax.com*, 397 Md. at 58 (quoting *Parish v. Md. & Va. Milk Producers Ass'n*, 250 Md. 24, 74 (1968)); *see also Frederick v. Corcoran*, No. 370685-V, 2013 MDBT 5, slip op. at 12 (Md. Cir. Ct. Aug. 14, 2013); *Hudson*, 2004 WL 1982383, at *13 (holding that directors "must disclose sufficient information to enable a 'reasonable investor' to make an informed decision").

[143] *In re Nationwide Health Properties, Inc.*, No. 24-C-11-001476, 2011 WL 10603183, at *18 (Md. Cir. Ct. May 27, 2011) (internal quotation marks and citations omitted).  The California courts have also applied a "fundamental fiduciary duty of disclosure." *Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Congress for Joint Reconstruction, Inc.*, 57 Cal.App.5th 1108, 1123 & n.11.  Thus, in California, "[t]he fiduciary duty of disclosure requires directors to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Bader v. Anderson*, C.A. No. 1-05-CV-041521, 2007 Cal. Super. LEXIS 592, at *6 (Jan. 31, 2007).

[144] *See Hudson*, 2004 WL 1982383, at *13 ("Contemporary Maryland caselaw has not had occasion to develop this duty of candor, but none of the parties to this action dispute that some such duty exists under Maryland law."); *see also Homer v. Crown Cork & Seal Co. of Balt. Cty.*, 155 Md. 66 (1928); *Paskowitz v. Wohlstadter*, 151 Md. App. 1, 10–11

45

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

in *Hudson v. Prime Retail, Inc.*, given the "paucity of Maryland law on the subject," the Maryland Circuit Court held that:

> The current state of Delaware's disclosure requirements can be gleaned from a trio of decisions authored by the Delaware Supreme Court's Chief Justice Veasey: *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001); *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135 (Del. 1997); and *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994). Under those decisions, information is material and must be disclosed if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[145]

In Delaware, "[t]he duty of disclosure is not an independent duty, but derives from the duties of care and loyalty."[146] "In the absence of a request for stockholder action, the Delaware General Corporation Law does not require directors to provide shareholders with information concerning the finances or affairs of the corporation."[147] However, where a board discloses information to stockholders (whether voluntarily or pursuant to federal securities laws), it has an obligation to

---

(2003) (applying Delaware law); *Wilcom v. Wilcom*, 66 Md. App. 84, 95 (1986) (assuming a duty to inform existed, no breach was found).

[145] *See id.* at *13.

[146] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (citation omitted).

[147] *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998).

46

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

do so honestly.[148]   Thus, disclosure claims that "do not concern a request for stockholder action" can implicate either the duty of care or the duty of loyalty.[149]

In addition, to successfully assert a duty of loyalty claim based on disclosures that do not involve a request for stockholder action, one must successfully prove scienter—"i.e., that the directors [or officers] 'deliberately misinformed shareholders about the business of the corporation, either directly or by a public statement.'"[150]   In other words, one must show that the corporate fiduciary "knowingly disseminat[ed] false information."[151]   "This level of proof is similar to, but even more stringent than, the level of scienter required for common law fraud."[152]

As such, to hold a director liable for a claim that implicates the duty of loyalty, "the disclosure violation [must have been] made in bad faith, knowingly or intentionally."[153]   "A determination of 'whether the alleged misleading statements

---

[148] *See id.* at 10; *see also A.R. DeMarco Enters., Inc. v. Ocean Spray Cranberries, Inc.*, 2002 WL 31820970, at *4 (Del. Ch. Dec. 4, 2002) ("Even if no duty of disclosure existed, once the board decided to provide information to the shareholders, it had to do so honestly and in good faith.").

[149] *In re Zimmer Biomet Hldgs., Inc. Deriv. Litig.*, 2021 WL 3779155, at *12, *18-19 (Del. Ch. Aug. 25, 2021), *aff'd*, 279 A.3d 356 (Del. 2022) (TABLE).

[150] *Zimmer*, 2021 WL 3779155, at *12 (alteration omitted) (quoting *Malone*, 722 A.2d at 14).

[151] *Malone*, 722 A.2d at 9.

[152] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 158 (Del. Ch. 2004).

[153] *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (Del. Ch. 1999).

47

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the . . . director [or officer] defendants.'"[154]  Thus, one must prove that the corporate fiduciaries "had knowledge that [the] disclosures or omissions were false or misleading or . . . acted in bad faith in not adequately informing themselves."[155]  To do so, one must successfully show "'sufficient [officer or director] involvement in the preparation of the disclosures' to 'connect the [officer or director] to the challenged statements.'"[156]

A material misstatement or omission could also potentially give rise to a duty of care claim, even in the absence of stockholder action.[157]  Under Delaware law, a disclosure violation  "can implicate the duty of care when the misstatement or omission was made as a result of the directors' [or officers'] good faith, but 'erroneous judgment' concerning the proper scope and content of the disclosure."[158]  However, where (as here, and discussed further below) the corporation's charter exculpates directors for duty of care violations, such a claim will not be available.[159]

---

[154] *Zimmer*, 2021 WL 3779155, at *12 (quoting *In re Citigroup Inc.*, 964 A.2d at 134).

[155] *Id.*

[156] *Id.* (footnote omitted).

[157] *Id.* at *18–19.

[158] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 987 (Del. Ch. 2000) (quoting *O'Reilly*, 745 A.2d at 915).

[159] 8 *Del. C.* § 102(b)(7); Article 9A, Silvergate Certificate of Incorporation, June 24, 2011.

48

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

### 6. Other Relevant Maryland Statutory Provisions

#### a. § 2-405.2 and Limitations on Monetary Damages for Breach of the Duty of Care

Under § 2-405.2 of the Maryland Corporations and Associations Code, "[t]he charter of the corporation may include any provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders as described under § 5-418 of the Courts and Judicial Proceedings Article."[160]  Further, § 5-418 permits a corporate charter to include "any provision expanding or limiting liability" except a provision that limits liability in any of the following conditions:

(1) To the extent that it is proved that the person actually received an improper benefit or profit in money, property, or services for the amount of the benefit or profit in money, property, or services actually received;

(2) To the extent that a judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding; or

(3) With respect to any action described in subsection (b) of this section.[161]

Notably, § 5-418(b) of the Maryland Corporations and Associations Code provides special exceptions to this provision in actions against banking institutions.

---

[160] Md. Code Ann. Corps. & Ass'ns § 2-405.2.  California Corporations Code § 208(10) likewise provides that a corporation's charter may eliminate or limit "the personal liability of a director for monetary damages in an action brought by or in the right of the corporation for breach of a director's duties to the corporation and its shareholders," subject to certain exceptions such as in connection with transactions "from which a director derived an improper personal benefit."  Cal. Corp. Code § 204(10).

[161] Md. Code Ann. Cts. & Jud. Proc. § 5-418(a).

49

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

The Company is a banking institution within the ambit of § 5-418(b).[162] Accordingly, the extent of the Company's liability limitations does not restrict any action brought "by or on behalf of a State governmental entity, receiver, conservator, or depositor against a director or officer."[163]

Pursuant to § 2-405.2 and § 5-418, Article 9A of the Certificate of Incorporation of Silvergate, as amended and effective June 24, 2011, in effect during the period at issue in this investigation, exculpates Silvergate directors to the fullest extent permitted by Maryland law:

> A director of the Corporation shall not be personally liable for monetary damages for any action taken, or any failure to take any action, as a director except to the extent that by law a director's liability for monetary damages may not be limited.[164]

Accordingly, as to claims against directors of the Company, recovery of monetary damages solely for breaches of the duty of care will be barred. However, breaches of other duties may still be actionable, such as a violation of the duty of loyalty.[165]

---

[162] Md. Code Ann. Cts. & Jud. Proc. § 5-418(b)(1) (holding that this section does not apply to "[a] banking institution as defined in §1-101 of the Financial Institutions Article"); *see also* Md. Code Ann. Fin. Inst. § 1-101.

[163] Md. Code Ann. Cts. & Jud. Proc. § 5-418(b)(1); *cf.* 8 Del. C. § 102(b)(7).

[164] Article 9A, Silvergate Certificate of Incorporation, June 24, 2011.

[165] Hanks, MARYLAND CORPORATION LAW § 6.10 (Nov. 2023).

50

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

### b. § 2-405.1(e) and Liability Immunity for Compliance with the Standard of Care in § 2–405.1(c)

Under § 2–405.1(e), a director who acts "in accordance with the standard of conduct provided by § 2-405.1(c)," has "immunity from liability."[166]  The immunity embodied in the phrase "no liability" extends to both monetary damages and equitable relief.[167]  Therefore, to the extent that any director is found to have acted within the statutory standard of care, a potentially broader immunity defense may apply under § 2-405.1(e).

### c. § 2–405.1(d)(1) and Good Faith Reliance on Statements of Officers

Under § 2–405.1(d)(1) of the Maryland Corporations and Associations Code, directors are entitled to rely in good faith on any "information, opinion, report, or statement, including any financial statement or other financial data" which is presented by an (1) officer or employee of the corporation; (2) a lawyer, certified public accountant, or other person; and (3) a committee of the board on which the director does not serve.[168]  Therefore, to the extent that any claim is predicated on the reports or materials presented to the board and associated reliance, a potential defense may apply under § 2-405.1(d)(1).

---

[166] Md. Code Ann. Corps. & Ass;ns § 2–405.1(e).

[167] Hanks, MARYLAND CORPORATION LAW § 6.10 (Nov. 2023).

[168] Md. Code Ann. Corps. & Ass'ns § 2–405.1(d)(1); *accord Billman*, 88 Md. App. at 105.  *See also* Cal. Corp. Code § 309(b) (containing similar provisions).

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

### d.   § 5–101 and the Statute of Limitations

Under Maryland law, the statute of limitations for an action challenging a director's activities is three years.[169]  Therefore, to the extent that any claim concerns a conduct or occurrence which pre-dates three years, a potential defense may apply under § 5–101.

### B.   **Fiduciary Duties of Officers**

A recent decision of the Supreme Court of Maryland has held that § 2–405.1 of the Maryland Corporations and Associations Code does not apply to officers.[170] The fiduciary duties of officers thus remain unsettled under Maryland law in light of the 2016 elimination of officers from the class of "individuals" covered by statutorily-enshrined fiduciary duties.[171]

Previous common law precedent, which has not been expressly overruled, applied fiduciary duties similar to those of directors to officers of Maryland corporations.[172]  Thus, Maryland courts have held that "a corporate officer may not

---

[169] Md. Code Ann. Cts. & Jud. Proc. § 5–101.

[170] *See Eastland Food Corp.*, 486 Md. at 24–25 ("Three observations about CA § 2-405.1 in its current form are relevant here. *First*, section 2-405.1 applies only to a current or former director acting in their "official capacity as a director of the corporation." CA § 2-405.1(b). **This section does not, therefore, apply to stockholders or officers acting in their capacity as such.**") (emphasis supplied); *accord* Hanks, MARYLAND CORPORATION LAW § 6.21 (Nov. 2023). *But see Shenker*, 411 Md. at 336 ("directors and officers owe the duty of care contained in § 2–405.1(a)).

[171] *See* Md. Code Ann. Corps. & Ass'ns § 2–405.1(b); *see also Mekhaya*, 486 Md. at 24–25.

[172] *Leavy v. Am. Fed. Sav. Bank*, 136 Md. App. 181, 193 (2000) ("Corporate officers and directors are fiduciaries who are under a duty to act for the benefit of the corporation.").

52

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

use the corporate office or assets for personal gain."[173]  Similarly, Maryland courts have recognized that, generally, a corporation's officers and directors stand in a fiduciary relationship to the stockholders of a corporation.[174]  Finally, at least one Maryland court—in the context of an employment relationship—has applied Delaware law and reasoned that "a corporate officer or employee" owes a duty of "undivided and unselfish loyalty to the corporation."[175]  It is well-established that officers of a corporation generally hold the duties accorded under agency law.[176]

## C.  **Breach of Fiduciary Duty Based on Insider Trading**

There has been no recognition of state-level insider trading claims in Maryland.  Rather, Maryland has rejected claims for breach of fiduciary duty premised on a theory of insider trading outside of the corporate context for failure to plead any evidence of harm.[177]  Nonetheless, as noted above, Maryland courts

---

[173] *See Leavy*, 136 Md. App. at 193; *accord Levin*, 43 Md. App. at 390.

[174] *See Coffman v. Md. Pub. Co.*, 167 Md. 275, 280–81 (1934); *see also Pittman v. Am. Metal Forming Corp.*, 336 Md. 517, 523 (1994).  California law also recognizes and applies the fiduciary duties of due care and loyalty to officers of a California corporation.  The California courts have held that "the rule [of fiduciary duties] applies alike to officers, directors, and controlling shareholders in the exercise of powers that are theirs by virtue of their position."  *Stephenson v. Drever*, 16 Cal. 4th 1167, 1178 (1997).

[175] *Md. Metals, Inc. v. Metzer*, 282 Md. 31, 38 (1978) (citing *Guth*, 5 A.2d at 510).

[176] *Hale Trucks of Md., LLC v. Volvo Trucks N. Am., Inc.*, 224 F. Supp. 2d 1010, 1023 (D. Md. 2002) (applying Maryland law and holding that "officers and employees owe an undivided and unselfish loyalty to the corporation."); *Ins. Co. of N. Am. v. Miller*, 362 Md. 361, 381 (2001) (holding that, as an agent of principal, agent is a "fiduciary with respect to matters within the scope of his agency.") (internal quotation marks and citations omitted).

[177] *See Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176 (1995).  Conversely, California Corporations Code Section 25402 expressly recognizes that it is

53

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

routinely look to Delaware law when there is a gap in their own precedent on corporate law issues.[178] Thus, there is some possibility that the Maryland courts would look to Delaware law if faced with a state law claim for insider trading in the corporate context.

Although Delaware law recognizes state law claims for insider trading (commonly known as *Brophy* claims), "the bar for stating a claim for breach of fiduciary duty based on insider trading is very high."[179] "[T]o prevail on a *Brophy* claim [a plaintiff] ultimately must show that: 1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information."[180]

With respect to the first *Brophy* prong, "[f]or information to be material, there must be a 'substantial likelihood' that the nonpublic fact 'would have assumed actual significance in the deliberations' of a person deciding whether to buy, sell, vote, or

---

unlawful for directors or officers to engage in insider trading. *See* Cal. Corp. Code § 25402. The California Corporation Code further provides that insiders may be liable to the corporation for damages in an amount up to three times any unfair gains, minus any amounts paid by the defendant in a proceeding brought by the SEC regardless of whether such payment was pursuant to a judgment or settlement. *See* Cal. Corp. Code § 25502.5.

[178] *See Shenker*, 411 Md. at 338 (quoting *Werbowsky*, 362 Md. at 618); *see also Oliveira*, 226 Md. App. at 538.

[179] *Clovis*, 2019 WL 4850188, at *15.

[180] *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd* 872 A.2d 960 (TABLE) (Del. 2005).

54

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

tender stock."[181]  "In other words, the nonpublic information must be of a magnitude that it would, upon disclosure, have 'significantly altered the 'total mix' of information in the marketplace.'"[182]

With respect to the second *Brophy* prong, a plaintiff must successfully prove scienter.[183]  More particularly, a plaintiff must show that "each sale by each . . . defendant was entered into and completed on the basis of, and because of, adverse material non-public information."[184]  Reflecting on this requirement, the Court of Chancery has stated that a plaintiff must show "the selling defendant, at least in part, 'consciously acted to exploit' the fact that they possessed material, nonpublic information."[185]

If a *Brophy* claim is proven, "equity requires disgorgement" of insider trading profits to the corporation, even in the absence of actual harm to the corporation.[186]

---

[181] *Id.* (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[182] *Id.*

[183] *In re Camping World Hldgs., Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *12 (Del. Ch. Jan. 31, 2022), *aff'd*, 285 A.3d 1204 (Del. 2022) (TABLE).

[184] *Tilden v. Cunningham*, 2018 WL 5307706, at *20 (Del. Ch. Oct. 26, 2018) (emphasis and citation omitted).

[185] *Silverberg ex rel. Dendreon Corp. v. Gold*, 2013 WL 6859282, at *14 (Del. Ch. Dec. 31, 2013) (quoting *Guttman*, 823 A.2d at 505).  In *Silverberg*, the plaintiff's *Brophy* claims survived a motion to dismiss, where the plaintiff had alleged that the defendants sold a large percentage of their holdings at the same time "after the stock reached a likely high point" and while in possession of adverse, nonpublic information that they failed to disclose, "despite having multiple opportunities to do so." *Id.* at *15.

[186] *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011).

55

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

D.    **The Framework for Derivative Claims**

Derivative actions have long been recognized in both Maryland and California.[187] Although a stockholder may have standing to pursue a derivative claim, the real party in interest and owner of the claim is the corporation.[188] Therefore, both Maryland and California law recognize that a stockholder must make a demand on the corporation's board of directors prior to filing derivative litigation, unless such stockholder can show that demand would be futile.[189] After receiving a demand, the corporation's board (either in full or through a duly appointed committee) shall investigate and make a decision on whether to pursue the claim. Under Maryland law, judicial review of board's decision to refuse a demand "is subject to the business judgment rule, and the court considering a demand refused action limits its review to whether the board acted independently, in good faith, and within 'the realm of sound business judgment.'"[190] Similarly,

---

[187] *See, e.g., Booth v. Robinson*, 55 Md. 419 (1881); *Fornaseri v. Cosmosart Realty & Bldg. Corp.*, 96 Cal. App. 549, 556 (1929).

[188] *Boland v. Boland* 423 Md. 296, 328 (2011) (citing *Werbowsky*, 362 Md. at 599–600).

[189] *Seidl v. Am. Century Cos., Inc.*, 713 F. Supp. 2d 249, 258 (S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir. 2011) (quoting *Werbowsky*, 362 Md. at 598) (applying Maryland law); *Fornaseri*, 96 Cal. App. at 556 ("Before a stockholder's suit for redress will lie . . . demand must first be made upon the officers to institute appropriate proceedings, unless such demand would be futile."); *see also* Cal. Corp. Code § 800(b)(2) (codifying the demand requirement).

[190] *Oliveira*, 226 Md.App. at 539–40 (2016) (quoting *Boland*, 423 Md. at 330).

56

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

under California law, "[i]f the board refuses to pursue the claim, that refusal is protected by the business judgment rule and constitutes a defense to a shareholder's derivative lawsuit," unless the majority of the board is interested in the decision.[191]

Where a majority of the directors are interested or lack independence with respect to derivative litigation, the board may form a special litigation committee ("SLC") comprised solely of disinterested and independent directors to consider whether the derivative claim should continue or be dismissed.[192]  In considering a motion by an SLC to dismiss a derivative claim, the Maryland courts require the directors to show that "the SLC followed reasonable procedures and that no substantial business or personal relationships impugned the SLC's independence and good faith."[193]  Under California law, a court shall grant an SLC's motion to dismiss a derivative claim upon a showing that "the SLC was (1) disinterested and that (2) the SLC conducted an adequate investigation in good faith."[194]

---

[191] *Desaigoudar v. Meyercord*, 108 Cal.App.4th 173, 184 (S.D. Cal. 2003).

[192] *See Boland*, 423 Md. at 332 ("In general, the use of SLCs has spread and is now widely recognized, and it is not disputed that an SLC may recommend termination of a derivative lawsuit.").

[193] *Id.* at 340-41.

[194] *IP Telesis Inc. v. Velocity Networks Inc.*, 2013 WL 12126105, at *3 (C.D. Cal. Feb. 8, 2013).

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

## IV. THE COMMITTEE'S KEY FACTUAL FINDINGS[195]

### A. Silvergate's Shift to Providing Banking Services to Customers in the Virtual Asset Industry

Prior to 2013, Silvergate Bank was a small private commercial bank. In 2013, CEO Lane developed an interest in virtual currencies and initiated an investigation into potentially providing banking services to companies in the virtual currency industry. Lane sought the assistance of Kathleen Fraher[196] and learned that, in March 2013, the United States Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") had issued regulatory guidance concerning businesses in the virtual currency industry. The FinCEN guidance provided that virtual currency administrators and exchanges were essentially money services businesses ("MSBs") under FinCEN's regulations. Silvergate was familiar with providing services to other forms of MSBs and, therefore, Lane determined that Silvergate would be well-positioned to offer banking services to these and potentially other businesses in the virtual currency space. At the time, many other banking institutions did not fully understand the virtual currency industry and declined to provide services to companies within the industry, resulting in a demand for banking services by such

---

[195] The factual findings discussed herein are the result of the Committee's investigation, including its interviews of certain directors, officers, and employees.

[196] During 2013, Fraher was transitioning from her role as Silvergate's BSA/AML Officer to the Enterprise Risk Manager.

58

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

companies. Lane discussed his interest in providing services to companies in the virtual currency space with the Board, which was supportive of such effort.

In 2016, Silvergate's pivot towards clients in the virtual currency industry substantially increased following the hiring of Ben Reynolds as Business Development Officer. After investigating the banking needs of members of the virtual currency industry, Reynolds developed the idea for the "Silvergate Exchange Network" or "SEN". The SEN was a near real-time payments system, which enabled SEN participants to exchange U.S. dollars in near real-time transfers 24 hours a day, 7 days a week, 365 days a year. The SEN allowed Silvergate customers to effect virtual currency transactions on other platforms, such as cryptocurrency exchanges, using U.S. dollars at any time during the day, thereby enabling them to take advantage of and/or mitigate the risks of virtual currency price fluctuations across time zones and jurisdictions.[197]

Following the launch of the SEN in 2017, Silvergate grew very rapidly as it attracted numerous new customers in the virtual currency space. Indeed, from 2017

---

[197] To be clear, while the SEN could be used to complete virtual currency transactions on other platforms, all SEN transactions were executed in fiat currencies (*i.e.*, traditional government backed currencies such as U.S. dollars). Also, the SEN was characterized as a "push only system" in which a Silvergate customer could transfer funds to another customer. The system did not allow a customer to "pull" funds from any other customer accounts.

59

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

to 2021, cash deposits at Silvergate by customers in the virtual currency industry grew from approximately $770 million to approximately $14.1 billion.

In November 2019, Silvergate went public through an IPO priced at a $13 per share. By November 2021, Silvergate's stock price reached a high of $219 per share, an increase of over 1,500%. Silvergate's rapid growth posed a variety of operational challenges, including with respect to its BSA and other compliance programs.

### B.     Silvergate's BSA/AML Compliance Program Generally

As a U.S. bank, Silvergate was subject to the requirements of the BSA and other statutes applicable to U.S. financial institutions. Among other things, these statutes (and the regulations thereunder) require banks to design and implement internal controls to reduce the risk of the bank being used to facilitate money laundering, the financing of terrorist activities, financial fraud, and other forms of wrongdoing. This required system of internal controls is referred to herein as a "BSA/AML Compliance Program."

Throughout its time as a bank, including the period relevant to this Report, Silvergate maintained and operated a BSA/AML Compliance Program. Silvergate's BSA/AML Compliance Program underwent significant changes and growth during the 2019-2022 period, largely as the result of Silvergate's rapid growth. Silvergate's BSA/AML Compliance Program was subject to regular examination by the FRB and the DFPI (or its predecessor agency). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████ Silvergate's

BSA/AML Compliance Program had various aspects, including, but not limited to:

(1) procedures for onboarding new clients, which included protocols to satisfy

"know your client" or "KYC" regulations; (2) ongoing monitoring of customers and

account activity, including automated transaction monitoring and periodic

"enhanced due diligence" or "EDD" reviews; and (3) suspicious activity monitoring,

including the filing of suspicious activity reports ("SARs").[198]

### 1.    Procedures for Onboarding New Clients

Silvergate maintained several procedures pertaining to customer onboarding

and customer due diligence ("CDD").    Specifically, Silvergate collected due

diligence information on all potential customers to satisfy KYC requirements and

develop an understanding of the nature and purpose of any requested account.[199]    As

part of the onboarding process, customers were categorized into certain due-

diligence levels based on their industry type, products and services offered, and/or

---

[198] Silvergate's BSA/AML Compliance Program included several additional aspects as well, including, but not limited to, OFAC controls, responding to subpoenas and inquiries from law enforcement agencies, periodic employee training, and working with customers to ensure adequate BSA/AML compliance by the customers.

[199] Silvergate AML and OFAC Policy, dated July 29, 2022.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

type of account requested.[200●]  Customers identified as "higher risk" would receive additional due diligence review, which frequently included: (i) screening for potential reputational risk to Silvergate; (ii) additional screening related to source of funds; (iii) additional screening related to information regarding beneficial ownership of 10% or more; (iv) a risk-based due diligence questionnaire; and (v) review and analysis of additional documentation related to the potential customer's BSA/AML controls.[201]

### 2.    Ongoing Customer Monitoring and Enhanced Due Diligence Reviews

Following initial onboarding review, Silvergate customers were assigned a risk rating.  The risk rating was used to determine the frequency and level for ongoing periodic reviews.[202]  All Silvergate customers were subject to ongoing customer due diligence reviews for the life of a customer relationship.[203]  The customer's risk rating would determine the frequency at which Silvergate would perform "Enhanced Due Diligence" or "EDD" reviews, with the highest-risk accounts receiving EDD reviews every three months.  Other risk categories would receive EDD reviews on other period schedules, such as every nine-months,

---

[200] *Id.*
[201] *Id.*
[202] *Id.*
[203] *Id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

annually, or on an 18-, 24- or 36-month basis.[204] EDD reviews included reviewing

transactions in all customer accounts (*e.g.*, custodial accounts, operating accounts,

trading accounts, market making accounts, and SEN accounts) for a particular

customer for anomalous activity or activity that otherwise differed from what was

expected based on the onboarding due diligence or prior EDD reviews.[205] EDD

reviews would further generally contain an analysis of previous suspicious activity

alerts and /or SARs involving the client.[206]

### 3. Automated Transaction Monitoring

Silvergate's BSA/AML Compliance Program during the relevant period also

involved maintaining an automated transaction monitoring system. These

computer-based systems are designed to review large volumes of data concerning

transactions occurring at the bank and identify suspicious patterns or activities that

may indicate fraud, money laundering, or other financial crimes. If such activity is

identified, the system would issue an "alert" that subsequently would be reviewed

by a member of the BSA department.[207] Prior to April 2021, Silvergate conducted

---

[204] Enhanced Due Diligence Periodic Review Procedure, dated August 15, 2022, at 16.

[205] *Id.*

[206] *Id.*

[207] This manual review process would involve a review of the transaction that generated the alert, as well as other recent transactions by the customer. Indeed, as of July 2022, the Investigative Operations Procedure required that analysts review all transactions going back 30 days prior to the date of the alert, which could include SEN transactions. *See* FCRM-101 FCRM Investigative Operations Procedure at 5, dated July 21, 2022.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

automated transaction monitoring for BSA/AML purposes using what was known as the "Prime" system. In April 2021, as explained in more detail below, Silvergate switched to the "Verafin" system for its BSA/AML automated transaction monitoring system. ███████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

### C.  Gabeire as BSA Officer and the Decision to Change Silvergate's Automated Transaction Monitoring System

In December 2018, Silvergate hired Osman Gabeire as its new BSA Officer.[208] While the Board at all times had ultimate responsibility for compliance with the BSA and related statutes, the BSA Officer was tasked with designing and implementing an effective and adequate BSA/AML Compliance Program. Prior to becoming the BSA Officer, Gabeire had been an FRB examiner who had examined Silvergate. During that period, ████████████████████████████████████████

███████████████████████████████████████████████████████

██████████[209]

Accordingly, one of Gabeire's initiatives upon becoming BSA Officer was to investigate alternative automated transaction monitoring systems. Gabeire, along

---

[208] Bank Board Minutes, dated December 14, 2018.
[209] ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

with other members of the Silvergate BSA/AML department, evaluated the most prominent vendors in the space, including platforms from Patriot Officer, Banker's Toolbox, Verafin, Guardian Analytics, Prime, and Fiserv.  Thereafter, Silvergate decided to make formal requests for a proposal (RFPs) to Verafin and Guardian Analytics.[210]  During the RFP process, Verafin and Guardian Analytics supplied responses and documentation relative to how their products could satisfy Silvergate's business requirements.[211]  The categories that were evaluated included (1) system integration; (2) services delivery; (3); support models; (4) commercial viability; (5) vendor sustainability; (6) implementation service; and (7) transition. The highest weighting was given to the system integration category, which contained the majority of the business requirements for system functionality.[212]  The FRP process showed that Verafin outperformed Guardian Analytics in nearly every category.[213]

In February 2020, the Silvergate Board was provided with a presentation entitled "BSA Transaction Monitoring System Conversion Enterprise Business Case," which detailed the RFP process and the evaluation of Verafin.  Among other things, the presentation provided that:

---

[210]  Board Meeting Materials, dated February 28, 2020, "BSA Transaction Monitoring System Conversion Enterprise Business Case."

[211] *Id.*

[212] *Id*.

[213] *Id*.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

- "Verafin is currently deployed in more than 3000 banks and credit unions, with a 97% customer retention rate.  It is endorsed by the Texas Bankers Association, Western Bankers Association, Florida Bankers Association, and Massachusetts Bankers Association."

- Verafin "has rich visual analysis capabilities and investigation tools, which will enable the Bank's investigators and analysts that are performing periodic reviews to easily spot trends and anomalies and be able to add visual detail to their reports. The product includes the ability to evaluate counterparties to transactions via link analysis, ███████████████████████████████ ███████████████████████████████████████████."

- "The Verafin High-Risk customer management module allows the Bank to segment its customers by type.  Therefore risk rating them by type, benchmarking amongst one another, and to set specific risk factors and periodic review elements for each customer category.  The product also contains a workflow for tracking and performing these periodic reviews."

- "The Verafin product also includes many fraud typologies in its transaction monitoring behavioral analysis...."

- Verafin's project implementation and support models are comprehensive and well resourced.  The company offers 24/7/365 product support domestically that is not outsourced, and also provides an online community to connect peers for the purposes of sharing advice, tips, tricks, resources, etc."[214]

At the February 28 meeting of the Bank's Board, Fraher presented the business case for switching Silvergate's automated transaction monitoring system to Verafin, including management's recommendation in favor of such change. Following discussion, the Board approved the change to the Verafin system.[215]

---

[214] *Id.*

[215] Bank Board Minutes, dated February 28, 2020

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Following the selection of Verafin, Silvergate initiated a detailed process for the conversion and implementation of the new system. A September 6, 2020 presentation entitled "Verafin BSA System Implementation," outlined the implementation plan and assigned key roles and responsibilities to various employees.[216] Gabeire was identified as the "Executive Sponsor" of the implementation project and Michelle Sabins was "Project Lead for Biz Syst."[217] Further, a "Silvergate Business Requirements Document, Verafin BSA Implementation," dated November 23, 2020, and its embedded files, identify the key business requirements for the Verafin system and Verafin's responses thereto.[218] One of the business requirements was that: "[T]he transaction monitoring system provides alerts on a daily, weekly and/or monthly cadence for review by the financial institution, and includes all transcodes/transaction types processed by the Bank."[219] Verafin's response to this requirement was: "Verafin will monitor all transaction types and transaction codes mapped into the platform during implementation."[220] Also, on December 1, 2020, Verafin provided Silvergate with a mapping analysis

---

[216] Email from C. Craig to M. Sabins, dated September 7, 2020 (attaching "Verafin BSA System Implementation Project Charter Project ID # 111," dated September 6, 2020).

[217] *Id.* at 9.

[218] Email from K. Fraher to T. Giel re: Verafin Selection Documentation, dated April 5, 2023 (attaching "Silvergate Business Requirements Document, Verafin BSA System Implementation," dated November 23, 2020).

[219] *Id.*

[220] *Id.*

67

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

showing how pre-existing monitoring rules and agents under the Prime system would be covered by the Verafin system.[221] Verafin stated that while there were certain points that could be considered gaps, it had solutions currently under development. Aside from these identified gaps, the Verafin representative stated "[t]he rest of your rules I feel would be sufficiently covered in a variety of methods with various Verafin agents."[222] Notably, this mapping analysis showed that the Prime rule for monitoring SEN transactions could be covered by various Verafin agents, including "CITO, TITO, TICO for regular customers."[223]

Following extensive implementation efforts, in April 2021, Silvergate switched over to Verafin as its principle automated transaction monitoring system.

### D. **Sabins' Tenure as BSA Officer**

Sabins began to take on more responsibility in the BSA/AML Compliance Program in April 2021 and, in May 2021, was appointed to replace Gabeire as the BSA Officer.[224] Sabins had a 14-year history with Silvergate, which included serving as Chief Compliance and BSA Officer, Deposit Operations Officer, CRA

---

[221] Email from S. Ahonen to O. Gaberie and M. Sabins re: Prime Rules Gap Analysis, dated December 1, 2020 (attaching spreadsheet).

[222] *Id.*

[223] *Id.*; *see also* Prime and Verafin Alert Categorization for System Testing/Validation (explaining that Verafin's "Cash In-Transfer Out (CITO), Transfer In-Cash Out (TICO), Transfer In-Transfer Out (TITO)" monitoring involves a total of 15 agents to monitor for suspicious activity).

[224] Sabins appointment was ratified by the Board on June 11, 2021. *See* Bank Board Minutes, dated June 11, 2021.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Officer, Managing Principal Fintech Consulting Practice, and Strategic Business Change Partner. Also, in May 2021, Silvergate hired Steven Dietz to serve as Deputy BSA Officer and Spencer Garlick as Senior AML Operations Manager. Dietz had more than 16 years of experience in the BSA/AML space, including working for several other banks either directly or on a consulting basis. Dietz's principal responsibility was to assist Sabins in enhancing the BSA/AML Compliance Program. During Sabins tenure as BSA Officer (May 2021 to October 2022), Silvergate continued to experience significant growth that required substantially expanding the BSA department. Indeed, during this period, the BSA department under Sabins grew from approximately 27 employees to 55 employees.

As BSA Officer, Sabins promptly discovered that the BSA/AML Compliance Program under Gabeire had developed a substantial backlog of alerts from the prior automated monitoring system (Prime) that had not been reviewed.[225] Sabins notified Fraher of the backlog and the BSA department developed a plan to remediate the backlog.[226] Also, by December 2021, Sabins discovered that the prior process for scheduling EDD reviews (using Horizon "tickler" software) was not working as intended and, as a result, certain EDD reviews were not getting completed.[227] In all,

---

[225] Messages between K. Fraher and M. Sabins, dated April 7, 2021–April 8, 2021.
[226] *Id.*
[227] Memorandum to File, Due Diligence Periodic Reviews, dated December 31, 2021; Email from M. Sabins re: Periodic Reviews Memorandum, dated January 20, 2022.

69

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Sabins identified "64 customers whose reviews were late and 406 customers who had not previously been reviewed and were outside the Bank's regular cadence of EDD review."[228]  Sabins notified Fraher of this issue and drafted a "memo to file" outlining her findings and remediation plan, which was provided to Fraher, Tyler Pearson (then Chief Risk Officer), ████████████████████████████[229]

Furthermore, as discussed above, in the month prior to Sabins becoming BSA Officer, Silvergate had switched over to Verafin as its principal automated monitoring system.  However, efforts to test the efficacy of the Verafin system and tailor it to the specific needs of Silvergate were ongoing throughout 2021.[230]

### 1.    The Verafin SEN Gap

Sabins believed that Verafin was monitoring SEN transactions as part of its existing set of rules based on information received from Verafin during the RFP and implementation processes, but nonetheless Sabins felt that tailored rules specifically designed for monitoring SEN transactions should be developed.  Indeed, Sabins and

---

At this time, the process for scheduling EDD reviews was being transferred to the Verafin system.

[228] *Id.*

[229] *Id.*

[230] Further, Silvergate's policies with regard to BSA/AML/OFAC compliance were revised and updated in December 2021.  Among other things, the new policy changed the name of the BSA department to the "Financial Crimes Risk Management" or "FCRM" department. *See* Bank Secrecy Act, Anti-Money Laundering, and OFAC Sanctions Compliance Policy, dated December 10, 2021.  Nonetheless, for ease of reference, this Report continues to use the name BSA department.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

others in the BSA department engaged with Verafin on the development of a number of "custom agents" that would enable them to better tailor Verafin to Silvergate's business, including specific agents for monitoring transactions occurring on the SEN.

During summer 2021, Dietz recalled learning that Verafin's detection tools were not available as Verafin had represented during the RFP and implementation processes. In November 2021, Dietz and Levi Stanley (a senior model and program analytics analyst) led a post-implementation analysis of the Verafin system and how it was operating at Silvergate. As a result of these efforts, by at least January 2022, Dietz had come to understand that while SEN-to-SEN transactions were fed into the Verafin system, they were not mapped to any particular Verafin agents and, as a result, no alerts were being generated solely due to transactions occurring on the SEN (referred to herein as the "Verafin SEN Gap").[231] Verafin also had other limitations with respect to SEN transactions, such as the inability to consider SEN transactions in determining a customer's risk rating.

During 2021, Silvergate retained independent auditing firm RSM to conduct an evaluation of its BSA/AML Compliance Program. RSM issued its report on

---

[231] As previously noted, SEN transactions remained the subject of EDD reviews and were also reviewed as part of the manual process of checking recent customer transactions whenever a Verafin alert was generated. Thus, the term "gap" in SEN monitoring only applies to Verafin's automated monitoring, not Silvergate's other monitoring processes.

71

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

December 22, 2021, which found "that internal controls implemented to provide for ongoing compliance with BSA requirements are sufficient for the size and complexity of the bank."[232]   Nonetheless, RSM identified certain areas where processes could be improved to strengthen the BSA/AML Compliance Program.[233] RSM rated each of these items as "low" or "moderate" risk and either "isolated" or "nonsystemic," and noted Silvergate's plan to address each concern.[234]

On January 26, 2022, RSM issued a further report focused on Silvergate's implementation of the Verafin system.[235]   Per this report:

> Silvergate Bank engaged RSM to complete model validation advisory services of the Bank's Verafin transaction monitoring system.  RSM's model validation methodology is designed to determine if the anti-money laundering (AML) model is performing as expected and is functioning in accordance with the design objectives and intended business uses of the system.  The validation assessed the major components of the institution's AML monitoring system, including inputs, processing, and reporting.  Additionally, the framework of our program incorporated the evaluation of the core elements of the model— conceptual soundness, ongoing monitoring processes and outcome analysis. The validation provides an assessment of the reliability of the AML monitoring model, based on its underlying assumptions, theory, and methods.[236]

---

[232] Email from J. Lester re: BSA Final Audit Report, dated December 29, 2021 (attaching RSM deck, titled "Bank Secrecy Act/Anti-Money Laundering Report," dated December 22, 2021).

[233] *Id.*

[234] *Id.*

[235] Email from J. Lester re: AML Validation Final Report, dated January 26, 2022 (attaching RDM deck, titled "Anti-Money Laundering (AML) Model Validation Services," dated January 24, 2022).

[236] *Id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

As a result of its testing, RSM concluded that Silvergate had properly implemented the Verafin system and it was operating adequately.  Specifically, the January 2022 report stated:

> Based on the testing performed, RSM concluded that the Verafin system and models therein have been implemented and appear to be functioning as intended.  We determined that the Bank is using Verafin and its features adequately.  The system is detecting potential unusual and suspicious activity in higher-risk areas based on the Bank's Bank Secrecy Act (BSA)/AML risk profile.[237]

Nonetheless, RSM again identified certain areas were Silvergate's AML monitoring system could be improved, all of which it ranked as being "low" or "moderate" risk.[238]  However, neither the December 2021 report nor January 2022 report identified the Verafin SEN Gap or raised concerns with Verafin's monitoring (or lack thereof) of SEN transactions.

All outside audit reports, including RSM's reports from December 2021 and January 2022, were provided to the Board's Audit Committee for review.

**2.** 

Silvergate as a "Regional Bank," given that it had recently surpassed $10 billion in

---

[237] *Id.*

[238] *Id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

assets. This was a significant change from a regulatory perspective. Previously, as a Community Bank, Silvergate had been subject to one full-scope examination by regulators per year. As a Regional Bank, Silvergate would be subject to "continuous monitoring" by regulators, including a full-scope and targeted examinations throughout the year, as well as required frequent communications with regulators.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████[239] Sabins also shared this concern with Fraher. Notably, however, Sabins maintains that she continued to believe that SEN transactions were subject to Verafin's standard rules for suspicious activity monitoring. Sabins stated that her concern was driven by a belief that the regulators would expect Silvergate to employ special agents to monitor SEN transactions as the volume of such transactions continued to increase. Despite Verafin having indicated that such custom agents could be made available during the RFP and implementation process, and the fact that Silvergate had first requested custom agents for the SEN early in 2021, Verafin as of this point still had not developed any custom agents for monitoring the SEN.[240]

---

[239] Messages from M. Sabins to S. Dietz, dated January 25, 2022; Email from M. Sabins to T. Pearson and K. Fraher, dated January 27, 2022.

[240] In particular, Sabins explained that Verafin had indicated an ability to map agents to trans-codes during the RFP process. However, Silvergate later learned that this ability was not yet commercially available from Verafin.

74

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM



was provided directly to Silvergate's Board.[244]

---

[241]

[242] *Id.*

[243] *Id.*

[244]

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL



### 3.    K2 Integrity Discovers the Verafin SEN Gap

As part of Silvergate's ongoing efforts to enhance its transaction monitoring programs, Silvergate retained outside consulting firm K2 Integrity to conduct a "gap analysis" of such programs.  On June 1, 2022, during K2's due diligence procedures, a K2 representative sent an email to Sabins, Dietz and others in the BSA department stating:

> [W]e would like to discuss the Silvergate Exchange Network (SEN) and the transactional data it produces.  We understand today, SEN is not being monitored.  Since this will also need to be monitored, we would like to further

---

[245] Email from A. Lane re: "Ask The Fed" Board Update, dated April 28, 2022 (attaching deck titled "Regional Banking: Beyond Examinations ask the Fed").

[246] Bank Board Minutes, dated April 29, 2022.

[247] Email from B. Chavez re: Response to Safety and Soundness Report, dated May 24, 2022 (attaching letter from A. Lane to L. Carlson and T. Geil, dated May 23, 2022).

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

understand the architecture, in/out activity, customer base, and any controls you have established as part of SEN.[248]

In response, Sabins sent the following email to members of her team:

I don't think we want [K2] to think that SEN is not being monitored .. it is, all transactions feed in to Verafin, there are just not specific scenarios for internal transfers running separately … however if there were transactions for instance contributing to the Transfer In Transfer out algorithms that caused it to flag that were SEN they would be part of the analysis.[249]

This email reflects Sabins' understanding at the time that Verafin's standard monitoring rules were being applied to SEN transactions.[250]

Following the June 1, 2022 email, Sabins engaged with others on her team, including Dietz and Stanley, as well as Verafin, to better understand Verafin's SEN-to-SEN transaction monitoring (or lack thereof). They discussed that while SEN transactions were fed into the Verafin system and were at times included on alerts issued by Verafin, the system did not map SEN transactions to any suspicious activity agents. Thus, SEN-to-SEN transactions would not result in transaction monitoring flags in Verafin—*i.e.*, the Verafin SEN Gap. This was because Verafin recognized SEN-to-SEN transactions as "internal transactions" among existing bank

---

[248] Email from O. Khan re: Silvergate / K2 TM Gap Analysis Connect, dated June 1, 2022.

[249] Email from M. Sabins re: Silvergate / K2 TM Gap Analysis Connect, dated June 1, 2022.

[250] Dietz stated that he was surprised by Sabins' view as expressed in this June 1, 2022 email given that he had earlier determined that Verafin did not have any agents generating flags specifically for SEN transactions.

77

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

customers that were considered low risk. Indeed, internal transactions among Silvergate's customers (including SEN-to-SEN transactions) were generally considered lower risk because the customers would have already been vetted through the Company's onboarding process and be subject to the ongoing EDD reviews.

As noted above, since early 2021, members of the BSA department had pushed Verafin to develop various custom agents to better tailor and enhance transaction monitoring at Silvergate, including with regard to SEN transactions. During the evening of June 1, 2022 (the same day as the K2 email referenced above), Sabins texted Fraher that she was "feeling fairly triumphant right now because I think I finally got Verafin to build some monitoring rules for SEN."[251] However, Sabins understood that the custom agents from Verafin would not be ready for implementation until months later. Fraher stated that she understood Sabins' comments in the June 1, 2022 text to solely relate to the development of custom agents for the SEN, and such comments did not change her belief that SEN transactions were subject to Verafin's standard monitoring rules. Indeed, Sabins also continued to believe that SEN-to-SEN transfers were subject to default monitoring by Verafin at this time. In fact, although others (such as Dietz) came to understand that SEN-to-SEN transactions were not mapped to any Verafin agents and, thus, could not trigger a Verafin alert, Sabins continued to question this position

---

[251] Messages between K. Fraher and M. Sabins, dated June 1, 2022–June 2, 2022.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

throughout her time as BSA Officer. Also, Sabins could not recall whether she informed Fraher that others had concluded that the Verafin SEN Gap existed at or around this period.[252]

### 4. The Special Verafin Agents for the SEN are Implemented ███████████████████████

In early September 2022, Silvergate implemented the two special agents that Verafin had developed specifically for monitoring SEN transactions. ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

On September 12, 2022, Dietz circulated to Pearson, with a copy to Sabins and a blind copy to Fraher, the 2022 Coverage Assessment of the transaction monitoring system (the "TM Coverage Assessment").[253] The TM Coverage Assessment was prepared by the BSA department to analyze the "conceptual soundness" of the Verafin system as implemented, including an assessment of what risks the system was covering and identifying opportunities for enhancement.[254] On page 7, the TM Coverage Assessment stated:

> After mapping the TM Agents to risk assessment components, FCRM management identified that the Transfer Processing (within the Services risk assessment category) was historically not covered in transaction monitoring

---

[252] Sabins further stated that she does not recall when or if she reported the Verafin SEN Gap to Pearson, and that she did not report the Verafin SEN Gap to Lane or the Board.

[253] Email from S. Dietz re: FCRM TM Coverage Assessment, dated September 12, 2022.

[254] *Id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

as expected because Verafin does not consider internal transfers as risky activity within any financial crime typologies. This is typically true as internal transfers are not indicative of money laundering activities. However, FCRM just implemented two (2) new custom TM Agents to monitor SEN transfers. The purpose of targeting the SEN transfers is to monitor for anomalous activity since those are among [Silvergate] customers.[255]

Dietz was the leader of the TM Coverage Assessment project. And, by this point, Dietz had reached the conclusion that Verafin was designed for a typical retail bank and, at least without significant customization, was not well-suited for Silvergate's needs. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Dietz also recalls advising Fraher of his conclusion that Verafin was designed for a typical retail bank and was not well-suited for Silvergate. Dietz does not recall whether at this time he expressly advised Fraher of the Verafin SEN Gap, which had already been addressed by the two new custom agents.

     **5.**    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **Sabins and Dietz Decide to Leave the BSA Department and Silvergate Begins the Search for a New BSA Officer**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[255] *Id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

At or about this time, both Sabins and Dietz expressed the desire to transition out of the BSA department.

---

257 *Id.*

81

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

[REDACTED] Around this time, Fraher also explained that she had developed concerns over whether Sabins had the ability to handle the stresses of the BSA Officer role.

[REDACTED]

[REDACTED] Further, at Fraher's recommendation, the Board and management "discussed hiring a BSA officer with large bank experience."[261]

Following this meeting, Sabins began to transition out of the BSA department and Fraher began to assume more responsibility with regard to BSA matters, including becoming the direct contact for the regulators [REDACTED]

[REDACTED]

---

[258]Messages between K. Fraher and S. Dietz, dated September 21, 2022-September 22, 2022.

[259] Bank Board Minutes, dated October 7, 2022.

[260] *Id.*

[261] *Id.*

[262] Also, by late October 2022, contemporaneous documents show that the decision had already been made to have Fraher transition into the Chief Risk Officer role in

82

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM



connection with a broader reorganization of Silvergate's management structure. *See, e.g.*, Email from K. Fraher re: BSA Officer Search, dated October 26, 2022; *see also* Bank Board Minutes, dated November 4, 2022 (discussing the management restructuring, including supporting reasoning, and Board's approval). Accordingly, speculation in public reports and the prior proceedings suggesting that Fraher's transition into (and Pearson's transition out of) the Chief Risk Officer position was somehow tied to the discovery of potential wrongdoing at FTX in early November 2022 are unfounded.

[263] █████████████████████████████████████████████████████████████

[264] *Id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

On October 26, 2022, the Board met ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ ██

On November 1, 2022, the Board met again ████████████████████

████████████████████████████████████████████████████

████████████████ ██

E.  **The Collapse of FTX and the BSA Department's Flow of Funds Review**

On November 2, 2022, CoinDesk published an article stating that Alameda—a trading company founded by FTX's chief executive Sam Bankman-Fried—was heavily dependent on FTX's digital token FTT.  The article also included a leaked FTX balance sheet showing its liabilities far exceeding its assets.  The article sparked a mass withdrawal of customer funds from FTX, as well as extensive public speculation about potential wrongdoing involving FTX, Alameda, and their related entities.  The mass withdrawal of funds from FTX led to a liquidity crisis at the firm.  And, on November 11, 2022, FTX, Alameda Research, and many affiliated entities filed for bankruptcy.  Throughout this period and thereafter, public speculation and reporting of potential financial improprieties involving FTX, Alameda, and related

---

[265] Bank Board Minutes, dated October 26, 2022.
[266] Bank Board Minutes, dated November 1, 2022.

84

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

entities continued, including allegations that FTX had provided customer funds to Alameda to cover its trading losses.

On or about November 17, 2022, in response to the FTX collapse and related public reporting, Silvergate's BSA department initiated a review of the flow of funds among FTX's and its affiliates' accounts at the bank.[267]  Among other things, the review found that certain transfers had occurred via the SEN from FTX's custodial account to the accounts of related entities, including Alameda.  The review also found a high volume of wire transfers among the FTX related entities, as well as wires of funds to FTX's senior management, including Bankman-Fried.[268]

### F.  The Effects on Silvergate of the FTX Collapse and Resulting Turmoil in the Virtual Currency Markets

The FTX collapse had wide effects on the virtual currency markets and companies within the virtual currency industry.  In particular, Silvergate experienced a large withdrawal of customer deposits as investors moved away from virtual currencies.  In addition, public speculation emerged related to Silvergate's potential exposure to FTX and the financial stability of the Bank.  This and other events led to an increasing withdrawal of customer funds from the Bank.  In response,

---

[267] Email from P. Gallegos to S. Dietz, M. Sabins, and S. Garlick re: FTX Flow of Funds Review, dated November 17, 2022 (including attachment).
[268] *Id.*

85

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Silvergate sought to reassure the Bank's customers regarding its compliance with banking regulations and the stability of the Bank.[269]

On November 21, 2022, Silvergate issued a letter to its customers through a post on its LinkedIn page under Lane's signature.[270] The letter stated, in part:

**Compliance**
Our business starts by knowing our customers, their business and the activity they plan to conduct at our institution. Once we approve a new customer, if the activity in their account does not match the activity that we expect based on our initial approval, we take immediate action up to and including terminating that relationship. No exceptions. The U.S. Bank Secrecy Act requires us to develop a robust compliance and risk management program. It's a responsibility we take very seriously.

**Managing Customer Funds**
Government regulations also require banks to maintain capital and liquidity ratios to support the business needs of the bank and its customers. Together, these ratios were built so that banks prioritize protecting customer funds, often at the expense of their own profits. It's something that we've always embraced at Silvergate, so much so that we invest our customers' deposits primarily in liquid investment securities with lower yields rather than investing in loans or other higher risk instruments. We also strive to maintain more capital than is required by regulation because it's the right thing to do to protect the customers we serve.[271]

---

[269] In addition, on November 7, 2022, Silvergate issued its quarterly report on Form 10-Q, which, *inter alia*, stated that "[t]here have been no material changes to the risk factors disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2021, as filed with the SEC on February 28, 2022." The referenced Form 10-K included disclosures concerning Silvergate's policies and procedures for compliance with BSA/AML regulations.

[270] Silvergate's Letter to Our Customers, dated November 21, 2022.

[271] *Id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Although issued under Lane's signature, the LinkedIn post was the result of input from several persons at Silvergate. Reynolds (then President) prepared an initial draft of the post on November 19, 2022, which was shared with Lane and Kailin Meyers (Senior Marketing Communications Manager) for their comments.[272] Meyers subsequently sent the draft to Fraher for comment.[273] Following input from each of these persons, the draft statement was sent to outside counsel for review.[274]

Also, during the same period, Lane was preparing for an appearance on CNBC and requested "talking points" concerning, among other things, Silvergate's compliance programs.[275] Meyer prepared an initial list of points and requested further input from Fraher. Fraher, in turn, sought input from Dietz, who assisted in preparing a list of talking points concerning Silvergate's compliance policies and procedures. Fraher forwarded these talking points to Lane for inclusion in the preparation materials for the CNBC appearance.

On November 30, 2022, Lane appeared on CNBC and stated, among other things, that:

---

[272] Email from B. Reynolds to A. Lane and K. Myers re: Letter from Alan - LinkedIn, dated November 19, 2022.

[273] Email from K. Myers to K. Fraher, re: Letter from Alan – LinkedIn, dated November 19, 2022.

[274] Email from A. Lane to K. Fraher and K. Myers re: Draft LinkedIn Letter to Customers, dated November 20, 2022 (noting "I think this is ready to go to John and H&K").

[275] Email from K. Myers re: CNBC Power Lunch Briefing Draft, dated November 18, 2022.

87

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

[W]e monitor for activity that is inconsistent with the purported use of the account. But, as long as the activity is consistent . . . then there's nothing else . . . that we would do. Now, if we do see activity that is inconsistent, we're required to file a Suspicious Activity Report.

. . . [A]nd so again, we built this business compliance-first. We satisfy all of the regulatory requirements . . . and we have also . . . offboarded customers in the past if we see activity that is inconsistent, and if they can't correct it or can't explain it, then we offboard those customers.[276]

## G.  **Silvergate's Ongoing Engagement with Its Regulators**

During this tumultuous period, Silvergate was in frequent contact with regulators on a number of issues, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  ██   ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████  ██  ████████████████████████

████████████████████████████████████████████████  ██

---

[276] SEC Complaint at ¶¶ 131–32.

[277] Bank Board Minutes, dated November 4, 2022.

[278] *Id.*

[279] *Id.* ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL



By this time, Silvergate's executive leadership had been restructured such that Lane had four key direct reports: Martino (CFO); Reynolds (President); Fraher (who had assumed the Chief Risk Officer ("CRO") position; and Roy Hinkamper (Chief Audit Executive). Pearson had moved into the role of Deputy Chief Risk Officer and continued to report to Fraher.

---

[280]

[281]

[282] Bank Board Minutes, dated November 23, 2022.

[283]

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL



### H.   Silvergate Issues a Public Letter to Customers and Receives a Public Letter from Certain U.S. Senators

On or about December 4, 2022, Silvergate's public relation's firm, Edelman Smithfield ("Edelman"), began work on a public letter to be sent under Lane's name to Silvergate customers.[287]  Drafts of the letter were sent to Reynolds, Myers, Lane, Fraher, John Bonino (Chief Legal Officer), and other executives at Silvergate for

---

[284] *Id.*

[285] *Id.*

[286] *Id.*

[287] Email from H. Hunter to B. Reynolds and K. Meyers re: Drafts for Review, dated December 4, 2022 (attaching draft letter from A. Lane).

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

comment, as well as multiple sets of outside counsel.[288]  The letter was issued on December 5, 2022, and contained statements concerning Silvergate's compliance programs (including the BSA/AML program) similar to those in the earlier LinkedIn post.[289]  In addition, the letter contained the following statement regarding FTX:

> Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures and the requirements outlined above.[290]

Later on December 5, 2022, Silvergate received a letter from U.S. Senators Elizabeth Warren, John Kennedy, and Roger Marshall.[291]  The letter, which was made public, sought information from Silvergate regarding, among other things, its knowledge of suspicious conduct by FTX and its related entities, and information on Silvergate's BSA/AML policies and procedures.[292]

I.



---

[288] Email from A. Lane to P. Cribben, J. Bonino, and B. Reynolds, copied to K. Fraher and K. Meyers re: Drafts for Review, dated December 4, 2022 (attaching draft letter from A. Lane).

[289] *See* SEC Form 8-K, dated December 5, 2022 (attaching letter).

[290] *Id.*

[291] Email from A. Lane to Board re: Letter from Senators Warren, Kennedy, and Marshall, dated December 5, 2022 (attaching letter).

[292] *Id.*

91

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM



And, on December 8, 2022, the Board's Regulatory Oversight Committee met and received a report from Fraher concerning, among other things, the Verafin SEN Gap issue.[294] Although it was noted that during the period when Verafin was not conducting transaction monitoring of SEN-to-SEN transactions, the SEN had been subject to internal audits and regulator examinations that did not identify any particular risk.[295] Nonetheless, the Regulatory Oversight Committee expressed

---

[293]

Bank Board Minutes, dated December 6, 2022
[294] Regulatory Oversight Committee Minutes, dated December 8, 2022
[295] *Id.*

92

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

discomfort and concerns with regard to how this issue had been handled and discussed potential further investigation efforts.[296]

On December 13, 2022, the full Board met and received a report from Fraher,



On December 16, 2022, Lane reported to the Board that the candidate for new BSA Officer, Leslie Pinnau, had accepted Silvergate's employment offer and would be starting in late December.[299]

J.    **Further Statements by Silvergate Concerning Its Compliance Programs**

On December 19, 2022, Silvergate responded to the letter from Senators Warren, Kennedy, and Marshall through a letter signed by Lane.[300]  This letter contained statements regarding Silvergate's BSA/AML Compliance Program, as well as due diligence regarding FTX, similar to that contained in the November 21, 2022 LinkedIn post and the December 5, 2022 letter to customers, discussed above.

---

[296] *Id.*

[297] Bank Board Minutes, dated December 13, 2022.

[298] *Id.*

[299] Bank Board Minutes, dated December 16, 2022.

[300] Email from J. Knowles re: Silvergate Response to Senator Warren Letter, dated December 19, 2022 (attaching letter).

93

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

The response to the Senators was drafted with the assistance of multiple counsel. On December 20, 2022, a third party made the letter public.

On January 5, 2023, Silvergate held a public update call with analysts to discuss its preliminary and unaudited fourth quarter 2022 financial metrics. During the call, an analyst asked for a "general overview of the steps [Silvergate] take[s] on the AML/KYC side before [Silvergate] onboard[s] a customer."[301] In response, Lane stated:

> We have KYC requirements, which includes the initial onboarding. It then also includes monitoring transactions on an ongoing basis. And so a lot of -- as you said, the misinformation out there is candidly very frustrating. We follow the Bank Secrecy Act, the USA Patriot Act for every account that we open and we conduct ongoing monitoring.[302]

K.



---

[301] Silvergate Capital Corporation Business Update Call, dated January 5, 2023, at 17.

[302] *Id.*

[303] ███████████████████████████████████ Further, on March 8, 2023, Silvergate announced its intent to wind down operations and voluntarily liquidate Silvergate Bank. *See* Silvergate Form 8-K, dated March 8, 2023.

[304] *Id.*

94

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM



## V.   **ANALYSIS OF POTENTIAL CLAIMS**

The Committee has considered the merits of the various claims alleged in the

Derivative Complaint and the Derivative Demand, as well as other potential claims

arising from the facts and circumstances at issue in the prior litigation, including, but

not limited to: (1) breach of fiduciary duty by Silvergate's directors for lack of

oversight over the Company's regulatory compliance programs; (2) breach of

fiduciary duty by Silvergate's officers for lack of oversight over the Company's

---

[305] *Id.*
[306] *Id.* ██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████ *see also*
Board Minutes, dated June 11, 2021.
[307] *Id.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

regulatory compliance programs; (3) claims for insider trading against former and current directors and officers; and (4) claims for breach of fiduciary duty associated with certain public disclosures. The Committee has also considered potential defenses and other factors in determining whether to pursue or recommend release of potential claims.

## A. <u>Lack of Oversight Claim Against the Directors</u>

As discussed above, Maryland law has not expressly addressed whether a fiduciary duty of oversight exists. However, in the absence of controlling Maryland authority, "Maryland courts often look to Delaware law for guidance on issues of corporate law."[308] Therefore, the Committee has analyzed any potential claims for lack of oversight under Delaware law.

To establish liability for lack of oversight under Delaware law, a plaintiff must show that "the directors knew that they were not discharging their fiduciary obligations"—*i.e.*, that the directors acted with scienter.[309] "Given this high bar, it is now indubitably understood, and oft-repeated, that a *Caremark* [oversight] claim is among the hardest to plead and prove."[310] Directors may only be held liable if: (1) they "utterly failed to implement any reporting or information system or

---

[308] *Oliveira v. Sugarman*, 226 Md. App. 524, 538 n.10 (2016), *aff'd*, 451 Md. 208 (2017).

[309] *Stone*, 911 A.2d at 370.

[310] *Clovis*, 2019 WL 4850188, at *12.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

controls"; or (2) "having implemented such a system or controls, [they] consciously failed to monitor or oversee its operations …."[311] Even when a company operates in a highly regulated industry (such as Silvergate did here), Delaware law "requires proof that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting."[312] Indeed, the Delaware Court of Chancery has recently confirmed that "imperfect attempts at [regulatory] compliance are not indicative of bad faith" and liability does not attach "simply because the directors' good faith efforts fell short of positive law."[313]

Furthermore, the Investigation revealed no reason to suspect that the directors were complicit in or had actual knowledge of the FTX/Alameda fraud prior to public reports of a potential fraud. Accordingly, the below discussion focuses solely on traditional oversight duties as there appears to be no basis assert claims for intentional support of the FTX/Alameda fraud.

### 1. Silvergate's Board had Established a Reasonable System of Controls and Reporting with Regard to BSA/AML Compliance

The evidence plainly demonstrates that the Silvergate board did not "utterly fail" to establish a system of controls and reporting with respect to BSA/AML

---

[311] *Stone*, 911 A.2d at 370.

[312] *Clovis*, 2019 WL 4850188, at \*12 (emphasis in original).

[313] *In re Transunion Deriv. Litig.*, 324 A.3d 869, 888 (Del. Ch. 2004).

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

compliance. To the contrary, the evidence shows that—under the Board's guidance—Silvergate had developed extensive compliance systems.[314]

For example, the Board (as well as all Silvergate employees) received regular training regarding BSA/AML/OFAC obligations under applicable laws and regulations. The BSA Officer or Deputy BSA Officer provided this training to the Board on an annual basis.[315] Additionally, the Board was required to review and approve the BSA department's periodic risk assessments.[316] Silvergate further dedicated significant resources to the BSA department, which grew from approximately 25 employees to nearly 60 employees during the relevant period. The BSA department operated pursuant a written policy statement, which was periodically reviewed and updated. The Board tasked the BSA Officer with principal responsibility for designing and implementing the BSA/AML Compliance Program, but also ensured adequate resources for that task—such as the retention, in May 2021, of Dietz as Deputy BSA Officer and Spencer Garlick as Senior AML Operations Manager.

---

[314] *See, e.g.*, *Stone*, 911 A.2d 362 (finding BSA/AML internal controls adequate to satisfy the board's fiduciary oversight duty).

[315] *See, e.g.,* Bank Board Minutes, dated July 29, 2022 (reflecting Dietz providing BSA training to board).

[316] *See, e.g.*, Bank Secrecy Act, Anti-Money Laundering, and OFAC Sanctions Complaint Policy at 3; AML and OFAC Policy and Program at 13.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

The Board also established an audit system that provided outside review of Silvergate's compliance programs. Of significance here, during 2021, Silvergate retained RSM to conduct both a general review of the BSA/AML Compliance Program, as well as targeted review specifically of the new Verafin automated monitoring system.[317] While RSM's reports from these audits flagged certain areas for improvement, RSM concluded in both instances that Silvergate's controls were adequate and operating effectively.[318] These audit reports were (as required) provided to the Board's Audit Committee.

Additionally, at each Board meeting in 2021, the Board was presented with a Chief Risk Officer Dashboard, which detailed key and emerging risks for the bank, including BSA, AML, and OFAC related issues.[319] The Board was also presented with a Chief Operating Officer dashboard that detailed the suspicious activity reports (SARs) for the prior month, as well as year to date.[320] In 2021, Silvergate engaged consultants to develop a new Board reporting package to enhance the nature of the information provided and more easily drive discussion of key points.[321] This new reporting package and the associated methodology was shared with the Board during

---

[317] Email from J. Lester re: Final Audit Report Distribution – BSA Audit, dated December 29, 2021 (attaching RSM deck); Email from J. Lester re: Final Audit Report Distribution – AML Validation Report, dated January 26, 2021 (attaching RSM deck).

[318] *Id.*

[319] *See, e.g.,* Bank Board Materials, dated January 29, 2021, at 24.

[320] *Id.* at 26.

[321] Bank Board Materials, dated December 10, 2021, at 138.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

its December 2021 meeting. The reporting package included several metrics for "Compliance & BSA/AML," including metrics for: (i) higher-risk customers as a percentage of customer base; (ii) increase in higher-risk geographies; (iii) increase in higher-risk customers; (iv) OFAC blocks/rejections; (v) increase in higher-risk products/services; (vi) backlogs in BSA/AML processes, such as transaction monitoring; (vii) suspicious activity report volume compared to prior quarter; and (viii) significant law enforcement requests and subpoenas.[322]

The Board also maintained a standing committee with direct oversight of potential risks, including BSA/AML/OFAC compliance risks. Prior to 2021, this committee was known as the Enterprise Risk Committee. In 2021, the name was changed to the Directors Risk Committee or DRC. The DRC was comprised of at least three non-management Board members. As set forth in the Directors Risk Committee Charter, the DRC was tasked with overseeing the Bank's enterprise risk management function and processes.[323] The DRC was also responsible for overseeing the activities of three-management level committees, including the Management Risk Committee or MRC.[324] The DRC received regular reporting

---

[322] Bank Board Materials, dated January 28, 2022, at 16.

[323] Directors Risk Committee Charter, dated January 27, 2021; Directors Risk Committee Charter, dated March 11, 2022; Directors Risk Committee Charter, dated September 16, 2022.

[324] *Id.* The MRC was comprised of several executive officers, including the CEO, CFO, CRO, COO, and Chief Legal Officer ("CLO"), among others. The MRC was tasked with overseeing all business lines and risks for the Bank, including, but not limited to, risks

100

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

concerning BSA/AML and OFAC risks, including written reports outside of meetings, as well as regular updates concerning regulator findings and remediation plans. During 2022, the DRC met eight times and considered BSA/AML issues at each meeting, as shown below:

- **January 26, 2022** – The DRC received a detailed BSA/AML compliance risk assessment presentation.[325]

- **March 7, 2022** – Fraher provided the DRC with "a detailed explanation of [Silvergate's] customer due diligence, screening process, beneficial ownership, and increased monitoring" processes.[326]

- **April 27, 2022** –


- **June 8, 2022** – The DRC was advised that "Regulatory/BSA" had been moved from an "emerging risk" to a "key risk," which change was discussed with management, during which it was explained that "there were measures in place to address the risk." Sabins also advised regarding the progress on remediating the backlog of EDD reviews, stating that they were "on track to meet the deadline." Sabins further "discussed the measures her area is taking to address BSA [examination] findings, including results of the gap analysis performed by an independent third party and recommendations from this third

---

related to BSA/AML and OFAC compliance and issues. This included reviewing and approving action plans and associated communications with regulators concerning MRIAs and MRAs. During their tenure as BSA Officer and Deputy BSA Officer, Sabins and Dietz regularly made presentations during the MRC meetings.

[325] Directors Risk Committee Materials, dated January 26, 2022.

[326] Directors Risk Committee Minutes, dated March 7, 2022.

[327] Directors Risk Committee Minutes, dated April 27, 2022.

101

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

party related to improved processes and procedures."[328]  Sabins also stated that the BSA department was "currently updating onboarding, due diligence, suspicious activity, and other key procedures."[329]

- **July 26, 2022** – ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████  The DRC also specifically asked "if risk management staffing was adequate", and Sabins and Pearson "confirmed that hiring has been supported by Management and that many key positions have been filled."  Finally, the DRC was advised that "all remediation activities were on track."[330]

- **September 14, 2022** – The DRC was advised that remediation efforts remain "on track" and the BSA efforts were merely "pending a final review by Audit."[331]

- **October 31, 2022** – Sabins reported on the BSA/AML metrics, ████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████[332]

- **December 14, 2022** – ██████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

Moreover, in response to the collapse of FTX and resulting turmoil in the virtual currency markets, the full Board held eight special meetings during the month

---

[328] ████████████████████████████████████████████████████████
████████████████████████████████████████████████

[329] Directors Risk Committee Minutes, dated June 8, 2022.

[330] Directors Risk Committee Minutes, dated July 26, 2022.

[331] Directors Risk Committee Minutes, dated September 14, 2022.

[332] Directors Risk Committee Minutes, dated April 27, 2022.

[333] Directors Risk Committee Minutes, dated December 14, 2022.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

of November 2022.[334]  On November 28, 2022, the Board organized three interim Board committees, including the Regulatory Oversight Committee.[335]  The Regulatory Oversight Committee was responsible for addressing



## 2. The Silvergate Board Reasonably Monitored the System of Controls and Did Not Ignore Red Flags

Having established a system of controls and reporting concerning BSA/AML compliance, the next issue is whether the Board actually monitored such system or, alternatively, consciously determined to ignore red flags.  The Committee finds that the Board's monitoring of its internal control systems was reasonable and that it did not ignore red flags.

---

[334] Bank Board Special Meeting Minutes, dated November 10, 2022; Bank Board Special Meeting Minutes, dated November 14 2022; Bank Board Special Meeting Minutes, dated November 16, 2022; Bank Board Special Meeting Minutes, dated November 17, 2022; Bank Board Special Meeting Minutes, dated November 18, 2022; Bank Board Special Meeting Minutes, dated November 21, 2022; Bank Board Special Meeting Minutes, dated November 23, 2022; Bank Board Special Meeting Minutes, dated November 28, 2022.

[335] Bank Board Special Meeting Minutes, dated November 28, 2022.  The Regulatory Oversight Committee was an expansion and renaming of a temporary Board committee created earlier in November 2022 (the BSA Remediation Committee).  *Id.*

[336] *Id.*; Memorandum of Understanding, dated November 23, 2022.

[337] *See, e.g.,* Regulatory Oversight Committee Minutes, dated December 8, 2022; Regulatory Oversight Committee Minutes, dated December 28, 2022.

103

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Indeed, the facts, as discussed in detail above, show that the full Board, as well as the DRC, actively monitored internal controls related to BSA/AML compliance and, when issues were flagged, undertook appropriate responsive measures. For example, in order to strengthen its BSA/AML compliance, Silvergate hired one of its former examiners (Gabeire) as BSA Officer in 2019. ███████ ████████████████████████████████████████████████████████ one of Gabeire's first initiatives was to search for a replacement automated transaction monitoring system. Following this process, Gabeire presented the Board with a detailed business case in favor of moving to the Verafin system. Based on Gabeire's expertise and the thorough process supporting his recommendation, the Board had no reason to doubt management's assessment that Verafin would offer several improvements to Silvergate's automated transaction monitoring process. Accordingly, the Board approved the switch to Verafin.

Similarly, at the time the Board ratified management's selection of Sabins as the new BSA Officer in June 2021, it had no reason to doubt her qualifications or capabilities.[338] Sabins had been a longtime employee of Silvergate (14 years), who had served in a number of compliance roles including an earlier stint as BSA Officer.

Furthermore, in December 2021 and January 2022, the Board received overall positive audits from RSM with regard to the BSA/AML Compliance Program,

---

[338] Bank Board Minutes, dated June 10, 2022.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

including specifically on the implementation and effectiveness of the Verafin system.

 Also,

at that point, there was no suggestion in the materials provided to the Board that

---

[339] *See, e.g.*, Directors Risk Committee Minutes, dated June 8, 2022; Directors Risk Committee Minutes, dated July 26, 2022.

[340] *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 132 (Del. Ch. 2009) ("[D]irectors of Delaware corporations are fully protected in relying in good faith on the reports of officers and experts."); Md. Code Ann. Corps. & Ass'ns § 2–405.1(d)(1) (providing directors may rely in good faith on any "officer or employee of the corporation").

105

Sabins was an inadequate BSA Officer or that the Verafin system was not operating as intended.[341]

In October 2022, when concerns were first raised with the Board concerning Sabins' abilities as BSA Officer, the Board promptly approved the search for a replacement with large bank experience and ensured that Fraher (who also had extensive BSA/AML compliance experience, including previously as BSA Officer) would be available to interface with regulators with regard to the ongoing examinations.



Nothing about these actions suggest that the directors intentionally and knowingly ignored their obligation to oversee Silvergate's BSA/AML compliance controls.  Rather, they demonstrate the opposite.

*     *     *

<hr/>

[341]

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

For these and other reasons stated here, the Committee determines that Silvergate does not have credible claims against its directors from this period for breach of their oversight duties.

## B.    Lack of Oversight Claim Against Officers[342]

As noted above, Maryland law is unsettled with respect to whether corporate officers owe fiduciary duties. And, even if officers owe fiduciary duties under Maryland law, no Maryland court has considered whether those duties include oversight obligations. Nonetheless, because Maryland courts frequently look to Delaware for guidance on issues concerning corporate law, the Committee will analyze a potential claim against Silvergate's officers for breach of oversight duties under Delaware law.

As explained in the Delaware Court of Chancery's recent *McDonald's* decision, the standards for a lack of oversight claim against corporate officers are

---

[342] Employees who do not hold executive officer positions or qualify as "key managerial employees" generally do not owe corporate law fiduciary duties, although such employees may owe more limited duties under agency law. *See Triton Const. Co., Inc. v. Eastern Shore Elec. Services, Inc.*, 2009 WL 1387115, at *9-10 (Del. Ch. May 18, 2009). Here, neither Sabins nor Dietz are likely to qualify as executive officers or key managerial employees who would owe corporate law fiduciary duties. Neither reported directly to the CEO, nor did they regularly participate in Board meetings or otherwise have input into financial or key operational decisions of Silvergate as a corporate enterprise. Accordingly, the Committee does not address potential claims against such employees in this Report, nor does the Committee recommend releases extending to such employees. Nonetheless, even if one were to assume that the Company had claims against Sabins and/or Dietz that could be successfully pursued, the costs of doing so would almost certainly exceed any recovery given their relatively modest means. Accordingly, the Committee determines that it is not in the best interests of Silvergate to pursue claims against Sabins or Dietz.

107

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

effectively the same as those applied to directors, with the exception that such claim must involve an area within the scope of the officer's authority.[343]   Specifically, "[t]he officer must consciously fail to make a good faith effort to establish information systems, or the officer must consciously ignore red flags."[344]  For certain officers, such as the CEO, who have company-wide responsibilities, their oversight obligations are likewise company-wide.  For officers with more narrow areas of responsibility, such as a CFO, the claim must normally involve conduct within such officer's authority.[345]

Here, the senior executive officers who had fiduciary oversight responsibilities for the BSA/AML Compliance Program were Lane and Fraher.  An argument could be made that Pearson—who Sabins briefly reported to when he was CRO—also had fiduciary oversight obligations.  However, it does not appear that Pearson was an executive officer at Silvergate, but rather was always in a subordinate role to Fraher.  It is unclear whether Delaware law would extend fiduciary duties to such an officer.  Nonetheless, the Committee has considered potential claims against Lane, Fraher, and Pearson.

At the outset, the Committee notes that its Investigation revealed no reason to suspect that the officers were complicit in or had actual knowledge of the

---

[343] *McDonald's*, 289 A.3d at 375.

[344] *Id.*

[345] *Id.* at 370.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

FTX/Alameda fraud prior to public reports of a potential fraud.  Nor did the Investigation reveal any reason to suspect that the officers intentionally turned a blind eye toward compliance issues with regard to FTX/Alameda and their affiliates. To the contrary, the record shows that the FTX/Alameda entities were subject to the same compliance processes as other Silvergate clients, including periodic EDD reviews.[346]  Accordingly, the following discussion focuses on potential lack of oversight liability for failure to establish or monitor internal controls, not intentional involvement in law breaking activities.

### 1.    Potential Lack of Oversight Claim Against Lane

For many of the same reasons discussed above as to the Board, it is clear that Lane did not utterly fail to establish a system of internal controls or reporting relating to Silvergate's BSA/AML Compliance Program.  As CEO, Lane was an integral part in establishing the controls discussed above, including, in particular, the MRC. Similar to the DRC, the MRC regularly received reports and risk assessments concerning BSA/AML issues.  The MRC also regularly received presentations directly from the BSA Officer and/or Deputy BSA Officer.

Thus, the analysis turns to whether Lane consciously ignored red flags concerning the adequacy of the BSA/AML Compliance Program.  The Committee's

---

[346] *See, e.g.,* Annual Enhanced Due Diligence Report of West Realm Shires Services Inc., dated March 15, 2021.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

investigation found no such evidence. No one in the BSA department reported directly to Lane. Rather, aside from meetings of the MRC, Lane relied on others to keep him apprised of issues within the BSA department. Absent some reason to question his subordinates' information, Lane was entitled to rely upon Silvergate's other employees. With regard to the MRC, Lane reasonably responded to issues within the BSA department, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

It was not until December 6, 2022 that Lane learned of the Verafin SEN Gap. By that time, Sabins was no longer acting as BSA Officer, a search was underway for a new BSA Officer, and the Verafin SEN Gap had largely been remedied by custom agents implemented in September 2022. Nonetheless, Lane (and Fraher) ensured that the information was promptly reported to the DRC and the full Board, satisfying his obligation to report significant issues "up the chain."[347] Lane also continued to implement plans to improve the BSA department, including the hiring of a new BSA Officer in late December and ongoing meetings of the MRC at which the BSA department's remediation efforts were discussed.[348]

---

[347] *McDonald's*, 289 A.3d at 365–66.

[348] *See* Bank Board Minutes, dated December 16, 2022 (noting hiring of new BSA Officer); MRC Minutes, dated January 20, 2023 (new BSA Officer provides report on remediation efforts, including discussion of Verafin issues).

110

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

In these circumstances and based upon the Investigation, the Committee determines that the Company does not have a credible claim against Lane for breach of his oversight duties.

### 2.    Potential Lack of Oversight Claim Against Fraher

For the same reasons discussed above, Fraher did not utterly fail to establish a system of internal controls or reporting relating to Silvergate's BSA/AML Compliance Program.

The more difficult question is whether Fraher ignored red flags that came to her attention.  Sabins reported to Fraher for much of the relevant period and the two of them were also personal friends.  As a result, Sabins shared more information with Fraher than with Lane.  While some of these communications reflect Sabins' concern with how Verafin was monitoring the SEN, none of them expressly identify the Verafin SEN Gap or suggest that no monitoring was occurring of SEN transactions.



CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

███████████████████████████████████████████████████

███████████████████████████████████████████

On February 18, 2022, Sabins and Fraher engaged in the following message chain:

**Sabins:**
I think I found a way to monitor SEN.  I found a pretty good conditional analytics tool overlay

**Fraher:**
Oh good!

**Sabins:**
Transcode driven

**Sabins:**
And I can be super granular

Fraher explained that she understood Sabins' messages to be referring to her effort to develop special agents for monitoring SEN transactions, which would be additional to the general Verafin algorithms that Fraher believed were being applied to all transactions (including SEN transactions).  And Sabins confirmed that this was indeed what she was conveying in the messages.

Similarly, in the evening on June 1, 2022—the same day that Sabins received information from K2 about the Verafin SEN Gap—Sabins sent Fraher a message stating: "I'm feeling fairly triumphant right now because I think I finally got Verafin to build some monitoring rules for SEN."  Fraher responded by "emphasizing"

112

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Sabins' message. Again, Fraher maintains that she understood Sabins' message to concern the effort to build custom agents for SEN transactions—not that no transaction monitoring was currently occurring on the SEN. And Sabins confirmed that this was the intent of her message. Sabins also indicated that she continued to have doubts about whether the Verafin SEN Gap existed, and she does not recall when she communicated with Fraher about the Verafin SEN Gap. Without receiving information from Sabins concerning the Verafin SEN Gap, Fraher's belief that the June 1 message continued to refer to developing additional special agents for monitoring the SEN is plausible.

Ultimately, the best evidence that Fraher was not aware of the Verafin SEN Gap during this period is her reaction upon finally learning of the issue ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Fraher indicated that she was surprised ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Nonetheless, she promptly contacted Lane to advise him of the issue. Lane also recalls Fraher being surprised by the issue and believing it was incorrect. The record also shows Fraher questioning BSA department staff about the issue ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮[349] All of this suggests that Fraher was not aware of the Verafin SEN GAP ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[349] *See, e.g.*, Email from K. Fraher to M. Sabins re: Prime Rules vs. Verafin Gap Analysis, dated December 19, 2022; Email from K. Fraher to M. Sabins re: Silvergate / K2 TM Gap Analysis Connect, dated December 20, 2022; *see also* Messages among A. Lear,

113

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

Nonetheless, the foregoing communications and others, show that Fraher was aware that Sabins had concerns about the lack of special agents to monitor SEN transactions. Yet, at the same time, Fraher understood that Sabins and the BSA team responsible for implementing Verafin had a detailed understanding of its capabilities, and that they were seeking to customize and improve several aspects of the product to better fit Silvergate. This customization process is common for such systems. Also, Fraher could have reasonably expected that Sabins would have explicitly and strongly flagged an issue as significant as the Verafin SEN Gap. Instead, Sabins sought to remedy the issue herself by working directly with Verafin (through development of the new custom agents) and did not report the issue up the chain.

Thus, taken as a whole, it appears highly unlikely that Silvergate would be able to establish that Fraher *knew* that she was violating her fiduciary duties to Silvergate by not reporting Sabins' general concern about developing special agents for monitoring SEN transactions.

### 3. Potential Lack of Oversight Claim Against Pearson

For the same reasons discussed above, Pearson did not utterly fail to establish a system of internal controls or reporting relating to Silvergate's BSA/AML

---

L. Stanley, L. Cherry, M. Rizzo, P. Cribben, P. Gallegos, S. Garlick, S. Dietz, and T Chesnos, dated December 7, 2020.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

Compliance Program. Also, it does not appear that Pearson consciously ignored red flags concerning the adequacy of the BSA/AML Compliance Program. Pearson was included on relatively few communications related to SEN monitoring. Also, Sabins could not recall whether she ever informed Pearson of the Verafin SEN Gap. Further, Sabins only formally reported to Pearson from about March 2022 to October 2022 and, even during this period, Sabins appears to have continued to regularly discuss BSA issues with Fraher.

In this context and for the same reasons discussed above, it appears highly unlikely that Silvergate would be able to establish that Pearson *knew* that he was violating his fiduciary duties to Silvergate by not reporting Sabins' general concerns.

C.    **Insider Trading Claims Against Directors and Officers**

In the Derivative Action, the plaintiff alleges insider trading claims against several of Silvergate's directors and officers. Although Maryland law has not addressed whether a state-law fiduciary duty claim exists for insider trading, the Maryland courts often look to Delaware law for guidance on corporate issues and Delaware law does recognize such a claim.[350] Accordingly, this Report considers whether the alleged insider trading claims are worth Silvergate pursuing.

As set forth in the Derivative Complaint, the alleged "inside information" possessed by Silvergate's directors and officers was purported "knowledge of the

---

[350] *See Brophy.*

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

irregularities of the FTX/Alameda scheme," as well as knowledge about Silvergate's "true business health and compliance with banking and applicable laws and regulations."[351] To the extent the insider trading claims are premised on the notion that Silvergate's directors and officers had knowledge of improprieties at FTX and/or Alameda prior to the public reporting on such issues, the Investigation found no such evidence. Similarly, to the extent the insider trading claims are based on purported knowledge that Silvergate's BSA/AML Compliance Program was inadequate, it is also contrary to the evidence revealed by the Investigation.

As an initial matter, the vast majority of the challenged stock sales occurred during calendar years 2019, 2020, and 2021.[352] ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[351] Derivative Complaint at ¶¶ 88, 96.
[352] A list of insider stock sales since Silvergate went public is attached hereto as Exhibit A.
[353] ████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

116

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████ It is therefore
not possible that stock sales earlier in 2022 (such as director Karen Brassfield's
February 2, 2022 sale) ████████████████████████████████████████ The
only challenged stock sales occurring after ███████████████ are as follows:

| Seller | Date of Sale | Amount Sold | Price Per Share | Proceeds from Sale |
|--------|--------------|-------------|-----------------|--------------------|
| Fraher | 4/21/2022 | 750 | $130.44 | $97,830 |
| Fraher | 4/22/2022 | 750 | $135 | $101,250 |
| Lane | 7/21/2022 | 7,100 | $91.83 | $651,993 |
| Lane | 7/21/2022 | 9,214 | $92.94 | $856,349 |

Even as to these stock sales, it is not reasonable to believe that they were
motivated by concerns over Silvergate's BSA/AML Compliance Program. ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

―――――――――――――――――

████████████████████████████████████████████████████

██████████████████████████████████████████

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

Furthermore, both Fraher and Lane provided credible responses and explanations as to these trades during their interviews.[354]  Specifically, Fraher explained that the sale was to refresh her cash holdings after having made a significant tax payment a week or so before.[355]  Lane explained that, in 2021, for retirement planning purposes, he determined to liquidate a portion of his Silvergate holdings by exercising options as they vested, but retaining the RSUs he would receive each year, other than that portion needed to meet tax obligations.  Consistent with this plan, Lane stated that in July 2022 he exercised 16,314 options from a 2019 grant, which had vested by such date, and sold the shares.[356]  Fraher and Lane also explained that the sales were not motivated by any concerns with Silvergate's compliance programs.

---

[354] Additionally, the record shows that both Fraher and Lane sought and received "preclearance" from Martino for the above trades, in which Martino confirmed that the officers were in an open trading window.  *See* K. Fraher and A. Martino Email chain, dated April 2●, 2●2●; A. Lane and A. Martino Email chain, dated July 2●, 2●22.

[355] The 1,500 shares that Fraher sold in April 2022 constituted approximately 12% of Fraher's ownership in the Company.  *See* Schedule 14A (Proxy Statement), dated April 14, 2022 (showing Fraher's total beneficial ownership of 12,305 shares).

[356] The 16,314 options that Lane sold in July 2022 constituted approximately 6.5% of Lane's ownership interests in the Company.  *See* Schedule 14A (Proxy Statement), dated April 14, 2022 (showing Lane's total beneficial ownership of 251,076 shares).

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Finally, even if Silvergate had a reasonable basis to assert claims based on these post-April 2022 trades, the total value of the trades would make litigation unreasonable. Indeed, as to Fraher, the trades total less than $200,000. At to Lane, the trades are approximately $1.5 million. In either case, even if Silvergate were to prevail in litigation over the trades, its litigation costs would likely exceed the recovery.

For all of these reasons, the Committee believes it would not be in Silvergate's best interests to pursue any claims based on the alleged insider stock sales.

### D. Claims Related to Public Disclosures Concerning the BSA/AML Compliance Program

As part of its Complaint, the SEC challenged certain disclosures by Silvergate and Lane during late 2022 and early 2023. Also, in the Derivative Action, the plaintiff challenges disclosures concerning Silvergate's compliance programs and business going back to November 2020. As explained here, the Committee determines that, to the extent Silvergate could assert any claims associated with these disclosures, such claims would have a very low likelihood of success.

With regard to the pre-2022 disclosures in SEC filings concerning Silvergate's compliance programs, the Investigation did not reveal any reason to believe that the Board and/or officers had reason to doubt their veracity. ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL



In the latter half of 2022, additional information came to the Board's and senior management's attention regarding the BSA/AML Compliance Program. The key events during this period were:



CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

The challenged disclosures occurred at different periods relative to each of these events.[359]

███████████████████████████████████████████████

███████████████████████████████████     ████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████ ██

█████████████████████████████████████████████████████

██████████████████████████  ███████████████████████

█████████████████████████████████████████████████████

---

[359] The challenged disclosures occurred on: (i) November 7, 2022, (ii) November 21, 2022, (iii) November 30, 2022, (iv) December 5, 2022, (v) December 19, 2022, and (vi) January 5, 2023. *See supra* Sections VI(F), (H), and (J).

[360] ████████████████████████████████████████████████████

██████████████████████████████     *See* Management Risk Committee Materials, dated September 8, 2022; Email from T. Pearson re: Final Exam Kickoff Deck, dated November 14, 2022 (████████████████████████████████████████████).

121

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

In these circumstances, the Board and senior management could reasonably believe that the BSA/AML program, taken as a whole, remained in material compliance with applicable laws and regulations. The Board and senior managers were further entitled to rely on employees within the BSA department for information about the program, including with regard to processes for onboarding new clients, KYC procedures, and the ongoing EDD reviews. The information available on these procedures, as well as the automated transaction monitoring system, demonstrated that Silvergate did, in fact, maintain an active and robust compliance program. The majority of the challenged statements were also reviewed and approved by counsel, who was knowledgeable of the findings made by the regulators. Given these facts and the high bar of showing that the directors and officers did not subjectively believe the truth of the public statements, it appears that any claims challenging statements prior to December 6, 2022 would be unlikely to succeed.

Upon learning of the Verafin SEN Gap on December 6, 2022, the Board and senior management were on alert concerning a serious flaw in Silvergate's BSA/AML Compliance Program and had grounds to question Sabins' handling of

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

the issue.  However, at that time, the Board and management were advised that the Verafin SEN Gap had been remedied through the new agents developed by Verafin and understood that Sabins was no longer in the BSA Officer role.  Furthermore, at all relevant times, Silvergate's BSA/AML Compliance Program included the ongoing EDD reviews and reviews of all recent customer transactions when an alert was triggered, which in both cases included reviews of a customer's SEN transactions.  Accordingly, even during the period when the Verafin SEN Gap existed, monitoring was being conducted of SEN transactions through these other processes.  Thus, even as to statements following December 6, 2022, it will be difficult to show that the directors and officers did not subjectively believe the statements about Silvergate's BSA/AML Compliance Program.

In addition, to succeed on a disclosure claim, the plaintiff would need to establish that the non-disclosure or misleading disclosure was "material" to investors.[361]  Given the significance of other events related to Silvergate during the relevant time period, including the "run on the bank" and management's responses thereto, a strong argument can be made that the challenged disclosures did not involve material information that would have had a meaningful effect on Silvergate's stock price or investor's actions.[362]

---

[361] *See, e.g., In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016).
[362] *See, e.g.,* Event Study Regarding Silvergate, prepared by William Choi, Ph.D., dated June 13, 2024.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Moreover, as explained above, Silvergate was able to resolve the SEC action without paying any value for the disclosure claims against the Company. Thus, the only harm that Silvergate appears to have suffered as a result of the alleged misstatements is the legal fees that it incurred and advanced to the directors and officers. However, if any of the directors or officers are ultimately found to have made intentional misrepresentations or otherwise are not entitled to indemnification, such directors or officers must repay the amounts advanced to them. This affirmative obligation on the part of the directors and officers to repay the amounts advanced if ultimately determined not to be entitled to indemnification is a further reason not to pursue claims against such persons at this time for the primary purpose of recovering amounts that have been advanced.

For these and other reasons stated herein, the Committee determines that it is not in the best interests of Silvergate to pursue claims against the directors or officers based on the challenged public statements.

E.    **Claims Related to Silvergate's OTTI Calculations and Disclosures**

The Committee did not conduct a detailed investigation into the SEC's claims against Silvergate and Martino regarding the Company's calculations and disclosures concerning OTTI. These claims are not part of the Derivative Action or the Derivative Demand. Furthermore, similar to the disclosure claims discussed above, the SEC litigation against Silvergate was settled without any value paid for

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

the OTTI claims. Thus, any claim that Silvergate would have on this issue would appear limited to its litigation expenses and the amounts advanced to Martino. However, if Martino is ultimately found liable in the SEC action or otherwise found to have engaged in conduct that makes him ineligible for indemnification, he is obligated to repay the amounts advanced. Given this obligation to potentially repay the amounts advanced, there appears to be no benefit in an affirmative action at this time seeking to recover any amounts advanced to Martino.

For these and other reasons stated herein, the Committee determines that it would not be in the best interest of Silvergate to pursue claims against Martino based on the OTTI allegations.

F.    **Additional Practical Concerns Related to Potential Litigation**

In considering whether to pursue claims against any former or current directors and officers, the Committee also considered practical considerations, such as the costs associated with litigation and the likelihood of any meaningful recovery.

For example, the claims considered herein would all be asserted against individuals. The Committee understands that while D&O insurance policies may provide coverage for all or certain of these claims, such D&O policies will likely be exhausted as a result of other litigation involving the Company. As a result, there is a likelihood that insurance coverage will not be available should Silvergate determine to pursue any claims against its current and former directors and officers.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

Therefore, Silvergate's recourse in any such litigation would likely be solely against the individuals. Thus, even if successful, Silvergate would be required to seek to collect a judgment against the individuals—frequently a difficult, uncertain, time consuming, and costly process.

G.    **Considerations in Favor of Providing Releases**

As detailed above, the Committee has not identified any strong claims against its current and former directors and officers. The Committee investigated those claims asserted in the Derivative Action and the Derivative Demand, as well as other claims that could arise out of or relate to the prior proceedings. Given the time since the critical events during 2022 and the Board's decision to winddown the Company in March 2023, it appears unlikely that any other potential claims exist against the former and current directors and officers.

If Silvergate were to pursue weak claims against the directors and officers, it would result in litigation costs for Silvergate and likely expose Silvergate to additional claims for indemnification. Also, because the identified claims are all weak and unlikely to result in any meaningful recovery for Silvergate, the Committee must further consider whether it would be in Silvergate's best interests to provide releases to the directors and officers. Providing releases would ensure that Silvergate's limited remaining funds are not expended in the pursuit of weak claims unlikely to generate a positive recovery. Here, the foregoing analysis,

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

supports the provision of releases to Silvergate's directors for any claims arising during the period of 2019 through March 8, 2023, and further supports the provision of releases to Lane, Fraher, Martino, and Pearson in their capacity as officers for the same period—***provided, however,*** that all such releases shall expressly carve out the directors' and officers' obligations to repay any amounts that have been advanced to them for their legal expenses should it ultimately be determined that they are not entitled to indemnification. Accordingly, to the extent third party litigation against any of the directors or officers continues (such as the SEC's continuing action against Martino) and may ultimately reveal wrongdoing by such persons, Silvergate would have the opportunity to seek repayment of the amounts advanced. Subject to this carveout, the Committee finds that the provision of releases to the directors and officers identified above would be in Silvergate's best interests.

## VI.   **CONCLUSION**

For all of the reasons discussed herein, the Committee finds that it would not be in the best interests of Silvergate to pursue its former or current directors and officers for the claims asserted in the Derivative Complaint and/or the Derivative Demand, or any other related claims. Rather, the Committee finds that it is in the best interests of Silvergate to provide releases to the Company's directors for any claims arising during the period of 2019 through March 8, 2023, as well as provide releases to Lane, Fraher, Martino, and Pearson for claims against them in their

127

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

capacities as officers during the same period.  However, all such releases should expressly carveout and preserve the directors' and officers' obligations to repay any amounts that have been advanced to them for their legal expenses should it ultimately be determined that they are not entitled to indemnification.

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

# Exhibit A

# Insider Stock Sales[1]
# (2019-2023)

| Seller | Title on Form 4 at Time of Sale | Date of Sale | Amount Sold | Price Per Share |
|---|---|---|---|---|
| Karen Brassfield | Director | 12/2/2020 | 2,500 | $36 |
| Karen Brassfield | Director | 2/22/2021 | 4,500 | $160.74 |
| Karen Brassfield | Director | 5/17/2021 | 10,000 | $88.53 |
| Karen Brassfield | Director | 6/1/2021 | 4,000 | $117.30 |
| Karen Brassfield | Director | 2/22/2022 | 3,000 | $113.34 |
| Robert Charles Campbell | Director | 5/26/2020 | 1,274 | $14.85 |
| Robert Charles Campbell | Director | 5/26/2020 | 1,748 | $15 |
| Robert Charles Campbell | Director | 5/26/2020 | 6,226 | $15.40 |
| Robert Charles Campbell | Director | 5/27/2020 | 5,000 | $14.80 |
| Robert Charles Campbell | Director | 5/27/2020 | 79 | $14.90 |
| Robert Charles Campbell | Director | 5/27/2020 | 5,352 | $14.93 |
| Robert Charles Campbell | Director | 5/28/2020 | 8,089 | $14.56 |
| Robert Charles Campbell | Director | 5/28/2020 | 1,830 | $14.56 |
| Robert Charles Campbell | Director | 5/28/2020 | 5,000 | $14.75 |
| Robert Charles Campbell | Director | 5/28/2020 | 2 | $14.90 |
| Robert Charles Campbell | Director | 5/29/2020 | 5,000 | $14.63 |
| Robert Charles Campbell | Director | 6/2/2020 | 5,000 | $14.10 |
| Robert Charles Campbell | Director | 6/2/2020 | 5,000 | $14.30 |
| Robert Charles Campbell | Director | 6/2/2020 | 5,000 | $14.40 |
| Robert Charles Campbell | Director | 6/2/2020 | 5,000 | $14.45 |
| Robert Charles Campbell | Director | 6/2/2020 | 23 | $14.80 |
| Robert Charles Campbell | Director | 6/3/2020 | 9,367 | $14.70 |
| Robert Charles Campbell | Director | 6/3/2020 | 100 | $14.75 |
| Robert Charles Campbell | Director | 6/3/2020 | 220 | $14.76 |
| Robert Charles Campbell | Director | 6/3/2020 | 610 | $14.80 |
| Robert Charles Campbell | Director | 6/4/2020 | 2,256 | $14.81 |
| Robert Charles Campbell | Director | 6/4/2020 | 1,307 | $14.82 |
| Robert Charles Campbell | Director | 6/4/2020 | 9,717 | $14.85 |
| Robert Charles Campbell | Director | 6/4/2020 | 1,400 | $14.87 |

[1] This chart lists stock sales reflected in Form 4s for any of the officers/directors who are alleged to have engaged in insider trading in either the Derivative Complaint or in Stilwell's examiner motion. This chart attempts to list all stock sales by such persons (assuming they filed a Form 4) since Silvergate Capital Corporation went public. Trades highlighted in yellow are referenced in the Derivative Complaint.

129

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

| Robert Charles Campbell | Director | 6/5/2020 | 4,201 | $14.85 |
|---|---|---|---|---|
| Robert Charles Campbell | Director | 6/5/2020 | 799 | $14.86 |
| Robert Charles Campbell | Director | 6/8/2020 | 1,988 | $15 |
| Robert Charles Campbell | Director | 6/8/2020 | 1,812 | $15.02 |
| Robert Charles Campbell | Director | 6/8/2020 | 1,200 | $15.10 |
| Robert Charles Campbell | Director | 6/9/2020 | 4,433 | $14.80 |
| Robert Charles Campbell | Director | 6/9/2020 | 420 | $14.81 |
| Robert Charles Campbell | Director | 6/9/2020 | 1,947 | $14.86 |
| Robert Charles Campbell | Director | 6/9/2020 | 200 | $14.90 |
| Robert Charles Campbell | Director | 8/5/2021 | 5,408 | $106.01 |
| Paul Colucci | Director | 11/12/2019 | 47,474 | $11.16 |
| Paul Colucci | Director | 11/15/2019 | 9,462 | $11.16 |
| Paul Colucci | Director | 11/18/2020 | 10,000 | $30.08 |
| Paul Colucci | Director | 8/2/2021 | 2,200 | $103.58 |
| Paul Colucci | Director | 8/2/2021 | 6,193 | $104.86 |
| Paul Colucci | Director | 8/2/2021 | 1,607 | $105.80 |
| Paul Colucci | Director | 9/13/2021 | 4,521 | $108.28 |
| Paul Colucci | Director | 9/13/2021 | 5,479 | $109.23 |
| Paul Colucci | Director | 11/3/2021 | 2,939 | $203.58 |
| Paul Colucci | Director | 11/3/2021 | 5,165 | $204.57 |
| Paul Colucci | Director | 11/3/2021 | 2,497 | $205.45 |
| Thomas Dircks | Director | 12/8/2020 | 7,603 | $39.67 |
| Thomas Dircks | Director | 12/8/2020 | 37,192 | $40.72 |
| Thomas Dircks | Director | 12/8/2020 | 4,788 | $41.58 |
| Thomas Dircks | Director | 12/8/2020 | 417 | $42.51 |
| Thomas Dircks | Director | 12/8/2020 | 1,521 | $39.67 |
| Thomas Dircks | Director | 12/8/2020 | 7,438 | $40.72 |
| Thomas Dircks | Director | 12/8/2020 | 958 | $41.58 |
| Thomas Dircks | Director | 12/8/2020 | 83 | $42.51 |
| Thomas Dircks | Director | 5/26/2021 | 3,484 | $114.17 |
| Thomas Dircks | Director | 5/26/2021 | 6,400 | $113.26 |
| Thomas Dircks | Director | 5/26/2021 | 116 | $112.87 |
| Thomas Dircks | Director | 5/27/2021 | 8,272 | $113.94 |
| Thomas Dircks | Director | 5/27/2021 | 6,528 | $114.75 |
| Thomas Dircks | Director | 5/27/2021 | 200 | $115.50 |
| Thomas Dircks | Director | 5/27/2021 | 1,600 | $115.18 |
| Thomas Dircks | Director | 5/27/2021 | 3,400 | $116.01 |
| Thomas Dircks | Director | 10/21/2021 | 900 | $144.47 |
| Thomas Dircks | Director | 10/21/2021 | 1,300 | $145.69 |
| Thomas Dircks | Director | 10/21/2021 | 414 | $147.33 |
| Thomas Dircks | Director | 10/21/2021 | 500 | $148.74 |
| Thomas Dircks | Director | 10/21/2021 | 17,201 | $149.95 |

130

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

| Thomas Dircks | Director | 10/21/2021 | 4,585 | $150.94 |
|---|---|---|---|---|
| Thomas Dircks | Director | 10/21/2021 | 100 | $151.30 |
| Thomas Dircks | Director | 10/21/2021 | 200 | $144.29 |
| Thomas Dircks | Director | 10/21/2021 | 300 | $145.70 |
| Thomas Dircks | Director | 10/21/2021 | 100 | $147.32 |
| Thomas Dircks | Director | 10/21/2021 | 2,550 | $149.97 |
| Thomas Dircks | Director | 10/21/2021 | 4,350 | $150.36 |
| Thomas Dircks | Director | 10/21/2021 | 10,000 | $151.80 |
| Thomas Dircks | Director | 10/21/2021 | 7,500 | $149.68 |
| Derek Eisele | Director & Vice Chairman & EVP | 5/22/2020 | 5,000 | $15.10 |
| Derek Eisele | EVP | 8/27/2020 | 5,000 | $15.21 |
| Derek Eisele | EVP | 12/2/2020 | 5,000 | $39.30 |
| Derek Eisele | EVP | 12/7/2020 | 595 | $44.55 |
| Derek Eisele | EVP | 2/24/2021 | 28,136 | $140.13 |
| Derek Eisele | EVP | 2/24/2021 | 700 | $141.15 |
| Derek Eisele | EVP | 2/25/2021 | 893 | $140.46 |
| Derek Eisele | EVP | 2/25/2021 | 207 | $141.39 |
| Derek Eisele | EVP | 2/25/2021 | 900 | $142.83 |
| Derek Eisele | EVP | 2/25/2021 | 154 | $143.91 |
| Derek Eisele | EVP | 3/11/2021 | 2,582 | $126.52 |
| Derek Eisele | EVP | 3/11/2021 | 4,744 | $127.50 |
| Derek Eisele | EVP | 3/11/2021 | 3,574 | $128.44 |
| Derek Eisele | EVP | 3/11/2021 | 200 | $129.15 |
| Derek Eisele | EVP | 3/11/2021 | 3,897 | $127.93 |
| Derek Eisele | EVP | 3/11/2021 | 2,786 | $128.78 |
| Derek Eisele | EVP | 8/6/2021 | 1,200 | $110.84 |
| Derek Eisele | EVP | 8/6/2021 | 2,165 | $111.98 |
| Derek Eisele | EVP | 8/6/2021 | 7,235 | $112.95 |
| Derek Eisele | EVP | 8/6/2021 | 2,400 | $113.75 |
| Derek Eisele | EVP | 8/13/2021 | 4,000 | $111.19 |
| Derek Eisele | EVP | 8/13/2021 | 500 | $111.71 |
| Derek Eisele | EVP | 10/25/2021 | 26,913 | $150.34 |
| Derek Eisele | EVP | 10/25/2021 | 12,787 | $151.50 |
| Derek Eisele | EVP | 10/25/2021 | 300 | $152.11 |
| Derek Eisele | EVP | 11/3/2021 | 3,600 | $200.34 |
| Derek Eisele | EVP | 11/3/2021 | 1,000 | $201.62 |
| Derek Eisele | EVP | 11/3/2021 | 400 | $202.36 |
| Derek Eisele | EVP | 11/3/2021 | 16,372 | $200.24 |
| Derek Eisele | EVP | 11/3/2021 | 4,663 | $201.24 |
| Derek Eisele | EVP | 11/3/2021 | 3,965 | $202.37 |

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

| Kathleen Fraher | EVP & COO | 11/30/2020 | 565 | $35.86 |
|---|---|---|---|---|
| Kathleen Fraher | COO | 8/2/2021 | 3,109 | $103.75 |
| Kathleen Fraher | COO | 8/2/2021 | 1,891 | $104.40 |
| Kathleen Fraher | COO | 8/2/2021 | 6,318 | $103.73 |
| Kathleen Fraher | COO | 8/2/2021 | 2,432 | $104.41 |
| Kathleen Fraher | COO | 8/4/2021 | 1,200 | $103.02 |
| Kathleen Fraher | COO | 8/27/2021 | 2,200 | $114.61 |
| Kathleen Fraher | COO | 11/19/2021 | 3,539 | $220.84 |
| Kathleen Fraher | COO | 4/21/2022 | 750 | $130.44 |
| Kathleen Fraher | COO | 4/22/2022 | 750 | $135 |
| Dennis Frank | Director | 11/12/2019 | 316,981 | $11.16 |
| Dennis Frank | Director | 11/12/2019 | 77,200 | $11.16 |
| Dennis Frank | Director | 11/15/2019 | 63,175 | $11.16 |
| Dennis Frank | Director | 11/15/2019 | 15,386 | $11.16 |
| Dennis Frank | Director | 8/5/2020 | 75,000 | $14.04 |
| Dennis Frank | Director | 8/6/2020 | 75,000 | $14.19 |
| Dennis Frank | Director | 8/6/2020 | 75,000 | $14.19 |
| Dennis Frank | Director | 3/12/2021 | 12,251 | $138.07 |
| Dennis Frank | Director | 3/12/2021 | 5,852 | $139.97 |
| Dennis Frank | Director | 3/12/2021 | 6,897 | $140.48 |
| Dennis Frank | Director | 8/2/2021 | 6,651 | $102.01 |
| Dennis Frank | Director | 8/2/2021 | 7,348 | $103.39 |
| Dennis Frank | Director | 8/2/2021 | 14,138 | $104.47 |
| Dennis Frank | Director | 8/2/2021 | 4,629 | $105.36 |
| Dennis Frank | Director | 8/2/2021 | 1,400 | $106.23 |
| Dennis Frank | Director | 8/2/2021 | 834 | $107.12 |
| Dennis Frank | Director | 8/2/2021 | 600 | $101.73 |
| Dennis Frank | Director | 8/2/2021 | 7,169 | $103.70 |
| Dennis Frank | Director | 8/2/2021 | 1,557 | $104.88 |
| Dennis Frank | Director | 8/2/2021 | 1,383 | $105.75 |
| Dennis Frank | Director | 8/12/2021 | 6,261 | $114.17 |
| Dennis Frank | Director | 8/12/2021 | 3,239 | $115.58 |
| Dennis Frank | Director | 8/12/2021 | 400 | $116.08 |
| Dennis Frank | Director | 8/12/2021 | 100 | $116.09 |
| Dennis Frank | Director | 8/13/2021 | 1,465 | $111.72 |
| Dennis Frank | Director | 8/13/2021 | 4,562 | $115.52 |
| Dennis Frank | Director | 8/13/2021 | 1,928 | $116.37 |
| Dennis Frank | Director | 8/13/2021 | 4,549 | $117.73 |
| Dennis Frank | Director | 8/13/2021 | 2,786 | $118.68 |
| Dennis Frank | Director | 8/13/2021 | 600 | $119.72 |
| Dennis Frank | Director | 8/13/2021 | 2,900 | $120.96 |
| Dennis Frank | Director | 8/13/2021 | 3,967 | $122.15 |

132
CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

| Dennis Frank | Director | 8/13/2021 | 933 | $122.80 |
|---|---|---|---|---|
| Dennis Frank | Director | 9/9/2021 | 1,476 | $113.44 |
| Dennis Frank | Director | 9/9/2021 | 1,704 | $114.24 |
| Dennis Frank | Director | 9/9/2021 | 3,864 | $115.50 |
| Dennis Frank | Director | 9/9/2021 | 2,531 | $117.10 |
| Dennis Frank | Director | 9/13/2021 | 4,851 | $107.43 |
| Dennis Frank | Director | 9/13/2021 | 6,493 | $108.31 |
| Dennis Frank | Director | 9/13/2021 | 13,456 | $109.06 |
| Dennis Frank | Director | 9/13/2021 | 200 | $109.91 |
| Dennis Frank | Director | 11/3/2021 | 16,372 | $200.24 |
| Dennis Frank | Director | 11/3/2021 | 4,663 | $201.24 |
| Dennis Frank | Director | 11/3/2021 | 3,965 | $202.37 |
| Dennis Frank | Director | 11/8/2021 | 3,563 | $217.35 |
| Dennis Frank | Director | 11/8/2021 | 2,206 | $218.57 |
| Dennis Frank | Director | 11/8/2021 | 5,642 | $219.67 |
| Dennis Frank | Director | 11/8/2021 | 11,177 | $220.73 |
| Dennis Frank | Director | 11/8/2021 | 2,412 | $221.36 |
| Martin Friedman | Director | 11/12/2019 | 243,732 | $11.16 |
| Martin Friedman | Director | 11/12/2019 | 69,207 | $11.16 |
| Martin Friedman | Director | 11/12/2019 | 7,754 | $11.16 |
| Martin Friedman | Director | 11/15/2019 | 48,576 | $11.16 |
| Martin Friedman | Director | 11/15/2019 | 13,793 | $11.16 |
| Martin Friedman | Director | 11/15/2019 | 1,546 | $11.16 |
| Alan Lane[2] | Director, President & CEO | 6/8/2021 | 6,249 | $101.82 |
| Alan Lane | Director, President & CEO | 6/8/2021 | 8,789 | $103.33 |
| Alan Lane | Director, President & CEO | 6/8/2021 | 10,006 | $103.72 |
| Alan Lane | Director, President & CEO | 6/8/2021 | 13,791 | $105.24 |
| Alan Lane | Director, President & CEO | 6/8/2021 | 13,512 | $105.94 |

---

[2] The Derivative Complaint lists a stock sale by Alan Lane that purportedly occurred on 2/18/2021 (with a filing date of 2/19/2021). According to the Derivative Complaint, Alan Lane purportedly sold 13,002 shares at the price of $15.91 per share. However, no such sale is reflected in any Form 4.

133

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

| Alan Lane | Director, President & CEO | 6/8/2021 | 7,391 | $107.12 |
| Alan Lane | Director, President & CEO | 6/8/2021 | 5,513 | $108 |
| Alan Lane | Director, President & CEO | 6/8/2021 | 3,738 | $109.05 |
| Alan Lane | Director, President & CEO | 6/8/2021 | 5,811 | $109.90 |
| Alan Lane | Director, President & CEO | 6/8/2021 | 200 | $110.57 |
| Alan Lane | Director, President & CEO | 6/9/2021 | 3,195 | $103.25 |
| Alan Lane | Director, President & CEO | 6/9/2021 | 3,034 | $103.95 |
| Alan Lane | Director, President & CEO | 6/9/2021 | 3,953 | $105.73 |
| Alan Lane | Director, President & CEO | 6/9/2021 | 23,088 | $106.45 |
| Alan Lane | Director, President & CEO | 6/9/2021 | 21,355 | $107.56 |
| Alan Lane | Director, President & CEO | 6/9/2021 | 16,726 | $108.45 |
| Alan Lane | Director, President & CEO | 6/9/2021 | 3,649 | $109.19 |
| Alan Lane | Director, President & CEO | 6/10/2021 | 7,122 | $101.09 |
| Alan Lane | Director, President & CEO | 6/10/2021 | 4,128 | $101.69 |

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

| Alan Lane | Director, President & CEO | 7/21/2022 | 7,100 | $91.83 |
|---|---|---|---|---|
| Alan Lane | Director, President & CEO | 7/21/2022 | 9,214 | $92.94 |
| Son-Jai Paik | Chief Human Resource Officer | 11/8/2021 | 5,000 | $219.38 |
| Scott Reed | Director | 11/12/2019 | 147,820 | $11.16 |
| Scott Reed | Director | 11/12/2019 | 62,079 | $11.16 |
| Scott Reed | Director | 11/15/2019 | 41,834 | $11.16 |
| Scott Reed | Director | 12/14/2020 | 426,488 | $40 |
| Scott Reed | Director | 2/22/2021 | 5,000 | $165 |
| Scott Reed | Director | 2/24/2021 | 5,000 | $140 |
| Scott Reed | Director | 3/11/2021 | 2,819 | $130.45 |
| Scott Reed | Director | 3/11/2021 | 2,647 | $131.56 |
| Scott Reed | Director | 3/11/2021 | 3,143 | $132.54 |
| Scott Reed | Director | 3/11/2021 | 1,296 | $133.41 |
| Scott Reed | Director | 3/11/2021 | 95 | $134 |
| Scott Reed | Director | 3/11/2021 | 2,217 | $135.78 |
| Scott Reed | Director | 3/11/2021 | 3,340 | $136.87 |
| Scott Reed | Director | 3/11/2021 | 3,390 | $137.73 |
| Scott Reed | Director | 3/11/2021 | 3,653 | $138.98 |
| Scott Reed | Director | 3/11/2021 | 6,980 | $139.83 |
| Scott Reed | Director | 3/11/2021 | 420 | $140.47 |
| Scott Reed | Director | 3/12/2021 | 19,900 | $137.79 |
| Scott Reed | Director | 3/12/2021 | 3,798 | $140 |
| Scott Reed | Director | 3/12/2021 | 1,302 | $140.41 |
| Scott Reed | Director | 5/27/2021 | 8,110 | $115.30 |
| Scott Reed | Director | 5/27/2021 | 1,890 | $116.22 |
| Scott Reed | Director | 8/2/2021 | 2,400 | $104.73 |
| Scott Reed | Director | 8/2/2021 | 100 | $105.66 |
| Scott Reed | Director | 8/5/2021 | 2,500 | $105.16 |
| Scott Reed | Director | 8/5/2021 | 800 | $107.54 |
| Scott Reed | Director | 8/5/2021 | 1,700 | $108.64 |
| Scott Reed | Director | 8/5/2021 | 2,500 | $109.32 |
| Scott Reed | Director | 9/3/2021 | 2,200 | $120.22 |
| Scott Reed | Director | 9/3/2021 | 300 | $121.36 |
| Scott Reed | Director | 9/3/2021 | 500 | $122.31 |
| Scott Reed | Director | 9/3/2021 | 102 | $125.55 |
| Scott Reed | Director | 10/21/2021 | 5,498 | $150.02 |

135

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

CONFIDENTIAL

| Scott Reed | Director | 10/25/2021 | 7,522 | $150.11 |
|---|---|---|---|---|
| Scott Reed | Director | 11/1/2021 | 2,600 | $170.48 |
| Scott Reed | Director | 11/1/2021 | 1,500 | $171.77 |
| Scott Reed | Director | 11/1/2021 | 700 | $173.04 |
| Scott Reed | Director | 11/1/2021 | 200 | $174.23 |
| Ben Reynolds | Chief Strategy Officer | 8/4/2021 | 1,600 | $102.72 |
| Ben Reynolds | Chief Strategy Officer | 8/4/2021 | 3,000 | $103.44 |
| Ben Reynolds | Chief Strategy Officer | 8/4/2021 | 400 | $104.38 |
| Ben Reynolds | Chief Strategy Officer | 8/4/2021 | 2,363 | $103.59 |
| Ben Reynolds | Chief Strategy Officer | 8/4/2021 | 1,900 | $104.75 |
| Ben Reynolds | Chief Strategy Officer | 8/4/2021 | 2,451 | $105.47 |
| Ben Reynolds[3] | Chief Strategy Officer | 11/5/2021 | 3,000 | $220 |

---

[3] The Derivative Complaint mistakenly lists two stock sales of 3,000 shares stock each on 11/5/2021. This is likely because Ben Reynolds later filed a corrected Form 4/A with respect to the 11/5/2021 trade.

136

CONFIDENTIAL -- CONTAINS CONFIDENTIAL SUPERVISORY INFORMATION OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

## RESOLUTIONS OF THE
## BOARD OF DIRECTORS OF
## SILVERGATE CAPITAL CORPORATION

### August 23, 2024

The members of the Board of Directors (the "Board") of Silvergate Capital Corporation, organized and existing under the laws of the State of Maryland (the "Company"), approved and adopted the following actions at the meeting of the Board held on August 23, 2024:

**WHEREAS** the Company (i) has been named as nominal defendant in a derivative complaint asserted by Randy Nkonoki, a purported owner of common stock of the Company (the "Derivative Complaint") and (ii) received a shareholder demand letter from counsel for Nikhil Bhayani, a purported beneficial owner of common stock of the Company, on March 6, 2023 (the "Shareholder Demand Letter");

**WHEREAS** the Board of Directors of the Company (the "Board") has determined that it is advisable and in the best interests of the Company to constitute a committee of the Board to (i) investigate any potential claims and causes of action the Company may hold against the Company's current and former directors, officers, managers, insiders, principals, employees and other related parties, including, but not limited to, those claims and allegations asserted in the Derivative Complaint and the Shareholder Demand Letter and (ii) determine what actions, if any, should be taken with respect to any such potential claims and causes of action, including regarding initiation of litigation, entry into settlements or provision of releases;

**WHEREAS** the Board has determined that Ivona Smith is disinterested and independent with respect to these matters;

**WHEREAS**, the Board has authorized the Committee (as defined below) to engage any advisors, including legal counsel, as the Committee deems necessary and advisable in connection with the Investigation; and

**WHEREAS**, the Board desires to approve the following resolutions.

**NOW, THEREFORE, BE IT**

**RESOLVED** that, effective immediately, an Internal Investigation Committee of the Board (the "Committee") hereby is established;

**BE IT FURTHER RESOLVED** that Ivona Smith be, and hereby is, appointed as the sole member of the Committee;

**BE IT FURTHER RESOLVED** that the Committee be and hereby is delegated the authority to consider, investigate, review and analyze the facts, allegations and circumstances that may give rise to any potential claims or causes of action against the Company's current and

[[6451798]]

former directors, officers, managers, insiders, principals, employees and other related parties, including, but not limited to, those claims and allegations asserted in the Derivative Complaint and the Shareholder Demand Letter (the "Investigation");

        **BE IT FURTHER RESOLVED** that the Committee shall have the full power and authority of the Board to carry out the Investigation and to take action in response to or with respect to the Investigation, including, without limitation, upon the completion of its Investigation, initiation of litigation, entry into settlements and provision of releases;

        **BE IT FURTHER RESOLVED**, that the Committee shall continue in existence until such time as the Committee shall recommend to the Board that it be dissolved;

        **BE IT FURTHER RESOLVED** that, to the extent permitted by Maryland General Corporations Law and the Company's articles of incorporation and bylaws, the Committee is hereby authorized and empowered to take such steps as it deems prudent and appropriate in connection with the matters described above, and that determinations made by the Committee as to matters within the scope of its charge shall not be subject to review by the Board;

        **BE IT FURTHER RESOLVED** that the Company shall authorize and direct its officers, attorneys, agents and employees to provide full cooperation and assistance to the Committee, and any person employed or acting on its behalf, on any and all matters that the Committee may request from time to time, to provide interviews, if requested, and to provide the Committee with all information and documents that it shall request;

        **BE IT FURTHER RESOLVED** that the Committee shall have the power and authority to retain, in its sole discretion, at the Company's expense, such advisors, including legal advisors as the Committee may deem advisable, and may enter into engagement letters on behalf of the Company with such advisors; and that the Company be, and hereby is, directed to pay the fees and expenses of such advisors as directed by the Committee, and to otherwise adhere to and honor the terms of engagement of such advisors; and that the Company shall not terminate, or otherwise modify the terms of, the retention of or the engagement of such advisors without the prior approval and authorization of the Committee;

        **BE IT FURTHER RESOLVED** that the Committee shall be indemnified, and shall receive an advancement of expenses with respect to, any losses or expenses (including attorney's fees) incurred in any threatened, pending or completed action, suit or proceeding (i) brought against any such person by reason of his or her service as a member of the Committee or (ii) brought by any such person to enforce his or her rights pursuant to this resolution, in each case to the fullest extent permitted by law;

        **BE IT FURTHER RESOLVED** that the Committee shall fix its own time and place of meetings and shall prescribe its own rules of procedure; and

        **BE IT FURTHER RESOLVED** that all actions taken and expenses incurred by the Committee heretofore in furtherance of any of the actions authorized by the foregoing resolutions are hereby expressly ratified, confirmed, adopted and approved.

[[6451798]]

SILVERGATE_INDEPENDENT COMMITTEE_00002075

### MINUTES OF A MEETING OF THE INVESTIGATION
### COMMITTEE OF THE BOARD OF DIRECTORS

#### August 21, 2024

PRESENT: Ivona Smith, constituting the sole director of the Investigation Committee (the "Committee") of the Board of Directors of Silvergate Capital Corporation (the "Company"). Present by invitation were Lisa A. Schmidt, Paul N. Heath, Brock E. Czeschin, Matthew D. Perri, and Elizabeth J. Freud of Richards, Layton & Finger, P.A. ("RLF") and Jed Zobitz of Cravath, Swaine & Moore LLP ("Cravath"). All meeting participants participated by Zoom, and all participants in the meeting were able to hear and communicate with each other.

The meeting was called to order at approximately 3:30 p.m. Eastern Time on August 21, 2024. Ms. Freud served as secretary of the meeting.

The primary purpose of the Meeting was for the Committee to consider retaining RLF as counsel to the Committee. Mrs. Schmidt gave an overview of RLF's experience in working with investigation committees and provided Ms. Smith with what RLF viewed as the plan of action in conducting the investigation. Ms. Smith asked, and RLF answered, questions regarding the investigation process.

At the end of the meeting, Ms. Smith indicated that she was comfortable retaining RLF to represent the Committee. Ms. Smith and RLF thereafter discussed the next steps in the investigation, including coordinating with the Company's counsel to understand what documents were previously collected in response to the various government and regulatory proceedings and/or litigations.

There being no further business, the meeting of the Committee was adjourned at approximately 4:00 p.m. Eastern Time.

Elizabeth J. Freud

SILVERGATE_INDEPENDENT COMMITTEE_00002311

## MINUTES OF A MEETING OF THE INVESTIGATION
## COMMITTEE OF THE BOARD OF DIRECTORS

### September 11, 2024

PRESENT: Ivona Smith, constituting the sole director of the Investigation Committee (the "Committee") of the Board of Directors of Silvergate Capital Corporation (the "Company"). Present by invitation were Paul N. Heath, Brock E. Czeschin, Matthew D. Perri, Cassandra L. Thompson and Elizabeth J. Freud of Richards, Layton & Finger, P.A. ("RLF"). All meeting participants participated by Zoom, and all participants in the meeting were able to hear and communicate with each other.

The meeting was called to order at approximately 2:00 p.m. Eastern Time on September 11, 2024. Ms. Freud served as secretary of the meeting.

At the outset of the meeting, Mr. Heath explained that RLF also currently represents the joint provisional liquidator in a bankruptcy proceeding in which Silvergate has filed a proof of claim. Mr. Heath explained that RLF does not believe this to be a conflict but nonetheless wanted to disclose it for the Committee's consideration. Ms. Smith stated that she understood the disclosure and her initial impression was that it did not create a conflict. However, Ms. Smith said that she would continue to consider the issue and would return to RLF with any questions or concerns.

Ms. Smith then confirmed that she had reviewed and approved the draft minutes of the prior meeting that were circulated in advance of this meeting.

Mr. Czeschin then updated Ms. Smith regarding RLF's progress in obtaining and reviewing information in furtherance of the investigation. Mr. Czeschin detailed the documents that were made electronically available to RLF. Mr. Czeschin explained that RLF had identified several key document sets that it was in the process of reviewing. These documents include: (1) board materials from 2020 through March 2023; (2) all documents cited in the various "Wells Notices" submitted to the Securities and Exchange Commission ("SEC"); (3) documents referenced in the SEC Complaint against the Company and its officers; and (4) a set of key documents flagged by Cravath, Swaine & Moore in a prior review. Mr. Czeschin further discussed the anticipated timeline for completing the review of the key document sets.

Ms. Smith then asked and RLF answered questions regarding the next steps in the investigation, including evaluation of the key documents and determining whether to request any additional documents. The parties then set a meeting for the following week on Thursday, September 19 at 2:00 p.m. Eastern Time.

CONFIDENTIAL                    SILVERGATE_INDEPENDENT COMMITTEE_00002316

There being no further business, the meeting of the Committee was adjourned at approximately 2:30 p.m. Eastern Time.

Elizabeth J. Freud

CONFIDENTIAL

SILVERGATE_INDEPENDENT COMMITTEE_00002317

**MINUTES OF A MEETING OF THE INVESTIGATION
COMMITTEE OF THE BOARD OF DIRECTORS**

**September 19, 2024**

PRESENT: Ivona Smith, constituting the sole director of the Investigation Committee (the "Committee") of the Board of Directors of Silvergate Capital Corporation (the "Company"). Present by invitation were Lisa A. Schmidt, Paul N. Heath, Brock E. Czeschin, Matthew D. Perri, Cassandra L. Thompson and Elizabeth J. Freud of Richards, Layton & Finger, P.A. ("RLF"). All meeting participants participated by Zoom, and all participants in the meeting were able to hear and communicate with each other.

The meeting was called to order at approximately 2:00 p.m. Eastern Time on September 19, 2024. Ms. Freud served as secretary of the meeting.

At the outset of the meeting, Mr. Heath explained that the Company had filed its Chapter 11 bankruptcy on September 17, 2024, in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Proceeding"). Mr. Heath then described the events of the Bankruptcy Proceeding's first day hearing, which was held on September 19, 2024.

Ms. Smith next inquired regarding the level of disclosure regarding the investigation that should be made to the full board of directors, and RLF answered those questions.

Mr. Czeschin then updated Ms. Smith regarding RLF's progress in reviewing information in furtherance of the investigation. Mr. Czeschin explained that RLF had fully reviewed the key document sets it had identified during the previous meeting. These documents include: (1) board materials from 2020 through March 2023; (2) all documents cited in the various "Wells Notices" submitted to the Securities and Exchange Commission ("SEC"); (3) documents referenced in the SEC Complaint against the Company and its officers; and (4) a set of key documents flagged by Cravath, Swaine & Moore in a prior review. Mr. Czeschin gave Ms. Smith RLF's initial impressions of the documents and discussed which claims appear to warrant further investigation. Ms. Smith asked and RLF answered questions regarding the documents, topics of investigation, and the oversight and compliance structure at the Company.

Mr. Czeschin then gave Ms. Smith an overview of the proposed next steps for the investigation. Mr. Czeschin identified certain categories of additional documents RLF would like to request from the Company. Ms. Smith agreed with requesting such additional documents and directed RLF to do so. Mr. Czeschin also preliminarily discussed with Ms. Smith potential candidates for interviews.

There being no further business, the meeting of the Committee was adjourned at approximately 2:40 p.m. Eastern Time.

CONFIDENTIAL                    SILVERGATE_INDEPENDENT COMMITTEE_00002318

Elizabeth J. Freud

SILVERGATE_INDEPENDENT COMMITTEE_00002319

## MINUTES OF A MEETING OF THE INVESTIGATION
## COMMITTEE OF THE BOARD OF DIRECTORS

### October 3, 2024

PRESENT: Ivona Smith, constituting the sole director of the Investigation Committee (the "Committee") of the Board of Directors of Silvergate Capital Corporation (the "Company"). Present by invitation were Lisa A. Schmidt, Paul N. Heath, Brock E. Czeschin, and Cassandra L. Thompson of Richards, Layton & Finger, P.A. ("RLF"). All meeting participants participated by Zoom, and all participants in the meeting were able to hear and communicate with each other.

The meeting was called to order at approximately 10:00 a.m. Eastern Time on October 3, 2024. Ms. Thompson served as secretary of the meeting.

At the outset of the meeting, Mr. Czeschin provided an update regarding additional documents that RLF had requested from the Company. Mr. Czeschin explained that RLF had communicated with Company counsel, and had received and reviewed the requested documents. A discussion ensued, and Ms. Smith asked questions regarding the Company's advancement obligations. Those questions were answered by RLF.

Thereafter, Mr. Czeschin recommended that the Committee request interviews from certain individuals, and Ms. Schmidt concurred. Mr. Czeschin explained RLF's typical interview process, and Ms. Smith inquired about her role in the interviews. Mr. Czeschin and Ms. Schmidt answered Ms. Smith's questions, and Ms. Smith agreed with RLF's interview recommendations.

A discussion then ensued regarding potential claims and claim releases. Ms. Smith asked questions, which were answered by RLF.

Ms. Smith then relayed that Joseph Stilwell had recently joined the Company's board, and a brief discussion followed.

RLF then discussed proposed next steps for the investigation, including requesting interviews from certain key individuals, and Ms. Smith concurred.

There being no further business, the meeting of the Committee was adjourned at approximately 10:49 a.m. Eastern Time.

*Cassandra L. Thompson*
Cassandra L. Thompson

CONFIDENTIAL                                    SILVERGATE_INDEPENDENT COMMITTEE_00002313

## MINUTES OF A MEETING OF THE INVESTIGATION
## COMMITTEE OF THE BOARD OF DIRECTORS

### October 14, 2024

PRESENT: Ivona Smith, constituting the sole director of the Investigation Committee (the "Committee") of the Board of Directors of Silvergate Capital Corporation (the "Company"). Present by invitation were Lisa A. Schmidt, Paul N. Heath, Brock E. Czeschin, Cassandra L. Thompson, and Elizabeth J. Freud of Richards, Layton & Finger, P.A. ("RLF"). All meeting participants participated by Zoom, and all participants in the meeting were able to hear and communicate with each other.

The meeting was called to order at approximately 1 p.m. Eastern Time on October 14, 2024. Ms. Freud served as secretary of the meeting.

At the outset of the meeting, Mr. Heath provided an update regarding the bankruptcy proceeding, including a recently filed examiner motion. A discussion ensued, and Ms. Smith asked questions regarding whether and how these developments in the bankruptcy proceeding would affect the Committee investigation.

Thereafter, Mr. Czeschin gave an update on the investigation and RLF's efforts to set up interviews with certain individuals. A discussion then ensured, and Ms. Smith asked questions regarding whether there were any other individuals RLF should set up interviews with. There was also a discussion regarding what information RLF will seek during the interviews.

RLF then discussed proposed next steps for the investigation, including scheduling upcoming interviews and preparing for those interviews, and Ms. Smith concurred.

There being no further business, the meeting of the Committee was adjourned at approximately 1:30 p.m. Eastern Time.

Elizabeth J. Freud

CONFIDENTIAL

## MINUTES OF A MEETING OF THE INVESTIGATION
## COMMITTEE OF THE BOARD OF DIRECTORS

### October 22, 2024

PRESENT: Ivona Smith, constituting the sole director of the Investigation Committee (the "Committee") of the Board of Directors of Silvergate Capital Corporation (the "Company"). Present by invitation were Lisa A. Schmidt, Paul N. Heath, Michael J. Merchant, Brock E. Czeschin, and David T. Queroli of Richards, Layton & Finger, P.A. ("RLF"), and Lindsay Timlin of Cravath, Swaine & Moore LLP. All meeting participants participated by Zoom, and all participants in the meeting were able to hear and communicate with each other.

The meeting was called to order at approximately 5:00 p.m. Eastern Time on October 22, 2024. Mr. Czeschin served as secretary of the meeting.

Mr. Heath explained that the purpose of the meeting was to discuss certain developments in the Bankruptcy Court proceedings, including the Rule 2004 Requests served by Stilwell Activist Investments, L.P. ("Stilwell") seeking, among other things, information related to the Committee process. Ms. Timlin, as Company counsel, had been invited to the meeting so that the Company would be informed of the Committee's positions with respect to the Rule 2004 Requests. RLF and Ms. Smith discussed the Rule 2004 Requests and, as applicable, the responses thereto.

Next, RLF provided Ms. Smith with a brief update concerning the briefing on Stilwell's motion for appointment of an examiner.

There being no further business, the meeting of the Committee was adjourned at approximately 5:20 p.m. Eastern Time.

_Brock Czeschin_

_____
Brock E. Czeschin

SILVERGATE_INDEPENDENT COMMITTEE_00002320

## MINUTES OF A MEETING OF THE INVESTIGATION
## COMMITTEE OF THE BOARD OF DIRECTORS

### November 11, 2024

PRESENT: Ivona Smith, constituting the sole director of the Investigation Committee (the "Committee") of the Board of Directors of Silvergate Capital Corporation (the "Company"). Present by invitation were Lisa A. Schmidt, Paul N. Heath, Brock E. Czeschin, Cassandra L. Thompson, and Elizabeth J. Freud of Richards, Layton & Finger, P.A. ("RLF"). All meeting participants participated by Zoom, and all participants in the meeting were able to hear and communicate with each other.

The meeting was called to order at approximately 2:30 p.m. Eastern Time on November 11, 2024. Ms. Freud served as secretary of the meeting.

At the outset of the meeting, Mr. Czeschin gave an update on the investigation and explained that RLF had scheduled interviews with four individuals from the Company. Mr. Czeschin gave a brief background of each of the interviewees and explained why RLF had determined to interview these individuals. Ms. Smith then asked questions and RLF answered regarding her participation and role at the interviews.

Mr. Czeschin then discussed the next steps for the investigation, including when RLF expected to have the report finished and any interim steps ahead of finishing the report. Mr. Czeschin gave a high-level review of the key issues RLF anticipated being covered by the report. A discussion then ensued, and Ms. Smith asked and RLF answered questions regarding the report and the key information RLF wanted to gather from the upcoming interviews for the report.

There being no further business, the meeting of the Committee was adjourned at approximately 3:00 p.m. Eastern Time.

Elizabeth J. Freud

RLF1 32352152v.1

CONFIDENTIAL

SILVERGATE_INDEPENDENT COMMITTEE_00002314

## MINUTES OF A MEETING OF THE INVESTIGATION
## COMMITTEE OF THE BOARD OF DIRECTORS

### December 13, 2024

PRESENT: Ivona Smith, constituting the sole director of the Investigation Committee (the "Committee") of the Board of Directors of Silvergate Capital Corporation (the "Company"). Present by invitation were Lisa A. Schmidt, Brock E. Czeschin, and Cassandra L. Thompson of Richards, Layton & Finger, P.A. ("RLF"). All meeting participants participated by Zoom, and all participants in the meeting were able to hear and communicate with each other.

The meeting was called to order at approximately 2:30 p.m. Eastern Time on December 13, 2024. Ms. Thompson served as secretary of the meeting.

At the outset of the meeting, Mr. Czeschin provided an update concerning the draft report regarding the Committee's investigation (the "Report") and explained that the Company's outside counsel had requested to see a redacted copy of the Report in advance of an upcoming hearing in the Bankruptcy Court. A discussion ensued regarding issues associated with dissemination of the Report. Ms. Smith authorized RLF to share a partial or redacted version of the Report with the Company's outside counsel.

Mr. Czeschin then explained that RLF believes that ███████████████ A brief discussion ensued regarding the interviews that had been conducted as part of the Committee's investigation. Ms. Smith then ███████████ and concluded that an interview with Mr. Pearson was unnecessary.

RLF and Ms. Smith then discussed next steps, including the manner in which the Committee's investigative findings and conclusions should be presented to the board.

There being no further business, the meeting of the Committee was adjourned at approximately 2:52 p.m. Eastern Time.

*Cassandra L. Thompson*

Cassandra L. Thompson

CONFIDENTIAL

SILVERGATE_INDEPENDENT COMMITTEE_00002321

## MINUTES OF A MEETING OF THE INVESTIGATION
## COMMITTEE OF THE BOARD OF DIRECTORS

### December 16, 2024

PRESENT: Ivona Smith, constituting the sole director of the Investigation Committee (the "Committee") of the Board of Directors of Silvergate Capital Corporation (the "Company"). Present by invitation were Lisa A. Schmidt, Brock E. Czeschin, Cassandra L. Thompson, and Elizabeth J. Freud of Richards, Layton & Finger, P.A. ("RLF"). All meeting participants participated by Zoom, and all participants in the meeting were able to hear and communicate with each other.

The meeting was called to order at approximately 1 p.m. Eastern Time on December 16, 2024. Ms. Freud served as secretary of the meeting.

Prior to the meeting, Ms. Smith had been sent a draft of the Report of the Internal Investigation Committee of the Board of Directors of Silvergate, Inc. (the "Report"). Ms. Smith provided feedback on and certain edits to the draft Report. Ms. Smith also asked and RLF answered questions about the draft Report, including the various legal standards and facts discussed in the draft Report. Based on this discussion, Ms. Smith proposed certain further edits to the draft Report.

Thereafter, Mr. Czeschin discussed the next steps in the investigation and explained that RLF planned to send a near-final version of the Report by the end of the week with Ms. Smith's edits implemented. Mr. Czeschin also explained that the final Report would likely be shared with the bankruptcy examiner, but this needed to first be approved by certain regulatory bodies given that the Report will contain confidential supervisory information.

There being no further business, the meeting of the Committee was adjourned at approximately 1:30 p.m. Eastern Time.

Elizabeth J. Freud

CONFIDENTIAL                    SILVERGATE_INDEPENDENT COMMITTEE_00002312

## MINUTES OF A MEETING OF THE INVESTIGATION
## COMMITTEE OF THE BOARD OF DIRECTORS

### December 23, 2024

PRESENT: Ivona Smith, constituting the sole director of the Investigation Committee (the "Committee") of the Board of Directors of Silvergate Capital Corporation (the "Company"). Present by invitation were Lisa A. Schmidt, Paul N. Heath, Brock E. Czeschin, and Cassandra L. Thompson of Richards, Layton & Finger, P.A. ("RLF"). All meeting participants participated by Zoom, and all participants in the meeting were able to hear and communicate with each other.

The meeting was called to order at approximately 2:01 p.m. Eastern Time on December 23, 2024. Ms. Thompson served as secretary of the meeting.

At the outset of the meeting, Mr. Czeschin discussed the latest changes to the draft report regarding the Committee's investigation (the "Report") with Ms. Smith. RLF provided an update regarding the dissemination of a partial copy of the Report to the Company's outside counsel. Mr. Czeschin also explained that RLF had held calls with Mr. Lane's, Ms. Sabins', and Mr. Dietz's counsel to discuss the factual findings in the Report relevant to their clients (but not the legal analyses or conclusions), as had been promised when those individuals had agreed to be interviewed. Ms. Smith then asked questions concerning ███████████████████████ ███████ which RLF answered. RLF and Ms. Smith continued to discuss the latest updates to the Report, and RLF provided further information regarding the various proceedings in which the Company was involved. Ms. Smith next directed RLF to look into a factual issue regarding ████ ███████████████████████████████ and RLF agreed to do so.

A discussion then ensued regarding the dissemination of the Report to the Board. Next, RLF and Ms. Smith discussed recent developments in the bankruptcy proceeding, including the expectation that the Bankruptcy Court would appoint an examiner and the potential scope of the examiner's review. Ms. Smith asked questions, which RLF answered.

There being no further business, the meeting of the Committee was adjourned at approximately 2:41 p.m. Eastern Time.

*Cassandra L. Thompson*

Cassandra L. Thompson

RLF1 32135517v.1

CONFIDENTIAL

SILVERGATE_INDEPENDENT COMMITTEE_00002322